## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | | |
|---|---|---|---|
| JAMES GIBSON, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | No. 19 C 4152 | |
| v. | ) | | |
| | ) | Judge Sara L. Ellis | |
| CITY OF CHICAGO, a municipal corporation, | ) | | |
| and former Chicago Police Officers | ) | | |
| ANTHONY MASLANKA, WILLIAM | ) | | |
| MOSER, JOHN E. BYRNE, LOUIS CAESAR, | ) | | |
| JOHN PALADINO, HENRY J. LEJA, | ) | | |
| JEROME RUSNAK, VICTOR BRESKA, | ) | | |
| ESTATE OF JOHN M. MCCARTHY, | ) | | |
| ESTATE OF THOMAS PTAK, ESTATE OF | ) | | |
| PHILLIP COLLINS, ESTATE OF JOHN | ) | | |
| OMARA, and ESTATE OF JON BURGE, | ) | | |
| | ) | | |
| Defendants. | ) | | |

## OPINION AND ORDER

Plaintiff James Gibson spent over twenty-nine years in prison for a crime he did not

commit. After the state court dismissed all charges against him, Gibson filed this civil rights

complaint against the City of Chicago, the Estate of Jon Burge, who served as the commander of

the Chicago Police Department's Area 3, and the following Chicago police officers: Anthony

Maslanka, William Moser, John E. Byrne, Louis Caesar, John Paladino, Henry J. Leja, Jerome

Rusnak, Victor Breska, John McCann, John M. McCarthy, Thomas Ptak, Phillip Collins, John

O'Mara.[1] Gibson brings both federal and state law claims seeking to hold Defendants

responsible for his wrongful conviction. Breska, Byrne, Caesar, Leja, Maslanka, Moser,

---

[1] Burge, Collins, McCann, McCarthy, O'Mara, and Ptak are deceased, so Gibson has named their estates as Defendants. Gibson filed a notice of dismissal with respect to McCarthy and Ptak's Estates. Doc. 88. Burge's Estate has filed an appearance. The Estates of McCann, Collins, and O'Mara have not filed appearances in this case, and it does not appear from the docket that Gibson has served these parties.

Paladino, and Rusnak (collectively, the "Defendant Officers"), as well as Burge and the City, have moved to dismiss certain claims pursuant to Federal Rule of Civil Procedure 12(b)(6).[2]

Having reviewed the parties' arguments and Gibson's complaint, the Court limits Gibson's coerced confession claim to Fifth and Fourteenth Amendment violations. Gibson cannot proceed on a due process claim based on the withholding of the circumstances surrounding his abuse and coerced statement, the failure to disclose the lineups in which Gibson participated and witnesses' failure to identify Gibson in those lineups, and the abuse of another suspect. The Court also finds that Gibson has not adequately alleged a right to counsel or denial of access to courts claim. And because Gibson does not allege facts suggesting Leja's involvement so as to hold him directly liable on any claim, Gibson may only proceed against Leja on his conspiracy claims. The Court also limits the Defendant Officers against whom Gibson can pursue certain aspects of his due process claim. Gibson may proceed to discovery on the remaining claims raised in his complaint.

## BACKGROUND[3]

On the morning of December 22, 1989, Lloyd Benjamin, Leon Coley, Curtis Garmon, Odell Garmon, James Horton, and Hunter Wash gathered at Wash's automobile repair shop at 1118 W. 58th Street, Chicago, Illinois. Benjamin, an insurance salesman, was in the area

---

[2] To the extent the arguments raised by the Defendant Officers apply equally to Collins, McCann, and O'Mara, the Court extends its decision to include these unserved Defendants because Gibson had an adequate opportunity to respond to the arguments. *See Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 280 (7th Cir. 2011) (court may *sua sponte* enter judgment in favor of additional non-moving defendants if motion by one defendant is equally effective in barring claim against other defendants and plaintiff had adequate opportunity to respond to the motion); *Roberts v. Cendent Mortg. Corp.*, No. 1:11-CV-01438-JMS, 2013 WL 2467996, at *5 (S.D. Ind. June 7, 2013) (although the defendants had not entered appearances and it was not clear if they had been served, court could impute arguments made by one defendant to all defendants and dismiss claims against all of them).

[3] The facts in the background section are taken from Gibson's complaint and are presumed true for the purpose of resolving the pending motions to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

collecting insurance premiums. Around 10:48 a.m., Fernando Webb confronted Benjamin as he exited the garage and shot Benjamin twice in the head, killing him. Wash heard the gunshots and exited the garage, at which time Webb shot him once in the head and killed him. The remaining individuals in the garage waited approximately five minutes after the last gunshot before exiting the garage to find Benjamin and Wash on the ground. Coley ran to Wash's house, after which Wash's son, Cortez, called the police. The police arrived on the scene at approximately 10:59 a.m.

Despite canvassing the area, police could not locate any eyewitnesses or physical evidence to help identify suspects. Gibson, whose nickname was Peter Gunn, heard a rumor tying him to the murders, prompting him to call the local police station on December 24 and disclaim any involvement. His call generated a contact card in the Chicago Police Department's database. Without other leads, on December 27, Chicago police officers who worked under Burge's command at Area 3 Violent Crimes started arresting and interrogating individuals mentioned in neighborhood gossip. Collins and O'Mara concocted an anonymous tip pinning the murders on Gibson. Because Gibson was not home when they sought to arrest him, Collins and O'Mara instead arrested Gibson's brother, Harold, and brought him to Area 3 for interrogation. Collins and O'Mara created a false police report to justify Harold's arrest, adding that the anonymous tipster indicated that Harold helped Gibson with the murders.

Upon learning of Harold's arrest, Gibson contacted Collins and O'Mara asking about the basis for his brother's arrest. Breska, Byrne, Caesar, Maslanka, Paladino, Ptak, and Rusnak then arrested Gibson at his home and brought him to Area 3 for questioning. Collins and O'Mara released Harold upon Gibson's arrest. Gibson remained at Area 3 overnight handcuffed to a chair, unable to use the washroom, and without food or drink. At some point, Collins, Maslanka,

McCann, O'Mara, and Paladino inserted Gibson into three lineups, but no one identified Gibson, a fact omitted from the police reports.

After the lineups, Collins and O'Mara questioned Gibson while he remained handcuffed in a room. They then left Gibson alone in the room for several hours, returning with Maslanka, Paladino, and Ptak. Paladino told Gibson "we through playing with your ass, nigga," and slapped him several times. Doc. 1-1 ¶ 30. Gibson continued to deny his and his brother's involvement in the murders. The denials prompted Maslanka to kick and punch Gibson in the ribs while stating, "you're going to tell us something different than that. We are going to kick your ass all night." *Id.* Collins and O'Mara joined in punching and kicking Gibson.

Gibson remained detained for a second night, again handcuffed to a chair and without food or drink or access to a washroom. On December 29, Breska and Rusnak interviewed Gibson and asked him to take a polygraph examination. After they emphasized that a polygraph would "clear all of this up and stop all this ass whooping," Gibson agreed. *Id.* ¶ 32. But before going for the polygraph, Collins and O'Mara entered the room and proceeded to tell him they were "done playing with [him]" while punching him. *Id.* ¶ 33. Byrne, Caesar, Maslanka, McCann, and Paladino then entered the room. Byrne pulled out his gun and asked if Gibson used it in the murders. Gibson continued to deny all involvement. Maslanka then left and reentered the room with a silver colored iron. After pointing out Gibson's Peter Gun tattoo, Maslanka used the iron to burn the tattoo off Gibson's right arm.

Breska and Rusnak then took Gibson for a polygraph. Gibson touched or tore the paper the polygraph machine used, which led Breska and Rusnak to strike Gibson in the back of the head, physically restrain him, and take him back to Area 3. On the drive back, in an attempt to stop the torture, Gibson told Breska and Rusnak of rumors that "K.D.," also known as "Bodine,"

was involved in the murders. Gibson knew Webb by both of these nicknames. Upon hearing this, Collins, Maslanka, Paladino, and Ptak detained Eric Johnson (K.D.)[4] and Webb (Bodine).

Upon his return to Area 3, Gibson saw Johnson in an interrogation room. Placed in a separate interrogation room while handcuffed, Gibson told Collins and O'Mara that he saw K.D. give Bodine a pistol to stop their abuse. Caesar, McCann, and Moser then entered the room and fed Gibson the following story: Gibson saw Johnson give Webb a pistol and Webb then shot Benjamin. Gibson repeated the story to Caesar, McCann, and Moser, who brought him to an office and removed his handcuffs. Gibson provided Linda Peters, an Assistant State's Attorney, with a statement in line with the story Caesar, McCann, and Moser fed him. Linda Peters also interviewed Johnson and Webb. But Linda Peters and another Assistant State's Attorney, Bill Merritt, refused to approve charges absent additional corroboration. Upon this refusal, McCann took Gibson to Maslanka and Paladino, who released Gibson and drove him home on December 30. Johnson and Webb remained in custody.

Before the police released Gibson from custody, his sister Loraine Brown, an Army sergeant home on leave, went to Area 3 in her uniform looking for Gibson. Burge told her that Gibson would be released later that day. When Gibson returned home, his family members noticed he was in pain and had burns on his arm and a swollen face. Gibson reported that the police had beaten him, prompting Brown to report the abuse to Ann Peters of the Chicago Police Department's Office of Professional Standards ("OPS"). Gibson also spoke with Ann Peters, relaying his treatment while in custody and specifically naming Collins and O'Mara. Ann Peters indicated someone would contact Gibson within three days.

Meanwhile, at Area 3, officers continued interrogating Johnson and Webb. Johnson initially told Maslanka and Paladino that he was asleep at home at the time of the murders.

---

[4] Gibson represents he knew Johnson as Keith Smith.

Maslanka and Paladino responded by beating Johnson and telling him that Gibson implicated him in the murders. Breska, Caesar, McCann, and Rusnak joined the interrogation. Caesar and McCann indicated they would take Johnson for a polygraph examination. When Johnson refused, McCann stated, "nigger you're taking a polygraph test," punched Johnson in the stomach, and, with Caesar, took him for a polygraph. *Id.* ¶ 49. On the drive back, McCann confessed that they did not have anything on Johnson but could not release him given Gibson's statement. They told Johnson that, to be released, he had to state that he saw Gibson murder Benjamin and Wash. Johnson initially refused, but after McCann struck and choked him in Caesar's presence, he agreed to tell Linda Peters that he saw Gibson shoot Benjamin. But once in the room with Linda Peters, he instead reported that the police had beaten and threatened him and that he was home asleep when the murders occurred. After Linda Peters relayed this to Byrne, Byrne ordered Caesar and McCann to take Johnson into another interrogation room. Byrne entered with his gun out, asked Johnson if it was like the gun used to commit the murders, and then pointed it at Johnson, telling him to "stop fucking lying" and "tell them you had something to do with this shit nigga." *Id.* ¶ 51. Moser followed up by informing Johnson that they needed him as a witness against Gibson. Johnson ultimately agreed to sign a statement so he could go home. Around 8:00 p.m. on December 31, a male Assistant State's Attorney came to Johnson with a pre-written statement, which Johnson signed without reading. The statement indicated that Gibson told Johnson about plans to rob Benjamin and paid Johnson $50 to act as a lookout and that Johnson saw Gibson shoot Benjamin. With this statement, Byrne, Caesar, Collins, McCann, Moser, O'Mara, Ptak, and other officers arrested Gibson again at his home. When Gibson returned to Area 3, he refused to speak with any officers.

6

To obtain additional evidence against Gibson, Caesar, Collins, McCann, Moser, and O'Mara took Johnson's sisters, Carla Smith and Janice Johnson, into custody on December 31 sometime after 9:00 p.m. Moser interrogated them in the presence of Caesar, Collins, McCann, and O'Mara. Carla indicated that she did not know anything about the murders and that her brother was asleep at the time they took place. Moser told Carla that she was lying, they were charging her brother with murder, and she would be charged as an accessory unless she admitted she heard Gibson discuss robbing Benjamin. He also represented that if she signed a statement to that effect, they would not charge her brother. Carla agreed. When Moser interrogated Janice, Janice repeated Carla's initial story. Moser responded that Carla had said that both sisters heard Gibson discussing the murders, prompting Janice to sign a statement saying she heard Gibson discuss robbing Benjamin in exchange for a promise that her brother would not be charged. Moser also promised Webb that if he admitted to seeing Gibson with a gun outside of the garage, they would not charge him and would release him from custody. Webb signed the statement, after which officers released him.

Officers charged Gibson and Johnson with murdering Benjamin and Wash. Gibson's assigned public defender documented in his notes that, before Gibson's bond hearing, Gibson told him that the police had beaten him. Gibson repeated this to the bond court judge. Upon learning Gibson had been at Area 3, the judge instructed the public defender to call an investigator and document Gibson's injuries. An investigator took pictures of Gibson, which showed bruises and swelling on Gibson's body. Gibson went to Cermak Hospital in the Cook County Jail, where, upon arrival on January 3, 1990 at 5:00 a.m., he complained of pain caused by police beatings.

Gibson's assigned public defender filed a motion to quash and suppress, and Gibson supplemented this with his own *pro se* motion. Gibson claimed that the police coerced Carla, Janice, and Johnson's statements and that witnesses did not identify him in three different lineups. Johnson also filed a motion to quash and suppress, claiming the police beat him into signing his statement. During the February 14, 1991 hearing on these motions, the Assistant State's Attorney stated:

> The fact of the matter is that no evidence was obtained as a result of arresting him. There were no statements, no line-ups, no physical evidence found by the defendant, or off this person which your honor could possibly suppress. There is nothing to suppress.

*Id.* ¶ 71. The trial court denied Gibson's motion to suppress, noting, among other things, that "if in fact there there's no line-up and no statements, there's nothing to suppress to begin with." *Id.* ¶ 72. The trial court also denied Johnson's motion to suppress.

Gibson proceeded to a bench trial, which began on October 7, 1991. William Benjamin, Coley, Curtis Garmon, Mark Grohevena, Janice, Moser, Carla, Rosa Wash, and Webb testified. Moser testified that Gibson acknowledged standing outside the garage where the murders occurred and that, two months earlier, Gibson had heard Webb and Johnson plan the robbery. Moser did not mention that police officers had tortured Gibson into making a statement. The trial court found Gibson guilty of murdering Benjamin and Wash, emphasizing the "extreme importance" of Gibson's statement. *Id.* ¶ 77. The trial court sentenced Gibson to a term of natural life in prison. Gibson lost all of his direct and post-conviction appeals.

A jury also convicted Johnson of first degree murder on January 21, 1992. In December 2010, the state court granted Johnson a new trial based on his claim that he was tortured into making a confession. Johnson then accepted an *Alford* plea in exchange for a sentence of time served and was immediately released from prison.

8

In 2011, the Illinois Torture Inquiry and Relief Commission ("TIRC") began investigating allegations of torture committed by Burge and officers under his supervision. Gibson filed a claim with the TIRC on May 29, 2012.  On July 22, 2015, the TIRC concluded that sufficient credible evidence of torture existed to warrant judicial review of Gibson's conviction.  The Circuit Court of Cook County then heard six days of testimony in 2016.  Byrne and Paladino invoked their Fifth Amendment rights and refused to answer any questions. Caesar, Leja, Moser, and Rusnak testified that they had no independent recollection of Gibson or Johnson's interrogations, with Caesar testifying he never encountered Gibson at Area 3.  They all denied knowing of any abuse by anyone under Burge.  Johnson detailed the torture he suffered, and Carla testified to the falsity of her statement and the officers' coercion to obtain it.  After hearing the evidence and argument, the circuit court found that Gibson had not shown by a preponderance that his confession was coerced by police torture.  The Illinois Appellate Court reversed and remanded for further consideration but the circuit court again denied relief.  The appellate court again reversed the denial of relief and ordered the circuit court to vacate Gibson's conviction and conduct a new trial at which his statement would not be introduced because it resulted from police torture.  The appellate court emphasized that the evidence indicated that "Burge's subordinates beat [Gibson] during his interrogation."  *Id.* ¶ 92.  On remand, on April 4, 2019, the circuit court vacated Gibson's conviction and, on April 26, 2019, dismissed all charges against Gibson.  Gibson spent twenty-nine years and four months in prison.  Gibson filed his complaint in this Court on May 10, 2019.

Gibson's experience of torture at the hands of police officers under Burge's command is not unique.  Between 1973 and 2006, officers under Burge at Areas 2 and 3 subjected many suspects, particularly African Americans, to mental, physical, and psychological torture.  A 1990

OPS report, sealed until 1992, found evidence of systemic physical and psychological abuse that had occurred under Burge at Area 2. A 2006 Special State's Attorney's Report into torture allegations at Areas 2 and 3 found sufficient evidence to seek Maslanka's indictment for aggravated battery, perjury, and obstruction of justice. In 2015, the City issued a resolution and ordinance acknowledging and condemning the systemic torture and abuse that occurred at Areas 2 and 3.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I.     Coerced Confession (Count I)

First, Gibson brings a coerced confession claim, contending that the Defendant Officers and Burge physically and psychologically tortured him into making an incriminating statement in violation of the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. In his response to the motions to dismiss, Gibson does not contest that he cannot base his coerced confession

claim on the First, Fourth, Sixth, or Eighth Amendments, and so the Court treats this claim as arising only under the Fifth and Fourteenth Amendments.

The Fifth Amendment, made applicable to the States by the Fourteenth Amendment, prohibits the use of coerced confessions at pre-trial hearings and at trials in criminal cases. *Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018). The Fourteenth Amendment allows for a substantive due process claim based on "police torture or other abuse that results in a confession." *Chavez v. Martinez*, 538 U.S. 760, 773 (2003).

The Defendant Officers and Burge acknowledge that Gibson has potentially viable Fifth and Fourteenth Amendment coerced confession claims. However, they argue that Gibson cannot premise these claims on any alleged physical abuse because claims of excessive force are only actionable under the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 394–95 (1989) ("*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."). But even after *Graham*, the Seventh Circuit has continued to recognize that coercive interrogation techniques that "shock the conscience" may support a substantive due process claim. *See Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017); *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010). Therefore, to the extent Gibson contends that the Defendant Officers and Burge obtained his confession through acts of physical torture, *Graham* does not prohibit Gibson from using such acts to support his Fifth and Fourteenth Amendment coerced confession claims.

The Defendant Officers and Burge also argue that the statute of limitations bars any coerced confession claim under the Fourth Amendment involving physical abuse because such a

claim accrued at the time of the abuse in December 1989.[5]  The Court does not understand Gibson to be pursuing a Fourth Amendment claim based on any physical abuse and so the Court need not address the timeliness of such a claim.

Finally, certain Defendant Officers, as well as Burge, argue that they did not have any personal involvement in the alleged misconduct that led to Gibson's confession.  Section 1983 creates a cause of action based on personal liability and predicated upon fault, meaning that "to be liable under § 1983, the individual defendant must have caused or participated in a constitutional deprivation."  *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (citation omitted) (internal quotation marks omitted); *see also Childress v. Walker*, 787 F.3d 433, 439–40 (7th Cir. 2015) ("[A]n individual must be personally responsible for a constitutional deprivation in order to be liable, [but] personal responsibility is not limited to those who participate in the offending act.").  "An official satisfies the personal responsibility required of § 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent."  *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1012 (7th Cir. 2000) (quoting *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985)).  Although somewhat hampered by the absence of discovery at this stage, Gibson has provided detailed information about all but Leja's involvement in his interrogation.  *See Kuri v. City of Chicago*, No. 13 C 1653, 2014 WL 114283, at *7 (N.D. Ill. Jan. 10, 2014) (a plaintiff may direct allegations of misconduct against multiple defendants at the pleading stage).  Breska and Rusnak view Gibson's claim too narrowly and

---

[5] The Defendant Officers and Burge do not contend that the statute of limitations bars a Fifth Amendment claim.  *See Saunders v. City of Chicago*, 146 F. Supp. 3d 957, 966–67 (N.D. Ill. 2015) (*Heck v. Humphrey*, 512 U.S. 477, 487 (1994), provides deferred accrual for a plaintiff's self-incrimination claims "based on Defendants' use of Plaintiffs' incriminating statements in their respective criminal convictions and sentencings" where the conviction was based primarily on the coerced confession).  The Court expresses no opinion on the timeliness of Gibson's Fourteenth Amendment claim given that the Defendant Officers and Burge do not adequately raise the issue in their briefing.

ignore his allegations that they interviewed him and administered the polygraph examination, all steps that Gibson alleges caused his coerced confession. Moser correctly notes that Gibson has not tied him to any alleged physical abuse but acknowledges that Gibson has alleged his involvement in other aspects of obtaining Gibson's confession. As for Burge, a supervisor may be personally liable under § 1983 where he "know[s] about the conduct and facilitate[s] it, approve[s] it, condone[s] it, or turn[s] a blind eye for fear of what [he] might see." *Gill*, 850 F.3d at 344 (quoting *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)). Gibson alleges that Burge was at Area 3 during his interrogation and knew details of Gibson's interrogation, as well as that the Defendant Officers acted under Burge's command in using coercive interrogation techniques to extract confessions and that the use of torture at Area 3 was systemic. This suffices at the pleading stage to allege Burge's personal involvement. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir. 1996) (claims against supervisors may proceed where based on "systemic, as opposed to localized, situations"); *Tillman v. Burge*, 813 F. Supp. 2d 946, 972 (N.D. Ill. 2011) (allegations that "Burge was present at Area 2 during his interrogation, that the physical evidence of his torture was apparent to those at Area 2, and that Burge 'encourag[ed], condon[ed] and permitt[ed]' his torture" sufficed to support personal involvement at pleading stage (alterations in original)).

The complaint does not include any allegations of Leja's involvement in Gibson's interrogation or prosecution, however. Aside from alleging that Leja conspired with the other Defendant Officers and Burge, the only other mention of Leja in the complaint refers to his TIRC hearing testimony that he had no recollection of Gibson's or Johnson's interrogation.

13

Without any basis to infer Leja's personal involvement, the Court dismisses all claims for which Gibson seeks to hold Leja directly responsible.[6]

In summary, Gibson may proceed on his coerced confession claim (Count I) only under the Fifth and Fourteenth Amendments against Burge and all Defendant Officers but Leja.

## II.  Failure to Intervene (Count II)

Gibson also seeks to hold the Defendant Officers and Burge liable for failing to intervene to the extent they did not directly participate in the coercive interrogation.[7] "Failure to intervene is not a claim for relief; rather, it is a theory of liability under section 1983, specifically, a way to prove the liability of a state actor who was not a direct participant in the challenged wrongdoing." *Fields v. City of Chicago*, No. 10 C 1168, 2014 WL 477394, at *10 (N.D. Ill. Feb. 6, 2014). A plaintiff may prevail against an officer who did not himself infringe on the plaintiff's rights if the officer was present and failed to prevent another officer from violating those rights despite a "realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

The Defendant Officers and Burge seek dismissal of Gibson's failure to intervene theory on several grounds. First, Breska, Burge, Leja, Moser, and Rusnak argue that the allegations do not support a finding that they knew of the physical force being used against Gibson or had a realistic opportunity to prevent it because they were not present during the alleged physical abuse. Initially, this focuses too narrowly on physical abuse given that Gibson's allegations

---

[6] Gibson does not address Leja's arguments about his lack of personal involvement or otherwise mention Leja individually in his responses to the motions to dismiss. The Court addresses Leja's potential liability based on a conspiracy theory below. Aside from this conspiracy discussion, subsequent references to "Defendant Officers" in this Opinion and Order do not include Leja.

[7] Given the parties' treatment of this claim in the pleadings and briefing, the Court considers only whether Gibson can pursue a failure to intervene claim against the Defendant Officers and Burge as it relates to the alleged coercive interrogation tactics deployed against Gibson.

support a broader focus on the Defendant Officers and Burge's failures to prevent the coercive interrogation underlying his Fifth and Fourteenth Amendment coerced confession claims. The Seventh Circuit "has implied that a 'realistic opportunity to intervene' may exist whenever an officer could have 'called for a backup, called for help, or at least cautioned [another defendant] to stop.'" *Abdullahi v. City of Madison*, 423 F.3d 763, 775 (7th Cir. 2005) (quoting *Yang*, 37 F.3d at 285). Although Breska and Rusnak argue that Gibson has not alleged that they were present for or knew of the alleged physical abuse, the complaint allows for the inference that they knew of the plans and could have stopped them. *See* Doc. 1-1 ¶ 33 (Breska and Rusnak left the interrogation room before other officers tortured Gibson and returned immediately after it concluded). Additionally, Gibson alleges that Breska and/or Rusnak struck Gibson during the polygraph examination in the other's presence. *Id.* ¶ 35. This suffices at this stage to suggest that Breska and Rusnak had a realistic opportunity to intervene. And Moser at least was present to feed Gibson his statement, suggesting the potential to also have intervened if any abuse occurred in his presence. But as already discussed, the complaint includes no allegations of Leja's presence during the interrogation to suggest Leja could have intervened. *See Powell v. City of Berwyn*, 68 F. Supp. 3d 929, 942 (N.D. Ill. 2014) (officer not present during alleged constitutional violation cannot be held liable for failure to intervene). As for Burge, even if not present, the allegations concerning his knowledge of the systemic torture used by officers at Area 3 also allow Gibson to proceed on a failure to intervene theory. *See Smith v. Burge*, 222 F. Supp. 3d 669, 687 (N.D. Ill. 2016) (allowing failure to intervene claim to proceed against supervisors with knowledge of torture used at Area 2).

Next, Caesar and Moser argue that, to the extent Gibson asserts they were personally involved in the underlying conduct, he cannot bring a claim for failure to intervene for the same

15

alleged misconduct. But a failure to intervene theory provides an alternative basis to hold someone liable for the underlying constitutional violation, and so the Court refuses to foreclose Gibson from pursuing such a theory at this stage. *See* Fed. R. Civ. P. 8(d)(2) (allowing for alternative pleading of claims). Finally, the Defendant Officers and Burge argue that the Court should dismiss the failure to intervene claim to the extent the underlying coerced confession claim does not remain viable. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation."). Because the Court has concluded that Gibson may proceed on his coerced confession claim under the Fifth and Fourteenth Amendments and may use the allegations of physical abuse to support these claims, the Court allows Gibson to pursue his failure to intervene theory as well.

## III. Due Process Violations (Count III)

Gibson claims that the Defendant Officers and Burge violated his due process rights by deliberately withholding exculpatory evidence and fabricating false police reports and other evidence. The Defendant Officers and Burge moved to partially dismiss this claim, which they categorized as encompassing: (1) the withholding of the circumstances surrounding Gibson's abuse and coerced statement; (2) Johnson's physical abuse and fabricated statement; and (3) the fabrication of Carla, Janice, and Webb's statements. With respect to fabrication of evidence, the Defendant Officers and Burge acknowledge that Gibson may proceed on a fabrication of evidence claim with respect to Carla, Janice, and Webb's statements but argue that certain of them did not participate in the fabrication of these statements. Gibson does not respond to this aspect of the Defendant Officers' argument, and so the Court only allows him to proceed on the fabrication of evidence claim as to these three statements against Burge, Caesar, Collins,

16

McCann, Moser, and O'Mara. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010)

("Failure to respond to an argument . . . results in waiver."). For Johnson's statement, the

Defendant Officers and Burge contend that Gibson has not sufficiently alleged that Johnson's

statements were used at any pre-trial hearing or at trial. *See Whitlock v. Brueggemann*, 682 F.3d

567, 580, 582 (7th Cir. 2012) (fabrication of evidence implicates due process rights only if the

fabricated evidence is used to deprive the plaintiff of liberty, such as using it during criminal

proceedings). Although the allegations could be clearer, the complaint allows the Court to draw

this inference based on allegations that Gibson was charged based in part on Johnson's statement

and that the trial court refused to suppress Johnson's statement. *See Fields v. Wharrie*, 740 F.3d

1107, 1112 (7th Cir. 2014) ("[T]he fabrication of evidence harmed the defendant before and not

just during the trial, because it was used to help indict him."). But, as with the other statements,

the Court only allows this aspect of Gibson's fabrication of evidence claim to proceed against

those involved in obtaining Johnson's statement: Breska, Byrne, Burge, Caesar, Maslanka,

McCann, Paladino, and Rusnak. Gibson cannot pursue a claim based on Johnson's torture,

however, which he essentially concedes by his silence. *See Petty v. City of Chicago*, 754 F.3d

416, 422 (7th Cir. 2014) ("[O]btaining a statement with coercive tactics that inculpated the

arrestee may have violated the witness's rights, but it did not violate the arrestee's due process

rights.").

As for Gibson's claims under *Brady v. Maryland*, 373 U.S. 83 (1963), he clarifies in his

response briefs that he challenges the withholding of information concerning: (1) the lineups in

which Gibson participated and witnesses' failure to identify Gibson in those lineups; (2) the

threats and coercion used to obtain Carla, Janice, and Webb's statements; and (3) the pattern and

practice of abuse at Areas 2 and 3.[8]  The Court only addresses the viability of these three grounds, treating Gibson's failure to respond to the Defendant Officers' and Burge's arguments about the withholding of the circumstances surrounding Gibson's abuse and statements as an abandonment of this ground.  *See Bonte*, 624 F.3d at 466.

To assert a *Brady* claim, Gibson must allege that (1) the police officers suppressed evidence; (2) the evidence was favorable to him; and (3) the evidence was material, i.e. that a reasonable probability exists that prejudice ensued.  *Anderson v. City of Rockford*, 932 F.3d 494, 504–05 (7th Cir. 2019).  With respect to Gibson's participation in the lineups, Gibson has not sufficiently alleged the "suppression" of this evidence to establish a *Brady* violation.  "Evidence is 'suppressed' when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence."  *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008).  "Evidence cannot be said to have been suppressed in violation of *Brady* if it was already known to the defendant."  *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017).  Gibson alleges that he argued in a *pro se* supplemental motion to suppress that witnesses failed to identify him in three lineups.  Doc. 1-1 ¶ 70.  Although the police may not have included this information in their police reports, causing the prosecutor not to have knowledge of the information when arguing the motion to suppress, this makes no difference because "*Brady* rights run to the defendant, not to the prosecution."  *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006).  Because Gibson had knowledge of the lineups and raised the issue with the trial court, he has pleaded himself out of court with respect to this category of allegedly

---

[8] The Defendant Officers and Burge treat Gibson's claim based on the failure to disclose the pattern and practice of abuse to go solely to impeaching Carla, Janice, and Webb's credibility.  But the Court understands Gibson to contend that the disclosure of the pattern and practice of abuse could have helped substantiate his claims of abuse more generally.

suppressed evidence. *See Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007) (no *Brady* violation where the plaintiff knew of the allegedly concealed information); *Craig v. City of Chicago*, No. 08 C 2275, 2011 WL 1196803, at *14 (N.D. Ill. Mar. 25, 2011) (no *Brady* violation where the plaintiff knew of allegedly withheld photograph used in a photo array and moved to suppress the identification that resulted from the photo array).

But Gibson may proceed on a *Brady* claim based on the Defendant Officers' and Burge's alleged failure to disclose the threats and coercion used to obtain Johnson, Smith, and Webb's statements, as well as the pattern and practice of police abuse at Areas 2 and 3. Moser argues that because Gibson alleges that he knew that Johnson, Smith, and Webb's testimony was not true, he had the ability to attack their credibility at trial. This does not affect Gibson's *Brady* claim, however, which he premises on the coercive tactics used to obtain those fabricated statements. *See Anderson*, 932 F.3d at 507 ("Regardless of whether Brown's statement (and resulting testimony) was true or false, *Brady* imposed a disclosure obligation: due process required disclosure to the plaintiffs of the coercive tactics used to obtain Brown's statement."). To the extent Gibson did not know of the use of coercive tactics to obtain their statements, he may proceed on such a claim, but again, only to those alleged to have knowledge of the abuse, specifically Burge, Caesar, Collins, McCann, Moser, and O'Mara. *See Avery*, 847 F.3d at 443–44 (summary judgment improper on claim that detectives did not disclose pressure and inducements they used to obtain false statements from witnesses because the plaintiff did not know of these tactics). And although the Defendant Officers and Burge argue that any pattern of abuse had no relevance to Gibson's prosecution and so need not have been disclosed, courts have rejected this argument and concluded that suppressing evidence of systemic torture and abuse at Areas 2 and 3 may support a *Brady* claim. *See Maxson v. Dwyer*, No. 16 C 9417, 2017 WL

19

1493712, at *4 (N.D. Ill. Apr. 26, 2017) (collecting cases); *Smith*, 222 F. Supp. 3d at 680–81

(collecting cases allowing *Brady* claims based on "events that transpired outside of the

interrogation room").  Gibson sufficiently alleges that all Defendant Officers and Burge knew of

this pattern and practice to hold them liable, at least at the pleading stage, for their failure to

disclose it.

To summarize, the Court allows Gibson to proceed on the following due process claims:

(1) the fabrication of Carla, Janice, and Webb's statements against Burge, Caesar, Collins,

McCann, Moser, and O'Mara; (2) the fabrication of Johnson's statement against Breska, Byrne,

Burge, Caesar, Maslanka, McCann, Paladino, and Rusnak; (3) the failure to disclose the threats

and coercion used to obtain Carla, Janice, and Webb's statements against Burge, Caesar, Collins,

McCann, Moser, and O'Mara; and (4) the failure to disclose the pattern and practice of police

abuse at Areas 2 and 3 against all Defendant Officers and Burge.

## IV. False Imprisonment (Count IV)

Gibson alleges that he was unlawfully detained for thirty years as a result of the

Defendant Officers and Burge's use of false evidence and conspiracy to keep secret their tactics

in obtaining the false evidence.  The Court treats this claim as one for unreasonable pretrial

detention without probable cause under the Fourth Amendment.  *See Manuel v. City of Joliet*

(*Manuel I*), --- U.S. ----, 137 S. Ct. 911, 918–19 (2017).

The Defendant Officers and Burge seek dismissal of Gibson's false imprisonment claim

based on the statute of limitations.  The parties do not dispute that a two-year statute of

limitations applies to this claim.  *See Manuel v. City of Joliet* (*Manuel II*), 903 F.3d 667, 668 (7th

Cir. 2018).  But they disagree on the claim's accrual date.  *Manuel II* clarified that a claim for

unreasonable pretrial detention accrues when the detention ends.  *Id.* at 670.  Here, Gibson

remained in pretrial detention from December 27 through December 30, 1989, and then again

from December 31, 1989 until his conviction on October 8, 1991. Therefore, the Defendant

Officers and Burge argue that Gibson brought his false imprisonment claim too late.

Gibson counters that because his false imprisonment claim directly impugns his

conviction, *Heck* tolled the statute of limitations until his conviction was overturned. *Heck*

instructs that when a plaintiff seeks damages in a § 1983 suit, the Court "must consider whether a

judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or

sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that

the conviction or sentence has already been invalidated." *Heck*, 512 U.S. at 487. The Defendant

Officers and Burge argue that *Heck* does not apply to a Fourth Amendment unreasonable

detention claim because the Seventh Circuit rejected this argument in *Knox v. Curtis*, 771 F.

App'x 656, 658–59 (7th Cir. 2019) (*Heck* does not affect the accrual date of an unreasonable

detention claim because the detention's unlawfulness "does not have 'any necessary effect on the

validity of [his] conviction'" (alteration in original) (quoting *Mordi v. Ziegler*, 870 F.3d 703, 708

(7th Cir. 2017)); *see also Brown v. City of Chicago*, No. 18 C 7064, 2019 WL 4958214, at *3

(N.D. Ill. Oct. 8, 2019) ("[A]ny unlawful pretrial detention claim that Plaintiff might have

asserted would be time-barred under Seventh Circuit precedent holding that such a claim is not

subject to the delayed accrual rule from *Heck*."). But since *Knox*, the Seventh Circuit has

considered the accrual date for fabrication of evidence claims, finding that *Heck* controls the

accrual date because such claims necessarily imply the invalidity of the conviction, "regardless

of the availability of habeas relief." *Savory v. Cannon*, 947 F.3d 409, 430–31 (7th Cir. 2020).

Following *Savory*, *Heck* provides the accrual date for an unreasonable detention claim based on

the fabrication of evidence or other direct challenges to a conviction. *See Sanders v. St. Joseph*

*Cty.*, 806 F. App'x 481, 484 & n.2 (7th Cir. Mar. 31, 2020) (while an unreasonable pretrial

detention claim typically accrues when the detention ends, if "a conclusion that [the plaintiff's]

confinement was unconstitutional would imply the invalidity of an ongoing criminal proceeding

or a prior criminal conviction, then *Heck* would continue to bar [the plaintiff's] claim after his

release and until either those proceedings terminated in his favor or the conviction was

vacated"); *Culp v. Flores*, No. 17 C 252, 2020 WL 1874075, at *2–3 (N.D. Ill. Apr. 15, 2020)

(accrual date for unlawful detention claim that implied invalidity of charges governed by *Heck*,

noting that this result "finds strong support" in *Sanders* and follows from *Savory*).  As the

Supreme Court recently noted, a claim that "centers on evidence used to secure an indictment

and at a criminal trial . . . . directly challenges—and thus necessarily threatens to impugn—the

prosecution itself."  *McDonough v. Smith*, --- U.S. ----, 139 S. Ct. 2149, 2159 (2019).  Gibson's

false imprisonment claim presents this scenario, meaning that the claim did not accrue until his

conviction was vacated.  *See Andersen v. City of Chicago*, No. 16 C 1963, 2019 WL 6327226, at

*6 (N.D. Ill. Nov. 26, 2019) (claim for unreasonable detention "based on a coerced confession

that implicated withheld and/or destroyed evidence" used to secure charges and conviction

implicated *Heck*, meaning it accrued upon the favorable termination of the case).  Because

Gibson filed his complaint within two months of the dismissal of charges, the statute of

limitations does not bar his false imprisonment claim.

## V.    Equal Protection Violation (Count V)

The Defendant Officers and Burge also seek dismissal of Gibson's equal protection

claim, contending that he only recites the legal elements of the claim without providing any

factual allegations to support a violation.  To state an equal protection claim based on race

discrimination, Gibson must allege that "the defendants' actions had a discriminatory effect and

22

were motivated by a discriminatory purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001). Proving discriminatory effect requires a showing that the plaintiff belongs to a protected class, is otherwise similarly situated to members of the unprotected class, and was treated differently from members of the unprotected class. *Id.* But this evidentiary standard does not apply at the pleading stage. *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 755 (N.D. Ill. 2015).

Although somewhat conclusory, Gibson's allegations sufficiently place the Defendant Officers and Burge on notice of his equal protection claim. Gibson pleads that, motivated by racial animus, the Defendant Officers, under Burge's supervision, tortured Gibson and other minority criminal suspects. "Racial profiling, or selective enforcement of the law, is a violation of the Equal Protection Clause." *Sow v. Fortville Police Dep't*, 636 F.3d 293, 303 (7th Cir. 2011). Gibson also alleges that the Defendant Officers and Burge's actions had a disproportionate impact on minorities as compared to similarly-situated Caucasian individuals, pointing to various investigations that documented the use of torture when interrogating young African American suspects at Areas 2 and 3. And Gibson alleges that at least two of the Defendant Officers used racially derogatory terms when interrogating him and Johnson. *See Hobley v. Burge*, No. 03 C 3678, 2004 WL 2658075, at *13 (N.D. Ill. Oct. 13, 2004) (allegations that white police officers "used racially offensive language and threatened him" supported equal protection claim). Drawing all inferences in Gibson's favor, Gibson's allegations support the conclusion that the Defendant Officers and Burge subjected him and other African Americans to torture because of their race. Although Gibson will have to provide evidence to prevail on this claim, his allegations suffice to allow him to proceed to discovery. *See Brown v. Budz*, 398 F.3d 904, 916 n.1 (7th Cir. 2005) ("[T]his court has held that an allegation as simple as I was turned

down a job because of my race is all a complaint has to say to plead sufficiently race discrimination in violation of the Equal Protection clause." (citation omitted) (internal quotation marks omitted)); *Casimir v. City of Chicago*, No. 15 C 3711, 2018 WL 1695362, at *9 (N.D. Ill. Apr. 6, 2018) ("The questions of which inferences can, or should, be drawn from the statistical evidence and the evidence of plaintiffs' treatment are better suited for summary judgment or a full evidentiary hearing.").

## VI.     Right to Counsel (Count VI)

The Defendant Officers and Burge moved to dismiss Gibson's right to counsel claim, arguing that the Sixth Amendment right to counsel does not attach until the initiation of criminal proceedings. *See Rothgery v. Gillespie Cty.*, 554 U.S. 191, 213 (2008) ("[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel."); *United States v. Thomas*, 39 F. Supp. 3d 1015, 1021–22 (N.D. Ill. 2014) (defendant did not have a Sixth Amendment right to counsel when agents interviewed him prior to the filing of an indictment or the beginning of criminal judicial proceedings). In response, Gibson clarifies that he bases his right to counsel claim on the Fifth Amendment.

Gibson's complaint does not include sufficient allegations to allow him to proceed on a Fifth Amendment right to counsel claim. A plaintiff's failure to receive *Miranda* warnings or an officer's failure to comply with the plaintiff's invocation of counsel may form the basis of a § 1983 claim but only if the resulting statements are used against the plaintiff in his criminal case. *See Sornberger*, 434 F.3d at 1024–25 ("In the paradigmatic *Miranda* case, the Fifth Amendment is violated when a criminal defendant's *Miranda*-infirm statements are admitted as

evidence against him in the prosecution's case-in-chief at criminal trial."); *Henderson v. Brower*, No. 18-CV-893-JPS, 2018 WL 6267907, at *3–4 (E.D. Wis. Nov. 30, 2018) ("[F]ailure to provide counsel does not create a cause of action under Section 1983 unless the plaintiff demonstrates that the statements he made to defendants without an attorney present were used against him in a criminal case."). Although Gibson alleges that his confession was used against him at trial, the complaint includes no allegations suggesting that he did not receive *Miranda* warnings before making that confession or that he made a clear request for counsel during the interrogation. Without any such allegations, Gibson cannot proceed on a Fifth Amendment right to counsel claim based on the violation of his *Miranda* rights or the failure to have counsel present during the interrogation.

## VII. Conspiracy Claims (Counts VII, VIII, and XII)

Gibson alleges that the Defendant Officers and Burge conspired to deprive him of his constitutional rights under § 1983 and § 1985(3). He also brings a civil conspiracy claim against the Defendant Officers and Burge under state law. To support conspiracy liability under § 1983, Gibson must allege that "(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). To state a conspiracy claim under § 1985(3), Gibson must allege "(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of a conspiracy, and (4) an injury to a person or property or a deprivation of a right or privilege granted to U.S. citizens."[9] *Green v. Benden*, 281 F.3d 661, 665 (7th Cir. 2002). A civil

---

[9] The Court questions the need for a § 1985(3) conspiracy claim given Gibson's allegation that all Defendant Officers and Burge acted in their official capacities under color of state law. *See Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009) ("The function of § 1985(3) is to permit recovery from a

conspiracy claim under Illinois law has similar elements: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317 (2004).

The Defendant Officers and Burge move to dismiss Gibson's conspiracy claims, arguing that Gibson has included only conclusory allegations of an agreement and "merely relies on a suspicion that everyone adverse to him was part of a wide-ranging conspiracy to frame him." Doc. 47 at 15. But they ask too much of Gibson at this stage: "it is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with." *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002); *see also Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) ("Under *Twombly*, all plaintiff needed to allege was a plausible account of a conspiracy."). Gibson meets these requirements, alleging that the Defendant Officers and Burge engaged in concerted action to frame him for the Benjamin/Wash murders and deprive him of his constitutional rights, including through acts of torture and concealment of evidence from the time of the murders through his conviction and incarceration until the conviction was overturned. *See Sánchez v. Vill. of Wheeling*, No. 19 C 2437, 2020 WL 490964, at *8 (N.D. Ill. Jan. 30, 2020) (plaintiff stated a viable conspiracy claim by identifying the parties to the conspiracy, the general purpose of coercing false statements to obtain the plaintiff's conviction, and the approximate dates of the conspiracy). Given the Defendant Officers and Burge's actions throughout the investigation and thereafter, the allegations give rise to the inference that the Defendant Officers and Burge formed

---

private actor who has conspired with state actors. All defendants are state actors, so a § 1985(3) claim does not add anything except needless complexity." (citations omitted)).

an agreement to deprive Gibson of his rights. *See Geinosky*, 675 F.3d at 749 ("If several members of the same police unit allegedly acted in the same inexplicable way against a plaintiff on many different occasions, we will not dismiss a complaint for failure to recite language explicitly linking these factual details to their obvious suggestion of collusion."); *Wrice v. Burge*, No. 1:14-cv-5934, 2019 WL 932024, at *6 (N.D. Ill. Feb. 26, 2019) (evidence that "Burge directed a general practice of coercive interrogation" and "was involved in investigating the specific crimes with which [plaintiff was] charged" supported holding him liable for conspiracy); *Smith*, 222 F. Supp. 3d at 688–89 (allegations that the defendants participated in a pattern and practice of torture, as well as covered up and concealed that practice, supported a conspiracy claim). Gibson's allegations therefore suffice to place the Defendant Officers and Burge on notice of the conspiracy claims.

## VIII. Denial of Access to Courts (Count IX)

"The First and Fourteenth Amendments protect the rights of individuals to seek legal redress for claims that have a reasonable basis in law and fact." *Rossi v. City of Chicago*, 790 F.3d 729, 734 (7th Cir. 2015). Courts have recognized two categories of denial of access claims: (1) "claims that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," and (2) "specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Christopher v. Harbury*, 536 U.S. 403, 413–14 (2002). Gibson's denial of access claim falls into the second, backward-looking category, alleging that the suppression of information and evidence caused him to lose "certain constitutional claims against certain potential defendants." Doc. 1-1 ¶ 178; *see Christopher*, 536 U.S. at 414 (describing denial of access claims that "allegedly have caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss

of an opportunity to seek some particular order of relief" (citations omitted)); *Rossi*, 790 F.3d at

734 ("Interference with the right of court access by state agents who intentionally conceal the

true facts about a crime may be actionable as a deprivation of constitutional rights under

§ 1983."). The ultimate object of such claims is "the judgment in the access claim itself, in

providing relief obtainable in no other suit in the future." *Christopher*, 536 U.S. at 414.

To state a denial of access claim, Gibson must specify the underlying cause of action he

claims to have lost, as well as "a remedy that may be awarded as recompense but not otherwise

available in some suit that may yet be brought." *Id.* at 415. Gibson has done neither. He only

alleges in conclusory terms that the Defendant Officers and Burge's actions "denied Plaintiff the

right to access to courts by their wrongful suppression of information and evidence which

deprived Plaintiff of certain constitutional claims against certain potential defendants," and that

"[o]ther claims were diminished by the passage of years and the accompanying erosion of

evidence necessary to prove them." Doc. 1-1 ¶¶ 178–79. And he seeks the same damages as he

does for all of his claims, failing to "request[ ] a remedy related to the denial of access to courts

that he cannot obtain through another procedure." *Thurman v. Unknown Cook Cty. Sheriff*

*Emps.*, No. 18 C 2720, 2018 WL 5315208, at *9 (N.D. Ill. Oct. 26, 2018). Absent such details,

Gibson's denial of access to the courts claim fails to give fair notice to the Defendant Officers

and Burge. *See Patterson v. Burge*, 328 F. Supp. 2d 878, 898 (N.D. Ill. 2004) ("The allegations

contained in Patterson's right of access claim are deficient, for they do not plead a short and

plain statement of the underlying claims and do not establish that Patterson has been denied

adequate legal redress for any legitimate claim. Count IV merely accuses defendants of

obstructing the investigation and suppressing evidence necessary for Patterson to vindicate his

28

constitutional rights in court without explaining how this conduct denied him his right to seek judicial redress."). Accordingly, the Court dismisses Gibson's denial of access claim.

## IX. *Monell* Claim (Count X)

The City seeks dismissal of Gibson's *Monell* claim to the extent it is based on any claims against the Defendant Officers and Burge that the Court deems insufficient. The City argues that it cannot be held liable under *Monell* absent an actionable constitutional violation. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). But a *Monell* claim may proceed against a municipality even without its officers being held liable unless doing so would create an inconsistent verdict. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010); *see also Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("In some civil-rights cases, however, a verdict in favor of individual defendants would not necessarily be inconsistent with a plaintiff's verdict on a factually distinct *Monell* claim."). The parties fail to address this distinction. Nonetheless, because Gibson has pleaded viable constitutional claims against the Defendant Officers and Burge, the Court does not find it appropriate to dismiss the *Monell* claim at this time.

## X. State Law Malicious Prosecution (Count XI)

Under Illinois law, a malicious prosecution claim requires that Gibson allege: "(1) the commencement or continuation of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Holland v. City of Chicago*, 643 F.3d 248, 254 (7th Cir. 2011) (quoting *Swick v. Liautaud*, 169 Ill. 2d 504, 512 (1996)). Burge and the Defendant Officers, except for Moser and

Caesar,[10] argue that they did not have any involvement in Gibson's criminal prosecution so as to meet the first element.

The first element requires consideration of "whether the defendant's conduct is both the cause in fact and a proximate cause of the commencement or continuation of the original criminal proceedings," with the proximate cause inquiry focusing on "whether the defendants played a significant role in the plaintiff's prosecution." *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 46. The Defendant Officers and Burge read "significant role" narrowly, ignoring the fact that "a person can be liable for commencing or continuing a malicious prosecution even if that person does not ultimately wield prosecutorial power or actively deceive prosecutors." *Id.* ¶ 43. For example, "[p]olice officers may be subject to liability for malicious prosecution if they initiate a criminal proceeding by presentation of false statements, or by withholding exculpatory information from the prosecutor." *Id.* ¶ 44 (citation omitted) (internal quotation marks omitted). Therefore, the fact that only Moser testified at the trial does not mean that the remaining Defendant Officers and Burge did not play a significant role. Gibson's complaint is replete with allegations of actions the Defendant Officers and Burge took that played a significant role in the initiation of Gibson's prosecution. His complaint implicates the Defendant Officers in concealing exculpatory evidence, torturing Gibson into the confession that played a central role in his prosecution and conviction, and obtaining false statements from other individuals. *See id.* ¶ 45 (in assessing whether an individual played a significant role, the court should consider those who "improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct

---

[10] Caesar's briefing is unclear as to whether he seeks dismissal of the malicious prosecution claim. He inconsistently references seeking dismissal of Count XI in its entirety and in part, *compare* Doc. 69 at 1 n.1, *and* Doc. 81 at 1, *with* Doc. 69 at 15–16. He does not include any substantive discussion of the malicious prosecution claim.

instrumental in the initiation of the prosecution" (citation omitted)); *Johnson v. Winstead*, No. 15 C 7177, 2019 WL 6527954, at *5 (N.D. Ill. Dec. 4, 2019) (the plaintiff sufficiently alleged the defendant officers commenced or continued criminal proceedings by, among other things, actively eliciting and knowing of misinformation used to bring charges against the plaintiff); *Nesby v. Searby*, No. 18-cv-02145-NJR, 2019 WL 1466300, at *4 (S.D. Ill. Apr. 3, 2019) (allegations that "a suspect was ignored, documents were falsified and evidence was fabricated to influence the institution and continuation of judicial proceedings, and false testimony and evidence was presented during the trial" sufficed for malicious prosecution claim to proceed against the defendant officers). And, as already discussed, because Gibson's allegations allow for the inference that Burge knew of or was personally involved in the Defendant Officers' actions in initiating the prosecution, Gibson may also proceed against Burge on the malicious prosecution claim.

## XI. Intentional Infliction of Emotional Distress (Count XIII)

The Defendant Officers and Burge argue that the statute of limitations has run on Gibson's intentional infliction of emotional distress ("IIED") claim. The parties agree that the IIED claim is subject to a one-year statute of limitations, *see* 745 Ill. Comp. Stat. 10/8-101(a), but they disagree as to the accrual date. In the context of an arrest and prosecution, an IIED claim accrues on the date of the arrest. *Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013). Under *Bridewell*, the Defendant Officers and Burge argue that Gibson's IIED claims accrued in December 1989 upon Gibson's interrogation and arrest. Gibson responds that, because he bases his IIED claim on conduct tied to malicious prosecution, his claim did not accrue until the criminal proceedings terminated in his favor, which would make his IIED claim timely.

31

"[T]he *Bridewell* decision did not discuss the accrual of an Illinois IIED claim in relation to the *Heck* rule, namely, that if a claim impugns the validity of a criminal conviction, that claim does not accrue—and the statute of limitations does not begin to run—until the plaintiff's conviction is overturned or otherwise set aside." *Smith*, 222 F. Supp. 3d at 693. Gibson clarifies in his response that he bases his IIED claim on the Defendant Officers and Burge's actions "torturing, framing, and falsely imprisoning him for a crime he did not commit." Doc. 64 at 16. These allegations directly attack the validity of his conviction, meaning that Gibson could not bring an IIED claim until his conviction was set aside. *Hill v. City of Chicago*, Nos. 19 C 6080, 19 C 6081, 2020 WL 509031, at *5 (N.D. Ill. Jan. 31, 2020) (IIED claim "based on the fabrication of evidence that led to [the plaintiffs'] convictions" accrued when their convictions were overturned); *Brown v. City of Chicago*, No. 18 C 7064, 2019 WL 4694685, at *6–7 (N.D. Ill. Sept. 26, 2019) (*Heck* delayed the accrual of IIED claim based on use of coerced confession to procure the plaintiff's conviction, noting that *Heck* applies even to state-based claims); *Smith*, 222 F. Supp. 3d at 693 (IIED claim based on "Defendants coercing his confession by torture, constructing and fabricating his confession, and procuring his prosecution, conviction, and imprisonment via his coerced and fabricated confession" accrued when the plaintiff's conviction was set aside). Gibson filed his complaint within two months of the dismissal of the charges against him, making his IIED claim timely.[11]

## XII. *Respondeat Superior* **and Indemnification (Counts XIV and XV)**

Finally, the City asks the Court to dismiss Gibson's *respondeat superior* and indemnification claims to the extent they seek to impose liability on the City for claims that the Court dismisses. Because viable claims remain against the Defendant Officers and Burge, the

---

[11] The Court does not address any issues of immunity with respect to testimony given at trial or the TIRC hearing given that Gibson clarifies that he does not base his IIED claim on this testimony.

Court does not find it appropriate to dismiss the *respondeat superior* and indemnification claims at this time. The Court notes, however, that Gibson may only recover from the City on these theories of vicarious relief with respect to claims on which he ultimately prevails against the Defendant Officers and Burge.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Paladino, Maslanka, Byrne, and the City's motion to dismiss [42]; Leja and the City's motion to dismiss [45]; Moser and the City's motion to dismiss [47]; Rusnak, Breska, and the City's motion to dismiss [49]; Burge and the City's motion to dismiss [65]; and Caesar and the City's motion to dismiss [69]. The Court dismisses all but the conspiracy claims against Leja. Gibson may proceed on his coerced confession claim (Count I) only under the Fifth and Fourteenth Amendments. The Court dismisses the due process claim (Count III) based on Johnson's physical abuse and fabricated statement, the withholding of the circumstances surrounding Gibson's abuse and coerced statement, and the failure to disclose the lineups in which Gibson participated and the witnesses' failure to identify Gibson in those lineups against all Defendant Officers and Burge. The Court dismisses the due process claim (Count III) based on the fabrication of Carla, Janice, and Webb's statements against Breska, Byrne, Maslanka, Paladino, and Rusnak. The Court dismisses the due process claim (Count III) based on the fabrication of Johnson's statement against Collins, Moser, and O'Mara. The Court dismisses the right to counsel and denial of access to courts claims (Counts VI and IX). The Court dismisses the Estate of John McCarthy and Estate of Thomas Ptak pursuant to Gibson's Rule 41(a)(1)(A) notice of voluntary dismissal [88].

Dated: July 29, 2020

SARA L. ELLIS
United States District Judge

33