**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES GIBSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19-cv-04152 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Hon. Sara L. Ellis |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF JAMES GIBSON'S CORRECTED OPPOSITION TO THE CITY OF CHICAGO'S MOTION TO BIFURCATE AND STAY DISCOVERY**

**INTRODUCTION**

In 1989, James Gibson was tortured by the Chicago Police Department ("CPD"). Officers under the command of Jon Burge hit, kicked, and burned Mr. Gibson; they deprived him of sleep, threatened him, and hurled racial slurs at him. The officers' goal was to extract a confession from Mr. Gibson to a double murder he did not commit, and they did not stop until they got it. Due to that false confession, Mr. Gibson was wrongfully convicted and imprisoned for decades. Mr. Gibson is not alone. Dozens of Black men were beaten, tortured, and forced to confess to crimes they did not commit at the hands of Jon Burge and the officers he commanded. Mr. Gibson has waited over 30 years to finally hold the City of Chicago ("City") accountable for the devastation it caused him and others just like him.

In its motion for bifurcation and a stay, the City argues this Court should force Mr. Gibson to wait years longer for justice. Even more troubling, it argues there's no reason for Mr. Gibson to *ever* be permitted to bring his *Monell* claim against it. The City is wrong. To demonstrate that bifurcation is warranted, the City must show that it will not unfairly prejudice Mr. Gibson *and* that bifurcation will avoid prejudice to the City or serve judicial economy. It has shown neither.

1

To the contrary, bifurcation will only further harm a man who has already been forced to wait decades to seek justice from the City that tortured and wrongfully imprisoned him for over 85% of his adult life. Mr. Gibson deserves his day in court against the officers *and* the City who violated his rights *now*, not years into the future, and certainly not never, as the City contends.

Not only will bifurcation prejudice Mr. Gibson, it will do so for no reason. Nothing will be gained from bifurcating this lawsuit and staying Mr. Gibson's *Monell* claim against the City. Almost all of the discovery that Mr. Gibson seeks from the City is relevant to his claims against the individual officers. Bifurcating discovery, therefore, won't reduce discovery costs. It will, however, lead to discovery disputes about which discovery requests are relevant to which claims. Nor will bifurcation save litigation costs. It's well-established that the CPD had a practice of torturing Black men—so well-established, in fact, that Mr. Gibson plans to move for summary judgment on that issue in the next month. That issue, therefore, can be efficiently resolved before trial. And, even if it isn't, this Court can ensure a fair trial for all of the parties through its jury instructions, just like in every other case involving individual and *Monell* claims.

Bifurcation will do nothing more than force the parties to conduct duplicative discovery, undergo duplicative trials, and generate unnecessary discovery disputes. And, fatal to the City's motion, it will unfairly prejudice Mr. Gibson and the public's interest in holding the City accountable for years of abuse. This Court should deny the City's motion.

## BACKGROUND

In 1989, Chicago police officers detained, interrogated, and tortured Mr. Gibson until he falsely confessed to a double murder he did not commit. At the hands of officers under Jon Burge's command, he suffered "physical beatings, hitting, kicking, slapping, burning, sleep deprivation, threats, racial slurs and insults." Am. Compl. ¶ 3, ECF No. 111. Armed with a false confession, the government tried and convicted Mr. Gibson to a life sentence. *Id.* ¶¶ 1-5. After more than 29 years

2

in prison, James Gibson won his freedom. On March 19, 2019, the Illinois Appellate Court vacated his conviction. The court found that "'[Jon] Burge's subordinates beat [Mr. Gibson] during his interrogation,'" and the false "'incriminating statement'" the police procured by torturing Mr. Gibson "'proved to be the decisive evidence against him, the lynchpin of his conviction,'" *id.* ¶ 94 (quoting *People v. James Gibson*, 2019 IL App. (1st) 182040-U (Mar. 19, 2019)). On April 26, 2019, the State asked for all charges against Mr. Gibson to be dismissed, and the Court did so. *Id.* ¶ 96.

Mr. Gibson was not the only Black man who was tortured by the Chicago Police Department nor the only man wrongfully imprisoned due to a false confession beaten out of him. As the City itself has recognized, for years it had a practice of officers under Burge's command in Areas 2 and 3 torturing Black men into confessing to crimes they did not commit. The City Council even passed a resolution "acknowledg[ing] this exceedingly sad and painful chapter in Chicago's history." Chicago City Council Resolution, *Reparations to victims of torture by Police Commander Jon Burge*, SR2015-256 (enacted May 6, 2015) ("City Council Resolution on Reparations").[1] And multiple mayors have acknowledged this practice. Mayor Lori Lightfoot observed that the City's practice of torture under Burge left a "dark legacy," "so many lives shattered, and a horrible stain on the legitimacy of policing."[2] And former Mayor Rahm Emmanuel called Burge's pattern of torture a "disgrace" to the people the City "was sworn to protect."[3]

On May 10, 2019, Mr. Gibson filed this civil rights action against the City and the officers

---

[1] https://chicago.legistar.com/LegislationDetail.aspx?ID=2262499&GUID=6DCDD51B-2234-4713-93FC-26D647905536&Options=&Search=.
[2] Herbert G. McCann, AP News, *Former Chicago police commander linked to torture dead at 70* (Sept. 19, 2018), https://apnews.com/article/677d71113f73437f962390e77be5b827, attached as Ex. D to the Declaration of Andrew M. Stroth (Jan. 18, 2021) ("Stroth Decl.").
[3] Mayor's Press Office, *Mayor Emanuel, Aldermen, and Representatives of Burge Victims Announce Reparations Package to Bring Closure to Dark Chapter of City's History* (Apr. 14, 2015), https://perma.cc/JY9N-8GHE.

3

who tortured him, seeking justice and accountability for the years of torture and imprisonment that the City perpetrated. ECF No. 1. On July 29, 2020, this Court denied in part the Defendants' motion to dismiss, authorizing Mr. Gibson to pursue his *Monell* claim against the City and his constitutional claims against the individual officers. Order and Opinion at 33, ECF No. 116.

On September 14, 2020, the Defendants answered Mr. Gibson's amended complaint. *See* ECF Nos. 133-136. On September 28, 2020, Mr. Gibson propounded written discovery requests. The Defendants have responded to those requests, and more than a week ago the Parties exchanged their initial production of documents. Stroth Decl. ¶ 3. Several of the officers have refused to answer discovery requests by invoking their right against self-incrimination. *Id.* ¶ 5 (Jan. 18, 2020). On November 18, 2020, the City filed its motion for bifurcation and a stay, ECF No. 142 ("Mot."), which was not joined by the officers.

## STANDARD OF REVIEW

The party seeking bifurcation bears the burden of demonstrating that bifurcation is warranted. *See Ortega v. United States*, No. 16 Civ. 5475, 2017 WL 3841632, at \*2 (N.D. Ill. Aug. 31, 2017) (citation omitted). To satisfy this burden, the City must show that: (1) "separate trials would avoid prejudice to a party or promote judicial economy"; *and* (2) bifurcation will "not unfairly prejudice the non-moving party." *Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir. 1999); *see also Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000) (even where bifurcation may promote judicial economy or avoid prejudice to a moving party, it cannot be granted if it may "unfairly prejudice the non-moving party").[4]

This is a high bar. As Judge Kendall concluded after reviewing "every decision in this

---

[4] In addition, "separate trials must not be granted if doing so would violate the Seventh Amendment." *Houseman*, 171 F.3d at 1121. Although Mr. Gibson does not argue here that bifurcation violates the Seventh Amendment, he reserves the right to do so in the future.

4

District involving bifurcation of *Monell* claims" since 2009, "[i]t is clear that the weight of authority holds that bifurcation is now heavily disfavored." *Awalt v. Marketti*, No. 11 Civ. 6142, 2012 WL 1161500, at *10 n.2 (N.D. Ill. Apr. 9, 2012).

## ARGUMENT

The City's motion should be denied. *First*, there is no need for bifurcation. The City has not shown that bifurcation will improve judicial economy or avoid prejudice to the City or the officers. To the contrary, it will undermine efficiency by duplicating the work and burden on the parties and this Court. And proper jury instructions can prevent any prejudice to the Defendants. *Second*, bifurcation will unfairly prejudice Mr. Gibson. Bifurcating and staying the *Monell* claim until the claims against the officers are tried will substantially delay discovery and trial on the *Monell* claim—making Mr. Gibson wait many more years for his day in court after already having waited 30 years for justice. Such a delay would almost certainly cause witnesses and evidence to be lost. It also will unduly delay Mr. Gibson's compelling non-economic interest in exposing and deterring one of the most heinous policing practices in American history—or, if the City has its way, permit the City to escape accountability entirely.

### I. Bifurcation will undermine, not advance, judicial economy.

The City's argument for bifurcation is entirely speculative: *If* Mr. Gibson fails to prove that his constitutional rights were violated, then bifurcation "*may*" "*potentially*" avoid unnecessary discovery and litigation costs. Mot. at 8, 10 (emphasis added). But there is no reason to believe that Mr. Gibson will fail to prove that his constitutional rights were violated—and even if he does, there's no reason to believe that bifurcation will avoid any litigation costs. To the contrary, bifurcation will *impose* unnecessary litigation costs on the parties and this Court.

Judicial economy will be maximized by moving the entire case to trial in short order, not by putting on hold Mr. Gibson's quest for justice from the City. And key features of this case make

5

it possible for the entire case to move quickly towards trial without years of further delay: namely, that there have already been lengthy legal proceedings finding Mr. Gibson was tortured, and the City has admitted to having a practice of torturing Black men like him in Areas 2 and 3.

As an initial matter, the Illinois courts have already found that Mr. Gibson was tortured by officers under Burge's command. In 2019, the Appellate Court of Illinois concluded that, in Mr. Gibson's proceeding before the Torture Inquiry and Relief Commission, he proved that his confession "was the product of physical abuse by Area 3 detectives under the command of Jon Burge." *People v. James Gibson*, No. 1:18-2040, 2019 IL App. (1st) 182040-U, ¶ 2 (Mar. 19, 2019). "There is not a shred of evidence," the Court held, that Mr. Gibson "was injured in a holding cell, at his own hands, or in any other way except one: Burge's subordinates beat him during his interrogation." *Id.* ¶ 70. Mr. Gibson already proved that he was tortured by Burge's officers. There's no reason to believe that he will not be able to do so again here.

Moreover, there is unlikely to be any need for a trial on the issue of whether the CPD had a practice of torturing Black men in Areas 2 and 3. That practice is well-established. Indeed, in 2015 the City "acknowledge[d] this exceedingly sad and painful chapter in Chicago's history," in which "[m]ore than 100 African-Americans who were detained by the Chicago Police Department between 1972 and 1991 have accused Burge or police officers working under his command of engaging in acts of torture and physical abuse." City Council Resolution on Reparations ("acknowledg[ing] and condemn[ing], as evil and reprehensible, any and all acts of torture and abuse inflicted upon the Burge victims"). So have the two most recent mayors. *See supra* at 3. Indeed, decades earlier, a 1990 report prepared by a CPD investigator found that "[i]n the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic" in Area 2. Am. Compl. ¶ 101 (internal citation and quotations omitted). And the State

6

has similarly acknowledged Burge's torture.[5] The only reason it remains an issue here is the City refuses to admit *in this case* what was proven or admitted elsewhere: The City had a practice of torturing suspects to coerce them into making false confessions in areas under Burge's command.[6]

Because it cannot be disputed that the City had a policy or practice of torturing suspects in Areas 2 and 3, Mr. Gibson plans to move for summary judgment on this element of his *Monell* claim in the next month. If this Court grants that motion, the only issue at trial on the *Monell* claim will be whether Mr. Gibson himself was subjected to that practice—the same issue that will be tried against the individual officers. Furthermore, even if Mr. Gibson is required to prove the existence of a pattern or practice at trial, that proof will substantially overlap with the claims against the individual officers. And, in any event, this Court need not decide now whether to bifurcate. If the City truly believes the trial itself should be bifurcated, it can renew its motion before trial, once it's clear what issues remain to be tried. *See Knauf Insulation, LLC v. Johns Manville Corp.*, No. 15 Civ. 00111, 2015 WL 7176269, at *2 (S.D. Ind. Nov. 13, 2015).

Even if Mr. Gibson were to ultimately fail in proving his claims, bifurcation would not avoid any discovery costs. The City's own motion proves the point. The City lists several discovery requests it hopes to avoid through bifurcation. *See* Mot. at 8-9. But most of those discovery requests are directly relevant to Mr. Gibson's claims against Burge and the other officers. For example, the

---

[5] *See, e.g.*, State of Illinois Torture Inquiry & Relief Commission, Mission and Procedures Statement, https://perma.cc/FH7Z-LU5C (describing the enactment of the Illinois Torture Inquiry and Relief Commission Act, following the "Police Department Review Board's rul[ing] that [Burge] had in fact used torture" in response to "a series of allegations that confessions had been coerced by Chicago Police Detectives under the command of Chicago Police Commander Jon Burge").

[6] In its response to Request for Admission No. 1, the City has categorically denied that it had this practice. *See* RFA No. 1 Resp., Ex. B to Stroth Decl. (City categorically denying the request to admit that "[b]etween 1973 and 2006, officers under Jon Burge's Command at Areas 2 and 3 subjected many suspects, particularly African Americans, to mental, physical, and psychological torture"); *see also* Stroth Decl. ¶ 7 (describing how after a meet-and-confer about the City's categorical denial of RFA No. 1, the City refused to admit that any portion of RFA No. 1 is true or qualify its denial of the request); Letter from Andrew M. Stroth to Paul A. Michalik (Dec. 9, 2020), Ex. C to Stroth Decl. (describing the City's failure to comply with Rule 36 in categorically denying RFA No. 1).

City highlights requests for documents on prior cases involving Burge, mayoral statements on Burge, City reports on torture in Areas 2 or 3, complaints against officers in Area 3 on the same types of violations Mr. Gibson suffered, documents on training officers received, policies on issues related to his abuse, and communications about torture in Areas 2 or 3. *See id*. at 8. But all of these documents are relevant to Mr. Gibson's claims against the officers, as well as his *Monell* claim.

Indeed, it is well-established that "evidence that is relevant" to a city's "practices and policies will be discoverable and admissible against the individual Defendants." *Awalt*, 2012 WL 1161500, at *13; *accord Patterson v. Burge*, No. 03 Civ. 4433, 2005 WL 8177571, at *2 (N.D. Ill. Aug. 2, 2005); *see also Maysonet v. Guevara*, No. 18 Civ. 2342, 2020 WL 3100840, at *3 (N.D. Ill. June 11, 2020) (denying bifurcation, in part because "much of the evidence required to litigate the individual claims will be relevant to the *Monell* claim and *vice a versa*, such that bifurcation could result in two rounds of depositions and document production"). Thus, even without the *Monell* claim against the City, Mr. Gibson would be entitled to this type of discovery. As one court explained when it denied a motion to bifurcate in another case involving similar torture under Burge's command, "the fact that a finding against an individual employee is a necessary prerequisite to a judgment against the City does not mean that a plaintiff's case against the individual employee might not be strengthened by evidence he discovers as to the City's governing policies and practices." *Patterson*, 2005 WL 8177571, at *2. "[I]t is easy to imagine that the information a plaintiff discovers concerning municipal policies and practices which caused his injury might well assist him in discovering evidence of and proving the unconstitutional conduct of individual City employees." *Id.* Thus, contrary to the City's claim, bifurcation will only duplicate discovery, not streamline it.

Furthermore, the City should already have compiled much, if not all, of the documents Mr. Gibson has requested. There have been many prior cases brought by other men tortured by officers under Jon Burge's command. *See, e.g.*, *Patterson*, 2005 WL 8177571, at *2; Stroth Decl. ¶ 8

8

(identifying prior Burge-related cases). The City makes no effort to identify which documents (if any) Mr. Gibson has requested that the City has not already produced or explain why discovery will be costly, when it already should have compiled the documents requested here for other cases.

With or without bifurcation, it is clear the City will need to respond to virtually identical discovery—discovery it should have already compiled. Discovery costs, thus, cannot be a reason to bifurcate. *Rodriguez v. City of Chicago*, No. 18 Civ. 7951, 2019 WL 4278501, at *2 (N.D. Ill. Sept. 10, 2019), *objections overruled*, 429 F. Supp. 3d 537 (N. D. Ill. 2019) (rejecting the City's discovery-based argument for bifurcation, as it already produced similar discovery in cases alleging the same practices); *Maysonet*, 2020 WL 3100840, at *3 (stating "this burden is mitigated by the fact that *Monell* discovery including written policies and training manuals, employee records, and samples of homicide and or CR files have or will be produced in other cases involving a similar group of Chicago Police Officers"); *cf. Love v. City of Chicago*, 363 F. Supp. 3d 867, 875 (N.D. Ill. 2019) ("discount[ing] the City's arguments of potentially burdensome and unnecessary discovery" because "the City has already turned over documents concerning its policies and procedures").

To the contrary, bifurcation will only increase the litigation costs associated with discovery. As evidenced by the City's own motion—and the parties' apparent disagreement about whether the discovery requests the City identifies are relevant to the claims against the individual officers—bifurcation will not minimize discovery disputes. Instead, it will multiply them, miring the parties and this Court in disputes about whether evidence is related to the individual claims or solely the *Monell* claim. "[A]ttempting to separate the discovery of the individual claims from the *Monell* claim[] will cause more complications than simplifications." *Ott v. City of Milwaukee*, No. 09 Civ. 870, 2010 WL 5095305, at *3 (E.D. Wis. Dec. 8, 2010) (refusing to bifurcate); *accord Patterson*, 2005 WL 8177571, at *2 (stating that the court would be "overwhelmed with discovery disputes that will

9

slow down and possibly impede the search for truth" if it were to bifurcate a *Monell* claim).[7]

Mr. Gibson will pursue his *Monell* claim regardless of whether this Court bifurcates it. As explained below, Mr. Gibson's claim against the City is about deterrence, accountability, and justice, not just compensation. And Mr. Gibson is determined to litigate his *Monell* claims, regardless of whether the Court bifurcates them. Bifurcation, therefore, will only serve to dramatically increase the costs and time that the parties, their counsel, and the Court spend on this litigation, including duplicative written discovery requests, multiple depositions of the same people, multiple trials on common issues, and successive appeals. *See Awalt*, 2012 WL 1161500, at *10; *Maysonet*, 2020 WL 3100840, at *3.

Accordingly, bifurcation will not serve judicial efficiency. It will severely undermine it.

## II. The City has not shown that the Defendants will be prejudiced absent bifurcation.

The City speculates that there is a potential for prejudice to the individual Defendants if the jury considers evidence about the City's policy or practice of similar constitutional violations. Mot. at 12-13. But the individual officers have not even joined the City's motion. They, apparently, do not fear the prejudice the City asserts on their behalf. The City further speculates that a jury could improperly hold the City liable under *Monell* solely because it finds that the officers violated Mr. Gibson's rights. *Id.* at 13. But bifurcation is not the proper remedy for this concern. Instead, "[l]imiting instructions [to the jury] and other evidentiary tools are the proper mechanism to address" the concern that "the jury will impute evidence against the officers to the City and

---

[7] The City also complains that Mr. Gibson's discovery requests are overbroad, but that's not a concern that bifurcation will resolve. As explained above, most of the requests the City complains about are relevant to the individual claims as well. And if the City believes they are overbroad, the solution is not to prevent Mr. Gibson from having his day in court. It's to ask the Court to limit their scope. *See Love*, 363 F. Supp. 3d at 875 ("To the extent the City finds Love's *Monell* discovery requests overly broad or unduly burdensome, after engaging in the required meet and confer process, the parties can seek the Court's assistance in tailoring the requests.").

10

evidence against the City to the individual officers," *Maysonet*, 2020 WL 3100840, at *4.

Courts have routinely followed this reasoning in rejecting bifurcation motions by the City and other municipalities in *Monell* cases. *See, e.g.*, *Estate of Loury by Hudson v. City of Chicago*, No. 16 Civ. 4452, 2020 WL 1491141, at *2 (N.D. Ill. Mar. 27, 2020) (holding that prejudice concerns "can be cured by limiting jury instructions," and citing *Burton v. City of Zion*, 901 F.3d 772, 784 (7th Cir. 2018) (courts "presume that juries follow the court's instructions")); *Marshbanks v. City of Calumet City*, No. 13 Civ. 2978, 2015 WL 1234930, at *5 (N.D. Ill. Mar. 16, 2015) ("City's argument that the evidence against [the] City will prejudice Defendant Officers is best cured by proper jury instructions and pre-trial evidentiary challenges."). Yet the City offers no argument why jury instructions or other evidentiary tools are insufficient to prevent any prejudice in this case or why this Court should reject the presumption that the jury will follow its instructions.

Indeed, if the City were right about prejudice to the Defendants, every *Monell* case would need to be bifurcated. That, of course, is not this Court's (or any court's) actual practice. Indeed, although the City routinely asks for bifurcation in *Monell* cases, the "weight of authority" in this Circuit is that "bifurcation is now heavily disfavored." *Awalt*, 2012 WL 1161500, at *10 & n.2.

In any event, the time to address potential jury confusion is not at the early stages of the case but instead after discovery and any motion practice. "[B]ifurcation is certainly not needed now in the early stages of litigation"; instead the City can file "another motion . . . closer to the trial date." *Knauf Insulation*, 2015 WL 7176269, at *2; *accord Rodriguez*, 2019 WL 4278501, at *2 (stating that a renewed bifurcation motion can be filed after discovery and dispositive motions).

Finally, "*some* prejudice to the [] Defendants" is not enough to justify bifurcation, but rather the Defendants must show that "they would suffer the kind of substantial, exceptional, extenuating prejudice which would justify bifurcation." *Texas Roadhouse, Inc. v. Texas Corral Rests., Inc.*, No. 16 Civ. 28, 2017 WL 2417086, at *2 (N.D. Ind. June 5, 2017). The City plainly has not done so here.

### III. Bifurcation will unfairly prejudice James Gibson.

Even if the City could show that bifurcation would enhance judicial efficiency or reduce any prejudice to the Defendants—something it cannot do—that still would not be enough. The City would also need to satisfy its burden to demonstrate that bifurcation will not unfairly prejudice Mr. Gibson. *Houseman*, 171 F.3d at 1121. But the City has not done so and cannot do so.

Mr. Gibson has sought justice since he was tortured in 1989. He seeks justice, not just against the individual officers who tortured him, but against the City that enabled them to do so—the City that had a practice of torturing Black men and imprisoning them for years based on the false confessions its officers extracted. If the *Monell* claim is bifurcated, Mr. Gibson will be forced to wait years to seek justice and accountability from the City that was responsible for his torture.

That, in and of itself, is reason to deny the motion. The City has already "delayed" Mr. Gibson "from seeking justice for" over 30 years, causing him to "suffer[ ] prejudice that was 'extraordinary and extreme,'" *Cannon v. Burge*, 752 F.3d 1079, 1098 (7th Cir. 2014). It should not be permitted to delay for years longer. *Cf. Puget BioVentures, LLC v. DePuy Orthopaedics, Inc.*, No. 10 Civ. 00463, 2017 WL 3495595, at \*4 (N.D. Ind. Aug. 14, 2017) ("It is unduly prejudicial to Plaintiff to require it to wait more than ten years to have its day in Court.").

Whether bifurcation is simply a way to delay Mr. Gibson's day in court or "a means to achieve a *de facto* dismissal of the *Monell* claim," this Court should "not deprive a plaintiff who has spent [decades] in prison on a conviction that has been vacated by the state courts, a merits determination on a *Monell* claim." *Maysonet*, 2020 WL 3100840, at \*5 (citation and internal quotations omitted) (denying bifurcation of a *Monell* claim against the City of Chicago brought by a plaintiff who spent 27 years in prison for a double murder conviction that was vacated in 2017).

Furthermore, although it should not require a trial to find that the City had an unconstitutional policy of torture in areas overseen by Burge, *see supra* at 6-7, if the parties are

12

forced to litigate this issue, the years of delay the City requests will make it harder—and, in some instances, likely impossible—for Mr. Gibson to gather evidence to support his *Monell* claim. Mr. Gibson was tortured decades ago. Many of the key witnesses—police officers and City officials—who could have testified about the City's practices have already died. Four of the twelve officer-defendants in this case have died, including Jon Burge. *See* Am. Compl. at 1 (naming the estates of Jon Burge and three other officers as defendants).

The longer Mr. Gibson is forced to wait to try his claim against the City, the more witnesses will have passed or moved away, the more evidence will be lost to time. Courts have long recognized the significant prejudice caused by delay: "faded memories, lost evidence, unavailable witnesses," *United States v. Anagnostou*, 974 F.2d 939, 941 (7th Cir. 1992), *abrogated on other grounds by United States v. Canoy*, 38 F.3d 893 (7th Cir. 1994).[8] This is particularly problematic here, where decades have already passed. Mr. Gibson should not be forced to wait to try his claims until nearly everyone who was witness to them has died.

The City does not address any of these concerns. Instead, the City contends that bifurcation will avoid the need to try Mr. Gibson's *Monell* claim at all. Mot. at 14. In other words, the City makes crystal clear the goal of its bifurcation motion: to prevent Mr. Gibson from *ever* holding the City of Chicago accountable for its practice of torturing Black men. In the City's view, preventing Mr. Gibson from ever bringing his *Monell* claim would not prejudice him, because he could still recover "any compensatory damages that a jury may award" against the individual officers who tortured him. *Id.* The City asserts that it will indemnify the officers for any judgment against them

---

[8] *Accord Hutchinson v. Spanierman*, 190 F.3d 815, 826 (7th Cir. 1999) (finding prejudice where "evidence had been lost, memories had faded, and witnesses had disappeared with respect to events that had occurred fifteen years earlier"); *Puget*, 2017 WL 3495595, at *4 ("given the age of" this dispute "it is possible that evidence may be lost or forgotten in the three years it may take" to resolve the other claims).

and pay compensatory damages, even if the officers are entitled to qualified immunity. *Id.*[9]

But Mr. Gibson's claim against the City is about far more than money. It is about holding to account the City that spent years allowing its officers to torture Black men and send those men to prison on false confessions. It is about deterring the City from ever turning a blind eye to such a practice again. These objectives cannot be satisfied absent a judgment against the City itself, holding that the City—not just a few rogue officers—are responsible for the torture that he and others endured. *See, e.g.*, *Rodriguez*, 2019 WL 4278501, at *2 ("[A] judgment naming the city itself and holding it responsible for its policies may have a greater deterrent effect than a judgment against a police officer that is paid by the city.") (citation and internal quotations omitted).

In arguing that no prejudice will result from denying Mr. Gibson his day in court on his *Monell* claim, the City grossly "misunderstands the policy value in [] finding that the City's policy and practices were constitutionally deficient," "the precedential value of such findings for other plaintiffs in future cases who might seek to hold the City liable for similar policies," and the fact that such *Monell* litigation "may spur institutional changes in the City's policies and procedures." *Bouto v. Guevara*, No. 19 Civ. 2441, 2020 WL 956294, at *3 (N.D. Ill. Feb. 27, 2020).

Here, the public interest in litigating Mr. Gibson's *Monell* claim is especially high—and bifurcation particularly improper—as the City's motion is premised on "expressly den[ying] any wrongdoing on the part of the City." *Rodriguez*, 429 F. Supp. 3d at 541-42 (collecting cases finding the same); *see* ECF No. 142-2 ¶ 3 (City "specifically denies any such constitutional violation" was

---

[9] It's not clear how the City's proposed limited consent to entry of judgment would work if the officers are granted qualified immunity, however. The City asserts that it would pay compensatory damages if "the finder of fact determines" that one or more officers violated Mr. Gibson's constitutional rights, but the Court holds they are entitled to qualified immunity. Limited Consent to Entry of Judgment (Proposed) ¶ 6, ECF No. 142-2. For one thing, qualified immunity is often determined without a finding on whether a constitutional right has been violated at all. *See, e.g.*, *Britt v. Anderson*, 21 F. Supp. 3d 966, 970 (N.D. Ill. 2014). And if the officers are granted qualified immunity and dismissed from the case without a ruling on whether a constitutional violation occurred, there will be no compensatory damages award for the City to pay.

14

caused by the City's policies and it "denies it has the requisite degree of culpability therefrom").

The City clearly has not learned the right lessons from the days of Burge's torture shop, because the City is still defending its actions and requiring the parties to litigate whether the City ever had an unconstitutional policy of torturing suspects. This stance sends an unmistakable message to current CPD leaders and officers that no matter how outrageous their conduct is, the City will defend it. Indeed, the City will claim that such conduct never even existed.

Courts routinely refuse to allow the City to use bifurcation to avoid claims against it, where a plaintiff has "important [nonmonetary] objectives—most notably, deterrence and reform—that would be furthered by a judgment holding the City liable." *Estate of Loury by Hudson v. City of Chicago*, No. 16 Civ. 04452, 2017 WL 1425594, at *4 (N.D. Ill. Apr. 20, 2017); *see also Maysonet*, 2020 WL 3100840, at *4; *Rodriguez*, 2019 WL 4278501, at *2 (bifurcation "would significantly prejudice [the plaintiff] and would not serve the interests of justice."). This Court should do the same here.

Finally, this Court should reject the City's proposed "limited consent to entry of judgment," as it has previously done. *See Claxton v. City of Chicago*, 14 Civ. 10076, 2015 WL 5304630, at *3 (N.D. Ill. Sept. 8, 2015). This "limited consent" is not a proper stipulation under Rule 16, because it is not agreed to by the parties, and it is not a permissible offer of judgment under Rule 68, because the City has not offered to pay a specific amount as a judgment. *Id.* Courts in this district have found "such stipulations insufficient to justify bifurcation, noting that the plaintiff is entitled to be the master of her own complaint and pursue claims even if they have a minimal pecuniary reward." *Rodriguez v. City of Chicago*, 429 F. Supp. 3d 537, 541 (N.D. Ill. 2019) (internal citations and quotations omitted) (collecting cases). They "provide[] the plaintiff and the court with little that the law does not otherwise provide," *Patterson*, 2005 WL 8177571, at *2, and should be rejected.

## CONCLUSION

For the reasons stated above, the City's motion for bifurcation and a stay should be denied.

Dated: January 22, 2021

Respectfully submitted,

*/ s /Andrew M. Stroth*
Andrew M. Stroth
Carlton Odim
Action Injury Law Group, LLC
191 North Wacker Drive, Suite 2300
Chicago, IL 60606
(844) 878 4529
*astroth@actioninjurylawgroup.com*
*carlton@actioninjurylawgroup.com*

Peter Romer-Friedman
Gupta Wessler PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*peter@guptawessler.com*

Jennifer D. Bennett
Gupta Wessler PLLC
100 Pine Street, Suite 1250
San Francisco, CA. 94111
(415) 573-0336
*jennifer@guptawessler.com*

*Attorneys for Plaintiff*