## AIN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| James Gibson, | ) | |
| | ) | Case No. 2019 CV 4152 |
| Plaintiff, | ) | |
| | ) | Honorable Judge Ellis |
| v. | ) | |
| | ) | Magistrate Judge Weisman |
| City of Chicago, et al., | ) | |
| Defendants. | ) | Jury Trial Demanded |

### Defendant Byrne's Answer, Affirmative Defenses, and Jury Demand to Plaintiff's First Amended Complaint

Defendant John Byrne, through his attorneys Hale & Monico, submits his Answer, Affirmative Defenses, and Jury Demand to Plaintiff James Gibson's First Amended Complaint. In so answering, Defendant Byrne states:

### Allegations Common To All Counts
### Introduction

**1.** On December 22, 1989, Lloyd Benjamin and Hunter Wash were murdered by Fernando Webb, a heroin addict with a history of weapons offenses, armed robberies, attempted murder, and other violent crimes.

**Answer:** Defendant Byrne admits, upon information and belief based on police reports, that on December 22, 1989, Lloyd Benjamin and Hunter Wash were murdered but denies that the murder was committed by Fernando Webb.

**2.** On December 27, 1989, Defendant Chicago Police Officers working under the command of Jon Burge at Area 3 Violent Crimes, arrested Plaintiff James Gibson (hereinafter "Gibson") without probable and took him Area 3 Violent Crimes against his will regarding the murders of Benjamin and Wash. In the process of "interrogating" Gibson at Area 3 several of the Defendant

Officers tortured Mr. Gibson beyond the limit of his capacity for pain and fear, after which Mr. Gibson made a statement that was considered of such "extreme importance" by the judge who convicted Mr. Gibson for the Benjamin/Wash murders that he would not have convicted him without it.

**ANSWER:** Defendant Byrne admits, upon information and belief based on police reports, that on December 27, 1989, Plaintiff was transported by Chicago Police Officers to Area 3 and that the commander, at that time, of Area 3 was Jon Burge. Defendant Byrne further admits, upon information and belief based on police reports, that Plaintiff made several statements during his interview on or about December 27, 1989. Defendant Byrne denies torturing Plaintiff and denies any such conduct occurred in Defendant Byrne's presence and, therefore, denies the remaining allegations contained in this paragraph.

3.      The torture to which Mr. Gibson was subjected to by several of the Defendant Officers included physical beatings, hitting, kicking, slapping, burning, sleep deprivation, threats, racial slurs and insults.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

4.      It has since been well documented that Chicago Police Officers in Area 3 under the command of Jon Burge were regularly engaged in this form of torture in the course of interrogating suspects, especially young African-American suspects in order to "solve" crimes. Indeed the use of torture by Chicago Police Officers under the command of Jon Burge to obtain false confessions, statements and fake evidence, were the direct result of a situation which spun out of control

because the City of Chicago's policymakers chose to allow it to continue thereby making torture a *de facto* policy of the City of Chicago and it's Police Department.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

5.     After Mr. Gibson succumbed to the Defendant's torture the resultant coerced statement was the key evidence used to convict him unjustly and to sentence him to life in prison for a crime he did not commit.

**ANSWER:** Defendant Byrne admits, upon information and belief based on police reports and the public record, that Plaintiff was convicted of the murders of Lloyd Benjamin and Hunter Wash but denies that Plaintiff did not commit the criminal act. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

6.     After many appeals and post-conviction petitions by Mr. Gibson, all of which were denied because of the continued policy of the City of Chicago to refuse to acknowledge or admit that many convictions were obtained by through the use of confessions and statements obtained by the use of torture by Jon Burge and his "Midnight Crew" of Chicago Police Officers, the State of Illinois enacted the Torture Inquiry and Relief Commission ("hereinafter "TIRC"). After investigating Mr. Gibson's claim of torture, the TIRC issued a Case Disposition which found that he had been tortured into making a statement which resulted in his conviction and imprisonment.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**7.** An evidentiary hearing was held in the Circuit Court of Cook County on the TIRC Case Disposition at which several of the Defendant Chicago Police Officers testified falsely and denied that there had been any torture or coercion involved in obtaining the statements used to convict Mr. Gibson or his co-defendant Keith Johnson a/k/a Eric Smith, and that there had never been any torture used by Chicago Police Officers under the command of Jon Burge at Area 3 or Area 2 Violent Crimes. These Defendant Chicago Police Officers testified in this manner in a conspiracy to conceal the fact that the City of Chicago had a *de facto* policy of allowing the use torture to obtain false confessions and statements from suspects and witnesses by Jon Burge and those under his command. These Defendant Chicago Police Officers engaged in this conspiracy to conceal the aforesaid *de facto* policy of the City of Chicago because of a *de facto* policy of the City of Chicago of protecting officers who perjure themselves in order to conceal the torture of suspects and witnesses from prosecution.

**ANSWER:** Defendant Byrne admits that there was an evidentiary hearing held in the Circuit Court of Cook County and that several Chicago Police Officers testified. Defendant Byrne denies the remaining allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**8.** After the evidentiary hearing on the TIRC Case Disposition Mr. Gibson was denied relief

4

by the Circuit Court of Cook County. Mr. Gibson appealed, and the denial of relief was reversed and remanded by the Appellate Court in *People v. James Gibson 2018 IL App (1st) 162177*. On remand from this first appeal the Circuit Court again denied Mr. Gibson any relief. Mr. Gibson again appealed, and the Appellate Court again reversed the Circuit Court in *People v. James Gibson 2019 IL App (1st) 182040-U*. In this second appellate court Order the Court of Appeal's remanded the case with instructions that Mr. Gibson's conviction be vacated, that he be given a new trial and that his statement be barred from introduction into evidence at the retrial because it was the product of torture by several of the Defendant Chicago Police Officers. The Appellate Court also ordered that the case be assigned to a different Circuit Court judge other than the judge who twice denied Mr. Gibson relief.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

9. On April 4, 2019, the Circuit Court of Cook County vacated Mr. Gibson's conviction. Then on April 26, 2019, the Circuit Court of Cook County dismissed all charges against Mr. Gibson arising out of the December 22, 1989, murders of Lloyd Benjamin and Hunter Wash.

**ANSWER:** Defendant Byrne admits, upon information and belief, the allegations contained in this paragraph but denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation.

10. James Gibson spent twenty-nine (29) years and four (4) months in prison for a crime he did not commit as a direct result of the torture inflicted on him by several of the Defendant Chicago Police Officers working under the command of Jon Burge.

**ANSWER:** Defendant Byrne admits, upon information and belief, that Plaintiff spent time in prison after being convicted of murdering Lloyd Benjamin and Hunter Wash. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

### Jurisdiction and Venue

**11.** This Court has jurisdiction of this action under 28 U.S.C. § 1983 in that Defendant's conduct violated rights guaranteed to Plaintiff under the United States Constitution. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

**ANSWER:** Defendant Byrne admits that this Court has jurisdiction as Plaintiff brings claims pursuant to 42 U.S.C. § 1983 and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Defendant Byrne denies that his conduct violated any of Plaintiff's rights under federal or state law.

**12.** Venue is proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. The events giving rise to the claims asserted here all occurred within the Northern District of Illinois, Eastern Division, and all of the parties reside in this district.

**ANSWER:** Defendant Byrne admits that venue is proper in the Northern District of Illinois, Eastern Division but denies that all parties reside in this district.

### The Parties

**13.** Plaintiff James Gibson is Fifty-Two (52) years old, African American male, and is a resident of the State of Illinois. He has spent the last twenty-nine (29) years and four (4) months in prison for a crime he did not commit.

**ANSWER:** Defendant Byrne admits, upon information and belief, that Plaintiff is fifty-two years old, is a resident of Illinois, and spent time in prison after being convicted of murdering Lloyd Benjamin and Hunter Wash but denies that Plaintiff did not commit the crime. Upon information and belief, Defendant Byrne denies the remaining allegations contained in this paragraph.

14. Defendant City of Chicago is a municipal entity which employed Chicago Police Officers Anthony Maslanka, William Moser, John E. Byrne, Louis Caesar, John Paladino, Henry J. Leja, Jerome Rusnak, Victor Breska, John McCann, Phillip Collins, John O'Mara, all of who worked in the Chicago Police Department's "Area 3" under Commander Jon Burge.

**ANSWER:** Defendant Byrne admits, upon information the belief, the allegations contained in this paragraph.

15. Anthony Maslanka, William Moser, John E. Byrne, Louis Caesar, John Paladino, Henry J. Leja, Jerome Rusnak, Victor Breska, John McCann, Phillip Collins, John O'Mara, and John Burge were all Chicago Police Officers of who worked in the Chicago Police Department's "Area 3" where Jon Burge was their commanding officer.

**ANSWER:** Defendant Byrne admits, upon information the belief, the allegations contained in this paragraph.

16. All of the forgoing individuals are sued in their individual capacities, and all acted under color of state law, and within the scope of their employment in engaging in the actions alleged in this Complaint.

**ANSWER:** Defendant Byrne admits that, during the relevant time, he acted within the scope of his employment with the City of Chicago and admits that Plaintiff has brought claims against

Defendant Byrne in his individual capacity. Defendant Byrne denies committing the misconduct as alleged by Plaintiff in this Complaint.

### The Murders of Benjamin and Wash

**17.** On December 22, 1989, at approximately 10:48 a.m. Lloyd Benjamin and Hunter Wash, were in a garage at 1118 W. 58th Street, Chicago, Illinois, out of which Mr. Wash operated his automobile repair shop. Curtis Garmon, Odell Garmon, Leon Coley and James Horton were also in the garage at that time.

**ANSWER:** Defendant Byrne admits, upon information and belief based on police reports, the allegations contained in this paragraph.

**18.** Lloyd Benjamin was known in the neighborhood around 1118 W. 58th Street as the "Insurance Man", because he sold insurance and collected the premiums. On December 22, 1989 he was in the area around 1118 W. 58th Street, collecting insurance premiums. Mr. Hunter Wash was known in the neighborhood around 1118 W. 58th Street as "Smiley".

**ANSWER:** Defendant Byrne admits, upon information and belief based on police reports, the allegations contained in this paragraph.

**19.** At approximately 10:48 a.m., after being in the garage for five (5) minutes, Lloyd Benjamin exited the garage alone, where he was confronted by Fernando Webb, (hereinafter "Webb"), who was armed with a handgun and intent on robbing Mr. Benjamin. Webb shot Mr. Benjamin two (2) times in the head killing him.

**ANSWER:** Defendant Byrne admits, upon information and belief based on police reports, that Benjamin exited the garage alone at approximately 10:48 a.m. after spending approximately five minutes in the garage. Defendant Byrne denies, upon information and belief, that Benjamin was

8

shot twice in the head by Fernando Webb, fatally wounding him. Defendant Byrne denies the remaining allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**20.** Immediately after hearing the gunshots that killed Mr. Benjamin, Mr. Wash exited the garage alone where he was confronted by Webb, who shot Mr. Wash one (1) time in the head killing him.

**ANSWER:** Defendant Byrne admits, upon information and belief based on police reports, that Wash exited the garage alone after gunshots were heard. Defendant Byrne admits, upon information and belief based on police reports, that Wash was shot one time in the head, which was a fatal wound. Defendant Byrne denies, upon information and belief based on police reports, that Webb is the individual who shot Wash. Defendant Byrne denies the remaining allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**21.** After hearing the gunshot that killed Mr. Wash, Messrs. Curtis Garmon, Odell Garmon, Leon Coley and James Horton stayed in the garage for up to five (5) minutes before exiting. When they exited the garage they saw Mr. Benjamin and Mr. Wash lying on the ground fatally wounded. Mr. Coley immediately ran to Mr. Wash's house, which was nearby, to tell Mr. Wash's son, Cortez Wash to call the police. Mr. Cortez Wash called the police who arrived on the scene at approximately 10:59 a.m.

**ANSWER:** Defendant Byrne admits, upon information and belief based on police reports, that Curtis Garmon, Odell Garmon, Leon Coley, and James Horton remained in the garage for a short period following the gunshots, that they exited the garage and observed Benjamin and Wash on the ground and injured, that one of the witnesses ran to the Wash residence and informed Cortez Wash of the shooting and to call 911, that Cortez Wash called 911, and that police officers arrived to the scene shortly. Defendant Byrne denies the remaining allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

### The First Arrest and Torture of James Gibson

22.     There were no eye witnesses to the Benjamin/Wash murders, and no physical evidence which could lead to the identification of any suspects. Officers of the Chicago Police Department, including several of the Defendant Officers, canvased the area surrounding 1118 W. 58th Street, Chicago, Illinois, to try to locate any witnesses to the murders without success.

**ANSWER:** Defendant Byrne admits, upon information and belief based on police reports, that no eyewitnesses were located, at that time, to the Benjamin/Wash murders. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

23.     Benjamin and Wash were both well liked in the neighborhood, and their murders were a major event and the subject of gossip, rumor and speculation. James Gibson who was also known

by the nickname "Peter Gunn", heard a rumor that his name had been mentioned in this neighborhood gossip, so on December 24, 1989 he called the local police station to state that he was not involved in the murders. A "contact card" was filled out by the officer who took the call which was put into the database of the Chicago Police Department.

**ANSWER:** Defendant Byrne admits, upon information and belief based on police reports, that Plaintiff called the Chicago Police Department on or about December 24, 1989 to deny his involvement in the Benjamin/Wash murders and that a field contact card was created documenting that call. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

24. Several of the Defendant Officers were assigned to investigate the murders of Benjamin and Wash. As of December 27, 1989, there was no evidence, witnesses, or suspects in the regarding the Benjamin/Wash murders and the investigation was at a dead end.

**ANSWER:** Defendant Byrne admits that, at some point, he was assigned to assist in the investigation regarding the Benjamin/Wash murders. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

25. Therefore, On December 27, 1989, the Defendant Chicago Police Officers, pursuant to the *de facto* policy of the City of Chicago Police Department allowing the arrest and interrogation of persons without probable cause by detectives working under the command of Jon Burge at Area 3 Violent Crimes, decided to start arresting and interrogating persons based on neighborhood gossip

in order to try to "solve" the Benjamin/Wash murders.

**ANSWER:**    Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

26.    Because Gibson's name had been mentioned in the neighborhood gossip and rumors, Defendant Officers O'Mara and Collins, who were working under the command of Jon Burge at Area 3 Violent Crimes, concocted a false "anonymous tip" in order to justify the arrest and interrogate James Gibson. This false "tip" stated that James Gibson was responsible for the Wash/Benjamin murders. However, on December 27, 1989 when O'Mara and Collins went to arrest James Gibson he was not at home, so they instead arrested Harold Gibson, who was James Gibson's brother, without probable cause and took him to Area 3 for interrogation regarding the Benjamin/Wash murders.

**ANSWER:**    Defendant Byrne admits, upon information and belief based on police reports, that an anonymous source informed Chicago Police Officers that Plaintiff may have been involved in the Benjamin/Wash murders and that Harold Gibson was transported to Area 3 and questioned concerning the murders. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

27.    After arresting Harold Gibson, Defendant Officers O'Mara and Collins created a false police report, which added, after the fact, that the non-existent person who gave them the fake "anonymous tip" also told them that Harold Gibson assisted James Gibson in the commission of

the Benjamin/Wash murders.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

28. After Harold Gibson's arrest without probable cause, based on a false non-existent "anonymous tip", Mr. Gibson contacted O'Mara and Collins at Area 3 of the Chicago Police Department to inquire why his brother was being held. When the Gibson revealed to the Defendant Officer that he was calling from his home, Defendant Officers Rusnak, Breska, Maslanka, Paladino, Ptak, McCann, Caesar, and Byrne appeared at Gibson's home while he was still on the phone and arrested him without probable cause to do so and transported him to Area 3 Violent Crimes for interrogation.

**ANSWER:** Defendant Byrne admits, upon information and belief based on police reports, that Plaintiff was transported to Area 3 for questioning relating to the Benjamin/Wash murders on or about December 27, 1989. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

29. Upon James Gibson's arrival at Area 3 Homicide, O'Mara and Collins reported that they were able to quickly determine that despite what the anonymous caller had told them, Harold Gibson could account for his activities at the time of the murders, and he was released. However, this was false, and in fact Harold Gibson had been a hostage who the Defendant Officers O'Mara, Collins Rusnak, Breska, Maslanka, Paladino, Ptak, McCann, Caesar, and Byrne were holding in

order to find James Gibson.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

30. James Gibson was held at Area 3 overnight and on the next day, December 28, 1989. While he was held overnight he was handcuffed to a chair and was not able to sleep. Also Gibson was not given any food or drink, nor was he allowed to use the washroom.

**ANSWER:** Defendant Byrne admits, upon information and belief based on police reports, Plaintiff remained at Area 3 overnight to December 28, 1989. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

31. Gibson was then put into three (3) lineups by Officers O'Mara, Collins, Maslanka, Paladino and McCann. Gibson was not identified at any of these lineups. Therefore the Defendant Officers Anthony Maslanka, William Moser, John E. Byrne, Louis Caesar, John Paladino, Henry J. Leja, Jerome Rusnak, Victor Breska, John McCann, John M. McCarthy, Phillip Collins, John O'Mara, decided that, pursuant to the *de facto* policy of the City of Chicago Police Department, they would torture Gibson into making a confession or statement which they could use to convict him for the Benjamin/Wash murders even though there was absolutely no evidence that he had committed that crime.

**ANSWER:** Defendant Byrne denies torturing Plaintiff and denies making any agreement or decision with anyone else to torture Plaintiff. Defendant Byrne denies the remaining allegations in

this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

32.     After the lineups, Gibson was placed into another room while handcuffed. He was not fed or able to lay down and eventually had to urinate on the floor. At some point, O'Mara and Collins entered the room and began asking him questions about his brother. Those Officers left defendant in the room alone for a few hours and returned with Maslanka, Paladino and Ptak. Suddenly, Paladino approached Gibson and told him, "we through playing with your ass, nigga", then slapped him on the head. After continuing to question defendant, Maslanka then kicked defendant in the left side of his chest near his ribs as defendant sat handcuffed to the chair. After being kicked, defendant was slapped again by Paladino and repeatedly told Gibson that he and his brother committed the murders after defendant denied any involvement. Then, Maslanka punched defendant in the right side of his ribs. Maslanka then told him, "[y]ou're going to tell us something different than that. We are going to kick your ass all night". O'Mara and Collins then began to punch defendant about the body. Collins then kicked defendant in the groins.

**ANSWER:**   Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

33.     Gibson was then placed in an interrogation room and held Gibson held overnight again handcuffed to a chair. He was not able to sleep, and he was not given any food or drink, nor was he allowed to use the washroom.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

34.     Next, early on December 29, 1998, Gibson was interviewed by Rusnak and Breska. Gibson again denied any involvement in the murders of Benjamin and Walsh. At this point Rusnak and Breska asked Gibson if he would take a polygraph examination, stating that if he did it would "clear all of this up and stop all this ass whooping". Gibson agreed to take the polygraph.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

35.     Before Breska and Rusnak took Gibson for the polygraph examination Rusnak and Breska left the interrogation room and Collins and O'Mara came into the room. They told Gibson to stop denying his involvement in the murders, and that they were "done playing with you". At that point Collins and O'Mara starting punching Gibson again. As this was going on Paladino and Malasanka entered the interrogation room, along with Louis Caesar, Jack McCann, and John Byrne. Byrne then pulled out his gun and asked if it was the gun that Gibson had used in the murders. Gibson continued to deny any involvement in the murders. Detective Malasanka told Gibson that they were going to have the gun in a minute and he left the room, perhaps with another detective.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide

investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

36.     The next thing that happened was that the Officers came back into the room with a silver colored iron. Malasanka then told Gibson that he had a tattoo on his arm with the name "Peter Gun" on it. They then showed Gibson pictures that they had of him, and Gibson stated that Peter Gun was his nick name and that he had a Peter Gun tattoo, along with some other tattoos. Then Detective Malasanka burned Gibson's "Peter Gun" tattoo off of his right arm with the iron. This burning off of the tattoo left Gibson with a triangular scar on his right arm, After that all of the Officers left the interrogation room. Gibson was then taken for the polygraph examination by Detectives Rusnak and Breska.

**ANSWER:**     Defendant Byrne admits, upon information and belief based on police reports, that Plaintiff was transported to the polygraph examination by Detectives Rusnak and Breska. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

37.     Then Gibson was then taken for a polygraph by Rusnak and Breska. During the examination Gibson either touched or tore the paper the polygraph machine used, and he was struck in the back of the head and physically restrained and taken back to Area 3.

**ANSWER:**     Defendant Byrne admits, upon information and belief based on police reports, that Plaintiff was transported to the polygraph examination by Detectives Rusnak and Breska and that, after being informed that the polygraph examination indicated deception, Plaintiff began tearing the polygraph papers. Defendant Byrne denies the allegations in this paragraph directed at

Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

38. On the drive back from the polygraph examination Gibson knew he was going to be beaten again. So in an attempt to stop the torture he told Rusnak and Breska that rumors in the neighborhood were that "K.D. a/k/a "Bodine" was involved in the murder of Benjamin and Walsh. According to Gibson, "KD" and "Bodine" are the same person, i.e. Fernando Webb. However, Gibson did not know Eric Johnson a/k/a Keith Smith was also known as KD. Gibson knew Eric Johnson as Keith Smith. However, Maslanka, Paladino, Collins and Ptak determined that Bodine was Fernando Webb and they further determined that KD was Eric Johnson a/k/a Keith Smith. The Defendant Officers then went out and picked up Fernando Webb and Eric Johnson.

**ANSWER:** Defendant Byrne admits, upon information and belief based on police reports, that Plaintiff made a statement implicating Eric Johnson (AKA Keith Johnson, AKA KD) and Fernando Webb (AKA Bodine) in the Benjamin/Wash murders. Defendant Byrne admits, upon information and belief based on police reports, that Johnson and Webb were eventually placed in custody. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

39. Fernando Webb a/k/a "Bodine" was a heroin addict who lived in the neighborhood. Webb had a history of armed robbery and weapons offenses who was charged with an armed robbery in another case after he was not charged and released in the Benjamin/Wash murders. It was Webb who testified against Gibson and his co-defendant Eric Johnson, and who was, in exchange for

that testimony, was let out of jail on probation on his armed robbery, delivery of a controlled substance and bail jumping charges.

**ANSWER:**     Defendant Byrne admits, upon information and belief based on police reports, that Webb was addicted to narcotics and had a criminal history in December 1989. Defendant Byrne admits, upon information and belief based on police reports, that Webb was not criminally charged for the Benjamin/Wash murders. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

40.     Then, after his return to Area 3 Gibson was being moved from one the one interrogation room back to another room, the Defendant Officer who was moving him opened the door to an interrogation room, and Gibson saw Eric Johnson, who he knew as Keith Smith. Gibson had known Keith Smith since he was a small boy. The Defendant Officer asked Gibson if he knew the man he had just seen, as Eric, Keith, KD or Bodine. Gibson replied that he knew the man, but knew him as Keith Smith, not Eric Johnson.

**ANSWER:**     Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

41.     Gibson was then placed into the interrogation room, which had a table and lockers, where he was handcuffed to something. Then Officer Collins and O'Mara came into the room and started to slap Gibson in the head again, while telling him to tell them "what's up". At that point Gibson stated that he saw KD give Bodine a pistol. This was not the truth, and Gibson said it just to stop

the beatings he was being subjected to. After Gibson had told Collins and O'Mara that he had seen KD give Bodine a gun, Officers Caesar, McCann, and Officer William Moser came into the interrogation room and they spoke among themselves. They then fed Gibson an untrue story to tell back to them. This story was that he saw Eric Johnson give Bodine a pistol, and that he saw Bodine shoot the "white guy". (Lloyd Benjamin was white) This story put Gibson near the scene of the murders when they occurred. This story was not true, and Gibson said it just to stop the beatings. This statement becomes crucial to Gibson's eventual conviction.

**ANSWER:**     Defendant Byrne admits, upon information and belief based on police reports, that Plaintiff gave a statement in which he implicated Johnson and Webb in the Benjamin/Wash murders and that Webb had shot both men. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

42.     Then Officers Caesar, McCann, and Officer William Moser took Gibson out of that interrogation room, and put him in a room that looked more like an office. He was not handcuffed. In this new room were two (2) officers and a lady who was a States Attorney and another States Attorney The lady States Attorney name was Linda Peters, and she was questioning Gibson about making a statement. Gibson gave ASA Peters the same statement that had been told to him by Officers Caesar, McCann, and Moser to tell ASA Peters.

**ANSWER:**     Defendant Byrne admits that Plaintiff made a statement to Assistant States Attorney Linda Peters, that Assistant States Attorney Bill Merritt may have been present during times, and that Plaintiff was not handcuffed at that time. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during

the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

43.    That evening ASA Peters interviewed James Gibson, Eric Johnson and Fernando Webb, and then she, along with ASA Bill Merritt, refused to approve charges against anyone unless there was additional corroboration. Gibson, who at that point had been in custody for ninety-six (96) hours, was then released. However, Eric Johnson and Fernando Webb stayed in custody. This was on Saturday December 30, 1989.

**ANSWER:**    Defendant Byrne admits that ASA Peters interviewed Plaintiff, Johnson, and Webb and that, after conferring with Merritt, ASA Peters declined to approve charges at that time. Defendant Byrne admits that ASA Peters agreed that additional corroboration was needed prior to the approval of charges. Defendant Byrne admits that Plaintiff was returned to his residence at that time and that Johnson and Webb remained in custody on outstanding warrants. Defendant Byrne admits that this occurred during the early evening of December 30, 1989. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

44.    Officer McCann took Gibson to Officer Malasanka and Paladino, who released him and drove him to his house. The police drove Gibson to his residence. Gibson then went directly into this house where his family was waiting for him.

**ANSWER:**    Defendant Byrne admits, upon information and belief based on police reports, that Plaintiff was returned to his home. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the

Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

45.     Upon his release Gibson went into his home where his family members were waiting. Unbeknownst to him his sister, Sargent Loraine Brown, who was home on leave from the Army, had gone to Area 3 looking for him.  When Ms. Brown went to Area 3 she was in her Army uniform. She was told by Jon Burge that her brother James Gibson was going to be released later that day. She was at the home when Gibson arrived home on December 30, 1989. Also at Gibsons home, which was his mother's house at 5734 S. Aberdeen, Chicago, Illinois,  was Loraine Brown's husband, Steve Brown, her four children Magdalene, Samara, Amanda, and Desai.

**ANSWER:**   Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

46.     DD Gibson (sic) went directly into his residence after being taken home by the police. His sister Sgt. Loraine Brown was in the kitchen, about fifteen (15) feet away when he entered. Gibson looked distraught. At first all of the younger children gathered around Gibson and were excited that he was home. When Samara Burks, who was one of the younger people there, gave Gibson a hug around his waist he flinched in pain and said "ow". Samarra also saw that his face was swollen. When Gibson took off his coat, Samarra noticed that his right arm was burned, and there was a swollen mass on his arm where a tattoo had been. Gibson also flinched in pain when the other people tried to give him a hug. After about five (5) to ten (10) minutes Sgt. Loraine Brown was able to get close to Defendant James Gibson. She noticed that his face was slightly swollen. Sgt. Brown went to give James Gibson a hug around his arms and chest, and he jerked

and flinched back in pain. Gibson went into the living room and took off his jacket. When he took

off his Jacket Sgt. Brown could see that her brother James Gibson's arm had been burned on the

upper part of his right arm. Gibson stated that he had been beaten by the police. Because she was

in the Army, Sgt. Brown knew that was illegal and determined to call the police to report the

beating by the detectives.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant

Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide

investigation, and denies such conduct occurred in his presence and, therefore, denies the

remaining allegations contained in this paragraph.

**47.** About twenty (20) to thirty (30) minutes after Gibson came home Sgt. Loraine Brown

called the police to report that her brother James Gibson had been beaten by the detectives while

he was in police custody. She called 911 first, and was put in touch with the office of professional

standards. According to the records of the Office of Professional Standards Lorraine Brown

contacted the Office of Professional Standards of the Chicago Police Department ("OPS"), on

Saturday December 30, 1989 at 9:30 pm. Sgt. Brown spoke to a woman at OPS. Gibson didn't call

OPS because he said you can't call the police on the police, because they do this all the time. The

woman who Sgt. Brown spoke to was Ann Peters. Sgt. Brown told OPS Investigator Peters that

her brother had been beaten by the police. Investigator Peters asked Sgt. Brown some additional

questions about what had happened, and then asked to speak with Gibson. At first Gibson did not

want to talk to Investigator Peters because she was also the police, and it was the police that had

beaten him. Then he spoke to her and Gibson stated that from December 27, 1989 through

December 30, 1989, at least two (2) unknown male white detectives detained him without charging

him for an excessive length of time and physically abused him by slapping, punching, kicking him,

and made physical threats against him. Gibson only named Officers O'Mara and Collins to the OPS investigator because those were the only names of officers that he knew because Officers O'Mara and Collins left their cards at his house when they were there looking for him on December 27, 1989 when they took his brother Harold into custody. Gibson did not know the names of the officers because they were not wearing name tags or badges with names on them when they were interviewing or beating and kicking him. After he had answered Investigator Peters questions, she told him that someone would contact him within the next three days. Gibson told the OPS investigator that he would be available.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**48.** After Gibson completed talking to the investigator at OPS he, went into the kitchen and got some ice for his ribs, butter for the burn, and he went upstairs in the residence to find medications and use the bathroom. Then after he came downstairs Gibson was told that his other sister was in the hospital, and that his mother was going to visit her there tomorrow. Then went into the basement of his residence and talked to his brother.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

### The Frame Up Of James Gibson

**49.** After Gibson's release, the Defendant Officers knew that charges against Gibson would

not be approved unless they obtained additional corroboration.

**ANSWER:** Defendant Byrne admits that ASA Peters had stated that additional corroboration was needed prior to the approval of criminal charges. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

50. While he was in custody starting on December 29, 1989, Eric Johnson was interrogated about the murder of Mr. Benjamin and Mr. Walsh initially by Officers Paladino and Maslanka. At first Johnson told the officers that he was asleep at home at the time of the murder. At that point Officer Paladino came around the table and slapped Johnson and called him a nigger and told him that he was lying. Officer Maslanka kicked Johnson. They told Johnson that they had Gibson in the next room and Gibson said that Johnson gave Bodine a gun which he used in the murder of Benjamin and Wash. Maslanka and Paladino continued slapping Johnson and punching him about the body. This went on for some time and then Officers Breska and Rusnak entered the interrogation room. Johnson told them he didn't know anything about the murders of Benjamin and Wash, and then Officer Breska punched Johnson in the face and Officers Rusnak and Breska continued to beat, kick, and threaten Johnson.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

51. Then Officers Caesar and McCann came at told Johnson that they were taking him for a polygraph test. Johnson refused to consent to the polygraph test, and McCann struck Johnson in the

stomach and told him "nigger you're taking a polygraph test". Caesar was in the room when this happened and did nothing. McCann and Caesar then took Johnson for a polygraph test.

**ANSWER:** Defendant Byrne admits, upon information and belief based on police reports, that Johnson was transported to complete a polygraph examination. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

52.     On the drive back from taking the polygraph test Officer McCann told Johnson that they didn't have anything on him, but they could not release him because Gibson had said that he was involved in the Benjamin/Wash murders. He told Johnson that he just had to say that he had seen Gibson murder Benjamin and Wash. When they got back to Area 3 McCann told Johnson, in the presence of Caesar, that they were going to have him meet with an assistant state's attorney and that Johnson was going to have to say that he was with Gibson when Gibson shot Benjamin and Wash. Johnson did not want to say that, and McCann told him that he would have to say he was with Gibson in order to be a witness. When Johnson said no, in the presence of Caesar, McCann struck Johnson on the left side of his face, and then grabbed Johnson's throat and started choking him and threatening to send him to prison with Gibson. Johnson then agreed to tell the states attorney what McCann told him to say; that he had seen Gibson shoot Benjamin, in order to stop the beating and choking, even though it was false.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

26

53.     Johnson was then placed in a room with ASA Peters. He told Peters that the police had been beating and threatening him and he was home asleep when Benjamin and Wash were murdered. Peters told Officer Byrne this and Byrne told McCann and Caesar to take Johnson out of the room where ASA Peters was. They then took Johnson to another interrogation room where Byrne took out his gun and asked Johnson if this was like the gun that was used to kill Benjamin and Wash. Byrne then pointed the gun at Johnson and told him that he better "stop fucking lying" and saying you were home asleep and that he better "tell them you had something to do with this shit nigga". Then McCann and Caesar put Johnson in another interrogation room where he stayed until Officers Moser came in.

**ANSWER:**   Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

54.     Moser told Johnson that Gibson had told them all they needed and he needed Johnson as a witness, and then he could go home because they didn't have anything on him.  Moser told Johnson that they were going to charge Gibson and they wanted his statement to make him a witness against Gibson, just like Webb. Johnson agreed to sign a statement because he was tired of being tortured and threatened and he feared for his life, and he wanted to go home.

**ANSWER:**   Defendant Byrne admits that Johnson agreed to give a statement relating to the Benjamin/Wash murders but denies it occurred in the manner alleged by Plaintiff and denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation.

55.     Later that same day, December 31, 1989 at approximately 8:00 p.m. a male Assistant States Attorney came into the room where Johnson was with a statement already written up and told

Johnson that he needed Johnson to sign his name and put his initials on the statement. Johnson was never allowed to read the statement.

**ANSWER:** Defendant Byrne admits that Johnson gave and signed a statement on December 31, 1989 at approximately 8:00 p.m. in the presence of Assistant States Attorney Ricardo Correa. Defendant Byrne denies the remaining allegations contained in this paragraph.

56. The statement that Johnson signed said that James Gibson told him about his plans to rob Lloyd Benjamin and that Gibson paid him $50 to be the look out when he robbed Benjamin. The statement further said that when he was the lookout for the robbery he saw James Gibson shoot and kill Benjamin. This statement was false and the only reason that Johnson signed it was because Johnson had been tortured, abused, and threatened by McCann, Caesar, Breska, Rusnak, Maslanka, Paladino and Byrne.

**ANSWER:** Defendant Byrne admits that the statement given and signed by Johnson stated that Plaintiff informed Johnson of his intent to rob Benjamin, that Plaintiff offered Johnson $50 to act as a lockup during the robbery, and that Johnson observed Plaintiff shooting Benjamin. Defendant Byrne denies the remaining allegations contained in this paragraph.

57. Right after Johnson had agreed to sign a written statement saying he was with Gibson, and saw him shoot Benjamin and Wash, but before he signed it, Defendant Officers Byrne, O'Mara, Moser, Collins, McCann, Ptak, and Caesar, (along with Officers Smith, Connors and Duffin) went to Gibson's home and arrested him for the second time. When the Defendant Officers Byrne, O'Mara, Moser, Collins, McCann, Ptak, and Caesar arrested Gibson this second time they knew that they did not have probable cause to do so because they knew that the statements against him were the product of false statements which they had fabricated and procured through torture, and there was no other evidence against Gibson tying him to the Benjamin/Wash murders.

28

**ANSWER:** Defendant Byrne admits that Plaintiff was arrested for the Benjamin/Wash murders on December 31, 1989 at approximately 7:00 p.m. and that Johnson signed his statement on December 31, 1989 at approximately 8:00 p.m. Defendant Byrne admits that the arrest report identifies Moser, Ptak, Byrne, Collins, O' Mara, Smith, Connors, and Duffin as arresting officers. Defendant Byrne denies the remaining allegations contained in this paragraph.

58.     When Gibson was taken back to Area 3 he refused to talk to the Defendant Officers and he was placed in an interrogation room.

**ANSWER:** Defendant Byrne admits that Plaintiff declined to make a statement following his December 31, 1989 arrest.

59.     However, even with Johnson's statement, the Defendant Officers knew that they needed to fabricate additional corroboration against Gibson because they knew that Johnson had given contradictory statements earlier, and that this could cause a problem in getting the murder charges approved. They also knew that Fernando Webb, who was willing to say whatever they asked him to say, was an addict so his statement would be subject to suspicion. So Officers Moser, Byrne, O'Mara, Collins, McCann, Ptak, and Caesar agreed that they would obtain additional false statements from other people in order to fabricate corroboration for Johnson's statement against Gibson.

**ANSWER:** Defendant Byrne denies the allegations contained in this paragraph.

60.     From earlier interviews the Defendant Officers knew that Johnson had two (2) sisters who lived at the same address he did, Carla Smith and Janice Johnson. Defendant Officers Moser, O'Mara, Collins, McCann and Caesar agreed to take Carla and Janice into custody and put them in interrogation rooms at Area 3 and use intimidation and lies in order to get them to give statements which could be used as corroboration to justify the arrest and charge of Gibson for the

Benjamin/Wash murders.

**ANSWER:**    Upon information and belief, Defendant Byrne admits that Carla Smith and Janice Johnson were transported to Area 3 after agreeing to give statements. Defendant Byrne denies the remaining allegations contained in this paragraph.

**61.**    On December 31, 1989, after 9:00 p.m., the Defendant Officers Moser, O'Mara, Collins, McCann and Caesar went to the home were Carla Smith and Janice Johnson lived, and handcuffed them, took them into custody, drove them to Area 3 and put them in separate interrogation rooms. Carla and Janice were held against their will. The Officers did not have any probable cause to arrest and hold either Janice or Carla.

**ANSWER:**    Upon information and belief, Defendant Byrne admits that Carla Smith and Janice Johnson were transported to Area 3 after agreeing to give statements. Defendant Byrne denies the remaining allegations contained in this paragraph.

**62.**    Carla and Janice were interrogated by Officer Moser while Officers Collins, O'Mara, McCann and Caesar were present. Carla was interrogated first and she told Moser that they didn't know anything about the Benjamin/Wash murders and that her bother was home asleep at the time of the murders. Officer Moser then yelled at Carla telling her she was lying, that her brother Eric Johnson was being charged with murder, and threatened to charge Carla with being an accessory to murder unless she said that she heard Gibson discuss robbing Benjamin. Moser also promised that if she signed a statement saying she had heard Gibson talk about robbing Benjamin that her bother would not be changed and would be released. Carla then agreed to sign a statement saying that she heard Gibson discuss robbing Benjamin, even though it was false because she was afraid that she would be charged if she didn't and because the Officer promised to release her brother Eric Johnson and not charge him with murder.

**ANSWER:** Upon information and belief, Defendant Byrne admits that Carla Smith agreed to sign a statement that she heard Plaintiff discuss robbing Benjamin. Defendant Byrne denies the remaining allegations contained in this paragraph.

63. Moser then interrogated Janice while O'Mara, Collins, McCann and Caesar were present. Janice also initially said that that her brother was home asleep at the time of the murders. Moser then told Janice that Carla has said that both she and Janice had heard Gibson discuss the Benjamin/Wash murders. Moser said that he was going to charge Janice with being part of the murders unless she said the same as Carla. He also promised Janice that if she signed a statement then would not be changed and would be released. Janice then agreed to sign a statement saying that she heard Gibson discuss robbing Benjamin, even though it was false because she was afraid that she would be charged if she didn't and because the Officer promised to release her brother Eric Johnson and not charge him with murder.

**ANSWER:** Upon information and belief, Defendant Byrne admits that Janice Johnson agreed to sign a statement that she had heard Plaintiff discuss robbing Benjamin. Defendant Byrne denies the remaining allegations contained in this paragraph.

64. Just prior to getting false written statements from Carla and Janice, Officer Moser, with Collins, O'Mara, McCann and Caesar, told Fernando Webb that if he agreed to state that he saw James Gibson holding a gun outside of the garage where Benjamin and Wash were murdered, he would not be charged with the murders, and he would be released from custody without being charged. Webb, who was the actual murders [sic] of Benjamin and Wash, of course agreed to this deal, and signed a statement saying he saw Gibson standing outside of the garage holding a gun.

**ANSWER:** Upon information and belief, Defendant Byrne admits that Webb signed a statement that he had observed Plaintiff standing outside of Wash's garage while holding a gun. Defendant Byrne denies the remaining allegations contained in this paragraph.

65. Amazingly, even though Fernando Webb, a heroin addict with a long criminal record of violent and gun crimes, including armed robbery, had just made a statement putting him at the scene of the Benjamin/Wash murders at the time of the murders, the Defendant Officers released Webb without any charges. Further, and unbelievably, the Defendant Officers chose to charge Gibson and Johnson with a capital offense rather than take the time and effort to investigate to see if there was any physical evidence against Webb, such as to search his home to see if the murder weapon was there, or to take a gunshot residue test to see if he had fired a gun recently. Shortly after his release Webb committed, and was charged, with yet another armed robbery.

**ANSWER:** Upon information and belief, Defendant Byrne admits that Webb was not criminally charged for the Benjamin/Wash murders. Defendant Byrne denied that he "chose to charge" Plaintiff and Johnson with any crime as the Assistant State's Attorney approved felony charges. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

66. In addition to the forgoing, the fact that Gibson was not identified in any of the three (3) lineups at Area 3 was hidden by Officers O'Mara, Collins, Maslanka, Paladino and McCann, and was never put in any reports, and was concealed by the Defendant Officers and was never disclosed to Gibson at any time prior to his trial or during his appeals.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

67. Solely based false statements of Johnson, Webb, Carla and Janice, which were procured by torture, intimidation, lies and false promises, and by concealing the fact that Gibson had not been identified in any of the lineups, Gibson was charged with the murders of Benjamin and Wash along with Keith Johnson.

**ANSWER:** Defendant Byrne admits that Plaintiff and Johnson were charged with the Benjamin/Wash murders. Defendant Byrne denies the remaining allegations contained in this paragraph.

### The Trial And Continued Conspiracy

68. When Gibson was to be first brought before a judge at his bond hearing, within a day of being charged, he was assigned a Public Defender for the bond hearing. When the public defender spoke to him in the holding cell outside of the bond court Gibson immediately told the public defender that he had been beaten by the police. The public defender documented Gibson's statement that he had been beaten by the police this in his notes.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

69. When Gibson was called before the bond court judge, the Hon. Judge Robert Bastone, he told Judge Bastone that he had been beaten by the police. Judge Bastone asked the public defender

what police station Gibson had been at, and when he was told it was Area 3, Judge Bastone instructed the public defender to call an investigator and to have photographs taken to document the injuries to Gibson.

**ANSWER:**   Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

**70.**    The public defender ordered an investigator to photograph Gibson. Judge Bastone entered an Order that stated "It is hereby ordered that the Public Defenders investigator be allowed to photograph James Gibson". After a short while the public defender came into the judge's chambers with an investigator who had a camera. The bailiff helped Gibson take his shirt off, and the public defenders investigator took pictures of Gibson. Four color Polaroid photographs were taken of James Gibson's chest and ribcage area. These photographs bear the name of the investigator who took them ("Inv. Martorana"), Judge Bastone's name, the date they were taken, and the notations "Right Chest Swollen" "Left Chest Swollen", and the name of the subject "James Gibson. These pictures show bruises and swelling on Gibson's body which are consistent with Gibson's allegations of being punched in the chest by the police.

**ANSWER:**   Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

**71.**    The public defenders notes from the bond hearing state in the bottom right hand corner, "Took photos of Δ – said he was severely beaten by police. See Gus". Gibson was then sent to

Cermak Hospital in the Cook County Jail. On January 3, 1991 at 5:00 a.m., Gibson arrived at the Cermak Hosptial emergency room. Gibson complained to the emergency room at Cermak of pain caused because he was "hit by police". The physical findings on the emergency room record state "no apparent distress, no apparent trauma L chest wall". However, the Patient Admission form for Gibson from Cermak later on January 3, 1990 states in the physical assessment part states that Gibson has "bruises on left ribs". The Mental Status Assessment says that Gibson "states he was beaten up".

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

72. Gibson's was indicted and he his case was assigned to Judge Richard Neville. Paul Stralka of the Cook County Public Defender's Office was appointed as Gibson's attorney. Gibson's co-defendant was Eric Johnson, who Gibson knew as Keith Smith. The matter was continued from time to time, and Gibson's attorney filed a Motion To Quash Arrest And Suppress Evidence. Gibson also filed his own *pro se* "Supplemental Motion to Quash Arrest And Suppress Evidence". The public defenders Motion To Quash is a form motion based on the allegation of an arrest without probable cause. Gibson *pro se* Supplemental Motion alleged that Eric Johnson's sisters were coerced by the police into giving statements with false promises that the statements would help their brother, that Gibson was in three (3) lineups that witnesses failed to identify him. Gibson attached to his *pro se* Supplemental Motion a written statement of Eric Johnson which stated that he was beaten repeatedly by Detectives O'Mara and Collins who forced him to sign an untrue statement implicating James Gibson in the murders of Lloyd Benjamin and Hunter Walsh. Co-

Defendant Eric Johnson, who had signed a written confession to being involved in the murders of Benjamin and Walsh as a lookout for Gibson, filed a Motion To Quash and Suppress the statement based on his allegation that he was physically coerced and beaten into signing the statement. Both motions went to hearing on February 14, 1991.

**ANSWER:** Defendant Byrne admits, upon information and belief, that there was a motion hearing as it relates to Johnson's criminal proceeding. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**73.** During the part of the hearing on Gibson's Motion To Quash and Suppress and Gibson's Supplemental Motion To Quash and Suppress, the Assistant State Attorney made the following statement when arguing about whether Gibson's motion was really even necessary:

"The fact of the matter is that no evidence was obtained as a result of arresting him.

**There were no statements, no line-ups, no physical evidence found by the defendant, or off this person which your honor could possibly suppress. There is nothing to suppress**."

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

**74.** Judge Neville denied Gibson's motion to suppress stating:

"And thirdly, **it does not appear from what the state's position is that there is nothing to suppress in any event**.

36

**The motion to quash, if it's granted, or if it were to be granted, will not in some way affect Mr. Gibson's case as to the evidence that comes against him because if he made statements to the police on prior investigations before he was under arrest, it's not affected. And if in fact there there's no line-up and no statements, there's nothing to suppress to begin with.**

**And therefore, I think, for all three of those reasons, the motion is not well founded."**

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

**75.** After Gibon's Motion and Supplemental Motion were denied, the trial court proceeded to hear the co-defendant Eric Johnson's Motion to Quash And Suppress, based on the physical coercion of his written confession. At the hearing, the State called Assistant States Attorney Richard Correa, Defendant Officer William Moser (who also testified regarding Gibson's Motion), Defendant Officer John Paladino (who later took the 5th when questioned about his role in abusing Johnson and Gibson), Assistant States Attorney Linda Peters, and Eric Johnson. Johnson's motion was also denied. The cases then proceeded forward and were set for trial. Co- Defendant Eric Johnson was convicted by a jury of first degree murder on January 21, 1992.

**ANSWER:** Defendant Byrne admits that there was a motion hearing as it relates to Johnson's criminal proceeding. Defendant Byrne denies the remaining allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash

homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

76. Gibson's bench trial commenced on October 7, 1991, ten (10) months prior to Johnson's jury trial, on October 7, 1991. The trial was not finished on the first day, and was continued to, and finished on, October 8, 1991. At Gibson's trial the following people testified: William Benjamin, Rosa Wash, Leon Coley, Curtis Garmon, Carla Smith, Janice Johnson, Mark Grohevena, Fernando Webb, and Officer William Moser. Moser was the only witness who testified on October 8, 1991.

**ANSWER:** Upon information and belief, Defendant Byrne admits that Plaintiff's criminal trial occurred in October 1991 and testimony and other evidence was presented. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

77. During Moser's testimony on October 8, 1991, the State asked him about an alleged conversation he had with Gibson. At this point Gibson's public defender Stralka objected and made a "motion in limine" to exclude the statement on hearsay grounds. Stralka did **not** object on the grounds, or bring up the fact, that the statement was the product of torture and coercion.

**ANSWER:** Defendant Byrne denies torturing or coercing Johnson or Plaintiff and, as a result, denies the allegations contained in this paragraph.

78. Moser testified that Gibson had stated he was standing outside the garage where Benjamin and Wash were murdered and that Gibson had further stated that two months earlier had heard Fernando Webb and Eric Johnson plan the robbery. Not only was this testimony not an accurate

description of the statement that Gibson had been tortured into giving, Defendant Officer Moser failed to inform the court that he and his fellow Defendant Officers had tortured Gibson into making the statement that he had made. In allowing Moser's testimony regarding Gibson's alleged statement into evidence Judge Neville stated:

> "Well I think, first of all, it is an admission as I stated before about being at the scene of the incident and also about knowing about it prior to it occurring and being there when it happens. Whatever inferences everybody is going to argue from that is a matter for the parties at trial. Whether it is an admission against interests or an admission against penal interests, I think it has to be determined on the basis of all the evidence in the record, but I think there is a sufficient showing at this point for it to be allowed, which I am going to do. I am overruling the motion in limine and the objection of the defense."

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

**79.** At the end of the trial on October 8, 1991, the Judge Neville found the Defendant guilty of murdering Benjamin and Wash. In finding the Gibson guilty the Judge Neville emphasized the importance of the statement that Moser testified that Gibson had given after having been beaten, kicked, and tortured by the Defendant Officers. Moser also failed to inform the Court that he and the Defendant Officers had threatened and lied to Carla Smith and Janice Johnson in order to get them to give false statements, nor did he inform the Court that the Defendant Officers had told Fernando Webb that if he signed a statement he would not be charged with the Benjamin/Wash

murders and that he would be released. Judge Neville stated:

> "Then I have a question of what to do with the statement of Mr. Gibson. I think at this point it is clear that there is an admission l and I believe that this becomes more than just an admission to being in the location based on a couple of other things that I think that corroborates. There is no doubt at this point that Mr. Gibson said he was there when this incident happens, and there is no doubt that Mr. Gibson says he sees a gun. He just has the gun in the hands of two other people.
>
> I think that the statement of the state's attorney in closing argument that it doesn't make much sense that once they are at the garage and this robbery is about to take place that the gun would be passing hands right at that point. That is, however, a minor matter. Basically, Mr. Gibson puts himself there and says other people did it. He does not explain why, if he knew about this being, planned for some months before and in fact, he knew that the robbery was going to take place, why is he there to begin with. Apparently, the officers didn't ask, and Mr. Gibson didn't decide to indicate that. I find it pretty remarkable that it would be happenstance that he would show up at the garage two months or -- Let's not even say two months –whatever time after he knew that a robbery was going to take place, he would be there right at the exact time that this happened.
>
> This is a horrible case for a number of reasons. You have two people who are not doing anything other than conducting a small conducting small business for themselves, and they are both shot in the head. Apparently, at relatively close-range for Mr. Benjamin and probably wasn't too far away for Mr. Wash either. It is a case with tremendous ramifications for all of the parties involved. It is not a case to be

taken lightly. I have thought long and hard after I heard the evidence yesterday about what the state has. **I think that the statement from Mr. Gibson is of extreme importance in my finding** as it corroborates the testimony of both the sisters and Fernando Webb and more than just some slight details. I find that Carla and Janice Webb are credible witnesses regarding their testimony that Mr. Gibson was in their house and had made those statements. I find that Fernando Webb is credible to the extent that he puts Mr. Gibson, and corroborates Mr. Gibson's own statement at the garage with the gun at the time. I think that that testimony and that evidence coupled with Mr. Gibson's knowledge of the robbery and being at the location in his own words are sufficient to prove Mr. Gibson guilty of this crime for both murders beyond a reasonable doubt, and I find him guilty."

**ANSWER:** Upon information and belief, Defendant Byrne admits that Plaintiff was found guilty following a trial. Defendant Byrne denies beating, kicking, or torturing Plaintiff. Defendant Byrne denies threatening or lying to Carla Smith or Janice Johnson in order to have the witnesses give false statements. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**80.** Gibson was sentenced to natural life in prison. He timely appealed from the verdict, judgment and sentence. His conviction was affirmed by the appellate court. Gibson was also denied leave to appeal to the Illinois Supreme Court, as well as certiorari to the U.S. Supreme Court. Gibson then filed several post-conviction petitions and a Habeas Corpus petition, all of which were denied.

41

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

81. Then, in December of 2010, Gibson's co-defendant, Eric Johnson was granted a new trial based on the fact that he was tortured into making a confession to involvement into the murders of Lloyd Benjamin and Hunter Walsh. It was this confession that implicated Gibson and caused his second arrest. Prior to this confession Gibson had been released by police, and it was after this confession by Johnson that Gibson was re-arrested. Co-defendant Johnson did not have a re-trial, as he accepted an agreement for an *Alford* plea of guilty in exchange for a sentence of time served. In the *Alford* plea, the State agreed that even though co-defendant Johnson was pleading guilty, he was still maintaining his innocence. Co-defendant Johnson was then immediately released from prison.

**ANSWER:** Defendant Byrne admits that Johnson gave a statement implicating Plaintiff in the Benjamin/Wash murders. Defendant Byrne denies, upon information and belief, that Johnson's plea of guilty was an *Alford* plea. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

### The Illinois Torture Inquiry And Relief Commission Proceedings

82. The Illinois Torture Inquiry and Relief Commission Act, *775 ILCS 40/1 et seq.*, ("TIRC") was passed by the Illinois State Legislature, and became effective, on August 10 2009, and "establishes an extraordinary procedure to investigate and determine factual claims of torture

related to allegations of torture........." *775 ILCS 40/10* Under the TIRC Act, a claim of torture is defined as "a claim on behalf of a living person convicted of a felony in Illinois asserting that he was tortured into confessing to the crime for which the person was convicted and the tortured confession was used to obtain the conviction and for which there is some credible evidence related to allegations of torture committed by Commander Jon Burge or any officer under the supervision of Jon Burge." *775 ILCS 40/5* It took several years for the TIRC to be set up and funded, and it began taking complaints in 2011.

**ANSWER:**     Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

**83.**     On May 29, 2012, Gibson filed a claim with The Illinois Torture Inquiry and Relief Commission ("TIRC") stating that he had been convicted based on a statement which was the product of torture by police officers working under the command of Jon Burge.

**ANSWER:**     Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

**84.**     On July 22, 2015, TIRC issued it's Case Disposition on Gibson's complaint, which found that:

> "Pursuant to 775 ILCS 40/45(c), and 2 Ill. Adm. Code §§ 3500.385(b) and 3500.386, the Commission ("TIRC") concludes that, by a preponderance of the evidence, there is sufficient credible evidence of torture to merit judicial review."

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

### The Hearing in the Circuit Court and Appeals

**85.** The case was then sent to the Circuit Court of Cook County for judicial review, and was eventually assigned to Judge Neera Wash, who heard six (6) days of testimony between March 8, 2016 and July 12, 2016. Gibson submitted forty-six (46) exhibits of over nine hundred and fifty (950) pages in support of his case. Gibson also presented the expert testimony of Doctor Michael Wolfson Kaufman, a forensic pathologist, who examined the Polaroid photos of Gibson taken in Judge Bastone's courtroom, as well as the medical records from Cermak Hospital and Cook County Jail. Doctor Kaufman testified that based on his examination of the pictures and medical records he was able to render an opinion within a reasonable degree of certainty in the field of forensic and anatomical pathology, that the findings were, "consistent with Mr. Gibson's allegations of being punched in the chest bilaterally".

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

**86.** Gibson also called Officers Byrne and Paladino to testify. Both Byrne and Paladino invoked their Fifth Amendment right to remain silent and refused to answer any questions in regard to their involvement in the Benjamin and Wash murder investigation. When asked if they had either participated in or observed James Gibson or Eric Johnson being beaten, punched, kicked, burnt or

otherwise physically abused or coerced during their interrogations of Gibson or Johnson, Byrne and Paladino invoked their Fifth Amendment right to remain silent.

**ANSWER:** Defendant Byrne denies he engaged in any misconduct during the investigation into the Benjamin/Wash homicides and denies he engaged in any misconduct during any interaction with Plaintiff, Eric Johnson, or any of the witnesses interviewed relating to the Benjamin/Wash homicides. Defendant Byrne admits the existence of a transcript for Plaintiff's post-conviction hearing and refers to that transcript for its content: Defendant Byrne denies any allegations inconsistent with that transcript. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

87.    Carla Smith was then called by Gibson to testify. She stated that she was Eric Johnson's sister. Smith indicated that on December 31, 1989 she was taken to the police station where her brother, Eric Johnson, and James Gibson were in custody for murder. She was told by the detectives investigating the murder that her brother would be released if she made a statement. She went on to testify that the detectives wrote down a different version of facts than what she had verbally told them. Smith indicated that she continued to tell the detectives that what they wrote down was not what she had said happened. Eventually, Smith signed the paper that the detectives had drafted. She went on to testify that she never heard Defendant say that he was going to rob the insurance man. Smith testified that she never saw Defendant show her brother a gun. She stated that she signed the statement that the detectives had drafted because the police told her to sign it and if she did, that they would release her brother. (R. 131).

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide

investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

88.     Eric Johnson a/k/a Keith Smith was called to testify by Gibson.  He testified in great detail how he had been tortured by Maslanka, Paladino, McCann, Byrne, and others into signing a false confession. He said that everything in his confession was false and the product of torture. He testified that neither he nor Gibson had anything to do with the murders of Benjamin and Wash.

**ANSWER:**    Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

89.     In addition to Byrne and Paladino, Defendant Officers Moser, Leja, Caesar, and Rusnak, testified.  Officers Moser, Leja, Caesar, and Rusnak testified that they had no independent recollection of what occurred back December 1989 in the interrogation of Gibson or Johnson. However, Caesar testified that he never even encountered James Gibson at Area 3 even though Officer Moser testified at the trial that Caesar and McCann were present when Gibson gave his statement. Further, Moser, Leja, Caesar, and Rusnak all testified that they had no knowledge of any abuse of suspects or witnesses by anyone working under John Burge.

**ANSWER:**    Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

90.     After the close of evidence and after the parties argued, on July 29, 2016, the Judge Neera Walsh made a written ruling as to the TIRC evidentiary hearing, which is incorporated in the

Common Law Record. In her ruling, the Court found defendant did not show by a preponderance of the evidence that his confession was coerced by police torture, and he was denied any relief by the Court.

**ANSWER:**    Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

**91.**    Gibson appealed and Judge Walsh's ruling denying him relief, and on March 22, 2018, the Illinois Appellate Court reversed Judge Walsh's ruling denying Gibson any relief, and remanded Gibson's case back to Judge Walsh. _People v. James Gibson_ *2018 IL App (1st) 162177*. The Appellate Court instructed Judge Walsh to take a negative inference from Byrne and Paladino's invocation of their 5th Amendment privilege, holding that her failure to do so was error:

> "While an adverse inference is permissive rather than mandatory, we think it can be error not to draw one when there is no credible reason for refusing to do so. And here, certain of defendant's allegations against Paladino were not rebutted by any of the detectives' testimony, or by any other evidence in the record. Those allegations were also corroborated-not proven, but corroborated-by defendant's immediate complaint to the Chicago Police Department's Office of Professional Standards and by contemporaneous documentation of his injuries, which, a forensic pathologist testified, were consistent with his allegations that Paladino and other officers repeatedly punched and kicked him in the chest.

**ANSWER:**    Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide

investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

92.     The Appellate Court also commented on Judge Walsh's ruling, stating that she was incorrect in her analysis of the evidence and testimony. The Appellate Court stated:

> "But a closer look at the pretrial proceedings demonstrates that defendant's claims have far more merit than the trial court credited."

> and

> "But we can go no further in crediting the circuit court's findings on the evidence. While there is no question that the details of defendant's testimony varied, there is likewise no question that the core allegations have remained the same: a group of detectives, including Paladino and Maslanka, repeatedly slapped, punched, and kicked him, primarily in his chest."

**ANSWER:**     Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

93.     On remand neither the State nor Gibson submitted any additional evidence or testimony and rested on the record and the Appellate Court's Opinion. Then, on August 27, 2018, Judge Walsh issued her second written Order denying Gibson any relief based on the TIRC Case Disposition. Gibson appealed this second ruling, and on March 13, 2019, the Illinois Appellate Court issued an Order which again reversed Judge Walsh's denial of relief to Gibson in _People v. James Gibson_ 2019 IL App (1st) 182040-U.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

94. In this Order the Appellate Court not only reversed Judge Walsh, but they also ordered that Gibson's conviction for the murders of Benjamin and Walsh be vacated, that Gibson be given a new trial where his statement to the Defendant Officers could not be used because it was the product of police torture, and that the retrial be heard by a judge other than Judge Walsh. In this Order the Appellate Court made the following findings:

> We will not indulge any more speculation, either from the circuit court or the State.
>
> There is not a shred of evidence that defendant was injured in a holding cell, at his own hands, or in any other way except one: **Burge's subordinates beat him during his interrogation**. (emphasis added)
>
> The circuit court did not cast any legitimate doubts on the evidence pointing to that conclusion. That was partly because its ostensible "doubts" were often sheer speculation, lacking any basis at all in the record. And partly because it looked at each piece of documentary evidence in isolation. It failed to probe, in any meaningful way, how that evidence all fit together, how each piece lent further corroboration to the others. When viewing the evidence as a whole, it is exceedingly difficult, if not impossible, to explain it all" away as the paper trail of a (fairly elaborate, if soon abandoned) ruse. **Defendant's immediate outcry, and the substantial body of documentary evidence it generated, is compelling evidence that he was punched and kicked in the chest during his interrogation**.

(emphasis added)

When we consider all of the evidence and circumstances favoring defendant's claim, including a properly drawn adverse inference, **we can only conclude that defendant has made a strong case that he was beaten during his custodial interrogation at Area 3**. (emphasis added)

**Defendant's incriminating statement proved to be the decisive evidence against him, the lynchpin of his conviction in the eyes of the trial judge**. That fact adds injury to insult as it were, undermining confidence in the result of defendant's trial, as well as offending some of our most basic constitutional norms governing' the conduct of the police and the integrity of the criminal trial process. But the affront to those norms would have entitled defendant to relief anyway, as "the use of a defendant's physically coerced confession as substantive evidence of his guilt can never be harmless error."

In sum, defendant is entitled to a new trial, at which his incriminating statement to the Area 3 detectives, **the product of police torture**, may not be introduced as substantive evidence of his guilt. (emphasis added)

**ANSWER:**   Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

## Gibson's Exoneration

**95.**   The case was then remanded to the Circuit Court of Cook County. On April 4, 2019, Presiding Judge Leroy Martin, Jr., entered an Order vacating Gibson's conviction for the murders

of Benjamin and Wash. The case was then assigned to Judge Hooks for trial. The State made a motion for a substitution of judges as a matter of right, and the case was then re-assigned to Judge Alfredo Maldonado for trial. Gibson demanded trial and made a motion to be released on bond while the case was pending, and on April 18, 2019 Judge Maldonado released Gibson on a $20,000 "D" bond, requiring him to post $2000 in bail, which he posted, releasing Gibson from custody for the first time since December 30, 1989.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

**96.** Then on April 26, 2019, the State made a motion *nolle prosequi* to dismiss all charges against James Gibson, which was granted. All charges for the murders of Lloyd Benjamin and Hunter Wash were dismissed against James Gibson on April 26, 2019.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.

**City of Chicago's *De Facto* Policy of Police Torture by Officers Working Under Jon Burge**

**97.** It is well established that during the time period of 1973 to 2006, crime suspects brought to Areas Two (2) and Three (3) of the Chicago Police Department were routinely subject to mental, physical and psychological coercion under Chicago Police Commander Jon Burge and his detectives and that this torture was systematic. ***People v. Wrice, 406 Ill. App. 3d 43, (1st Dist. 2010)*** (Court found widespread, systematic torture of prisoners at Area 2.)**; *People v. Whirl, 2015***

51

*Il App (1ˢᵗ) 111483,* (pervasive evidence that Burge and many of the officers working under him regularly engaged in physical abuse and torture of suspects.)**;** ***People v. Tyler, 2015 Il App (1ˢᵗ) 123470,*** (Court cited appellate decisions, affidavits, complaints, citing instances of torture by Detective William Moser)**;** ***Cannon v. Burge, 2006 U.S. Dist. Lexis 4040, 2006 WL 273544, (N.D. Ill., 2006)*** (Court references OPS report stating John Byrne racially abused and tortured the plaintiff in that case.)**;** ***Cannon v. Burge, 2011 U.S. Dist. Lexis 105715, WL 4361529, (N.D. Ill. 2011)*** (Court finds Special State's Attorney's Report on torture by Burge and offices under his command 'offensive, unacceptable, and systematic.')**;** ***Hinton v. Uchtman, 395 F.3d 810, 822 (7th Cir. 2005)*** (Court found torture under the command of Burge had been a regular part of the system for more than ten years)**;** ***United States ex rel. Maxwell v. Gilmore, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999)*** (Court found "It is now common knowledge that in the early to mid-1980's Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture to extract confessions.")

**ANSWER:**   Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or to Defendant Byrne's conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution.  Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

**98.**   Some of these cases specifically name detectives who were responsible for interviewing

James Gibson. *People v. Tyler*, *2015 Il App (1st) 123470* (torture at the hands of *Detective William Moser*); *People v. Wrice, 406 Ill. App. 3d 43, (1st Dist. 2010)*, (torture at the hands of *Sergeant John Byrne*); *Cannon v. Burge, 2006 U.S. Dist. Lexis 4040, (N.D. Ill. 2006)* (torture at the hands of *Sergeant John Byrne*); *Wiggins v. Burge, 173 F.R.D. 226, (N.D. Ill. 1997)* (references torture at the hand of *Detective Anthony Maslanka* and *Sergeant John Byrne*). *Report of the Special State's Attorney, Edward J. Egan, June 20, 2006, page 290* (recommends the indictment and prosecution of *Detective Athony Maslanka* for aggravated battery for torturing a defendant in custody to obtain a false confession.) Further, in Gibson's case Jon Burge himself was in command of the officers accused of torture in this case, and was present at the station when the torture was occurring, and Mr. Gibson's sister actually spoke to him.

**ANSWER:** Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

**99.** The torture of crime suspects by Burge and his detectives was so pervasive and consistent that two (2) official investigations were conducted, and reports were generated on the topic. First, was the Sanders-Goldston Report followed by the Special State's Attorney's Report.

**ANSWER:** Defendant Byrne denies all wrongdoing as it relates to his conduct during the

Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

100.    The Special State's Attorney's Report was generated by Special State's Attorney Appellate Court Justice Edward J. Egan (Ret.). The report's topic was the depth of the torture claims posited by crime suspects interrogated at Chicago Police Department Area Two (2) and Three (3) police stations by Jon Burge and his detectives. In the report, Justice Egan concluded, "we have sufficient evidence to present to a grand jury and seek the indictment of Detective Anthony Maslanka and McDermott for aggravated battery, perjury, and obstruction of justice." *Report of the Special State's Attorney, Edward J. Egan, June 20, 2006, page 290.* Detective Maslanka is one of the officers in the instant case who tortured Gibson.

ANSWER:    Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

**101.** The Sanders-Goldston Report was the result of an investigation by Francine Sanders and Michael Goldston, both investigators for the Chicago Police Department, Office of Professional Standards. The aim of this report was to "determine if there was systematic abuse at Area 2 during that period, and if so, to determine culpability, if any, of Area 2 Command Personnel." ***Sanders-Goldston Special Project Conclusion Reports (The Burge Investigation)***, November 2, 1990. The report states:

> "In the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic. The time span involved covers more than ten years. The abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture. The evidence presented by some individuals convinced juries and appellate courts that personnel assigned to Area 2 engaged in methodical abuse." **Id.** at 6.

**ANSWER:** Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

102.     In addition to the case law and reports listed above, the systematic torture by Burge and his detectives has been recognized as fact by the City of Chicago in an Ordinance and a Resolution. These documents, in relevant part, state the following:

> "WHEREAS, the City of Chicago acknowledges that former Chicago Police Commander Jon Burge and detectives under his command systematically engaged in acts of torture, physical abuse and coercion of African American men and women at Area 2 and 3 Police Headquarters from 1972 through 1991…." ***City of Chicago Reperations Ordinance: Reparations for the Chicago Police Torture Survivors, 2015.***

> "BE IT RESOLVED, That we, the Mayor and Members of the City Counsel of the City of Chicago, on behalf of all Chicagoans – (1) acknowledge and condemn, as evil and reprehensible, any and all acts of torture and abuse inflicted upon the Burge victims…" ***City of Chicago Resolution, 2015.***

**ANSWER:**    Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution.  Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

103.     Burge and the officers working under supervision, his "Midnight Crew" or "A Team" ("A"

for Ass Kicking), were allowed to develop and continue their practice of torturing suspects into false confessions because the City of Chicago, as a matter of policy and practice, had a disciplinary systems for its police officers which, according to the 2017 Justice Department Report, failed to investigate reports of violence and coercion against suspects and witnesses. In the rare instances when investigations were conducted, the questioning of officers is aimed at eliciting information favorable to the officer, and investigators do not confront officers with inconsistent physical evidence. From prior to the time of Gibson's torture, through at least 2017, the Chicago Police Department disciplinary system was geared toward clearing officers of charges of misconduct rather than disciplining misconduct.

**ANSWER:** Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

104.    At the time of the Gibson's arrest and subsequent trial, the Mayor of the City of Chicago was Richard M. Daley and the Superintendent of Police was LeRoy Martin Sr. These policy makers, and those in policy making positions under them, allowed this practice of torture and coercion by Burge and those under his supervision to continue unabated by knowingly allowing this inadequate disciplinary system to stay in place despite the fact that it violated the constitutional

rights of the accused. As a result of this, to date, other than Jon Burge, no Chicago police officer who has tortured and coerced suspects and witnesses into making false confessions and statements has been disciplined or prosecuted even though there have been dozens of exonerations of people who have served long prison sentences for crimes they did not commit because of coerced confessions and statements. Jon Burge was not prosecuted until 2010, long after Gibson had been victimized by Burge and his "Midnight Crew".

**ANSWER:** Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

**105.** This resulted in a *de facto* policy in the City of Chicago of allowing police officers in general, and the Defendant Officers in particular, to believe they were immune from discipline and prosecution if they "solved" crimes by torturing suspects into false confessions and statements, and intimidated and coerced witnesses into making false statements to corroborate the false confessions. Because of this *de facto* policy the Defendant Officers "solved" cases for which they had no evidence of who committed the crime, by torturing suspects into false confessions and statements.

**ANSWER:** Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

106. This *de facto* policy and practice was implemented in Gibson's case in that even though Gibson made a complaint within hours of being tortured, the only investigation was done was to take the accused officers written denials, after which all the officers were cleared of any wrongdoing.

**ANSWER:** Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

107. The Mayor of the City of Chicago, Rahm Emanuel, stated in a speech to the City Council

on December 9, 2015, that a blue wall of silence existed and had existed for some time, which allowed Chicago police officers to violate the rights of citizens with impunity and without fear of discipline or prosecution.

**ANSWER:** Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

108. Information regarding the *de facto* policy of immunity for police officers was hidden and suppressed by the City of Chicago, such as the September 1990 report of Office of Professional Standards ("OPS") investigator Michael Goldston. This "Goldston Report" concluded that there was a "systematic" and methodical" pattern and practice of abuse and torture of suspects by Chicago Police officers since at least 1980 and continuing through the date of the report. This report was suppressed and kept secret by Superintendent Martin until it was unsealed, over Superintendent Martin's objection, in 1992. During the time that the Goldston Report was being suppressed, which was during the time when Gibson was being prosecuted based on a statement made under torture, nothing was done by then Mayor Daley or then Superintendent Martin to discipline the officers who were the subject of the report.

**ANSWER:** Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

**109.** Also, in 1987 Chief Administrator of OPS, David Fogel, issued a memo that admitted that the disciplinary system of the Chicago Police Department was a farce, and that it immunizes the police from discipline and institutionalized lying. This memo was also kept secret and suppressed by Superintendent of Police.

**ANSWER:** Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

**110.** This suppression of information about torture by police officers, including the Defendant

Officers, and reinforced to the Defendant Officers that they were immune from discipline and accountability for torturing suspects.

**ANSWER:** Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

### Effects on James Gibson

**111.** James Gibson was deprived of the enjoyment of thirty (30) years of his life. He was locked up in jail and prison from December 31, 1989 through April 18, 2019, (twenty-nine (29) years and four (4) months), from ages 23 to 53.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**112.** James Gibson has spent virtually his entire adult life living in a tiny cold cell under the tightest security imaginable and all of the indignities/inhumanity that entails, all under the specter of an unjust life sentence for a crime he did not commit. When he was arrested Gibson had two (2) children, a son and a daughter. He was in prison when his mother and his son died, and he was

not able to go to their funerals or visit their graves. He was deprived of being able to raise his children, to have the pleasure of being with them, or to have contact with his grandchildren and enjoy their company.

**ANSWER:**   Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, denies Plaintiff did not commit the crime for which he was imprisoned, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**113.**   Gibson suffers from post-traumatic stress disorder, and has been psychologically damaged so badly that while he can be treated, he will never be cured. Gibson, who is heterosexual, was deprived of having a sexual relationship with a woman. He was deprived of the opportunity to have a wife or female companion to share his life with. He was unable to enjoy having a job, a career, or to do any of the normal or things that are taken for granted by people not in a maximum security prison. He could not use the toilet in private, take a bath, or eat and drink what he wanted to. He had to endure eating food that was of substandard quality, or even having a drink of cold water. He had to sleep on a thin filthy mattress than less than two inches thick, with no sheets and a dirty blanket. He suffered the indignity of having to ask permission to make a telephone call, go outside, or choose his own bedtime or time to wake up.

**ANSWER:**   Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**114.**   Before his arrest at age 23 in the manner described above in this Complaint, Gibson had

no criminal record other than a conviction for which he was sentenced to two days in jail. The Defendants framed him for a double murder knowing that he did not commit it. As a result of being railroaded in this manner, and then being deprived unjustly of exculpatory materials, Mr. Gibson has spent his entire adult life in prison, the majority of it in maximum security at the states toughest prisons. This treatment is extraordinarily unjust, and must be remedied in the only manner which it can be, by the payment of a very substantial sum of money.

**ANSWER:** Defendant Byrne denies, upon information and belief, that Plaintiff had no criminal record other than a conviction for which he was sentenced to two days in jail. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

### COUNT I
### (Coerced Confession – 42 U.S.C §1983)

**115.** Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph one-hundred-thirteen (113) of Count I of this Complaint. [sic]

**ANSWER:** Defendant Byrne incorporates all answers to all paragraphs of this Complaint as though fully set forth herein.

**116.** As more fully described above, Defendant Officers Collins, O'Mara, Malasanka, and Paladino beat, kicked, and tortured Gibson in order to get him to make his incriminating statement.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**117.** As more fully described above, Defendant Officers Defendant Officers Maslanka, Moser, Byrne, Caesar, Paladino, Leja, Rusnak, Breska, McCann, Collins, and O'Mara, held Gibson without probable cause for over 92 hours while not allowing him to sleep, eat or use the toilet, in order to coerce him into making an incriminating statement.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**118.** As more fully described above, Defendant Officers Defendant Officers Maslanka, Moser, Byrne, Caesar, Paladino, Leja, Rusnak, Breska, McCann, Collins, O'Mara and Burge withheld and concealed exculpatory evidence that would have shown that Gibson was innocent of murdering Benjamin and Wash.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**119.** As more fully described above, Defendant Officers Defendant Officers Maslanka, Moser, Byrne, Caesar, Paladino, Leja, Rusnak, Breska, McCann, Collins, O'Mara and Burge decided that, pursuant to the *de facto* policy of the City of Chicago Police Department, they would torture Gibson into making a confession or statement which they could use to convict him for the Benajmin/Wash murders even though there was absolutely no evidence that he had committed that crime.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide

investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

120.    As more fully described above, Defendant Officers Defendant Officers Maslanka, Moser, Byrne, Caesar, Paladino, Leja, Rusnak, Breska, McCann, Collins, and O'Mara believed that they could torture and coerce Gibson into making an incriminating statement, and conceal exculpatory evidence, they were immune from discipline and prosecution if they "solved" crimes by torturing suspects into false confessions and statements because of the de facto policy and practice of the Police Department of the City of Chicago of not disciplining officers for committing these offenses.

**ANSWER:**    Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

121.    As more fully described above, Defendant Officers Defendant Officers Maslanka, Moser, Byrne, Caesar, Paladino, Leja, Rusnak, Breska, McCann, Collins, and O'Mara violated the constitutional rights of Gibson.

**ANSWER:**    Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

122.    The forgoing misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Gibson and others.

**ANSWER:**    Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide

investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**123.**     As more fully described above the constitutional injuries complained-of herein were proximately caused by a pattern and practice of misconduct which occurred with Defendants Burge and Martin's knowledge and consent in their supervisory capacity, such that Burge and Martin personally knew about, facilitated, approved, and condoned this pattern and practice of misconduct, or else affirmatively turned a blind eye thereto without taking any steps to stop it.

**ANSWER:**     Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**124.**     In this way, Defendants Burge and Martin are personally responsible for the complained-of injuries because they knowingly, willfully, or at least recklessly caused the alleged deprivation by their action or by their deliberately indifferent failure to act. Independently, Defendant Burge is a supervisor who failed to stop misfeasor officers under his direction who had summarily tortured Plaintiff despite his knowledge of the same.

**ANSWER:**     Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**125.**     As more fully described above the forgoing violated Gibson's rights under the Constitution of the United States of America, including the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States of America.

**ANSWER:** Pursuant to the Court's ruling on the motions to dismiss (*Docket No. 116*), Plaintiffs' claims under the First, Fourth, Sixth, and Eighth Amendments have been dismissed. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

## COUNT II
### (Failure to Intervene – 42 U.S.C §1983)

**126.** Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph one-hundred-twenty-four (124) of Count II of this Complaint. [sic]

**ANSWER:** Defendant Byrne incorporates all answers to all paragraphs of this Complaint as though fully set forth herein.

**127.** In the manner described above, during the coercive interrogation of Gibson Defendants Officers Maslanka, Moser, Byrne, Caesar, Paladino, Leja, Rusnak, Breska, McCann, Collins, O'Mara, and Burge (and possibly other Chicago Police Officers) stood by without intervening to prevent the violence to which Plaintiff was subjected.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**128.** As more fully described above the Defendant Officers who had knowledge of the coercive interrogation and therefore had a reasonable opportunity to intervene included Defendants Maslanka, Moser, Byrne, Caesar, Paladino, Leja, Rusnak, Breska, McCann, Collins, O'Mara, Burge, all acting independently, jointly, and in conspiracy.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

129. As more fully described above, as a result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered wrongful imprisonment, deprivation of the enjoyment 30 years of his life, pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

130. As more fully described above, as a result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered wrongful imprisonment, deprivation of the enjoyment 30 years of his life, pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

131. As more fully described above the misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Gibson's constitutional rights.dd Gibson's rights under the Constitution of the United States of America, including the

First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States of America.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

132. As more fully described above the misconduct described in this Count was undertaken pursuant to Chicago's policy and practice in the manner described in preceding paragraphs.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

## COUNT III
### (Violation of Due Process – 42 U.S.C §1983)

133. Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph one-hundred-thirty-one (131) of Count III of this Complaint.

**ANSWER:** Defendant Byrne incorporates all answers to all paragraphs of this Complaint as though fully set forth herein.

134. As described more fully above, Defendant Officers Maslanka, Moser, Byrne, Caesar, Paladino, Leja, Rusnak, Breska, McCann, Collins, O'Mara, and Burge, all while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

**ANSWER:** Pursuant to the Court's ruling on the motions to dismiss (*Docket No. 116*), this claim is permitted to proceed only against identified defendant officers on specified theories of

liability. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**135.**    In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence, as well as fabricated false reports and other evidence, thereby misleading and misdirecting the state criminal prosecution of the Plaintiff. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

**ANSWER:**    Pursuant to the Court's ruling on the motions to dismiss (*Docket No. 116*), this claim is permitted to proceed only against identified defendant officers on specified theories of liability. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**136.**    The misconduct of the Defendant Officers also resulted in the  unjust criminal conviction of Plaintiff, thereby denying him his Constitutional right to a fair trial (and a fair appeal thereof) in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

**ANSWER:**    Pursuant to the Court's ruling on the motions to dismiss (*Docket No. 116*), this claim is permitted to proceed only against identified defendant officers on specified theories of liability. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the

remaining allegations contained in this paragraph.

**137.** As a result of the violation of his constitutional right to fair trial, Plaintiff suffered injuries, including but not limited to loss of freedom and emotional distress.

**ANSWER:** Pursuant to the Court's ruling on the motions to dismiss (*Docket No. 116*), this claim is permitted to proceed only against identified defendant officers on specified theories of liability. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**138.** The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

**ANSWER:** Pursuant to the Court's ruling on the motions to dismiss (*Docket No. 116*), this claim is permitted to proceed only against identified defendant officers on specified theories of liability. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**139.** The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

**ANSWER:** Pursuant to the Court's ruling on the motions to dismiss (*Docket No. 116*), this claim is permitted to proceed only against identified defendant officers on specified theories of liability. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide

investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**140.** Independently, the misconduct described in this Count is also attributable to Defendants Burge in his supervisory capacities as described more fully above.

**ANSWER:** Pursuant to the Court's ruling on the motions to dismiss (*Docket No. 116*), this claim is permitted to proceed only against identified defendant officers on specified theories of liability. Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**COUNT IV**
**(False Imprisonment – 42 U.S.C §1983)**

**141.** Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph one-hundred-thirty-nine (139) of Count IV of this Complaint. [sic]

**ANSWER:** Defendant Byrne incorporates all answers to all paragraphs of this Complaint as though fully set forth herein.

**142.** As described more fully above, Defendant Officers Maslanka, Moser, Byrne, Caesar, Paladino, Leja, Rusnak, Breska, McCann, Collins, O'Mara, and Burge all while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, caused Plaintiff to be falsely imprisoned in violation of his Constitutional rights.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**143.** As a result of this violation, Plaintiff suffered injuries, including but not limited to false imprisonment for thirty (30) years and emotional distress.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**144.** The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**145.** The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**146.** Independently, the misconduct described in this Count is also attributable to Defendant Burge in his supervisory capacities in the manner described more fully in the Counts alleging conspiracy.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide

investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

## COUNT V
## (Equal Protection – 42 U.S.C §1983)

**147.** Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph one-hundred-forty-five (145) of Count V of this Complaint. [sic]

**ANSWER:** Defendant Byrne incorporates all answers to all paragraphs of this Complaint as though fully set forth herein.

**148.** As described more fully above, Defendant Officers Maslanka, Moser, Byrne, Caesar, Paladino, Leja, Rusnak, Breska, McCann, Collins, O'Mara, and Burge, all while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, denied Plaintiff equal protection of the law in violation of his Constitutional rights.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**149.** Specifically, these Defendants actively participated in or personally caused misconduct in terms of torturing minority criminal suspects in a manner calculated to coerce confessions. Said misconduct was motivated by racial animus and constituted purposeful discrimination; it also affected minorities in a grossly disproportionate manner vis-avis similarly- situated Caucasian individuals.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the

remaining allegations contained in this paragraph.

150.     As a result of this violation, Plaintiff suffered injuries, including but not limited to wrongful imprisonment and emotional distress.

**ANSWER:**     Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

151.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

**ANSWER:**     Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

152.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

**ANSWER:**     Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

153.     Independently, the misconduct described in this Count is also attributable to Defendant Burge in his supervisory capacities as described more fully in the Counts alleging conspiracy.

**ANSWER:**     Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide

investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

## COUNT VI
### (Right to Counsel – 42 U.S.C §1983)

**Pursuant to the Court's ruling on the motions to dismiss (*Docket No. 116*), this claim has been dismissed so no answer is required. To the extent an answer is required to the allegations, Defendant Byrne denies the allegations in these paragraphs directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in these paragraphs.**

**154.**     Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph one-hundred-fifty-two (152) of Count VI of this Complaint. [sic]

**155.**     As described more fully above, Defendant Officers Maslanka, Moser, Byrne, Caesar, Paladino, Leja, Rusnak, Breska, McCann, Collins, O'Mara, and Burge, all while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, denied Plaintiff his right to counsel in violation of his Constitutional rights.

**156.**     This violation caused the confession on which his conviction was predicated, and this allegation therefore necessarily implies the invalidity of that conviction.

**157.**     As a result of this violation, Plaintiff suffered injuries, including but not limited to imprisonment and emotional distress.

**158.**     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

**159.**     The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

**160.**    Independently, the misconduct described in this Count is also attributable to Defendant Burge in their supervisory capacities as described more in the Counts alleging conspiracy.

**COUNT VII**
**(Conspiracy to Deprive Constitutional Rights – 42 U.S.C §1983)**

**161.**    Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph one-hundred-fifty-nine (159) of Count VII of this Complaint. [sic]

**ANSWER:**    Defendant Byrne incorporates all answers to all paragraphs of this Complaint as though fully set forth herein.

**162.**    Prior to date of the constitutional injuries suffered by Plaintiff in this case, it was agreed among the police officer Defendants, on the one hand, and the individuals who comprise the Office of Professional Standards on the other hand, that if any members of the Chicago Police Department were subsequently accused by citizens of wrongdoing, then the O.P.S. employees would actively endeavor to deem those citizen complaints unfounded or unsustained, even where police officers in fact violated citizens' rights.

**ANSWER:**    Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**163.**    The Agreement referenced in the preceding paragraph is the policy and practice of the Chicago Police Department, and was tacitly ratified by policy-makers for the City of Chicago with final policymaking authority.

**ANSWER:**    Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the

remaining allegations contained in this paragraph.

**164.**     As a direct and proximate result of the illicit prior Agreement referenced above, Plaintiff's rights were violated.

**ANSWER:**     Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**165.**     Specifically, Plaintiff was convicted based on a coerced confession as a direct result of the Agreement with O.P.S. employees to decline to sustain citizen complaints even where meritorious. Because of this Agreement, the Defendant Officers were encouraged to believe they could act with a sense of impunity and without fear of any repercussions, even where they purposefully violated the rights of the citizens they were supposed to protect. In this manner, the alleged Agreement proximately caused Plaintiff's injuries in this case.

**ANSWER:**     Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**166.**     Independently, after the murder at issue in Plaintiff's case, the Defendant Officers further conspired, and continue to conspire, to frame Plaintiff for this murder and to thereby deprive Plaintiff of his constitutional rights as described in the various Paragraphs of this Complaint.

**ANSWER:**     Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the

remaining allegations contained in this paragraph.

167.    Independently, before and after Plaintiff's conviction, each of the Defendants further conspired, and continue to conspire, to deprive Plaintiff of exculpatory materials to which he was lawfully entitled and which would have led to his exonerated of the false charges as described in the various Paragraphs of this Complaint.

**ANSWER:**    Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

168.    In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, including persons who are not members of the Chicago Police Department, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

**ANSWER:**    Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

169.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

**ANSWER:**    Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

170.    The misconduct described in this Count was undertaken with malice, willfulness, and

reckless indifference to the rights of others.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

171. As a proximate result of the conspiracy, Plaintiff suffered financial damage, as well as severe emotional distress and anguish.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

172. This conspiracy was undertaken for the additional purpose of punishing Plaintiff for exercising his First Amendment right to speak out about matters of public concern, namely, the police abuses described above.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

173. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully in preceding paragraphs.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the

remaining allegations contained in this paragraph.

## COUNT VIII
### (Conspiracy to Deprive Constitutional Rights – 42 U.S.C §1985(3))

**174.**   Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph one-hundred-seventy-two (172) of Count VIII of this Complaint. [sic]

**ANSWER:**   Defendant Byrne incorporates all answers to all paragraphs of this Complaint as though fully set forth herein.

**175.**   As described more fully above, each of the Defendants conspired, directly or indirectly, for the purpose of depriving Plaintiff of Equal Protection of the law.

**ANSWER:**   Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**176.**   In so doing, Defendants took actions in furtherance of this conspiracy, causing injury to Plaintiff.

**ANSWER:**   Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**177.**   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**   Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the

remaining allegations contained in this paragraph.

**178.** The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully in preceding paragraphs.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

## COUNT IX
### (Denial of Access to Courts – 42 U.S.C §1983)

**Pursuant to the Court's ruling on the motions to dismiss (*Docket No. 116*), this claim has been dismissed so no answer is required. To the extent an answer is required to the allegations, Defendant Byrne denies the allegations in these paragraphs directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in these paragraphs.**

**179.** Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph one-hundred-seventy-seven (177) of Count IX of this Complaint. [sic]

**180.** In the manner described more fully herein, each of the Defendants, all while acting individually, jointly, and in conspiracy, denied Plaintiff the right to access to courts by their wrongful suppression of information and evidence which deprived Plaintiff of certain constitutional claims against certain potential defendants.

**181.** Other claims were diminished by the passage of years and the accompanying erosion of evidence necessary to prove them.

**182.** The misconduct described in this Count was undertaken with malice, willfulness, and

reckless indifference to the rights of others.

**183.** The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully in preceding paragraphs.

## COUNT X
### (Monell Claim Against the City of Chicago – 42 U.S.C §1983)

**184.** Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph one-hundred-eighty-two (182) of Count X of this Complaint. [sic]

**ANSWER:** Defendant Byrne incorporates all answers to all paragraphs of this Complaint as though fully set forth herein.

**185.** As described more fully above beginning as early as the early 1980s, the City of Chicago was expressly on notice that Burge and some of the officers under his command in Area 2 and Area 3were torturing suspects during interrogations.

**ANSWER:** Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

**186.** As described more fully above throughout this time period, individual members of the Chicago Police Department, including Superintendent Martin had knowledge of the ongoing torture and abuse being used by Area 2 and Area 3 officers to extract coerced confessions.

**ANSWER:** Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

187.    As described more fully above the pattern of ignoring and thereby facilitating the abuse was so prevalent and widespread that it constituted the *de facto* policy and practice of the City of Chicago and the Chicago Police Department. Policymaking officials of the City of Chicago and the Chicago Police Department knew about it or should have, yet took no steps to remedy it such that the failure to do so was deliberately indifferent.

**ANSWER:** Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

188.     As described more fully above the lack of interest on the part of the City of Chicago and the Chicago Police Department dates all the way back to the early 1980s.

**ANSWER:**     Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution.  Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

189.     As described more fully above the acquiescence of the City of Chicago and the Chicago Police Department continues through the present. Specifically, the City of Chicago spent and spends millions of dollars to defend Burge and officers under his command and supervision at Areas 2 and Area 3 against civil suits and administrative proceedings involving torture allegations over a thirty (30) year period.

**ANSWER:**     Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution.  Defendant Byrne lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

190.    As described more fully above the City of Chicago continues to shield officers who were under Burges command and supervision from prosecution, and defend them in civil suits notwithstanding the crimes they committed against James Gibson. Other than Burge, none of the police officers engaged in this torture and abuse have ever been prosecuted.

ANSWER:    Defendant Byrne denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation as it relates to Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation. For all remaining allegations contained in this paragraph that are directed toward Defendant Byrne and go beyond Defendant Byrne's interaction with Plaintiff and Johnson or his conduct during the Benjamin/Wash homicide investigation, upon advice of counsel, Defendant Byrne invokes his rights guaranteed to him by the Fifth Amendment of the United States Constitution. Defendant Byrne lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph that are not directed toward Defendant Byrne.

## COUNT XI
### (Malicious Prosecution)

191.    Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph one-hundred-eighty-nine (189) of Count XI of this Complaint. [sic]

ANSWER:    Defendant Byrne incorporates all answers to all paragraphs of this Complaint as though fully set forth herein.

192.    As described more fully above plaintiff James Gibson was improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Plaintiff's

favor in a manner indicative of innocence.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

193. As described more fully above the Defendant Officers identified above accused Plaintiff of criminal activity knowing those accusations to be without probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

194. As described more fully above statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that the statements were false and perjured. In so doing, Defendant Officers fabricated evidence and withheld exculpatory information.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

195. As described more fully above the misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant

Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**196.** As described more fully above as a result of this misconduct, Plaintiff has suffered and continues to suffer injuries including wrongful imprisonment and pain and suffering.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

### COUNT XII
### (Civil Conspiracy)

**197.** Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph one-hundred-ninety-five (195) of Count XII of this Complaint. [sic]

**ANSWER:** Defendant Byrne incorporates all answers to all paragraphs of this Complaint as though fully set forth herein.

**198.** As described more fully in the preceding paragraphs, Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**199.** As described more fully in the preceding paragraphs, in furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**200.** As described more fully in the preceding paragraphs, the misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**201.** As a proximate result of Defendants' conspiracy, Plaintiff suffered damages, including wrongful imprisonment and severe emotional distress and anguish.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

## COUNT XIII
### (Intentional Infliction of Emotional Distress)

**202.** Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph two-hundred (200) of Count XIII of this Complaint. [sic]

**ANSWER:** Defendant Byrne incorporates all answers to all paragraphs of this Complaint as though fully set forth herein.

**203.** The acts and conduct of the Defendant Officers as set forth above were extreme and outrageous. The Defendants Officers intended to cause, or were in reckless disregard of the

probability that their conduct would cause, severe emotional distress to Plaintiff.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**204.** Said actions and conduct did directly and proximately cause severe emotional distress to Plaintiff and thereby constituted intentional infliction of emotional distress.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**205.** The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**206.** As a proximate result of Defendants' wrongful acts, Plaintiff suffered damages, including severe emotional distress and anguish.

**ANSWER:** Defendant Byrne denies the allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

## COUNT XIV
## (Respondeat Superior)

**207.** Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph two-hundred-five (205) of Count XIII of this Complaint. [sic]

**ANSWER:** Defendant Byrne incorporates all answers to all paragraphs of this Complaint as though fully set forth herein.

**208.** In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the City of Chicago, Chicago Police Department, acting at all relevant times within the scope of employment and under color of law.

**ANSWER:** Defendant Byrne admits that, during the relevant time, he acted within the scope of his employment with the City of Chicago. Defendant Byrne denies the remaining allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

**209.** Defendant City of Chicago is liable as principal for all torts committed by its agents.

**ANSWER:** Defendant Byrne denies this is a full or accurate statement of the law and, as such, denies the allegations contained in this paragraph.

## COUNT XV
## (Indemnification)

**210.** Plaintiff re-alleges paragraphs one (1) through one-hundred-twelve (112) of this Complaint as paragraph two-hundred-eight (208) of Count XV of this Complaint. [sic]

**ANSWER:** Defendant Byrne incorporates all answers to all paragraphs of this Complaint as though fully set forth herein.

**211.** Illinois law provides that public entities are directed to pay any tort judgment for

compensatory damages for which employees are liable within the scope of their employment activities.

**ANSWER:** Defendant Byrne denies this is a full or accurate statement of the law and, as such, denies the allegations contained in this paragraph.

**212.** The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

**ANSWER:** Defendant Byrne admits that he was an employee of the Chicago Police Department and acted within the scope of his employment during the relevant time. Defendant Byrne denies the remaining allegations in this paragraph directed at Defendant Byrne, denies all wrongdoing as it relates to his conduct during the Benjamin/Wash homicide investigation, and denies such conduct occurred in his presence and, therefore, denies the remaining allegations contained in this paragraph.

## AFFIRMATIVE DEFENSES

**1)** Defendant Byrne is not liable for the claims alleged under state law because a public employee is not liable for his or her acts or omissions in the execution or enforcement of any law unless such acts or omissions constitute willful and wanton conduct. 745 ILCS 10/2-202.

**2)** Under the Illinois Tort Immunity Act, Defendant Byrne is not liable under state law for any injury caused by the act or omission of another person. 745 ILCS 10/2-204.

**3)** Plaintiff's claims in the operating complaint are barred by the applicable statutes of limitations.

**4)** Plaintiff's claims in the operating complaint are barred by the doctrines of *res judicata* and collateral estoppel.

**5)** To the extent Plaintiff is asserting a federal malicious prosecution claim, such claim fails as a matter of law. *Manuel v. City of Joliet, Illinois*, 903 F.3d 667, 670 (7th Cir. 2018); *see also*

*Manuel v. City of Joliet,* 137 S. Ct. 911, 918-19 (2017).

**6)**     To the extent Plaintiff is asserting a due process fabrication of evidence claim based on allegedly fabricated evidence that was not admitted at trial, such claim fails as a matter of law. See *Avery v. City of Milwaukee*, 847 F.3d 433, 442 (7th Cir. 2017).

**7)**     At all times material to the events alleged in Plaintiff's Complaint, reasonably competent police officers, objectively viewing the facts and circumstances then confronting them, would have believed that the actions taken were objectively reasonable and were within clearly established constitutional limits. Defendant Byrne, therefore, is entitled to qualified immunity.

**8)**     To the extent any injuries or damages claimed by Plaintiff were proximately caused, in whole or in part, by negligent, willful, wanton and/or other wrongful conduct on the part of Plaintiff as reflected in the public record, including but not limited to police reports and/or the criminal trial transcript, any verdict or judgment obtained by Plaintiff must be reduced by an amount commensurate with the degree of fault attributed to Plaintiff by the jury in this case.

**9)**     To the extent Plaintiff failed to mitigate any of his claimed injuries or damages, any verdict or judgment obtained by Plaintiff must be reduced by application of the principle a Plaintiff has a duty to mitigate his or her damages.

**10)**     Plaintiff's operating complaint fails to state claims upon which relief may be granted and should be dismissed with prejudice.

**11)**     Under the Illinois Tort Immunity Act, a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause.  745 ILCS 10/2-208.

**12)**     City of Chicago police employees are absolutely immune for any testimony they may have given in Plaintiff's underlying criminal case.  See *Briscoe v. LaHue*, 460 U.S. 325 (1983).

## JURY DEMAND

Defendant Byrne demands a trial by jury.

                                    Respectfully submitted,
                                    */s/ Shawn W. Barnett*
                                    Attorney No. 6312312

HALE & MONICO LLC
Andrew Hale
Barrett Boudreaux
Shawn W. Barnett
Kelly Olivier
Jennifer Bitoy
53 West Jackson, Suite 337
Chicago, IL 60604
(312) 870-6905

## CERTIFICATE OF SERVICE

I, the undersigned attorney, certify that I filed the foregoing document with the Clerk of the Northern District of Illinois using the Court's electronic filing system. As a result, copies of the filed document were electronically served upon all counsel of record.

A courtesy copy of the filed document may have been provided to the Court, depending upon the Court's standing order.

*/s/ Shawn W. Barnett*