**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES GIBSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19 C 4152 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| CITY OF CHICAGO, a municipal | ) | |
| Corporation et al., | ) | Magistrate M. David Weisman |
| | ) | |
| Defendants. | ) | |

## JOINT STATEMENT OF UNDISPUTED MATERIALS FACTS

Pursuant to Judge Ellis' standing order on summary judgment practice, the parties submit the following Joint Statement of Undisputed Material Facts (JSUMF) relative to Plaintiff's forthcoming Motion for Partial Summary Judgment.[1]

1. The Illinois Torture Inquiry and Relief Commission (TIRC) was created by the Illinois General Assembly in 2009. Illinois State Representative Art Turner stated during a debate that it was created for the purpose of investigating claims of torture and abuse by former Chicago Police Commander Jon Burge and officers under his supervision.

**Supporting Material**: **Exhibit 1,** 95th General Assembly, House of Representatives, Transcription Debate, May 29, 2008 at p. 216 (Gibson 010992), Statement of Illinois State Representative Art Turner ("[T]he rationale for this commission is to look into the police allegations or the torture allegations that have been leveled against Chicago police officers under the supervision of Commander Jon Burge.").

2. An April 2016 report of the Police Accountability Task Force entitled Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities they Serve stated, "From 1972 to 1991, CPD detective and commander Jon Burge and others he supervised tortured and abused at least 100 African-Americans on the South and West sides in attempts to coerce confessions."

---

[1] The parties are cognizant of this Court's standing order pertaining to the filing of a joint statement of undisputed material facts, and have extensively met and conferred regarding its preparation. Specifically, the parties are aware of this Court's admonition that "Perfunctory objections, such as 'not material' or 'irrelevant,' are not reasonable bases for failing to stipulate to an undisputed fact." Both parties contest the relevance, materiality, and/or accuracy of certain proposed "material facts," and/or the admissibility of certain statements on the grounds of hearsay, relevance, materiality, foundation, or other bases, but consistent with the Court's standing order, have not refused to stipulate or suggested deleting those paragraphs. The parties nevertheless reserve their rights to challenge certain "material facts" and/or the supporting material in the joint statement of undisputed material facts later in this litigation and to challenge the admissibility of those facts and supporting material at summary judgment.

**Supporting Material**: **Exhibit 2,** Police Accountability Task Force: Recommendations for Reform (April 2016), at p. 34 (Gibson 010215) ("Police Accountability Task Force Report") .

3.     Burge was the lieutenant in charge of Area 2 Violent Crimes from 11/12/81 to 8/10/86 and the commander of Area 3 from 1/27/88 to 11/13/91. In a career spanning more than twenty years, Jon Burge rose to the rank of Commander in the Chicago Police Department before he was suspended on 11/12/91 after charges were filed in the police board seeking his separation and he was fired in 1993 for the abuse he carried out.

Supporting Material: **Exhibit 3,** City Council Resolution, Establishment of reparations fund for victims of torture by Police Commander Jon Burge (Substitute Resolution 2015-256), May 6, 2015, (Gibson 010046-010049) ("More than 100 African-Americans who were detained by the Chicago Police Department between 1972 and 1991 have accused Burge or police officers working under his command of engaging in acts of torture and physical abuse.").

4.     According to the April 2016 Report of the Police Accountability Task Force, "Burge's methods included administering electric shocks to victims' genitals, suffocating them with typewriter covers, threatening them with loaded guns, and burning them on radiators." Other allegations included punching, kicking, and hitting suspects, including with objects like telephone books.

**Supporting Material**: Exhibit 2, Police Accountability Task Force Report at 34, (Gibson 010215) (Stating that "Burge's methods included administering electric shocks to victims' genitals, suffocating them with typewriter covers, threatening them with loaded guns and burning them on radiators.").

5.     Complaints of torture and abuse carried out by Burge and his subordinates have been the subject of multiple investigative reports, including by an investigator of the Office of Professional standards, the division within the Chicago Police Department then responsible for investigating excessive force , and a special states attorney. On or about September 28, 1990, OPS investigator Michael Goldston provided a report regarding the conduct of Jon Burge and officers under his command at Area 2 to the Chief Administrator of OPS, the so-called Goldston Report.

**Supporting Material**: City of Chicago's Answer, Dkt. 117 at ¶ 99 (admitting "the existence of a document dated September 28, 1990, from OPS investigator Michael Goldston to the Chief Administrator of OPS (the so-called "Goldston Report")"); **Exhibit 4,** Edward J. Egan, Report of the Special State's Attorney, Appointed and Ordered by the Presiding Judge of the Criminal Division of the Circuit Court of Cook County in No. 2001 Misc. 4 (2006) (Gibson 009755-010045).

6.     On or about October 26, 1990, OPS investigator Francine Sanders submitted a report regarding the conduct of Jon Burge and officers under his command, the so-called Sanders Report, regarding Andrew Wilson's claim that he was abused "while in the custody of Area 2 personnel" as a suspect in the killing of Officers Fahey and O'Brien on February 9, 1982.

**Supporting Material**: City of Chicago's Answer ¶ 99 (admitting "the existence of a document dated October 26, 1990, from OPS investigator Francine Sanders (the so-called "Sanders Report").").

7.      The Sanders report recommended a "sustained" finding for multiple violations of policy against Burge and Detectives Jon Yucaitis and Patrick O'Hara, including that Burge "repeatedly administered electrical stimulation to Mr. Wilson's body in order to create pain and that he held Mr. Wilson, while handcuffed, against a hot radiator causing burns to Mr. Wilson's face, chest and thigh." In addition, the Sanders Report stated that it found that Burge "engaged Andrew Wilson in several unjustified physical altercations during which Mr. Wilson was handcuffed and incapable of providing any resistance," and "[f]ailed to provide prompt medical attention to Andrew Wilson, a prisoner in his custody who was suffering from multiple injuries," *id.* at 64. The Sanders Report also stated that Detectives Jon Yucaitis and Patrick O'Hara were involved or had knowledge of these acts against Mr. Wilson.

**Supporting Material**: **Exhibit 6, Section II – Report of Investigator Francine**
Sanders at 63-66 (000138-000141).

8.      One of the aims of the Goldston report was to "determine if there was systematic abuse at Area 2 during that period, and if so, to determine culpability, if any, of Area 2 Command Personnel."

**Supporting Material**: **Exhibit 5,** Cover Memorandum for Goldston Report (Gibson 007823); City of Chicago's Answer ¶ 101 (admitting that "a cover memorandum from the OPS Chief Administrator to Superintendent Martin reflected that part of Goldston's assignment 'was to determine if there was systematic abuse at Area 2 during that period, and if so, to determine culpability, if any, of Area 2 Command Personnel.'").

9.      The Goldston Report concluded that: "In the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic. The time span involved covers more than ten years. The abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture. The evidence presented by some individuals convinced juries and appellate courts that personnel assigned to Area 2 engaged in methodical abuse." The Goldston Report identified at least 50 potential victims of Burge and officers under his Command at Area 2, including allegations of "shockings," "baggings," and "beatings."

**Supporting Material**: Exhibit 6, Section I – Report of Investigator Michael Goldston at 3 (000006); Exhibit 6, Goldston Report, Appendix D & F at 000018-000025; City of Chicago's Answer ¶ 101 (admitting that the block quotation from the Goldston Report, located in Paragraph 101 of the Amended Complaint, "accurately recites a paragraph from the Goldston Report).

10.      The Goldston Report stated that "In the process of analyzing the data produced during this endeavor, credibility of the individuals and sources was paramount. The credibility of some individuals was suspect as a result of their relationships to other individuals (gang affiliation, shared criminal history, familial, et. cetera). There were also a number of individuals who were contacted by the People's Law Office. The manner in which the PLO broached the subject of abuse in these cases is questionable. There were examples of their representatives initiating the contact by relating the nature of their business, which would include information that some other individual alleged physical abuse at the hands of Commander BURGE for example. The next question asked would be, "Were you ever physically abused by Jon BURGE?" BURGE had some contact with practically each person with whom the PLO spoke and each had, at the least, been suspected of

committing a serious offense. Taking these facts into consideration, any response by these individuals had to be taken with the proverbial grain of salt. Others were quite credible as a result of how they related what allegedly happened to them and being supported by corroborating evidence such as medical records. In fact, some individuals were so credible that civil suits filed by them resulted in settlements. In one case, a conviction was reversed based on information given in a motion to suppress which had originally been denied."

**Supporting Material**: Exhibit 6, Goldston Report at p. 2 (000005).

11.     The Goldston Report further concluded, "The number of incidents in which an Area 2 command member is identified as an accused can lead to only one conclusion. Particular command members were aware of the systematic abuse and perpetuated it either by actively participating in same or failing to take any action to bring it to an end. This conclusion is also supported by the number of incidents in which the Area 2 offices are named as the location of the abuse."

**Supporting Material**: Exhibit 6, Goldston Report at p. 3 (000006).

12.     Among other things, the Goldston Report sources included complaint register files, police reports, court transcripts, and other Chicago Police Department documents.

**Supporting Material**: City of Chicago's Answer ¶ 101 (stating that Goldston made an inquiry involving the "compilation of complaint register files, police reports, court transcripts, and other documents. Defendant City states that Goldston attempted to summarize certain documents and create spreadsheets, indices, and summaries from selected information contained in those documents").

13.     In 1991, after receipt of the Goldston Report, Superintendent Leroy Martin forwarded it to the Police Foundation for review and analysis. The Police Foundation authored certain correspondence and memoranda regarding the Goldson Report and supplied those to the police department. Among other things, the Police Foundation stated, "The methodology in the Goldston Report fails to support the conclusions it draws about its major assertions."

**Supporting Material**: **Exhibit 7,** November 22, 1991 letter from the Police Foundation to Supt. Martin (CITY-JG-006157 - CITY-JG-006159); **Exhibit 8,** February 26, 1992 Police Foundation memorandum at 12 (CITY-JG-006174); and **Exhibit 9,** July 30, 1992 Police Foundation memorandum (CITY-JG-006177 - CITY-JG-006187).

14.     In July 2006, the Special State's Attorney released a report (the "OSSA Report") and many memoranda (the "OSSA Memoranda") regarding the conduct of Jon Burge and officers under his command.

**Supporting Material**: City of Chicago's Answer ¶ 99 (admitting "the existence of the Report of the Special State's Attorney released in July 2006."); Exhibit 4, Egan Report.

15.     The OSSA Report was released in July 2006 under the auspices of Special State's Attorney Edward J. Egan and Chief Deputy Special State's Attorney Robert D. Boyle. The OSSA Report stated that "The petition asked that a Special State's Attorney be appointed to investigate

allegations of torture . . . and other offenses by police officers under the command of Jon Burge at Area 2 and Area 3 Headquarters in the city of Chicago during the period from 1973 to the present."

**Supporting Material**: City of Chicago's Answer ¶ 99, 100 (admitting "the existence of the Report of the Special State's Attorney ("OSP Report") released in July 2006 under the auspices of Special State's Attorney Edward J. Egan and Chief Deputy Special State's Attorney Robert D. Boyle. Defendant City admits the OSP Report indicates the Special State's Attorney was appointed 'to investigate allegations of torture . . . and other offenses by police officers under the command of Jon Burge at Area 2 and Area 3 Headquarters.'"); Exhibit 4, Egan Report at p. 3 (Gibson 009757) ("When we accepted this Court's request to serve as Special Prosecutors, we examined the pleadings filed in connection with the Petition for Appointment of a Special State's Attorney and particularly the Order of Appointment. The petition asked that a Special State's Attorney be appointed 'to investigate allegations of torture, perjury, obstruction of justice, conspiracy to obstruct justice, and other offenses by police officers under the command of Jon Burge at Area 2 and Area 3 Headquarters in the city of Chicago during the period from 1973 to the present.'").

16.     With respect to the allegations of Alfonso Pinex arising from his interrogation at Area 2 in 1985 about a 1982 homicide, the OSSA Report concluded that "we have sufficient evidence to present to a grand jury and seek the indictment of Maslanka and McDermott for aggravated battery, perjury, and obstruction of justice."

**Supporting Material**: Exhibit 4, Egan Report at p. 290 (Gibson 010043-1); City of Chicago's Answer ¶ 100 (admitting to the existence of the Report of the Special State's Attorney ("OSP Report") released in July 2006).

17.     The authors of the OSSA Report interviewed hundreds of witnesses and submitted 148 complaints to an investigation, including the complaints of 64 people who had alleged acts of brutality at the hands of Jon Burge and those under his command.

**Supporting Material**: Exhibit 4, Egan Report at pp. 8-9 (Gibson 009762-009763) (stating "We have interviewed hundreds of persons"; "At the beginning of our investigation we received the names of 64 persons who alleged acts of brutality. From various sources we received additional potential 'complainants'"; "We have submitted 148 complaints to such an investigation.").

18.     The OSSA Report concluded that there were three cases that would justify seeking indictments for mistreatment of prisoners by Chicago police officers under Burge's command: Andrew Wilson relative to his 1982 interrogation at Area 2, Alfonzo Pinex relative to his 1985 interrogation at Area 2, and Phillip Adkins relative to his 1984 interrogation at Area 2. The OSSA Report stated that the evidence in those cases would be sufficient to establish guilt beyond a reasonable doubt.

**Supporting Material**: Exhibit 4, Egan Report at p. 16 (Gibson 009770) ("After our investigation, that has taken almost four years, we judge that there are cases which we believe would justify our seeking indictments for mistreatment of prisoners by Chicago police officers. These cases are based on the complaints of Andrew Wilson, Alfonzo Pinex and Phillip Adkins. It is our judgment that the evidence in those cases would be sufficient to establish guilt beyond a reasonable doubt. The police officer involved in the Wilson case is Jon Burge. In the Pinex case the officers are Anthony Maslanka and Michael McDermott. In the Adkins case the officers are James Lotito

and Ronald Boffo. There are many other cases which lead us to believe or suspect that the claimants were abused, but proof beyond a reasonable doubt is absent.").

19.     The OSSA Report further concluded: "There are many other cases which lead us to believe or suspect that the claimants were abused, but proof beyond a reasonable doubt is absent. While not all the officers named by all the claimants were guilty of prisoner abuse, it is our judgment that the commander of the Violent Crimes section of Detective Areas 2 and 3, Jon Burge, was guilty of such abuse. It necessarily follows that a number of those serving under his command recognized that, if their commander could abuse persons with impunity, so could they."

**Supporting Material**: Exhibit 4, Egan Report at p. 16 (Gibson 009770).

20.     OSSA Report further concluded:

> We have made the judgment that the admissible evidence would justify our asking a grand jury to indict in three cases: they are the cases of Andrew Wilson, Phillip Adkins, and Alfonso Pinex. There are many other cases that raised the belief that the claimant was telling the truth, e.g. Michael Johnson, Melvin Jones and Shadeed Mumin, but their testimony would not be sufficient to establish proof beyond a reasonable doubt. And there are some cases we have concluded that the claimant was not telling the truth, e.g. Leroy Orange and Leonard Kidd.

> In our judgment the evidence would support an indictment and conviction of Jon Burge in the case of Andrew Wilson. We believe that he also mistreated Michael Johnson and Melvin Jones. He was the commander of the unit. Common sense compels the conclusion that those who worked for him would not be concerned about their own mistreatment of prisoners, if their commander mistreated them. We have said in another part of this report that if some action had been taken against Jon Burge at the time of the Andrew Wilson case, or even shortly after, our appointment would not have been necessary."

As to Michael Johnson's allegations, the OSSA reported that Johnson admittedly lied, for the purpose of being "vindictive," when he stated at deposition that Burge had electro shocked him. Michael Johnson also lied to the FBI and OPS when he told them he was electro shocked. The OSSA concluded that there were "numerous problems with Michael Johnson's inconsistencies and serious credibility problems."

**Supporting Material**: Exhibit 4, Egan Report at pp. 12-13 (Gibson 009766-009767), **Exhibit 10,** January 31, 2005 OSSA Memo regarding Michael Johnson at pp. 4, 9 (Gibson SDT-OSP-Andrews-132306, Gibson SDT-OSP-Andrews-132311); **Exhibit 11,** August 18, 2003 memo from Gordan Nash to Edward J. Egan and Robert Boyle at 1 (Gibson SDT-OSP-Andrews-129587).

21.     Multiple courts have addressed allegations that Burge and his subordinates tortured suspects:

- In *Hinton v. Uchtman*, 395 F.3d 810, 822 (7th Cir. 2005) (Wood, J., concurring), Judge Wood stated in a concurring opinion:

6

Nonetheless, as Hinton's appellate lawyers have pointed out to this court, a mountain of evidence indicates that torture was an ordinary occurrence at the Area Two station of the Chicago Police Department during the exact time period pertinent to Hinton's case [i.e., 1983].

- In *United States ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999), a case arising from a 1986 Area 2 homicide investigation, Judge Shadur stated in an opinion:

    Maxwell's next contention is that the prosecutors violated Brady v. Maryland, 373 U.S. 83 (1963) by withholding exculpatory information about police officers' widespread (and indeed systematic) physical abuse of prisoners in the Area 2 Violent Crimes division. It is now common knowledge that in the early to mid-1980's Chicago Police Commander Jon Burge and many officers working under him regularly engaged in physical abuse and torture to extract confessions.

- In *People v. Wrice*, 406 Ill. App. 3d 43, 50, 55, 940 N.E.2d 102, 108, 112 (1st Dist. 2010), affirmed as modified People v Wrice, 962 N.E.2d 934 (Ill. 2012), a case arising from a 1982 Area 2 investigation of a sexual assault, the Illinois Appellate Court stated:

    The Special State's Attorney determined 'the admissible evidence would justify ... asking a grand jury to indict in three cases: they are the cases of Andrew Wilson, Phillip Adkins, and Alfonso Pinex. There are many other cases that raised the belief that the claimant was telling the truth, e.g. Michael Johnson, Melvin Jones and Shadeed Mumin, but their testimony would not be sufficient to establish proof beyond a reasonable doubt.

    ***

    [T]he Report of the Special State's Attorney released in 2006 . . . found evidence of torture perpetrated by officers at Area 2 had been proven beyond a reasonable doubt. Such findings provide significant corroboration of defendant's torture claims.

- In *People v. Whirl*, 2015 Il App (1st) 111483, ¶ 98, a case arising from an Area 2 investigation of a 1990 murder, the Illinois Appellate Court stated that the trial "court acknowledged the pervasive evidence that Burge and many of the officers working under him regularly engaged in the physical abuse and torture of suspects with the goal of extracting confessions."

**Supporting Material**: *Hinton v. Uchtman*, 395 F.3d 810, 822 (7th Cir. 2005) (Wood, J., concurring); United States ex rel. Maxwell v. Gilmore, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999); *People v. Wrice*, 406 Ill. App. 3d 43, 55 (1st Dist. 2010); *People v. Whirl*, 2015 Il App (1st) 111483, ¶ 98.

22.    In 2010, Burge was convicted on charges of perjury and obstruction of justice for falsely denying that he and detectives under his command had engaged in torture and abuse and denying that he was aware of this torture and physical abuse of suspects.

7

**Supporting Material**: Exhibit 3, City Council Substitute Resolution 2015-256 ("In 2010, Burge was convicted on charges of perjury and obstruction of justice for falsely denying that he and detectives under his command had engaged in torture and abuse and that he was aware of this torture and physical abuse of suspects."); *U.S. v. Burge*, 08 CR 846, Dkt. 1 (N.D. Ill 2008) (Burge's Indictment leading to his conviction).

23.     In sentencing Burge for perjury, U.S. District Judge Lefkow stated, in part, as follows:

> You denied any knowledge of torture of the plaintiff or of any other torture or abuse having occurred under your direction or command. You denied it in answers to the interrogatories, and you maintained that denial under oath in this courtroom where you testified in your own defense. Unfortunately for you the jury did not believe you, and I must agree that I did not either. ...

> Now when I hear your attorney implying that if someone did the crime, no harm, no foul, they deserved it, I am frankly shocked. Even if counsel only means to say that none of these people can be believed because they are criminals, the mountain of evidence to the contrary completely belies that position. ...

> When a confession is coerced, the truth of the confession is called into question. When this becomes widespread, as one can infer from the accounts that have been presented here in this court, the administration of justice is undermined irreparably. ...

> Let me turn from the seriousness of the offense to the issue of deterrence. As you know I am no stronger to violent crime. I am deeply indebted to the valiant police officers who, like you did on so many occasions, dedicated themselves to apprehending the persons responsible. I fully trusted, and I was not disappointed, that the Chicago Police Department and other law enforcement agencies would apprehend the perpetrator of the crime that affected me. Respect is hardly a sufficient word for how I feel about the talent and dedication of the people who helped me and my family in a time of crisis.

> Yet too many times I have seen officers sit in the witness box . . . and give implausible testi[mony] to defend themselves or a fellow officer against accusations of wrongdoing. ...

> Perhaps the praise, publicity, and commendations you received for solving these awful crimes was seductive and may have led you down this path. On your behalf how I wish that there not been such a dismal failure of leadership in  the department that it came to this.

**Supporting Material**: **Exhibit 12,** 1/21/11 Sentencing Hearing Transcript, *U.S. v. Burge*, 08 CR 846 (N.D. Ill.), at pp. 3-4, 6, 7-8, 10 (Gibson 010369-010373, Gibson 010375).

24.     In 2015, the Chicago City Council recognized that the torturing of African American suspects by Burge and officers working under his command was an exceedingly sad and painful chapter in Chicago's history, and the Council formally expressed its profound regret for any and all shameful treatment of citizens of Chicago that occurred.

Supporting **Material**: Exhibit 3, City Council Substitute Resolution 2015-256 (stating "The City Council wishes to acknowledge this exceedingly sad and painful chapter in Chicago's history, and to formally express its profound regret for any and all shameful treatment of our fellow citizens that occurred").

25.     In 2015, the Chicago City Council recognized that "words alone cannot adequately convey the deep regret and remorse that we and our fellow citizens feel for any and all harm that was inflicted by Burge and the officers under his command."

**Supporting Material**: Exhibit 3, City Council Substitute Resolution 2015-256.

26.     In 2015, a City Council Resolution stated, "For only words can end the silence about wrongs that were committed and injustices that were perpetrated, and enable us, as a City, to take the steps necessary to ensure that similar acts never again occur in Chicago."

**Supporting Material**: Exhibit 3, City Council Substitute Resolution, Establishment of reparations fund for victims of torture by Police Commander Jon Burge (Substitute Resolution 2015-256), May 6, 2015, Gibson Production 010046-010049.

27.     In 2015, a City Council Resolution stated, among other things, that the "Mayor and Members of the City Council of the City of Chicago, on behalf of all Chicagoans—(1) acknowledge and condemn, as evil and reprehensible, any and all acts of torture and abuse inflicted upon the Burge victims; and (2) apologize to the Burge victims for these horrific and inexcusable acts."

**Supporting Material**: Exhibit 3, City Council Substitute Resolution 2015-256.

28.     Harold Washington was the Mayor of Chicago from April 29, 1983, to November 25, 1987. Eugene Sawyer was the Mayor of Chicago from December 2, 1987, to April 24, 1989, and Richard M. Daley was the Mayor of Chicago from April 24, 1989, to May 16, 2011. Prior to becoming Mayor, Richard M. Daley had been the State's Attorney of Cook County since 1980.

**Supporting Material**: **Exhibit 13**, Chicago Public Library, Mayor Richard M. Daley Biography, https://www.chipublib.org/mayor-richard-m-daley-biography/.; **Exhibit 14,** Chicago Public Library, Mayor Harold Washington Biography, https://www.chipublib.org/mayor-harold-washington-biography/; **Exhibit 15,** Mayor Eugene Sawyer Biography, Chicago Public Library, https://www.chipublib.org/mayor-eugene-sawyer-biography/.

29.     Richard J. Brzeczek was the Superintendent of the Chicago Police Department from January 11, 1980 until April 29, 1983.

**Supporting Material**: Exhibit 4, Egan Report at p. 67 (Gibson 009821).

30.     Andrew Wilson was convicted of murdering Officers Fahey and O'Brien on February 9, 1982. After Andrew Wilson confessed to the murders, Dr. John M. Raba, a physician at Cook County Jail, sent a letter to Superintendent Brzeczek, stating that:

> I examined Mr. Andrew Wilson on February 15 & 16, 1982. He had multiple bruises, swellings, and abrasions on his face and head. His right eye was battered and had a superficial laceration. Andrew Wilson had several linear blisters on his right thigh, right

cheek and anterior chest which were consistent with radiator burns. He stated that he had been cuffed to a radiator and pushed into it. He also stated that electrical shocks had been administered to his gums, lips, and genitals. All these injuries occurred prior to his arrival at the Jail. There must be a thorough investigation of this alleged brutality.

Superintendent Brzeczek provided the Raba letter to OPS, which closed its investigation in 1985 after Andrew Wilson's attorneys declined to allow Andrew Wilson to be interviewed for the investigation. Superintendent Brzeczek also sent Dr. Raba's letter to State's Attorney Daley, who asserted that he referred it to the appropriate professionals within the State's Attorney's Office.

**Supporting Material**: Exhibit 4, Egan Report at p. 108 (Gibson 009861), February 25, 1982 Letter from Richard J. Brzeczek, Superintendent of Police, to Richard M. Daley, State's Attorney of Cook County; Exhibit 4, Egan Report at p. 66 (Gibson 009820), February 17, 1982 letter from John M. Raba to Richard J. Brzeczek; **Exhibit 16,** Sworn Statement by Mayor Richard Daley (June 12, 2006) at pp. 19-20 (Gibson 010145-010146). Exhibit 4, Egan Report at 74-85, 110 Gibson 009828-009838, Gibson 009863.

31. Brzeczek testified in 1988/1989 during Wilson's civil case that it was his opinion that injuries suffered by Wilson took place between Wilson leaving Area 2 and his arrival at the lock-up. He further testified at that time there was nothing brought to his attention that Burge or any other supervisory or command officer was responsible for Wilson's injuries. In 2005, Brzeczek told the Special State's Attorney that he believed as early as February 1982 that the torturing of Andrew Wilson had in fact occurred in Area 2 under Burge's command and that he spoke with "command personnel," including Deputy Superintendents Thomas Lyons and Joseph McCarthy, Chief of Detectives William Hanhardt, and Director of OPS Francis Nolan, to discuss his beliefs at that time. According to the Special State's Attorney, two members of the Command Staff that Brzeczek said he spoke to the day he received the letter from Dr. Raba denied speaking to him. One of the members Brzeczek claimed was present (McCarthy) could not have been present because records proved he was at the Mayo Clinic at the time. The Special State's Attorney also "interviewed former Deputy Superintendent Lyons who told us if such a meeting had ever taken place he would remember it, and he does not remember it." Director of OPS Francis Nolan was deceased at the time of the OSSA investigation and the Special State's Attorney did not report that they interviewed Hanhardt..

**Supporting Material**: Exhibit 4, Egan Report at 108 (Gibson 009861), February 25, 1982 Letter from Richard J. Brzeczek (informing Mr. Daley of an enclosed letter from a doctor who examined Andrew Wilson, stating that the letter "indicates that Mr. Andrew Wilson sustained certain injuries subsequent to his arrest"); Exhibit 4, Egan Report at 66 (Gibson 009820), February 17, 1982 letter from John M. Raba; Exhibit 16, Sworn Statement by Mayor Richard Daley (June 12, 2006), at pp. 19-20 (Gibson Production 010145-010146) (stating that Mayor Richard Daley became aware of the letter that his office received in February 1982 from Richard J. Brzeczek). Exhibit 4, Egan Report at 74-85, 110 Gibson 009828-009838, Gibson 009863.

32. After Superintendent Brzeczek sent Dr. Raba's letter to State's Attorney Daley, the letter was referred to First Assistant State's Attorney Richard Devine, Chief Assistant State's Attorney William Kunkle, and Deputy Chief Frank DeBoni of the State's Attorney's Office's Special Prosecutions Unit, which prosecuted police misconduct cases. According to Devine, "the conclusion given to him (and Daley) by the lawyers running the case . . . , was that there may have

been physical abuse, but it was abuse at the hands of the wagon men"—i.e., people who later transported Wilson—and that "DeBoni believed he did not have a basis for doing anything then because the alleged victims were unwilling to participate." The Special Prosecutions Unit had a policy of not conducting an investigation into complaints of police misconduct if the alleged victim does not cooperate. According to a May 20, 1983 article in the Chicago Tribune, then State's Attorney Richard M. Daley "honored eight Chicago police officers and three private citizens, . . . who helped in the arrest and conviction" of Andrew and Jackie Wilson, including "Lt. Jon Burge, and detectives Patrick O'Hara, Thomas McKenna, Fred Hill and Anthony Katalinic."

**Supporting Material**: **Exhibit 17,** *Daley hails 11 in crime war*, Chicago Tribune (May 20, 1983) (Burge Archive 05.11.83.CT.Daley Hails 11 in Crime War.pdf) (stating that "State's Attorney Richard M. Daley "honored eight Chicago police officers . . . who helped in the arrest and conviction" of Andrew Wilson, including "Lt. Jon Burge."). **Exhibit 18**, Press Release of Statement of Mayor Daley (July 21, 2006) at Gibson 010395. Exhibit 4, Egan Report at pp. 124-128, 144 (Gibson 009876-009882, Gibson 009898).

33.     In 1987, the Illinois Supreme Court vacated Andrew Wilson's conviction because the State failed to meet its burden of proof at the suppression hearing by clear and convincing evidence that all the 15 separate injuries on his "head, torso, and right leg" that Wilson testified he sustained from being "punched, kicked, smothered with a plastic bag, electrically shocked, and forced against a hot radiator"  were sustained after his court reported confession.

**Supporting Material**: *People v. Wilson*, 506 N.E.2d 571, 572-76 (1987) (stating that Wilson had "some 15 separate injuries" on his "head, torso, and right leg" that occurred during the day he spent in police custody, and that Wilson "testified that he was punched, kicked, smothered with a plastic bag, electrically shocked, and forced against a hot radiator throughout the day on February 14, until he gave his confession").

34.     The OSSA Report stated as follows: "The evidence supports the conclusion that Superintendent Brzeczek was guilty of a 'dereliction of duty' and did not act in good faith in the investigation of the claim of Andrew Wilson. Despite the fact that Brzeczek believed that officers in the Violent Crimes unit of Detective Area 2 had tortured Andrew Wilson he kept that belief to himself for over twenty years. He also kept Burge in command at Area 2 and issued a letter of commendation to all of the detectives at Area 2."

**Supporting Material**: Exhibit 4, Egan Report at p. 17 (Gibson 009771) ("The evidence supports the conclusion that Superintendent Brzeczek was guilty of a 'dereliction of duty' and did not act in good faith in the investigation of the claim of Andrew Wilson. Despite the fact that Brzeczek believed that officers in the Violent Crimes unit of Detective Area 2 had tortured Andrew Wilson he kept that belief to himself for over twenty years. He also kept Burge in command at Area 2 and issued a letter of commendation to all of the detectives at Area 2.").

35.     In 1986, Andrew Wilson filed a civil complaint against the City and various officials and police officers alleging that after he was arrested for killing Officers Fahey and O'Brien, that he was "beaten, burned, shocked by electrical devices, and received many injuries because of my treatment."

11

**Supporting Material**: *Andrew Wilson v. City*, 86 C 2360 (N.D. Ill. 1986); *Wilson v. City of Chicago*, 684 F. Supp. 982, 983 (N.D. Ill. 1988) (denying the City of Chicago's motion to dismiss Wilson's complaint alleging that "the police officers detained and brutalized him after arresting him for allegedly murdering two Chicago police officers.").

36.     On August 17, 1989, September 14, 1989, and November 30, 1989, members of the public raised claims of torture of individuals in police custody by Jon Burge at meetings of the Chicago Police Board. The Superintendent of the Police Department was present at the meetings.

**Supporting Material**:  **Exhibit 19**, August 17, 1989 Chicago Police Board Minutes (Gibson 11071 – Gibson 11079); **Exhibit 20,** September 14, 1989 Chicago Police Board Minutes (Gibson 11080 – Gibson 11090); **Exhibit 21,** November 30, 1989 Chicago Police Board Minutes (Gibson 11091 – Gibson 11096).

37.     The OSSA report stated that "if some action had been taken against Jon Burge at the time of the Andrew Wilson case, or even shortly after, our appointment would not have been necessary."

**Supporting Material**: Exhibit 4, Egan Report at pp. 12-13 (Gibson 009766-009767)

38.     At the time of Gibson's arrest and subsequent trial, the Mayor of the City of Chicago was Richard M. Daley and the Superintendent of Police was LeRoy Martin Sr.

**Supporting Material**: City of Chicago's Answer ¶ 104 ("Defendant City admits Richard M. Daley was Mayor of the City of Chicago in December 1989. Defendant City admits Leroy Martin Sr. was Superintendent of Police in December 1989.").

39.     Daley was inaugurated as Mayor on April 24, 1989. The City suspended Burge in November 1991 and separated him in 1993. Subsequently, Burge was indicted in 2008.

**Supporting Material**: City of Chicago's Answer ¶ 104 ("Defendant City admits Jon Burge was prosecuted in 2010."); Exhibit 3, City Council Substitute Resolution 2015-256 ("In a career spanning more than twenty years, Jon Burge rose to the rank of Commander in the Chicago Police Department before he was fired in 1993 for torturing a confession from a murder suspect."); Exhibit 2, Police Accountability Task Force Report at 34 (Gibson 010215) (stating that "the Chicago Police Board fired [Burge] in 1993"). *U.S. v. Burge*, 08 CR 846, Dkt. 1.

40.     As described below, Mayors, City Council Members, and other City of Chicago officials have acknowledged that Burge and officers under his command tortured suspects.

**Supporting Material**: See the 12 paragraphs directly following this paragraph.

41.     In an article published in 2018 after Burge's death, Lori Lightfoot during her candidacy was quoted as stating that "With the passing of Jon Burge, we must reflect on the dark legacy that he embodied." She was also quoted as stating, "So many lives shattered, and a horrible stain on the legitimacy of policing that resonates today." In another article published in 2020, Mayor Lightfoot was quoted as stating that "Jon Burge caused immeasurable harm to so many people." The 2016 Report of the Police Accountability Task Force, which was chaired by Lightfoot and appointed by Mayor Emanuel, stated,

From 1972 to 1991, CPD detective and commander Jon Burge and others he supervised tortured and abused at least 100 African-Americans on the South and West sides in attempts to coerce confessions. Burge's methods included administering electric shocks to victims' genitals, suffocating them with typewriter covers, threatening them with loaded guns and burning them on radiators. For years, Burge and the City denied allegations of torture, reinforcing community beliefs in a police "code of silence." Burge was eventually suspended in 1991, and the Chicago Police Board fired him in 1993. After Burge's firing, the FOP attempted (unsuccessfully) to enter a float in the South Side Irish Parade honoring him.

**Supporting Material**: **Exhibit 22,** Herbert G. McCann, AP News, *Former Chicago police commander linked to torture dead at 70* (Sept. 19, 2018), (Gibson Production 010665-010672); see also Exhibit 2, Police Accountability Task Force Report at pp. 22, 34 (Gibson 010203, Gibson 010215); **Exhibit 23,** Planet Money, Reparations for Police Brutality, NPR (Gibson 010673-010688).

42.     A release dated April 14, 2015, from Mayor Rahm Emanuel's press office stated in part:

> Mayor Rahm Emanuel, Alderman Howard Brookins (21st), Chairman of the City Council Black Caucus, Alderman Joe Moore (49th), Alderman Joe Moreno (1st), and representatives of a number of victims of disgraced former police commander Jon Burge today announced a sweeping reparations package for the individuals Burge abused and tortured prior to being fired from the police department in 1993. The package, which will be introduced to the City Council on Wednesday, is the culmination of months of work and meetings with stakeholders and representatives of Burge victims, including Chicago Torture Justice Memorials and Amnesty International, USA.
>
> Jon Burge's actions are a disgrace - to Chicago, to the hard-working men and women of the police department, and most importantly to those he was sworn to protect," said Mayor Emanuel. "Today, we stand together as a city to try and right those wrongs, and to bring this dark chapter of Chicago's history to a close."
>
>                                  * * *
>
> The package includes three overarching components, including a public recognition of the torture committed by Jon Burge, financial reparations for his victims, and a collection of services to help bring closure for the individuals impacted by his actions, as well as their families.
>
> As a reminder of the injustices that occurred, and to ensure that they are not repeated, the City will acknowledge and educate the public about this dark chapter in Chicago's history. This will include a formal City Council apology, the creation of a permanent memorial recognizing the victims of torture, and curricula about the Burge case and its legacy in eighth and tenth grade CPS history classes.
>
> The City will also provide services to support Burge victims and their families. City College tuition and job training will be provided for free to Burge victims, their immediate family members and their grandchildren. The City will fund psychological,

family, substance abuse, and other counseling services to Burge victims and their immediate family members. The City will work with sister agencies to create new opportunities for Burge victims in reentry or transitional job programs. The City will also prioritize Burge victims and their families for re-entry support and social services, senior care services, health services and small business assistance.

Additionally, a $5.5 million fund will be created to provide financial reparations to individuals with a credible claim of Burge-related torture.

**Supporting Material**: **Exhibit 24,** Mayor's Press Office, *Mayor Emanuel, Aldermen, and Representatives of Burge Victims Announce Reparations Package to Bring Closure to Dark Chapter of City's History* (Apr. 14, 2015), (Gibson 010689-010690) (announcing a "public recognition of the torture committed by Burge," stating that the "City will acknowledge and educate the public about this dark chapter in Chicago's history, calling this practice a "disgrace – to Chicago, to the hard-working men and women of the police department, and most importantly to those he was sworn to protect," and recognizing "those wrongs" that Burge committed).

43.     A press release from the Mayor's office dated July 21, 2006 entitled Statement of Mayor Richard M. Daley, Special Prosecutors Report stated in part, as follows:

This week, the court released a lengthy special prosecutors report on the practice of abuse and torture of suspects in the 1970s and 1980s at the Calumet police district.

The city strongly supported the release of this report because the public deserves to know the full story about this shameful episode in our history.

They also need to know that the city has, in the two decades since, put in place a series of safeguards aimed at preventing such abuses.

First, let me say, we ask a lot of our police. They put their lives on the line to protect our communities. They see tragedy and loss every day, and are forced to confront the people responsible and bring them to justice. It's a tough, dangerous and often heartbreaking job.

But even as they work in a violent world, these men and women have a responsibility to operate within the law they have taken an oath to uphold. It's this simple: You cannot enforce the law by breaking the law.

No matter how awful the crime, no suspect should be subject to the kinds of abuses detailed in this report. And no suspect should ever be coerced into confessing to crimes he did not commit.

It fundamentally undermines our system of justice, and destroys public confidence. It should never happen.

*       *       *

14

Finally, I want to comment on one aspect of the report that has received a great deal of attention and that is the letter the then police superintendent sent to my office about one case when I was state's attorney twenty-four years ago.

I believe the letter, which suggested but did not charge abuse in the case of a man accused of killing a police officer, was referred to the appropriate professionals within the State's Attorney's Office.

Only years later did the pattern of misconduct on the part of Burge and his unit become known.

**Supporting Material**: Exhibit 18, Press Release re: Statement of Mayor Richard M. Daley: Special Prosecutors Report, July 21, 2006, (Gibson 010394-010395).

44.    Former Alderman Thomas Allen stated with respect to the Special State's Attorney's report, in part, as follows:

Then I also look at this list of witnesses that is part of our packet here and basically, I see that we're going to delve into something that probably in greater particularity than we have in the past dealing with the Lieutenant Burge's scurrilous history of torture and as everybody knows and we have already - - we already - - we have known this for 20 years, we all know, every police officer on the street is embarrassed by what Lieutenant Burge has done and gotten away with.

\*      \*      \*

I think what this body wants is a change in the direction from the administration as to you know how we deal with Burge, not with whether or not Burge tortured people, because I, for one, can attest to in a personal way since I tried cases with the infamous Lieutenant Burge with the plastic bag over the head and the baseball bat on top of the telephone book and the typewriter cover so we all know that.

\*      \*      \*

[W]hat I'm saying is we got to get to the next level and which is, you know, exploring the possible sanctions against Lieutenant Burge and most people who are in control. ... Okay. Then in any event, First Deputy Starks, just a few questions. As I said a moment ago, I come to this hearing with some personal knowledge, you know, being a lawyer for 30 years and being in the Public Defender's office from '76 to '86. I was in the belly of the beast in Area 2 on many homicide cases, death penalty cases, capital cases. I underscore Area 2 because I handled cases in all six areas, all six police districts, and there was only one area out of the six where this pattern was evident.

**Supporting Material**: **Exhibit 25,** Chicago City Council, Committee on Police and Fire, Police Torture Hearing (July 24, 2007) at pp. 33, 34, 36 (Gibson 010428 - Gibson 010429, Gibson 010431), Statement of Alderman Thomas Allen.

45.    Former Alderman Ed Smith stated at a City Council committee hearing on July 24, 2007, in part:

Now, I want to make some statements here that are ancillary, Mr. Chairman, to what we're talking about but I think it is within reason that I should talk about this.

We talk about trust in the police department and I got to tell you that a lot of - - I want to take it out of context when I make these statements because there are thousands of good police officers in the City who lay their lives on the line every day for the citizens of the City but I call them hot dogs because there's some hot dogs in the police department that is causing us some serious problems and they are still in this department, even though they were back there when Burge was in. There are a lot of them still here, and they need to be looked at.

Now, these atrocities that were committed would not have been committed had someone condoned it or either acquiesced when it was going on because apparently no one said anything and it just kept happening and because of that, a lot of people endured some abuse, severe pain and almost lost their lives because of this man.

**Supporting Material**: Exhibit 25, Chicago City Council, Committee on Police and Fire, Police Torture Hearing (July 24, 2007) at pp. 46-47 (Gibson 010440-010441), Statement of Alderman Ed Smith ("[T]hese atrocities that were committed would not have been committed had someone condoned it or either acquiesced when it was going on because apparently no one said anything and it just kept happening and because of that, a lot of people endured some abuse . . . Now, it is incumbent upon the City, it is incumbent upon us, everyone who has a concern about this to do something about it.").

46.    Former Alderman and former chair of the City Council's Police and Fire Committee Isaac Carothers stated at a City Council committee hearing on July 24, 2007, in part as follows:

Clearly right, I think there's no doubt that everybody in the chamber, I believe everybody in the building, I believe in this city believes that certainly Burge committed these atrocities. I think we all know that. We all know that it is significant, that it was a terrible thing that happened. That's no doubt. So I have to tell you that I didn't create the witness list. The makers of the ordinance and my colleagues created this witness list. I think you have the list.

You're preaching to the choir when you're talking about what Burge did because everyone believes and knows what Burge did. You must remember, I was the public defender investigator on the case, on one of the cases myself, and I know what Burge did.

**Supporting Material**: Exhibit 25, Chicago City Council, Committee on Police and Fire, Police Torture Hearing (July 24, 2007) at p. 34 and 35 (Gibson Production 010429-010430), Statement of Isaac Carothers (stating that "I think there's no doubt that everybody in this chamber, I believe everybody in this building, I believe in this city believes that certainly Burge committed these atrocities. I think we all know that . . . [E]veryone believes and knows what Burge did.").

47.    Former Alderman Joe Moore stated at a City Council hearing on May 6, 2015 in part as follows: "This is indeed a very momentous day. For far too long, those in positions of

16

authority turned a blind eye and a deaf ear to atrocities that were occurring on their watch in this city. The torture of individuals exercised by the power of the state. . . . It happened right here. And then when there was an acknowledgement that yes perhaps it happened, there was still this reluctance to come to terms with it and make to recompense to those who were abused, those whose rights were snatched from them. And for many years, and many millions of dollars in litigation fees, we continued as a city to fail to come to terms with that. Finally, finally, we have begun to acknowledge this horrible wrong."

**Supporting Material**: Exhibit 25, Chicago City Council, Committee on Police and Fire, Police Torture Hearing (July 24, 2007) at p. 49 (Gibson Production 010443), Statement of Alderman Joe Moore (criticizing state and federal prosecutors for failing to "bring a measure of justice in this case, to hold the people who committed these heinous crimes, who abused their authority to some measure of justice."); **Exhibit 26,** Statement of Alderman Joe Moore (Chicago City Council passing of resolution on reparations, May 6, 2015), http://chicago.granicus.com/MediaPlayer.php?view_id=2&clip_id=425) at timemaker 39:08 to 40:27; id. (calling Area 2 torture "terroristic acts").

48.     Former Cook County Clerk David Orr stated at a City Council committee hearing on July 24, 2007 in part as follows:

I am submitting testimony because I like the rest of you have watched this scandal fester for more than 25 years and obviously it is way past time to correct these injustices.

In the 1980s when I was in the City Council sitting where you did, I signed a resolution demanding action on the Area 2 torture scandal. The evidence of prosecution was indisputably strong then as the Egan/Boyle report concedes. Despite the long delays, the evidence remains strong now.

Area 2 conducted a program of torture involving beatings, mock executions, electric-shock, suffocation and racist psychological abuse to obtain confessions.

By the way, an Alderman asked whether all the victims were black, and the answer is yes, they were.

**Supporting Material**: Exhibit 25, Chicago City Council, Committee on Police and Fire, Police Torture Hearing (July 24, 2007) at pp. 54-58 (Gibson 010448-010452), Statement of Cook County Clerk David Orr; id. at p. 58 (Gibson 010452) ("We said that many years ago when I first signed onto a resolution calling for action on the Area 2 scandals. We said it before our children were born. We said it before the group made it to adulthood. We said it before our hair turned gray, before home computers, before the Internet, before cell phones, before ipods, and before the elder George Bush was president. We have been saying these things for more than a generation.").

49.     Daniel Cantrell read a letter written by Danny Davis into the record at a City Council committee hearing on July 24, 2007, which stated in part as follows:

After the expenditures of more than $10 million of public funds to defend Burge and others involved in these illegal, immoral, repugnant activities, it is time for the City to move expeditiously to a fair and just settlement of these cases. Further expenditures

defending police torture is in my judgment inconsistent and inconsistent with the law and harmful to public interests.

**Supporting Material**: Exhibit 25, Chicago City Council, Committee on Police and Fire, Police Torture Hearing (July 24, 2007) at p. 61 (Gibson Production 010455), Statement of Congressman and former Alderman Danny Davis ("After expenditures of more than $10 million of public funds to defend Burge and others involved in these illegal, immoral, repugnant activities, it is time for the City to move expeditiously to a fair and just settlement of these cases. Further expenditures defending police torture is in my judgment inconsistent with the law and harmful to the public interests.").

50.    Former State Representative Jim Sacia stated at a hearing dated May 29, 2008, in the General Assembly, House of Representatives, in part as follows:

> I want you to know, Representative, and I'd like this Body to know that first of all, what you're doing here is you're creating a commission. The most . . . the second most important thing you're doing is you are investigating the most despicable man that ever carried a badge and I think that what is so important to your legislation is the man that you are creating your commission for has brought unbelievable great discredit on the profession of law enforcement, deserves to be looked into, and the commission is a positive thing.

**Supporting Material**: Exhibit 1, 95th General Assembly, House of Representatives, Transcription Debate, May 29, 2008 at p. 226 (Gibson 011002), Statement of Illinois State Representative Jim Sacia (Commission tasked with "investigating the most despicable man that ever carried a badge")

51.    State Senator Kwame Raoul stated during the 96th General Assembly, Regular Session Senate Transcript, March 25, 2009, in part as follows:

> [T]his is about people who were tortured in police departments utilizing methods such as electrodes to testicles, suffocating with . . . typewriter covers. . . . We've heard about the Attorney General's Office and the Cook County State's Attorney's Office playing hot potato with this matter. You know, we're trying to create a vehicle where there would be a commission who will confront this issue once and for all. . . . [C]losure will not be achieved until each and every victim of Commander Burge and – and the police officers under his command, each and every one of their cases are heard.

**Supporting Material**: **Exhibit 27,** Statement of Illinois State Senator Kwame Raoul (96th General Assembly, Regular Session Senate Transcript, March 25, 2009), at p. 27 (Gibson 010720) ("[T]his is about people who were tortured in police departments utilizing methods such as electrodes to testicles, suffocating with . . . typewriter covers. . . . We've heard about the Attorney General's Office and the Cook County State's Attorney's Office playing hot potato with this matter. You know, we're trying to create a vehicle where there would be a commission who would confront this issue once and for all. . . . [C]losure will not be achieved until each and every victim of Commander Burge and – and the police officers under his command, each and every one of their cases are heard.").

52.     By ordinance, the City Council created the Police Board of the City of Chicago. The City Council empowered the Police Board to "adopt rules and regulations for the governance of the police department of the city." The City Council empowered the Superintendent of Police to, among other things, "have full and complete authority to administer the department in a manner consistent with the ordinances of the city, the laws of the state, and the rules and regulations of the police board." The Chicago Police Department Rules and Regulations adopted by the Police Board and in effect in December 1989 were adopted for the "control, disposition and governance of the employees of the Chicago Police Department." The Rules and Regulations adopted the Law Enforcement Code of Ethics as a "general standard of conduct for all sworn members of the Department." The Law Enforcement Code of Ethics requires police officers to comport themselves in relevant part as follows:

> As a law enforcement officer, my fundamental duty is to serve mankind; to safeguard lives and property, to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder and to respect the Constitutional rights of all men to liberty, equality and justice.
>
> ***
>
> Honest in thought and deed in both my personal and official life. I will be exemplary in obeying the laws of the land and the regulations of my department.
>
> ***
>
> I will never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions. . . . I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.
>
> I recognize the badge of my office as a symbol of public faith, and accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession ... law enforcement.

**Supporting Material**: **Exhibit 28**, Rules and Regulations, Law Enforcement Code of Ethics at CITY-JG-001388, CITY-JG-001385; **Exhibit 29**, Section 11 of the Municipal Code of Chicago at CITY-JG-001376- CITY-JG-001377.

53.     The Rules and Regulations in effect in December 1989 state that "The use of excessive and unwarranted force or brutality will not be tolerated under any circumstances," and that "all persons have a right to dignified treatment under the law, and the protection of this right is a duty which is as binding on the Department and each of its members as any other. Every member must treat each person with respect and he must be constantly mindful that the people with whom he is dealing are individuals with human emotions and needs."

**Supporting Material**: Exhibit 28, Rules and Regulations at CITY-JG-001389-CITY-JG-001390.

54. The Rules of Conduct contained in the Rules and Regulations sets forth the following prohibited acts, among others:

Rule 1: Violation of any law or ordinance.

Rule 2: Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department.

Rule 8: Disrespect to or maltreatment of any person while on or off duty.

Rule 9: Engaging in any unjustified verbal or physical altercation with any person, while on or off duty.

**Supporting Material**: Exhibit 28, Rules and Regulations at CITY-JG-001395-CITY-JG-001397.

55. CPD General Order 78-1: Processing Persons Under Department Control, in effect in December 1989 states, among other things, that "Department personnel will [n]ever use force or coercion in seeking admissions or confessions."

**Supporting Material**: **Exhibit 30**, CPD General Order 78-1: Processing Persons Under Department Control at CITY-JG-000466-CITY-JG-000479.

56. General Order 88-12: Civil Rights, in effect in December 1989 states, among other things, as follows:

[T]his order continues the Department's policy to observe, uphold and enforce all laws relating to individual rights without regard to race, religion, sex ....

Every member of the Department will respect and protect each person's civil rights,

and will comply with all laws and Department policy relating to civil rights.

Department members will treat all persons with complete courtesy and with the dignity inherently do every person as a human being.

**Supporting Material**: **Exhibit 31,** May 19, 1988 Chicago Police Department General Order 88-12: Civil Rights at CITY-JG-000512.

57. Per CPD Sergeant and Detective Paul Carroll, at all relevant times, including at the CPD police academy for basic recruit training and pre-service detective training, police officers and detectives were taught not to abuse suspects and to respect a suspects' constitutional rights. Mr. Carroll stated at a deposition that the CPD required about nine months of intensive training at the police academy for basic recruit training, including training regarding civil rights, Constitutional rights, human relations, and other things. With respect to due process rights, Mr. Carroll stated that the first thing CPD recruits are trained on is due process, the law enforcement code of ethics, and honoring the rights of suspects. Mr. Carroll stated that the CPD pre-service detective training was approximately four additional weeks and included but was not limited to civil rights and Constitutional rights. Mr. Carroll stated that during the 1980s there were additional roll call and

20

inservice trainings for detectives regarding civil rights, due process, legal updates on the Fourth Amendment, and ensuring the voluntariness of statements. Mr. Carroll stated an additional general order was issued in May 1988 and supplied to the detectives and all police officers regarding compliance with the civil rights of suspects. Mr. Carroll went into the training academy as a recruit in 1970, at which time he received nine months of intensive training; he received four weeks of pre-service detective training in 1978 when he was promoted to detective; he was promoted to Sergeant in 1986, at which time he received additional training; he started as a training coordinator in 1988, and assisted in training detectives until his retirement in 1997; he reviewed the 1980 Pre-Service Investigators Training Program prior to his deposition, as well as training materials he and others prepared in the late 1980s; and did not speak with any former trainers at the CPD specifically in preparation for his 2020 deposition. **.** The May 1988 directive that Mr. Carroll referenced, General Order 88-12, stated in part as follows:

    I.     PURPOSE

    This order continues the Department's policy to observe, uphold and enforce all laws relating to individual rights without regard to race, religion, sex, sexual preference, color, age, national ancestry, economic status or physical or mental disability.

DEPARTMENT POLICY

    A.   Every member of the Department will respect and protect each person's civil rights, and will comply with all laws and Department policy relating to civil rights.

    B.   When making a lawful arrest, search or seizure, Department members will use physical force authorized by law only when the exercise of persuasion, advice, and warning is found to be insufficient to obtain cooperation, and will use only the minimum degree of such physical force necessary on any occasion.

    C.   In addition to respect for those civil rights bestowed by law, Department members will treat all persons with complete courtesy and with the dignity inherently due every person as a human being. Department members will:

        1.  never show any bias or prejudice against any individual or group because of race, religion, sex, sexual preference, color, age, national ancestry, economic status or physical or mental disability.

        2.  act, speak, and conduct themselves as professionals.

        3.  never adopt a condescending attitude towards members of the public nor employ the use of derogatory terms.

        4.  recognize that it is their duty to serve and protect, and therefore will be courteous in all dealings with the public.

    **Supporting Material**: **Exhibit 32,** Excerpt of Rule 30(b)(6) Deposition of City representative Paul Carroll in *Brown v. City*, 18 C 7064, at 19, 31-34, 46-47, 66-70, 84-85, 88, 97, 119, 167, 168, 188; see also **Exhibit 33**, 1980 CPD Pre-Service Investigators Training Program, CITY-JG-006124-52. **Exhibit 31,** May 19, 1988 Chicago Police Department General Order 88-12: Civil Rights at CITY-JG-000512.

58.     In 1987, according to the CPD's 1987 Annual Report, among other things, there were 281,038 Uniform Crime Reporting Part I offenses (also known as "Index" offenses) in the City of Chicago, including 691 murders. Part I offenses consist of murder, criminal sexual assault, robbery, aggravated assault, burglary, theft, motor vehicle theft, and arson. In 1987, the CPD made 52,811 Part I arrests, including 855 arrests for murder. There were 39,471 Part I offenses in Area 3 in 1987, including 90 murders. In Chicago in 1987, there were 279,732 calls for service for Part I offenses, with 38,842 calls for Part I offenses occurring in Area 3.

**Supporting Material**: **Exhibit 34,** CPD's 1987 Annual Report at pp. 4, 5, and 18.

59.     In 1988, according to the CPD's 1988 Annual Report, among other things, there were 303,789 Part I offenses in the City of Chicago, including 742 murders. In 1988, the CPD made 75,074 Part I arrests, including 865 arrests for murder. There were 41,599 Part I offenses in Area 3 in 1988, including 85 murders. In Chicago in 1988, there were 295,041 calls for service for Part I offenses, with 41,343 calls for Part I offenses occurring in Area 3.

**Supporting Material**: **Exhibit 35,** CPD's 1988 Annual Report at pp. 4, 5, and 18.

60.     In 1989, according to the CPD's 1989 Annual Report, among other things, there were 297,873 Part I offenses in the City of Chicago, including 660 murders. In 1989, the CPD made 74,342 Part I arrests, including 838 arrests for murder. There were 45,457 Part I offenses in Area 3 in 1989, including 132 murders. In Chicago in 1989, there were 302,462 calls for service for Part I offenses, with 45,046 calls for Part I offenses occurring in Area 3.

**Supporting Material**: **Exhibit 36,** CPD's 1989 Annual Report at pp. 4, 5, and 18.

61.     From 1987 to 1989, according to the CPD's 1987-1989 Annual Reports, among other things, there were 882,700 Part I offenses in the City of Chicago, including 2,093 murders. From 1987-1989, the CPD made 202,227 Part I arrests, including 2,558 arrests for murder. There were 126,527 Part I offenses in Area 3 from 1987-1989, including 307 murders. In Chicago in 1987-1989, there were 877,235 calls for service for Part I offenses, with 125,231 calls for Part I offenses occurring in Area 3.

**Supporting Material**: Exhibits 34, 35, 36, CPD's 1987-1989 Annual Reports at pp. 4, 5, and 18.

62.     Anthony Maslanka, William Moser, John E. Byrne, Louis Caesar, John Paladino, Henry J. Leja, Jerome Rusnak, Victor Breska, John McCann, Phillip Collins, and John O'Mara were employed by the Chicago Police Department ("CPD") and were assigned to Area 3 Violent Crimes in December 1989.

**Supporting Material**. City of Chicago's Answer ¶ 14 (stating that "police department records reflect that Anthony Maslanka, William Moser, John E. Byrne, Louis Caesar, John Paladino, Henry J. Leja, Jerome Rusnak, Victor Breska, John McCann, Phillip Collins, and John O'Mara were employed by the Chicago Police Department ("CPD") and were assigned to Area 3 Violent Crimes in December 1989, and that Jon Burge was Commander of Area 3 Violent Crimes in December 1989."); City of Chicago's Answer ¶ 15 (stating that "police department records reflect that Anthony Maslanka, William Moser, John E. Byrne, Louis Caesar, John Paladino, Henry J. Leja, Jerome Rusnak, Victor Breska, John McCann, Phillip Collins, and John O'Mara were employed by

CPD and were assigned to Area 3 Violent Crimes in the December 1989 time frame, and that Jon Burge was Commander of Area 3 Violent Crimes in December 1989").

63.     Anthony Maslanka, William Moser, John E. Byrne, Louis Caesar, John Paladino, Henry J. Leja, Jerome Rusnak, Victor Breska, John McCann, Phillip Collins, and John O'Mara each worked under the command of Jon Burge in December 1989 in Area 3.

**Supporting Material**. City of Chicago's Answer ¶ 14 (stating that "police department records reflect that  Anthony Maslanka, William Moser, John E. Byrne, Louis Caesar, John Paladino, Henry J. Leja, Jerome Rusnak, Victor Breska, John McCann, Phillip Collins, and John O'Mara were employed by the Chicago Police Department ("CPD") and were assigned to Area 3 Violent Crimes in December 1989, and that Jon Burge was Commander of Area 3 Violent Crimes in December 1989."); City of Chicago's Answer ¶ 15 (stating that "police department records reflect that Anthony Maslanka, William Moser, John E. Byrne, Louis Caesar, John Paladino, Henry J. Leja, Jerome Rusnak, Victor Breska, John McCann, Phillip Collins, and John O'Mara were employed by CPD and were assigned to Area 3 Violent Crimes in the December 1989 time frame, and that Jon Burge was Commander of Area 3 Violent Crimes in December 1989"); City of Chicago's Answer ¶ 98 (admitting that "Jon Burge was Commander of Area 3 Violent Crimes in December 1989").

64.     Several of the Defendant Officers were assigned to investigate the murders of Benjamin and Wash.

**Supporting Material**: City of Chicago's Answer ¶ 24 (admitting that "Several of the Defendant Officers were assigned to investigate the murders of Benjamin and Wash.").

65.     James Gibson was at Area 3 overnight the night of December 27, 1989, and on the next day, December 28, 1989, and remained overnight at Area 3 from December 28, 1989, into the next day.

**Supporting Material**. City of Chicago's Answer ¶ 30 (admitting that "James Gibson was held at Area 3 overnight and on the next day, December 28, 1989."); City of Chicago's Answer ¶ 33 (admitting that "plaintiff remained overnight at Area 3 from December 28, 1989, into the next day")

66.     Early on December 29, 1998, Gibson was interviewed by Rusnak and Breska. Gibson again denied any involvement in the murders of Benjamin and Walsh. Rusnak and Breska took Gibson for a polygraph examination on December 29, 1989. Gibson was brought back to Area 3 after the polygraph examination.

**Supporting Material**. City of Chicago's Answer ¶ 34 (admitting to the first two sentences and the fourth sentence of Paragraph 34); City of Chicago's Answer ¶ 36 (admitting that "Detectives Rusnak and Breska took plaintiff for a polygraph examination on December 29, 1989"); City of Chicago's Answer ¶ 37 (stating the same); City of Chicago's Answer ¶ 37 (admitting that "plaintiff was brought back to Area 3 after the polygraph examination.").

67.     On December 30, 1989, Gibson was interviewed by Assistant States Attorney Linda Peters at Area 3, and then was released to his residence when ASA Peters continued the investigation. Prior to his release, Gibson told ASA Peters that he saw Eric Johnson give the gun to Fernando Webb, he saw Webb shoot the insurance man, he saw Hunter Wash exit the garage,

and he saw Webb shoot Wash. The City maintains that Gibson made this statement voluntarily. Gibson maintains he made it because he feared additional torture and abuse.

**Supporting Material**. City of Chicago's Answer ¶ 42 (admitting that "ASA Linda Peters of the State's Attorney's Office interviewed plaintiff at Area 3 on December 30, 1989."); City of Chicago's Answer ¶ 43 (admitting that "plaintiff was then returned to his residence from Area 3, while arrangements were made for Johnson and Webb to take polygraph examinations on December 31, 1989"). **Exhibit 37,** Excerpt of Gibson's April 26, 2016 post-conviction testimony at R. 683.

68.     According to the records of the Office of Professional Standards ("OPS") of the Chicago Police Department, Sgt. Lorraine Brown contacted OPS, on Saturday December 30, 1989 at 9:30 pm., to file "the complaint [about plaintiff's treatment] on behalf of her mother, Clara B. Gibson, who is deaf." During that call, OPS intake investigator Grace Johns spoke with Lorraine Brown and then Gibson. Investigator Johns reported the "complainant," who was identified as James Gibson "alleges that from December 27, 1989 to December 30, 1989, at least two unknown male/white detectives detained him without charging him for an excessive length of time, physically abused him by slapping, punching, and kicking him, and made physical threats against him."

**Supporting Material**. City of Chicago's Answer ¶ 47 (admitting to the third sentence of Paragraph 47 of the Amended Complaint, and admitting that "OPS records reflect plaintiff told the OPS intake person that from December 27, 1989 to December 30, 1989, 'at least two unknown male/white detectives detained him without charging him for an excessive length of time, physically abused him by slapping, punching, and kicking him, and made physical threats against him.'"). **Exhibit 38,** January 5, 1989 statement of Lorraine Brown contained with OPS CR#173046 at OSP 004915.

69.     When James Gibson was arrested on December 31, 1989, he did not make any further statements to the police.

**Supporting Material**: City of Chicago's Answer ¶ 58 (admitting that "plaintiff declined to make any further statements after his arrest on December 31, 1989.").

70.     According to OPS records, Gibson was interviewed by OPS Investigator Jose Ortiz on March 13, 1990 and stated, among other things, the following:

> Detectives Collins and O'Mara between 27-30 December 1989 detained him in Area 3, Violent Crimes without charging him for an excessive length of time (did not know hours, but knew he was there 4 days). On the 29th of December, while still being detained in Area 3 – VC without being legally charged, both Detectives Collins and O'Mara punched him in the ribs and neck area approximately 30-40 times, kicked him in the groin area twice, and slapped him about 7 times, and further threatened to beat the shit out of him. … [H]e only sustained soreness to his ribs and neck area.

The OPS records do not reflect that Gibson identified any other police officer who committed an act of abuse against him. The OPS records do not reflect that Gibson claimed that the detectives burned a tattoo of "Peter Gunn" off of his arm.

24

**Supporting Material**: **Exhibit 39,** March 13, 1990 statement of James Gibson, OPS CR#173046 at OSP 004956.

71. Detectives Collins and O'Mara never worked under Jon Burge at Area 2. In addition, Detectives Caesar, Leja, Rusnak, Breska, and McCann did not work under Burge at Area 2. Maslanka, Paladino, and Byrne worked under Burge at Area 2.

**Supporting Material**: **Exhibit 40,** Employee Assignment Histories (HM 022390-HM 022403).

72. James Gibson's bench trial commenced on October 7, 1991 and concluded on October 8, 1991. Prior to trial, Gibson did not file a motion to suppress his statement to police and ASA Peters. According to the opinion of the Appellate Court of Illinois affirming plaintiff's conviction, the evidence at trial was sufficient to establish that "on the morning of December 22, 1989, Lloyd Benjamin, an insurance agent, and Hunter Wash, a mechanic and client of Benjamin's, were shot to death outside Wash's garage." The Appellate Court opinion explained that co-defendant Eric Johnson's sisters, Janice and Carla, "testified that about two days before the incident [Gibson] was at their house and told codefendant that he was starving and needed money, and that he was going to 'stick up the insurance man' and if the man panicked [Gibson] would shoot him. The next day [Gibson] returned to codefendants house. One of codefendant's sisters heard [Gibson] 'asking for some 32 bullets.'" The Appellate Court summarized the testimony of Fernando Webb, stating among other things that:

> According to Webb, about 7 a.m. on the morning of the shooting he took some heroin. About 10:45 a.m. he left the house to get 'another fix.' As he walked outside he saw [Gibson], whom he had known for several years, standing near Wash's garage with a gun in his hand. Webb saw some other person in the area but could not identify that person. Webb continued walking and moments later heard gunshots.

Webb further testified that about a week before trial, Gibson threatened to harm Webb if he testified against him. The Appellate Court also summarized Gibson's statement to Detective William Moser:

> Detective William Moser testified that when he questioned defendant about two days after the incident, defendant told him that he had not been truthful when he first spoke to the police about the incident. He then proceeded to tell Moser about the shooting. Defendant told Moser that on the day of the shooting he was outside the garage and saw codefendant hand a gun to Webb who then shot Wash and Benjamin. Defendant also stated that he knew about two months earlier that codefendant and Webb were planning a robbery. Moser then interviewed codefendant who, when told of defendant's statement, informed Moser that he had lied to the police and that defendant had shot decedents.

**Supporting Material**: City of Chicago's Answer ¶ 76 ("plaintiff's bench trial commenced on October 7, 1991 and concluded on October 8, 1991"). **Exhibit 53** at 1-4, *People v. Gibson*, No. 1-92-2306 (Ill. App. Ct. 1993)(unpublished opinion affirming Gibson's conviction on direct appeal).

73.     At the end of the trial on October 8, 1991, Judge Neville found James Gibson guilty of murdering Benjamin and Wash.

**Supporting Material**: City of Chicago's Answer ¶ 79 (admitting the first sentence of ¶ 79 of the Amended Complaint that "At the end of the trial on October 8, 1991, the Judge Neville found the Defendant guilty of murdering Benjamin and Wash.").

74.     Gibson was sentenced to natural life in prison. He timely appealed from the verdict, judgment and sentence. His conviction was affirmed by the appellate court. Gibson was also denied leave to appeal to the Illinois Supreme Court, as well as certiorari to the U.S. Supreme Court. Gibson then filed several post-conviction petitions and a 28 U.S.C. § 2254 petition for a writ of habeas corpus, all of which were denied.

**Supporting Material**: City of Chicago's Answer ¶ 80 (admitting that "Gibson was sentenced to natural life in prison. He timely appealed from the verdict, judgment and sentence. His conviction was affirmed by the appellate court. Gibson was also denied leave to appeal to the Illinois Supreme Court, as well as certiorari to the U.S. Supreme Court. Gibson then filed several post-conviction petitions and a Habeas Corpus petition, all of which were denied.").

75.     On March 14, 2007, Gibson's then post-conviction attorneys sent him a letter stating, in part, as follows:

> One issue we are pursuing is the involvement of Detective Anthony Maslanka in your case. Detective Maslanka was implicated in the Jon Burge investigation, and his involvement was most likely why you were contacted by the special prosecutor. We believe that these accusations of misconduct directly tie into your case, and we are currently in the process of determining the best avenue to address these issues.

Gibson had never made any allegation of misconduct against Detective Maslanka on or before March 14, 2007.

**Supporting Material**: **Exhibit 41,** March 14, 2007 letter from Doug Johnson of Kathleen T. Zellner & Associates to Gibson (Gibson 008264) .

76.     On July 6, 2011, in his Petition for Executive Clemency, Gibson made the allegation for the first time that Detectives Maslanka and Paladino, specifically, committed acts of physical abuse against him. Among other things, Gibson claimed for the first time in his Petition for Executive Clemency (other than his contention at deposition in this case that he told his prior attorneys and OPS Investigator Ortiz) that:

> Paladino and Maslanka invited a few other detectives into the room, bringing an iron with them. One of the detectives asked James about his alias, 'Peter Gunn.' He said he had heard of a tattoo on James's arm with that name, and asked to see it. They then forced off James's shirt and pressed the searing iron against the tattoo. James struggled with the detectives, crying out in pain: but James was overmatched. To this day James still bears a scar from the burn."

**Supporting Material**: **Exhibit 42**, Gibson's July 6, 2011 Petition for Executive Clemency at pp. 13-14 (Gibson 006678–Gibson 006679);   Exhibit 37, Gibson's April 26, 2016 post-

conviction testimony at R. 714 (Gibson 005859); **Exhibit 43,** Excerpt of December 8, 2021 Deposition of James Gibson Vol. 2 at p. 577; **Exhibit 44,** Excerpt of December 17, 2021 Deposition of James Gibson Vol. 3 at p. 650, 654.

77.     Although photographs of Gibson were taken on January 2, 1990, to memorialize any injuries he had at that time, there is no photograph depicting any burn or other injury to Gibson's right arm.

**Supporting Material**: Exhibit 37, Gibson's April 26, 2016 post-conviction testimony at R. 714 (Gibson 005859).

78.     On May 23, 2012, James Gibson filed a claim with the Illinois Torture Inquiry and Relief Commission alleging that his statement was the product of physical abuse by Area 3 detectives.

**Supporting Material**: City of Chicago's Answer ¶ 83 (admitting that "plaintiff filed a claim with TIRC 'alleging that his statement was the product of physical abuse by Area 3 detectives.'"); **Exhibit 45**, Gibson's Form to File Claim of Torture with TIRC at HM 007596-HM 007597; Exhibit 37, Gibson's April 26, 2016 post-conviction testimony at R. 714 (Gibson 005859).

79.     On July 22, 2015, the TIRC issued a case disposition in which it concluded that by a preponderance of evidence there was sufficient credible evidence of torture to merit judicial review.

**Supporting Material**: City of Chicago's Answer ¶ 84 (admitting that "TIRC issued a Case Disposition dated July 22, 2015 pertaining to plaintiff's claim, in which TIRC concluded there was sufficient credible evidence of torture to merit judicial review.").

80.     On April 26, 2016 and May 25, 2016, during his testimony at a post-conviction evidentiary hearing, Gibson claimed for the first time that Sgt. John Byrne committed an act of misconduct against him by threatening him with a gun.

**Supporting Material**: City of Chicago's Answer ¶ 86 (stating that "Detectives Byrne and Paladino were called as witnesses at the evidentiary hearing and both invoked their Fifth Amendment rights and declined to answer any substantive questions about their involvement in plaintiff's questioning."). **Exhibit 46,** Excerpt of Gibson's April 26, 2016 post-conviction testimony at pp. 66-67 (HM 022914-HM 022915); **Exhibit 47,** Excerpt of Gibson's May 25, 2016 post-conviction testimony at pp. 34-36, 58, 120, 129 (HM 023034-HM 023036, HM 023058, HM 023120, and HM 023129); Exhibit 37, Gibson's April 26, 2016 post-conviction testimony at R. 714 (Gibson 005859).

81.     William Moser, Louis Caesar, and Jerome Rusnak testified at Gibson's 2016 evidentiary hearing that they did not physically abuse Gibson or any other witness or suspect in the Wash/Benjamin murder investigation and did not witness any such misconduct. With respect to interrogations in general, William Moser, Louis Caesar, and Jerome Rusnak also testified that they never physically abused any suspect, that they never witnessed any other Chicago police officer physically abuse any suspect, that they were at Area 3 before Jon Burge became the commander of Area 3, and that Jon Burge did not train them in any way with respect to the interrogation of

suspects. Detective Leja testified he did not abuse Gibson or ever see anyone at Area 3 abuse a suspect. Detectives O'Mara and Collins, who were deceased at the time of plaintiff's post-conviction hearing in 2016, denied Gibson's allegations of physical abuse when they responded to his OPS complaint against them in 1990.

**Supporting Material**: **Exhibit 48,** Moser's March 8, 2016 testimony at pp. 95, 99-101, 107-110 (HM 022534, HM 022538-HM 022540 and HM 022546-HM022549); **Exhibit 49,** Caesar's June 15, 2016 testimony at pp. 109, 111 (HM 023320, HM 023322); **Exhibit 50,** Rusnak's July 12, 2016 testimony at pp. 91-92, 94, 97 (HM 023469-HM 023470, HM 023472, and HM 023475); **Exhibit 51,** Leja's April 26, 2016 testimony at p. 21 (HM 022869); **Exhibit 52**, OPS CR#173046 at OSP 004968 and OSP 004971.

82.     William Moser, Louis Caesar, Henry J. Leja, Jerome Rusnak, Victor Breska, and the Estates of John McCann, Phillip Collins, and John O'Mara filed answers to Gibson's complaint denying the material allegations of the complaint, including but not limited to any abuse of Gibson or any other witness or suspect in the Wash/Benjamin homicide investigation, and denying that there was a widespread practice of abuse of suspects at Area 3. The City reserves the right to supplement this JSUMF following the depositions of William Moser, Louis Caesar, Henry J. Leja, Jerome Rusnak, and Victor Breska who the City expects will testify consistent with their answers to the complaint.

**Supporting Material**:  See Defendant Breska's Answer, Dkt. 118; Defendant Caesar's Answer, Dkt. 119; Defendant Leja's Answer, Dkt. 120; Defendant Moser's Answer, Dkt. 121; Defendant Rusnak's Answer, Dkt. 122; Defendant Estate of Phillip Collins's Answer, Dkt. 133; Defendant Estate of John McCann's Answer, Dkt. 134; and Defendant Estate of John O'Mara's Answer, Dkt. 135 at ¶ 3-4, 30-38, 41, 97-110.

83.     The deposition of defendant Louis Caesar proceeded on April 26, 2022. Mr. Caesar testified that he was a detective at Area 3 from approximately April 1987 to late 1992. Among other things, Mr. Caesar testified that he did not abuse any person during the Wash/Benjamin homicide investigation and that he did not observe any other police officer or detective abuse any person during the Wash/Benjamin homicide investigation. Mr. Caesar also testified that he never physically abused a suspect or witness while at Area 3 or elsewhere at the CPD, never saw any other CPD personnel commit such misconduct, never heard anyone being abused in an interview room, never threatened a suspect or witness with physical abuse, never heard other CPD personnel threaten a suspect or witness with physical abuse, and that in his experience there was not a practice of physical abuse at Area 3 when he was there and that plaintiff's allegation to that effect is untrue. Mr. Caesar also testified he worked at Area 3 before Burge was assigned there, that neither Burge nor anyone else trained him to abuse people (he was trained to treat people respectfully), that he would report physical abuse of a suspect or witness if he saw it or heard it, and that he did not experience a "code of silence" at Area 3 or elsewhere at the CPD.

**Supporting Material**: **Exhibit 54**, Excerpt of April 26, 2022 deposition of Louis Caesar at 21, 22, 57-59, 96, 100-101, 104-108, 113-115. The parties will supply the full deposition transcript to the Court as required by its standing order after the errata sheet is completed and necessary corrections are made to the transcript.

/s/ Andrew M. Stroth

Andrew M. Stroth
Carlton Odim
Action Injury Law Group, LLC
191 North Wacker Drive, Suite 2300
Chicago, IL 60606
(844) 878-4529

Peter Romer-Friedman
Robert Friedman
Gupta Wessler PLLC 1900
L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741

Jennifer D. Bennett
Gupta Wessler PLLC
100 Pine Street, Suite 1250
San Francisco, CA. 94111
(415) 573-0336

Alexander Thomas Brown
Jackson R. Hobbs
Michael J. Abrams
William G. Beck
Lathrop GPM LLP
2345 Grand Boulevard, Suite 2200
Kansas City, MO 66206
(816) 292 2000

Robert Thackston
Lathrop GMP LLP
2101 Cedar Springs Road, Suite 1400
Dallas, Texas 75201
(469) 983 6100

***Attorneys for Plaintiff***


CELIA MEZA

Corporation Counsel of the City of Chicago

By: /s/ Daniel M. Noland

Special Assistant Corporation Counsel

29

Terrence M. Burns
Paul A. Michalik
Daniel M. Noland
Reiter Burns LLP
311 S. Wacker Dr., Suite 5200
Chicago, IL 60606

***Attorneys for Defendant City of Chicago***