# EXHIBIT A

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JAMES GIBSON,<br><br>       Plaintiff,<br><br>  v.<br><br>CITY OF CHICAGO, a municipal corporation, and former Chicago Police Officers ANTHONY MASLANKA, WILLIAM MOSER, JOHN E. BYRNE, LOUIS CAESAR, JOHN PALADINO, HENRY J. LEJA, JEROME RUSNAK, VICTOR BRESKA, ESTATE OF JOHN M. MCCARTHY, ESTATE OF THOMAS PTAK, ESTATE OF PHILLIP COLLINS, ESTATE OF JOHN OMARA, and ESTATE OF JON BURGE,<br><br>       Defendants. | Case No.: 19 C 4152<br><br>Judge Sara L. Ellis |

## BRIEF OF *AMICI CURIAE* CHICAGO BUSINESS & CIVIC LEADERS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Jeetander T. Dulani
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street NW
Washington, D.C. 20036-3006
(202) 663-8383
jeetander.dulani@pillsburylaw.com

Chloe Stepney
Emily Huang
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 S. Figueroa Street, 36th Floor
Los Angeles, CA 90017-5524
(213) 488-7100
chloe.stepney@pillsburylaw.com
emily.huang@pillsburylaw.com

*Attorneys for Amici Curiae Chicago Business & Civic Leaders*

## TABLE OF CONTENTS

Page

INTRODUCTION AND STATEMENT OF INTEREST OF *AMICI CURIAE* ............................ 1

SUMMARY OF ARGUMENT ................................................................................................ 3

FACTUAL BACKGROUND .................................................................................................. 4

ARGUMENT ........................................................................................................................... 6

I.   Chicago Is Plagued By Wrongful Convictions. ................................................................ 6

     A.  Wrongful Convictions Are Far Too Common. ......................................................... 7

     B.  Chicago Cannot Deny Its History as a Civil Rights Offender. ............................... 8

II.  The City's Two-Faced Litigation Strategy Harms the Entire Chicago Community. ............. 10

     A.  Chicago's Approach to Civil Rights Litigation Is Fiscally Irresponsible. ..................... 11

     B.  Taxpayer Dollars Are Not Properly Invested in the City but Spent Fruitlessly
         Litigating Wrongful Conviction Claims. ................................................................ 13

CONCLUSION ...................................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

Cases

*Andrews v. Burge, et al.*,
No. 1:2008cv05874 (N.D. Ill.)................................................................................14

*Banks v. Burge, et al.*,
No. 1:1991cv06470 (N.D. Ill.)................................................................................14

*Caine v. City of Chicago, et al.*,
No. 1:11-cv-08996 (N.D. Ill.)................................................................................14

*Cannon v. Burge, et al.*,
No. 1:2005cv02192 (N.D. Ill.)................................................................................14

*In re Claim of James Gibson*
(TIRC Claim No. 2013.139-G).................................................................................6

*Evans v. City of Chicago*,
No. 1:04-cv-3570 (N.D. Ill.)................................................................................14

*Fauntleroy v. Burge, et al.*,
No. 1:2011cv00118 (N.D. Ill.)................................................................................14

*Fields v. City of Chicago*,
No. 1:10cv1168 (N.D. Ill.)................................................................................14

*United States v. Garsson*,
291 F. 646 (S.D.N.Y. 1923).................................................................................7

*People v. Gibson*,
No. 1-18-2040, 2019 IL App (1st) 1802040-U (Mar. 13, 2019) .............................................6

*Harris v. City of Chicago, et al.*,
No. 1:2014cv04391 (N.D. Ill.)................................................................................14

*Hill v. City of Chicago, et al.*,
No. 1:2006cv06772 (N.D. Ill.)................................................................................14

*Hinton v. Uchtman*,
395 F.3d 810 (7th Cir. 2005) (Wood, J., concurring) .............................................4

*Hobley v. Burge, et al.*,
No. 1:03-cv-03678 (N.D. Ill.)................................................................................14

*Howard v. City of Chicago, et al.*,
No. 1:2003cv08481 (N.D. Ill.) ...........................................................................14

*Jimenez v. City of Chicago*,
No. 1:09cv8081 (N.D. Ill.) .................................................................................14

*Johnson v. Guevara, et al.*,
No. 1:05cv1042 (N.D. Ill.) .................................................................................14

*Jones v. Burge, et al.*,
No. 1:2011cv04143 (N.D. Ill.) ...........................................................................14

*Kitchen v. Burge*,
No. 1:10-cv-04093 (N.D. Ill.) ............................................................................14

*Kluppelberg v. Burge*,
No. 1:13-cv-03963 (N.D. Ill.) ............................................................................14

*Logan v. Burge, et al.*,
No. 1:2009cv05471 (N.D. Ill.) ...........................................................................14

*United States ex rel. Maxwell v. Gilmore*,
37 F. Supp. 2d 1078 (N.D. Ill. 1999) ...................................................................4

*Orange v. Burge, et al.*,
No. 1:04-cv-00168 (N.D. Ill.) ............................................................................14

*Patrick v. Chicago, et al.*,
No. 1:14-cv-03658 (N.D. Ill.) ............................................................................14

*Patterson v. Burge*,
No. 1:2003cv04433 (N.D. Ill.) ...........................................................................14

*Rivera v. Guevara*,
No. 1:12cv4428 (N.D. Ill.) .................................................................................14

*Smith v. Burge, et al.*,
No. 1:16-cv-03404 (N.D. Ill.) ............................................................................14

*Speiser v. Randall*,
357 U.S. 513 (1958) ..............................................................................................7

*Starstone Ins. SE v. City of Chicago*,
No. 20 CV 2475, 2021 WL 1088313 (N.D. Ill. Mar. 22, 2021) ...........................13

*Tillman v. Burge*,
No. 1:10-cv-04551 (N.D. Ill.) ............................................................................14

*People v. Whirl*,
  2015 Il App ..........................................................................................................5

*In re Winship*,
  397 U.S. 358 (1970)............................................................................................7

*Wrice v. Byrne, et al.*,
  No. 1:14-cv-05934 (N.D. Ill.) ...........................................................................14

## Statutes and Codes

Illinois Compiled Statutes
  Section 5/2-702 (2022) ........................................................................................8
  Section 5/2-702(g) (2022)....................................................................................8
  Section 5/2-702(h) (2022)....................................................................................8
  Title 775, Section 40 (2022) ...............................................................................9

## Other Authorities

2018 Annual Report, National Registry of Exonerations (Apr. 9, 2019),
  https://www.law.umich.edu/special/exoneration/Documents/Exonerations%20in%202018.pdf
  ............................................................................................................................9

2019 Annual Report, National Registry of Exonerations (Mar. 30, 2020),
  https://www.law.umich.edu/special/exoneration/Documents/Exonerations_in_2019.pdf........9

2020 Annual Report, National Registry of Exonerations (Mar. 30, 2021),
  https://www.law.umich.edu/special/exoneration/Documents/2021AnnualReport.pdf..........7, 9

Alejandro Serrano, *Final design picked for memorial to police torture victims under Jon Burge*,
  Chicago Tribune (June 5, 2019)...........................................................................5

*Birmingham Jail*, African Studies Center – University of Pennsylvania,
  https://www.africa.upenn.edu/Articles_Gen/Letter_Birmingham.html ...................................4

Chicago Police Accountability Task Force, Recommendations for Reform: Restoring Trust
  Between the Chicago Police and the Communities They Serve (2016)
  ....................................................................................................................8, 9, 11

Chip Mitchell, *Mayor Lori Lightfoot Says Police Tortured 'At Least 100' Black Chicagoans, But
  Her Law Department Tells A Different Story*, WBEZ.org (June 3, 2021),
  https://www.wbez.org/stories/mayor-lori-lightfoot-says-police-tortured-at-least-100-black-
  chicagoans-the-city-refuses-to-call-it-a-pattern/7b5eca8c-5089-44a4-9648-6e720e8fb521.....1

Dan Hinkel, *A hidden cost of Chicago police misconduct: $213 million to private lawyers since
  2004*, Chicago Tribune (Sept. 12, 2019), https://www.chicagotribune.com/investigations/ct-
  met-chicago-legal-spending-20190912-sky5euto4jbcdenjfi4datpnki-story.html............ *passim*

Flint Taylor, The Torture Machine (2020) ................................................................10

Fran Spielman & Andy Grimm, *Another $14 million settlement tied to Burge torture era*, Chicago Sun Times (Jan. 20, 2022) ....................................................................14

*Government Misconduct and Convicting the Innocent: The Role of Prosecutors, Police, and Other Law Enforcement*, National Registry of Exonerations (Sept. 1, 2020), https://www.law.umich.edu/special/exoneration/Documents/Government_Misconduct_and_ Convicting_the_Innocent.pdf ................................................................7

James Gibson, National Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5550 (accessed Dec. 19, 2021) ........................................................................6

John Conroy, Unspeakable Acts, Ordinary People (2001) ..........................................10

Megan Crepeau, *20 more convictions linked to disgraced ex-CPD sergeant are tossed*, Chicago Tribune (Feb. 1, 2022) ........................................................................8

Mission and Procedures Statement, State of Illinois Torture Inquiry and Relief Commission, https://www2.illinois.gov/sites/tirc/Pages/default.aspx (accessed Feb. 28, 2022) ...................9

Press Release, Office of the Mayor, Victims of Burge Begin to Receive Reparations (Jan. 5, 2016), https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2016/january/Victi ms-Receive-Reparations.html ........................................................................12

Sam Roberts, *Jon Burge, 70, Ex-Commander in Chicago Police Torture Cases, Dies*, N.Y. Times (Sept. 20, 2018) ........................................................................10

Samuel R. Gross, *What We Think, What We Know and What We Think We Know About False Convictions*, 14 Ohio State J. of Crim. L. 753 (2017) ..........................................6, 7

State of Illinois Torture Inquiry and Relief Commission, https://www2.illinois.gov/sites/tirc/Pages/default.aspx (last visited Mar. 2, 2022) ...............10

Ted Cox, *Burge Reparations, Apology for Police Torture Victims OK'd by Council*, DNA Info (May 6, 2015), https://www.dnainfo.com/chicago/20150506/downtown/burge-reparations- apology-for-police-torture-victims-okd-by-council/ ................................................................1

**INTRODUCTION AND STATEMENT OF INTEREST OF *AMICI CURIAE***

It has taken nearly three decades to uncover the truth about then-Chicago Police Commander Jon Burge's torture of innocent citizens in Chicago. And with each successive exoneration of his victims, public outrage has grown. In 2015, then-Mayor Rahm Emanuel and the Chicago City Council publicly apologized for Burge's two-decade pattern and practice of torture.[1] A year later, a city panel, led by current Chicago Mayor Lori Lightfoot concluded that Burge and his detectives "tortured and abused at least 100 African Americans on the South and West sides in attempts to coerce confessions."[2] Despite these public statements condemning and apologizing for Burge's pattern of torturing, burning, beating, and abusing Chicagoans, the City has steadfastly denied any pattern of torture when confronted by Burge's victims in court. The City has clung to its denial for decades, even as the truth about Burge's torture regime led to a cascade of exonerations, settlements, and exorbitant bills from the City's high-priced outside counsel. The City's longstanding practice of spending millions of taxpayer dollars to deny the pattern and practice of torture that City officials repeatedly admitted in public, in the news, in press releases, and to victims themselves is indefensible and fiscally irresponsible.

And the City is applying the same approach to James Gibson. Mr. Gibson is one of more than a hundred known victims tortured by Burge's Midnight Crew to obtain a false confession.[3] That torture and false confession cost James Gibson over twenty-nine years of his life. And yet

---

[1] Ted Cox, *Burge Reparations, Apology for Police Torture Victims OK'd by Council*, DNA Info (May 6, 2015), https://www.dnainfo.com/chicago/20150506/downtown/burge-reparations-apology-for-police-torture-victims-okd-by-council/.

[2] Chip Mitchell, *Mayor Lori Lightfoot Says Police Tortured 'At Least 100' Black Chicagoans, But Her Law Department Tells A Different Story*, WBEZ.org (June 3, 2021), https://www.wbez.org/stories/mayor-lori-lightfoot-says-police-tortured-at-least-100-black-chicagoans-the-city-refuses-to-call-it-a-pattern/7b5eca8c-5089-44a4-9648-6e720e8fb521.

[3] Throughout the brief, any references to Jon Burge also include his detectives, the members of his Midnight Crew, who followed and implemented the pattern of torture that the City has apologized for.

1

the City continues to deny the very pattern of torture that was the basis for Mr. Gibson's exoneration and certificate of innocence. The City cannot be allowed to continue to admit and publicly condemn police abuse only to deny it in federal court. This two-faced approach must stop.

*           *           *

*Amici* are a diverse group of 47 experienced executives and civic leaders across a dozen industries and sectors who call Chicagoland home.[4] Many *amici* are Chicago natives who have dedicated themselves to giving back to the community; others have made Chicagoland the place where they now live, work, invest, and volunteer. *Amici* include entrepreneurs, financial executives, civic and religious leaders, university professors, technology innovators, and former leaders of multinational corporations—united in their support of and investment in the city and people of Chicago.

*Amici* are members of the Chicago community and believe their business and leadership experience provides crucial apolitical context to the social and economic costs of Burge's torture. *Amici* provide insight on the harm caused by the City's abhorrent litigation strategy of denying the established pattern of torture that Jon Burge and his Midnight Crew inflicted on Chicagoans. Chicago leaders have publicly admitted this torture since at least 2015 but have spent millions of dollars denying it in court. Indeed, the City relies on the same cadre of private law firms to make the same arguments, which not only hurts Burge's victims and their families but also wastes taxpayer dollars. Simply put, fighting the indefensible is fiscally irresponsible. The City itself has

---

[4] *Amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than amicus, its members, or its counsel made a monetary contribution to the brief's preparation or submission.

2

publicly apologized for the insurmountable pain caused by the systematic torture inflicted by Burge and his Midnight Crew. Disputing those same facts in court makes no sense.

## SUMMARY OF ARGUMENT

The vitality of all our communities is undermined and threatened by the City of Chicago's deficient, ineffective, and financially unsound method of denying responsibility for a decades long pattern of police misconduct and torture. And while the pattern and practice of torture by Jon Burge and his Midnight Crew is not the only reason Chicago holds the ignominious distinction as the national leader in wrongful convictions, it remains one of the most infamous sources of wrongful convictions anywhere in the country.

Throughout nearly three decades, city officials, politicians, and elected leaders have publicly commented on the dark past of the Chicago Police Department, its notorious police officers (including Jon Burge), their pattern of abhorrent misconduct, and the ongoing need for police reform and accountability. But in the courtroom, the City denies that there was any pattern of torture by Burge and his henchmen. Instead, the City has spent more than $200 million of taxpayer money paying private law firms to litigate these cases, while innocent victims like Mr. Gibson are forced to relive the worst moments of their lives to prove a pattern that City leaders have admitted to and even apologized for publicly.[5]

The City's litigation tactics delay justice for Mr. Gibson, waste taxpayer dollars, and reduce essential investments in the very communities that were targeted by Jon Burge and his gang. Indeed, if the City is allowed to continue denying Burge's pattern of torture in court while

---

[5] Dan Hinkel, *A hidden cost of Chicago police misconduct: $213 million to private lawyers since 2004*, Chicago Tribune (Sept. 12, 2019), https://www.chicagotribune.com/investigations/ct-met-chicago-legal-spending-20190912-sky5euto4jbcdenjfi4datpnki-story.html [hereinafter Hinkel, *Hidden Cost of Chicago Police Misconduct*].

ignoring its public admissions about that same pattern, police abuse will continue. And Chicago

will remain the wrongful conviction capital of the country.

Thus, *amici* have come together to urge this Court to hold the City to account and make

clear that it cannot continue to deny the truth in court and run out the clock on justice. "We must

come to see [that] . . . , 'justice too long delayed is justice denied.'"[6] This Court should hold the

City accountable and grant Mr. Gibson's motion for partial summary judgment.

## FACTUAL BACKGROUND

*Amici* adopt Mr. Gibson's and the City of Chicago's joint statement of undisputed facts, a

few aspects of which warrant emphasis here. In April 2016, the Police Accountability Task

Force—chaired by now-Mayor Lori Lightfoot—released a report entitled "Recommendations for

Reform: Restoring Trust between the Chicago Police and the Communities They Serve." The

report concluded: "From 1972 to 1991, [Chicago Police Department] detective and commander

Jon Burge and others he supervised tortured and abused at least 100 African-Americans on the

South and West sides in attempts to coerce confessions."[7] During Burge's nearly twenty-year

career, he and other Chicago police officers administered electric shock to victims' genitals,

suffocated victims with typewriter covers, threatened victims with loaded guns, burned victims

with radiators, and punched, kicked and hit victims with heavy objects such as telephone books.[8]

Multiple courts and the Chicago City Council have recognized these horrors.[9] And the

press, including the *Chicago Tribune*, have documented both Burge's pattern of torture and the

---

[6] Martin Luther King, Jr., *Letter from a Birmingham Jail*, African Studies Center – University of Pennsylvania, https://www.africa.upenn.edu/Articles_Gen/Letter_Birmingham.html.

[7] Joint Statement of Undisputed Material Facts, ¶ 2.

[8] Joint Statement of Undisputed Material Facts, ¶¶ 3–4.

[9] Joint Statement of Undisputed Material Facts, ¶ 21 (*Hinton v. Uchtman*, 395 F.3d 810, 822 (7th Cir. 2005) (Wood, J., concurring) ("[A] mountain of evidence indicates that torture was an ordinary occurrence at the Area Two station of the Chicago Police Department[.]"); *United States ex rel.*

City's repeated public admissions about that pattern.[10] So too have multiple mayors of Chicago and other city officials.[11] In fact, fifteen years ago, the mayor's office released the following statement after the publication of a special prosecutor's report:

> No matter how awful the crime, no suspect should be subject to the kinds of abuses detailed in this report. And no suspect should ever be coerced into confessing to crimes he did not commit.
>
> It fundamentally undermines our system of justice, and destroys public confidence. It should never happen.[12]

Yet, today, the City of Chicago continues to deny in court the exact pattern of torture that multiple mayors, the City Council, and city officials have admitted to publicly. The City's continued denial of this basic fact in court further punishes Burge's innocent victims and defies common sense.

For Mr. Gibson, this is the third tribunal where his claim of torture by Burge's crew has been evaluated. In 2015, he submitted his torture claim to the Illinois Torture Inquiry and Relief Commission for review. The Commission found credible evidence of torture that warranted judicial review.[13] Mr. Gibson then presented his case for the second time to the circuit court,

---

*Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999) ("It is now common knowledge that in the early mid-1980's Chicago Police Commander Jon Burge and many officers working under him regularly engaged in physical abuse and torture to extract confessions."); *People v. Whirl*, 2015 Il App (1st) 111483, ¶ 98 (The Illinois Appellate Court held that the trial "court acknowledged the pervasive evidence that Burge and many of the officers working under him regularly engaged in the physical abuse and torture of suspects with the goal of extracting confessions.")); ¶ 24–27 ("In 2015, the Chicago City Council recognized that the torturing of African American suspects by Burge and officers working under his command was an exceedingly sad and painful chapter in Chicago's history, and the Council formally expressed its profound regret[.]").

[10] *See, e.g.*, Alejandro Serrano, *Final design picked for memorial to police torture victims under Jon Burge*, Chicago Tribune (June 5, 2019), https://www.chicagotribune.com/news/ct-met-burge-victims-memorial-20190605-story.html; *see also* Joint Statement of Undisputed Material Facts, ¶ 40–41.

[11] Joint Statement of Undisputed Material Facts, ¶¶ 40–52.

[12] Joint Statement of Undisputed Material Facts, ¶ 43.

[13] In particular, the Commission found that Burge's pattern and practice of physically abusing suspects along with substantial, independent evidence warranted judicial review. That evidence included: 1) Mr. Gibson's immediate complaint to the Office of Professional Standards; 2) uncontroverted

which denied his claim of torture. That denial was reversed by the appellate court, which held that the circuit court's "determination that [Mr. Gibson] failed to carry his burden of proving claims of torture while in police custody was against the manifest weight of the evidence."[14] The appellate court then vacated Mr. Gibson's convictions and remanded the case.

In April 2019, the prosecution dropped all charges against Mr. Gibson. Less than a year later, in February 2020, Cook County issued to Mr. Gibson a certificate of innocence. Yet even after the state dismissed all charges and granted Mr. Gibson a certificate of innocence, the City's expensive outside counsel continues to argue that there was no pattern of torture.[15]

## ARGUMENT

### I.     Chicago Is Plagued By Wrongful Convictions.

Wrongful convictions show that the system's fundamental protections have failed. As University of Michigan Law Professor Samuel R. Gross aptly stated, "[t]he very occurrence of a false conviction is a reflection of our ignorance. We never know that a defendant is innocent when he is convicted—if we did, he would not be convicted—and we rarely know better later on."[16] But here we know better. Here, the City and the public know how gravely the system failed Mr. Gibson and all of Jon Burge's victims for over three decades. The City cannot continue to deny the established practice of torture that undergirds Mr. Gibson's wrongful conviction.

---

photographic evidence; 3) report of a forensic pathologist who reviewed of Mr. Gibson's medical records; and 4) the finding that Mr. Gibson's claims mirrored Burge's other torture victims.  *See generally In re Claim of James Gibson* (TIRC Claim No. 2013.139-G).

[14] Order at ¶ 1, *People v. Gibson*, No. 1-18-2040, 2019 IL App (1st) 1802040-U (Mar. 13, 2019).

[15] James Gibson, National Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5550 (accessed Dec. 19, 2021).

[16] Samuel R. Gross, *What We Think, What We Know and What We Think We Know About False Convictions*, 14 Ohio State J. of Crim. L. 753, 764 (2017) [hereinafter Gross, *False Convictions*].

A. **Wrongful Convictions Are Far Too Common.**

A central tenet of the American criminal justice system is that it is a far greater evil to wrongfully convict the innocent, than to fail to convict the guilty. *See, e.g.*, *In re Winship*, 397 U.S. 358, 363-64 (1970) (citing *Speiser v. Randall*, 357 U.S. 513, 525-26 (1958)); *Id.* at 372 (Harlan, J., concurring) ("fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free"). Yet for nearly a century, many believed the conviction of innocent people is so rare that it "is an unreal dream."[17]

But the numbers show that wrongful convictions are an all too real and common nightmare. According to the National Registry of Exonerations, there have been 2,737 recorded exonerations in the United States from 1989 through the end of 2020.[18] What we do not know is how many exonerations during this timeframe are *unrecorded*.[19] A September 1, 2020 report by the Registry revealed that out of the 2,400 exonerations that were posted by February 27, 2019, official misconduct contributed to the false convictions of fifty-four percent (54%) of exonerees. Thirty-five percent (35%) of such misconduct was committed by police officers—from witness tampering, to misconduct and violence in interrogation, to fabricating evidence and concealing exculpatory evidence.[20] The same report shows that fifty-seven percent (57%) of the recorded instances of government misconduct were perpetrated against black exonerees.[21]

---

[17] *United States v. Garsson*, 291 F. 646, 649 (S.D.N.Y. 1923).

[18] 2020 Annual Report, National Registry of Exonerations (Mar. 30, 2021), https://www.law.umich.edu/special/exoneration/Documents/2021AnnualReport.pdf.

[19] Gross, *False Convictions*, *supra* note 16, at 763 ("[W]e keep learning about exonerations that happened years ago. How many we find depends primarily on how much time we have to search. There is no indication that we have come close to identifying anything like all the exonerations that have occurred. Plainly, there are more exonerations that we still have not found; we have no idea how many.").

[20] *Government Misconduct and Convicting the Innocent: The Role of Prosecutors, Police, and Other Law Enforcement*, National Registry of Exonerations (Sept. 1, 2020), at pp. iii to iv, https://www.law.umich.edu/special/exoneration/Documents/Government_Misconduct_and_Convicting_the_Innocent.pdf.

[21] *Id.*

Mr. Gibson was not only exonerated but received a certificate of innocence from the State of Illinois. That certificate declared that James Gibson was innocent of the offenses that stole more than twenty-nine years of his life.[22] To obtain a certificate of innocence, a person must prove by a preponderance of evidence that he was convicted and imprisoned for a crime that he did not commit, he is innocent of all charges, and his conviction did not result from his own conduct.[23] Mr. Gibson met that high standard and was officially declared innocent of the crimes Jon Burge's crew tortured him into confessing.[24] Mr. Gibson is only one of Jon Burge's too many victims.[25]

## B. Chicago Cannot Deny Its History as a Civil Rights Offender.

Chicago, with its dark history of official misconduct by Jon Burge and others in the Chicago Police Department, has been a breeding ground for wrongful convictions. Beyond Burge's dynasty of tyranny, Chicago—and Illinois more broadly—has been at the epicenter of exonerations based on police abuse and misconduct.[26] In fact, according to the National Registry

---

[22] James Gibson, National Registry of Exonerations, *supra* note 15; 735 Ill. Comp. Stat. 5/2-702(h) (2022).

[23] 735 Ill. Comp. Stat. 5/2-702(g) (2022).

[24] *See generally* 735 Ill. Comp. Stat. 5/2-702 (2022).

[25] Chicago Police Accountability Task Force, Recommendations for Reform: Restoring Trust Between the Chicago Police and the Communities They Serve, 34-35 (2016) [hereinafter "PATF Final Report"] ("The fallout from Burge's actions was substantial. Many convictions where Burge had played a role were reversed, remanded or overturned.").

[26] *See* Hinkel, *Hidden Cost of Chicago Police Misconduct*, *supra* note 5 ("At least 12 convictions related to [former detective Reynaldo Guevara] have been reversed since 2016."); Megan Crepeau, *20 more convictions linked to disgraced ex-CPD sergeant are tossed*, Chicago Tribune (Feb. 1, 2022), https://www.chicagotribune.com/news/criminal-justice/ct-ronald-watts-cases-dismissed-kim-foxx-20220201-cmftmcd5yjdgnpq7gof777anoe-story.html ("Cook County prosecutors agreed to the dismissal of 20 convictions connected to notorious ex-Chicago police Sgt. Ronald Watts and his crew. … More than 130 such convictions have been dismissed in recent years, according to the Cook County state's attorney's office. [State's Attorney Kim] Foxx said … the effort was crucial to restoring trust so that citizens are comfortable cooperating with police and prosecutors.").

of Exonerations, Illinois has had more exonerations from police misconduct than any other jurisdiction for three straight years.[27]

But this systemic problem has existed for even longer. In 2009, the legislature enacted the Illinois Torture Inquiry and Relief Commission Act, which established the Torture Inquiry and Relief Commission, a state agency specifically tasked with investigating claims of torture.[28] When first created, the Commission was only authorized to review claims of torture related to Jon Burge.[29] The origins of the Commission date to the early 2000s, when the late Justice Edward Egan, who served as a Cook County Special Prosecutor, investigated several allegations of confessions coerced through torture inflicted by Burge and detectives under his command in the 1980s and 1990s.[30] Special Prosecutor Egan concluded that Burge and his gang had likely tortured those victims. But the statute of limitations prevented any crimes from being prosecuted.[31] In an attempt to remedy the horrific effects of Burge's pattern of torture, the Commission began investigating claims of torture in 2011 and continues to do so today.

The City, however, has taken a different approach. Rather than take responsibility for the wrongful convictions from Burge's two-decade long torture regime, the City has denied legal responsibility for the crimes of Burge and his Midnight Crew. While the City has employed a

---

[27] *See* 2020 Annual Report, *supra* note 18; 2019 Annual Report, National Registry of Exonerations (Mar. 30, 2020), https://www.law.umich.edu/special/exoneration/Documents/Exonerations_in_2019.pdf; 2018 Annual Report, National Registry of Exonerations (Apr. 9, 2019), https://www.law.umich.edu/special/exoneration/Documents/Exonerations%20in%202018.pdf.

[28] TIRC Act, 775 Ill. Comp. Stat. 40 (2022); Mission and Procedures Statement, State of Illinois Torture Inquiry and Relief Commission, https://www2.illinois.gov/sites/tirc/Pages/default.aspx (accessed Feb. 28, 2022) [hereinafter TIRC Mission and Procedures Statement].

[29] TIRC Act, 775 Ill. Comp. Stat. 40 (2022).

[30] TIRC Mission and Procedures Statement, *supra* note 28.

[31] *Id.*; *see also* PATF Report *supra* note 25 ("In 2006, after a four-year investigation, special prosecutors concluded that there was enough evidence to bring criminal charges against police officers in three [Burge] cases of torture (Andrew Wilson, Phillip Adkins and Alfonzo Pinex), but the statute of limitations had already run out.").

9

compelling public relations campaign of justice for Chicagoans abused by the police, the City has thoroughly denied any responsibility when confronted by those same victims of police abuse in court.

## II. The City's Two-Faced Litigation Strategy Harms the Entire Chicago Community.

As business and civic leaders deeply invested in the well-being and growth of Chicago, *amici* also condemn the City's incredulous denial of Burge's pattern and practice of torture because it is financially reckless. Indeed, the City's litigation position ignores the fact that Burge and the Midnight Crew's actions were widely documented in a variety of news publications, articles, and reports—all detailing Burge's systematic torture of victims like Mr. Gibson.[32] That documentation along with the findings of the special prosecutor's report, ultimately led to the enactment of the Torture Inquiry and Relief Commission Act in 2009.[33]

That the State of Illinois had to create a commission to address Burge's torture shows the appalling nature of the City's in-court denials in this case. In fact, the original statutory definition of "claim of torture" was limited to "torture committed by Commander Jon Burge or any officer under the supervision of Jon Burge."[34] It was not until 2016 that the Act was amended to encompass any police "torture occurring within a county of more than 3,000,000 inhabitants."[35] And while the full effect of Burge's actions remains unknown, the Mayor, and other City leaders have acknowledged that at least 100 black men were tortured and wrongfully convicted based on

---

[32] *See generally* Flint Taylor, The Torture Machine (2020); John Conroy, Unspeakable Acts, Ordinary People (2001); Sam Roberts, *Jon Burge, 70, Ex-Commander in Chicago Police Torture Cases, Dies*, N.Y. Times (Sept. 20, 2018), https://www.nytimes.com/2018/09/20/obituaries/jon-burge-dead.html.

[33] State of Illinois Torture Inquiry and Relief Commission, https://www2.illinois.gov/sites/tirc/Pages/default.aspx (last visited Mar. 2, 2022).

[34] *Id.*

[35] *Id.*

the torture inflicted by Burge and his crew.[36] The City's two-faced approach of admitting Burge's long practice of torture publicly, but then denying the existence of that same pattern when confronted with civil rights claims of Burge's victims, serves no one.[37]

Ultimately, the City's litigation strategy costs the taxpayers tens of millions of dollars in legal fees year after year, diverts time, attention, and resources away from addressing economic and social issues for its citizens, and undermines the already fragile civic trust between government and the people who are governed.[38] In short, the City's approach makes no moral or economic sense.[39] The Court should grant Mr. Gibson's partial summary judgment motion and end the City's practices of delay and denial.

A.      **Chicago's Approach to Civil Rights Litigation Is Fiscally Irresponsible.**

Until now, Chicago has been able to weather and hide from taxpayers the increasing financial costs of wrongful convictions, including the exorbitant costs resulting from the City's approach to litigating civil rights claims by Burge's victims. In 2015, Chicago announced the creation of a $5.5 million fund "to provide reparations to individuals with a credible claim of Burge-related torture."[40] Commenting on the fund's creation, an alderman applauded the fund as

---

[36] *See* PATF Final Report, *supra* note 25.

[37] PATF Final Report, *supra* note 25, at 34 ("For years, Burge and the City denied allegations of torture, reinforcing community beliefs in a police 'code of silence.'").

[38] *Id*. at 32 ("[The Chicago Police Department]'s long history and current practices are at the root of the deep distrust of the people and remain a significant impediment to improved community-police relations.").

[39] *See* Hinkel, *Hidden Cost of Chicago Police Misconduct*, *supra* note 5 ("In some of the most costly police lawsuits in Chicago history, private lawyers have billed the city for millions to defend the cases, only to lose millions more at trial or in a settlement.  At least 11 times, the city spent $2 million or more on lawyers and expenses, then at least $5 million to resolve the case.").

[40] *See* Joint Statement of Undisputed Material Facts, ¶ 43.

"one of justice for Jon Burge's victims." "It finally brings an end to this painful chapter in Chicago's history book," he claimed.[41]

In hindsight, the alderman's statements were premature. Six years later, it is painfully clear that the repercussions of Burge's misconduct are far from over. A year after the $5.5 million fund was established, now-Mayor Lightfoot's 2016 Police Accountability Task Force Report found that there were *at least* 100 African American men that were tortured by Burge and his gang.[42] With at least 100 known victims, Chicago's $5.5 million fund fell dreadfully short of what was, and still is, needed to provide the requisite compensation and restitution to the victims. Indeed, only fifty-seven victims were approved for financial reparations from this fund.[43]

Rather than pursue effective ways to compensate and support justice for all of Burge's torture victims, the City continues its reckless and unjust approach of delaying justice through adamant in-court denials of the existence of a pattern and practice of torture. This Court can and should require the City learn from its own pattern of denial and end the City's cycle of litigation gamesmanship. Until then, the harms to Mr. Gibson and the rest of Burge's victims cannot be fully remedied.

The City can no longer afford to shirk responsibility for Burge's actions. It must change course now and stop denying the undisputed facts around Burge's enduring pattern and practice of torture. Otherwise, residents and businesses in Chicago will continue to pay the price. And

---

[41] Press Release, Office of the Mayor, Victims of Burge Begin to Receive Reparations (Jan. 5, 2016), https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2016/january/Victims-Receive-Reparations.html [hereinafter 2016 Press Release].

[42] PATF Final Report, *supra* note 25.

[43] 2016 Press Release, *supra* note 41.

eventually the costs of its continued denial may result in a broader penalty that changes the very financial risk profile of the city.[44]

**B.      Taxpayer Dollars Are Not Properly Invested in the City but Spent Fruitlessly Litigating Wrongful Conviction Claims.**

Every dollar spent by the City defending the indefensible is a dollar that is not invested in meeting other public needs such as infrastructure, education, and environmental protection. A *Chicago Tribune* investigation revealed that the City spent $213 million in legal fees and costs for private attorneys to defend the City in civil rights cases from 2004 to 2018.[45] And from 2004 to early 2019, "[t]he city paid more than $27 million in fees and costs for outside lawyers" in lawsuits brought based on the pattern and practice of torture inflicted by Burge and his Midnight Crew.[46] During that same timeframe, the City spent more than $80 million on settlements, reparations, and other costs in Burge-related cases.[47]



---

[44] The City's ability to insure against law enforcement liability is already jeopardized, and only full transparency can help make it a good underwriting candidate.  Our understanding is that the City's law enforcement liability insurance coverage program has been limited for the last decade to very high SIR coverage applicable only to exonerations that occur within a single year. See, for example, the City's 2011 Insurance Policy, appended to this brief as Appendix C, which is at issue in *Starstone Ins. SE v. City of Chicago*, No. 20 CV 2475, 2021 WL 1088313 (N.D. Ill. Mar. 22, 2021).

[45] Hinkel, *Hidden Cost of Chicago Police Misconduct*, *supra* note 5 ("Over the last 15 years, fees and costs for private attorneys in civil rights cases totaled $213 million, the Tribune found by analyzing city data obtained through an open records request. [In 2018] alone, the city spent $30.1 million — that's more than twice what it spent on the agency that investigates police misconduct.").

[46] *Id.*

[47] *Id.*

And the cycle has continued. As of 2019, the settlements, judgments, reparations, and legal fees spent on Burge-related torture cases is reported to have cost the City and Cook County taxpayers a total of nearly $140 million.[48] To date, there have been at least two dozen civil rights lawsuits brought by Burge's victims against the City.[49] The City hired private outside counsel to defend it in all those cases. Most cases dragged on for three to six years before the City settled or went to trial. This litigation gamesmanship steals precious time from innocent people like Mr. Gibson, who have already lost decades of their lives to Burge's torture machine.

The City, however, had complete discretion in deciding to spend hundreds of millions of dollars defending the indefensible. In fact, according to the *Chicago Tribune*, "[w]hile private lawyers handle much of the city's legal work, it is up to Law Department officials to decide whether to fight or try to settle."[50] The latter—trying to resolve Burge-related cases quickly— could help the City realize substantial savings.[51] Indeed, as economist Dr. Jarrod Welch explains, those savings could instead be spent on various municipal projects and initiatives—including, for

---

[48] Fran Spielman & Andy Grimm, *Another $14 million settlement tied to Burge torture era*, Chicago Sun Times (Jan. 20, 2022), https://chicago.suntimes.com/city-hall/2022/1/20/22893760/burge-torture-era-settlements-corey-batchelor-kevin-bailey-14-million-lula-mae-woods-murder-case.

[49] *Caine v. City of Chicago, et al.*, No. 1:11-cv-08996 (N.D. Ill.); *Kitchen v. Burge*, No. 1:10-cv-04093 (N.D. Ill.); *Smith v. Burge, et al.*, No. 1:16-cv-03404 (N.D. Ill.); *Kluppelberg v. Burge*, No. 1:13-cv-03963 (N.D. Ill.); *Tillman v. Burge*, No. 1:10-cv-04551 (N.D. Ill.); *Patterson v. Burge*, No. 1:2003cv04433 (N.D. Ill.); *Hobley v. Burge, et al.*, No. 1:03-cv-03678 (N.D. Ill.); *Orange v. Burge, et al.*, No. 1:04-cv-00168 (N.D. Ill.); *Wrice v. Byrne, et al.*, No. 1:14-cv-05934 (N.D. Ill.); *Harris v. City of Chicago, et al.*, No. 1:2014cv04391 (N.D. Ill.); *Patrick v. Chicago, et al.*, No. 1:14-cv-03658 (N.D. Ill.); *Evans v. City of Chicago*, No. 1:04-cv-3570 (N.D. Ill.); *Johnson v. Guevara, et al.*, No. 1:05cv1042 (N.D. Ill.); *Jimenez v. City of Chicago*, No. 1:09cv8081 (N.D. Ill.); *Fields v. City of Chicago*, No. 1:10cv1168 (N.D. Ill.); *Rivera v. Guevara*, No. 1:12cv4428 (N.D. Ill.); *Banks v. Burge, et al.*, No. 1:1991cv06470 (N.D. Ill.); *Jones v. Burge, et al.*, No. 1:2011cv04143 (N.D. Ill.); *Fauntleroy v. Burge, et al.*, No. 1:2011cv00118 (N.D. Ill.); *Logan v. Burge, et al.*, No. 1:2009cv05471 (N.D. Ill.); *Andrews v. Burge, et al.*, No. 1:2008cv05874 (N.D. Ill.); *Cannon v. Burge, et al.*, No. 1:2005cv02192 (N.D. Ill.); *Howard v. City of Chicago, et al.*, No. 1:2003cv08481 (N.D. Ill.); *Hill v. City of Chicago, et al.*, No. 1:2006cv06772 (N.D. Ill.).

[50] Hinkel, *Hidden Cost of Chicago Police Misconduct*, *supra* note 5.

[51] *See generally* Appendix B, Affidavit of Jarrod R. Welch, Ph.D.

example, better public transit, improved education, and a lower tax burden for Chicago's residents.[52] Finally, early settlements provide timely justice to victims, like Mr. Gibson, who have already lost decades of their lives, and they reduce the City's risk of a catastrophic jury verdict.

The City's decision to spend hundreds of millions of taxpayer dollars on litigating these cases and denying Burge's pattern and practice of torture is indefensible and must stop. This Court should not allow the City's duplicitous litigation strategy to continue to delay justice for Burge's victims and waste resources that could and should be invested in Chicago communities.

**CONCLUSION**

The City's public apologies for the two-decade pattern of torture by Jon Burge and his henchman are meaningless if the City continues to deny that same pattern in court. Even worse is the City's decision to spend hundreds of millions of taxpayer dollars on a litigation strategy based on denying the very torture pattern for which the City has publicly apologized. In addition, the City's ongoing failure to admit past wrongs perpetuates the harm from Burge's torture and delays justice for Mr. Gibson, other Burge victims, and all Chicagoans. Chicago and its citizens deserve better.

For all these reasons, *amici* ask the Court to hold the City accountable and grant Mr. Gibson's motion for partial summary judgment. Doing so will be a crucial step towards "lay[ing] the foundation for the rejuvenation of trust between the police and the communities they serve by facing hard truths and creating a roadmap for real and lasting, transparency, respectful engagement, accountability and change."[53]

---

[52] *Id.*
[53] PATF Final Report, *supra* note 25.

Dated: May 19, 2022                                 Respectfully submitted,

*/s/ Jeetander T. Dulani*
Jeetander T. Dulani
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street NW
Washington, D.C. 20036-3006
(202) 663-8383
jeetander.dulani@pillsburylaw.com

Chloe Stepney
Emily Huang
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 S. Figueroa Street, 36th Floor
Los Angeles, CA 90017-5524
(213) 488-7100
chloe.stepney@pillsburylaw.com
emily.huang@pillsburylaw.com

*Attorneys for Amici Curiae Chicago Business
& Civic Leaders*

# APPENDIX A—List of *Amici Curiae*, Chicago Business & Civic Leaders

**APPENDIX A**
**LIST OF *AMICI CURIAE***
**CHICAGO BUSINESS & CIVIC LEADERS**

**Russ Rosenzweig**
*Executive Director, World Ventures Group*
*(Chairman, Chief Executive Officer & Non-Profit Leader)*

| | |
|---|---|
| **Ric Bachrach**<br>*President &*<br>*Chief Executive Officer* | **Chad Bernstein**<br>*Founder &*<br>*Non-Profit Executive* |
| **Bob Bernstein**<br>*Chairman, Senior Business Executive*<br>*& Non-Profit Executive* | **Maya Bordeaux**<br>*Senior Human Resources Executive* |
| **Kevin Brown**<br>*Senior Advertising Executive* | **Jonathan Bross**<br>*Senior Business Executive* |
| **Michael Burk**<br>*Managing Partner* | **Dean Casagrange**<br>*Founder &*<br>*Business Entrepreneur* |
| **Michael Casey**<br>*Chairman Emeritus &*<br>*Former Chief Executive Officer* | **Bob Cogan**<br>*Former Business Executive* |
| **Konyia Clark**<br>*Founder &*<br>*Business Entrepreneur* | **Jared Davis**<br>*Senior Banking Executive &*<br>*Community Leader* |
| **Robert Dold**<br>*Former Senior Accounting Executive* | **Adam Farmer**<br>*Senior Executive &*<br>*Chief Operating Officer* |
| **John Fonseca**<br>*Chief Executive Officer* | **Brian Garelli**<br>*President* |
| **Tony Garland**<br>*Entrepreneur & Business Owner* | **Kenard Gibbs**<br>*Senior Media Executive &*<br>*Former Chief Executive Officer* |
| **Clare Golla**<br>*Managing Director &*<br>*Civic Leader* | **Simon Gordon**<br>*Chairman, Bishop &*<br>*Senior Pastor* |

A1

| | |
|---|---|
| **John Hill**<br>*Managing Partner &*<br>*Former Chief Operating Officer* | **Sharon Hunley**<br>*Business Executive &*<br>*Government Executive* |
| **Olawale Kadiri**<br>*Senior Business Executive* | **Mark Kaufman**<br>*Chairman &*<br>*Chief Executive Officer* |
| **Seth Lichter**<br>*Professor, Northwestern University* | **Patti Lupo**<br>*Non-Profit Leader &*<br>*Musician* |
| **Reynold Martin**<br>*Managing Principal &*<br>*Civic Leader* | **Joel Mathew**<br>*Chief Executive Officer &*<br>*Entrepreneur* |
| **Todd Musberger**<br>*President & Attorney* | **Kevin Newell**<br>*Former Senior Business Executive* |
| **Michael Pfleger**<br>*Senior Pastor &*<br>*Community Leader* | **Derek Perkins**<br>*Senior Financial Executive* |
| **Jack Pressman**<br>*Senior Partner &*<br>*Entrepreneur* | **Vince Price**<br>*Non-Profit Leader* |
| **Bruce Prolow**<br>*Former Vice Chairman &*<br>*Chief Executive Officer* | **Lynsey Psimas, Ph.D.**<br>*Business Executive* |
| **Bijoy Samuel**<br>*Senior Marketing Executive* | **Irina Shelest**<br>*Managing Director & Attorney* |
| **Elena Sotomayor**<br>*Senior Executive Hispanic Marketing* | **Walter Turner**<br>*Senior Pastor &*<br>*Community Leader* |
| **Larry Roberts**<br>*Founder &*<br>*Chief Executive Officer* | **Cheryl Romanowski**<br>*Non-Profit Leader* |
| **Julie Walner**<br>*Senior Business Executive* | **Tami White**<br>*President & Entrepreneur* |

**Mwanga Williams**
*Postal Worker &*
*Community Leader*

**Andrea Wise**
*President & Entrepreneur*

# APPENDIX B—Affidavit of Jarrod R. Welch, Ph.D.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES GIBSON,<br><br>          Plaintiff,<br><br>     v.<br><br>CITY OF CHICAGO, a municipal corporation, and former Chicago Police Officers ANTHONY MASLANKA, WILLIAM MOSER, JOHN E. BYRNE, LOUIS CAESAR, JOHN PALADINO, HENRY J. LEJA, JEROME RUSNAK, VICTOR BRESKA, ESTATE OF JOHN M. MCCARTHY, ESTATE OF THOMAS PTAK, ESTATE OF PHILLIP COLLINS, ESTATE OF JOHN OMARA, and ESTATE OF JON BURGE,<br><br>          Defendants. | Case No.: 19 C 4152<br><br>Judge Sara L. Ellis |

**AFFIDAVIT OF JARROD R. WELCH, Ph.D.**

**May 13, 2022**

## I.     QUALIFICATIONS AND ASSIGNMENT

1.     My name is Jarrod R. Welch.  I am a Principal at Charles River Associates ("CRA"), a consulting firm that specializes in the application of economics to legal and regulatory matters, where I have worked since 2013.

2.     I earned a bachelor's degree in economics from the University of California, Santa Barbara in 2002.  I earned a doctorate degree in economics from the University of California, San Diego in 2011.  Before beginning my work at CRA, I was a Postdoctoral Research Fellow at the National Bureau of Economic Research.

3.     At Charles River Associates I specialize in applied econometrics and writing expert reports.  I have consulted on and supported expert testimony in litigation in federal and state courts in a variety of antitrust, intellectual property, consumer fraud, false advertising, and class action litigation, in a variety of industries including media and telecom, agricultural products, pharmaceuticals, shipping and transportation, grocery and retail sales, among others.  I have also provided expert testimony to the City of Chicago's Zoning Board of Appeals regarding the economic impact of a development project on Chicago's south side.

4.     I have been asked by counsel for *Amici Curiae* Chicago Business and Civic Leaders ("*amici*") to describe an analytical approach for assessing the social cost, to Chicago residents, of the City of Chicago's practice of engaging in lengthy litigation of compensation claims for victims of wrongful conviction and imprisonment, such as that of Mr. Gibson.  My work in this matter is strictly pro bono.

## II.     THE CITY'S CHOICE TO LITIGATE CLAIMS BROUGHT BY VICTIMS OF WRONGFUL CONVICTION HARMS CHICAGO RESIDENTS

5.     Counsel for *amici* have cited evidence and public admissions that Burge and the Midnight Crew tortured at least 100 African Americans to coerce confessions,[1] yet the City continues to litigate compensation claims for these victims of wrongful conviction, often over the course of several years, spending millions of dollars in legal defense fees paid to outside counsel, rather

---

[1] *See, e.g.*, Ted Cox, *Burge Reparations, Apology for Police Torture Victims OK'd by Council* (May 6, 2015), https://www.dnainfo.com/chicago/20150506/downtown/burge-reparations-apology-for-police-torture-victims-okd-by-council/.  *See also*, Chip Mitchell, *Mayor Lori Lightfoot Says Police Tortured 'At Least 100' Black Chicagoans, But Her Law Department Tells A Different Story* (June 3, 2021), https://www.wbez.org/stories/mayor-lori-lightfoot-says-police-tortured-at-least-100-black-chicagoans-the-city-refuses-to-call-it-a-pattern/7b5eca8c-5089-44a4-9648-6e720e8fb521.

than using in-house counsel already employed by the City for this type of work.[2]  A complete analysis of the total social cost of the City's legal defense strategy would require extensive discovery of facts and data that was not available to me at the time of writing this affidavit.[3]  For the purposes of my descriptive analysis, I rely on publicly available estimates, and make several assumptions.  In particular, I adopt the premise of *amici* that spending taxpayers' dollars on outside counsel to deny wrongdoing that has already been established is a waste and provides no social value to Chicago residents.

6.      According to an investigation by The Chicago Tribune, the City paid more than $200 million to outside counsel for legal defense fees in civil rights cases involving Chicago police, over $27 million of that in roughly 15 cases related to Burge and the Midnight Crew, between 2004 and 2019.[4]  In total, at least twenty-five such lawsuits have been brought against the City by Burge's victims,[5] and most dragged on for several years.  One of these cases, that of James

---

[2] *See, e.g.*, Dan Hinkel, *A hidden cost of Chicago police misconduct: $213 million to private lawyers since 2004*, Chicago Tribune (Sept. 12, 2019), https://www.chicagotribune.com/investigations/ct-met-chicago-legal-spending-20190912-sky5euto4jbcdenjfi4datpnki-story.html: "Chicago spends tens of millions of dollars a year on outside lawyers for civil rights suits, but the Law Department also has about 40 lawyers in the unit that handles such cases."

[3] A complete analysis of the total social cost would require complete discovery of the City's financial decision-making strategies, including whether and when to levy additional taxes, and how to allocate incremental tax revenues.  This information is not available to me, and a full analysis of the City's financial decision making is beyond the scope of this affidavit.  I focus instead on the opportunity cost of the resources the City has demonstrably chosen to allocate to litigation of civil rights cases.  A complete analysis of this sort would also require complete discovery of the City's expenditures on outside counsel to litigate these civil rights cases.  Exact data for all cases were not available to me either; instead, I use estimates from public sources of the cost of some cases.

[4] Dan Hinkel, *A hidden cost of Chicago police misconduct: $213 million to private lawyers since 2004*, Chicago Tribune (Sept. 12, 2019), https://www.chicagotribune.com/investigations/ct-met-chicago-legal-spending-20190912-sky5euto4jbcdenjfi4datpnki-story.html.

[5] *Caine v. City of Chicago, et al.*, No. 1:11-cv-08996 (N.D. Ill.); *Kitchen v. Burge*, No. 1:10-cv-04093 (N.D. Ill.); *Reeves, et al. v. Burge, et al.*, No. 1:10-cv-01989 (N.D. Ill.); *Smith v. Burge, et al.*, No. 1:16-cv-03404 (N.D. Ill.); *Kluppelberg v. Burge*, No. 1:13-cv-03963 (N.D. Ill.); *Tillman v. Burge*, No. 1:10-cv-04551 (N.D. Ill.); *Patterson v. Burge*, No. 1:2003cv04433 (N.D. Ill.); *Hobley v. Burge, et al.*, No. 1:03-cv-03678 (N.D. Ill.); *Orange v. Burge, et al.*, No. 1:04-cv-00168 (N.D. Ill.); *Wrice v. Byrne, et al.*, No. 1:14-cv-05934 (N.D. Ill.); *Harris v. City of Chicago, et al.*, No. 1:2014cv04391 (N.D. Ill.); *Patrick v. Chicago, et al.*, No. 1:14-cv-03658 (N.D. Ill.); *Evans v. City of Chicago*, No. 1:04-cv-3570 (N.D. Ill.); *Johnson v. Guevara, et al.*, No. 1:05cv1042 (N.D. Ill.); *Jimenez v. City of Chicago*, No. 1:09cv8081 (N.D. Ill.); *Fields v. City of Chicago*, No. 1:10cv1168 (N.D. Ill.); *Rivera v. Guevara*, No. 1:12cv4428 (N.D. Ill.); *Banks v. Burge, et al.*, No. 1:1991cv06470 (N.D. Ill.); *Jones v. Burge, et al.*, No. 1:2011cv04143 (N.D. Ill.); *Fauntleroy v. Burge, et al.*, No. 1:2011cv00118 (N.D. Ill.); *Logan v. Burge, et al.*, No. 1:2009cv05471 (N.D. Ill.); *Andrews v. Burge, et al.*, No. 1:2008cv05874 (N.D. Ill.); *Cannon v. Burge, et al.*, No. 1:2005cv02192 (N.D. Ill.); *Howard v. City of Chicago, et al.*, No. 1:2003cv08481 (N.D. Ill.); *Hill v. City of Chicago, et al.*, No. 1:2006cv06772 (N.D. Ill.).

Kluppelberg, dragged on for nearly five years, costing the City over $6 million in legal fees.[6] Mr. Gibson filed his lawsuit approximately two years ago and, if one were to extrapolate from Mr. Kluppelberg's case, the City may have already spent millions in legal fees on this matter.

### A. Early Settlement of Compensation Claims Would Lead to Substantial Savings for the City of Chicago and its Residents

7.     The City of Chicago could realize substantial savings by making a good-faith effort to resolve these cases quickly, either through mediation, early summary judgement, or otherwise settling early.  For the sake of exposition, I will consider an example in which legal fees are roughly constant over the course of these cases.[7]  Under this assumption, in the case of Mr. Kluppelberg, the City would have spent over $100,000 per month of litigation.[8]  Resolving the case in two months rather than five years could have led to roughly a 97% savings in litigation costs.[9]  The total social cost to the City of Chicago and its residents, however, is actually more than the nominal amount spent, as I outline in the next section.

### B. The Social Cost to Chicago Residents

8.     Estimating the total social cost to Chicago residents of the City's excess spending on legal fees depends on what the City would have done if it had avoided these costs.  If the City avoided excess legal fees by opting to mediate or otherwise settle with victims of wrongful conviction—especially those who have already been provided with a certificate of innocence—it would be able to either: 1) collect less tax revenue; or 2) reallocate tax revenue to other projects.  If the City opted to collect less tax revenue, this would leave more money in the pockets of Chicago

---

[6] Dan Hinkel, *A hidden cost of Chicago police misconduct: $213 million to private lawyers since 2004*, Chicago Tribune (Sept. 12, 2019), https://www.chicagotribune.com/investigations/ct-met-chicago-legal-spending-20190912-sky5euto4jbcdenjfi4datpnki-story.html.

[7] In reality, legal fees probably vary considerably over time, and likely are clustered around filing dates.  The longer a case drags on, however, the more complex the arguments and motions.  Billings around filing dates close to the end of litigation spanning multiple years are probably higher than billings around earlier filing dates.  What is important for this argument is that attorneys bill by the hour and earlier resolution of these cases would lead to some reduction in litigation costs.  The rest of my analysis is robust to any assumed or estimated percentage reduction in litigation costs.

[8] $6 million / 60 months = $100,000 per month.

[9] (60 months - 2 months) / 60 months = 97%.

residents, including local business owners who may invest some of it in additional entrepreneurial activities, which would stimulate the economy and create social value. Alternatively, if the City continued to collect this revenue, it could spend the funds on other projects (e.g., community food, housing, and other relief services; primary and secondary schools; public transit; etc.) that create social value. In either case, the total social cost of the City's tax collection and allocation is even larger than the nominal amount spent on litigation, as I explain below.

9.      In the event that the City had to collect additional tax revenue to finance these litigation costs, there is "deadweight" loss. This is an economic concept highlighting the distortionary aspect of taxation. In order to generate more tax revenue, governments have to tax income, wealth, or sales of products and services. In so doing, they change incentives: taxing income reduces the wage workers earn, distorting incentives to work; taxing sales of products and services increases the price of those products and services, reducing the quantity demanded (and therefore sold). Deadweight loss is the lost value (in the form of consumption value to the buyers and profit to the sellers) of the sales of products and services that did not occur because of the tax. This loss is in addition to the loss associated with the foregone consumption and investment Chicago residents would have engaged in had they faced a lower tax burden.

10.     On the other hand, if the City reallocated funds from other projects, the total social cost is still more than the nominal amount spent on litigation to the extent that those other projects provided more social value than litigating compensation claims for victims of wrongful imprisonment, as I discuss in more detail below.

11.     In reality, the City's strategy of hiring outside counsel to litigate civil rights cases probably involves a combination of collecting additional tax revenue and diverting revenue from other projects. For the remainder of my analysis, I focus on the revenue that is diverted from other projects to fund the City's hiring of outside counsel. The general logic and structure of the analysis, however, also applies to evaluating the social cost of foregone consumption and investment by Chicago residents resulting from increased taxes.

12.     The first step in estimating the total social cost of the City's excess spending on litigation is ascertaining how the City spends incremental or "marginal" tax revenue. The question is, if the City were to collect one additional dollar in tax revenue, how would that dollar be spent? The answer to this question gives an indication of the types of projects from which the City

might divert marginal tax revenue to fund their litigation of civil rights cases. Recent COVID 19 relief funds may provide some insight. In 2021, the City received $1.46 billion in COVID relief funds from the federal government.[10] The majority of this was spent on pandemic-related relief, but the City also spent over $100 million of these funds on more general community services; for example, $70 million on services for the homeless, $13 million on senior services, $11 million on child services, $10 million on violence prevention, and $3 million on HIV/AIDS.[11] These are examples of the types of projects and programs from which the City may have diverted funds in order to finance the litigation of civil rights cases.

13.     Two additional examples of programs from which the City could have hypothetically diverted funds to finance the litigation of civil rights cases are primary and secondary education, and public transit. In either case, there would have been substantial economic impact and distributional effects as I discuss in more detail below.

14.     The second step in estimating the total social cost of the City's excess spending on litigation is estimating the "economic impact" of the alternative project the City may have funded had it avoided those litigation costs. The economic impact of investment in a new project, or new spending in a particular industry, is not limited solely to the direct impact of that project or in that industry—the new economic activity in that industry involves inputs from other industries, generates new jobs, and has indirect or "spillover" effects on economic activity and jobs in other industries. For example, building a new shopping mall generates demand for local goods and services (the direct impact; e.g., concrete, glass, electrical wiring, plumbing, contractors, transportation, etc.); this in turn generates new demand in other industries that supply those inputs (the indirect impact; e.g., mining, steel manufacturing, fuel, etc.). This increased economic activity also increases the number of jobs and earnings in the industries that provide the inputs, and these workers will in turn spend more in the region.

15.     The Regional Input-Output Modeling System (RIMS II) published by the Bureau of Economic Analysis of the U.S. Department of Commerce is a regional economic model used by investors, planners, and government agencies to assess the potential economic impacts of various projects. The RIMS II model comprises a set of input and output tables that account for the

---

[10] City of Chicago, *2021 Budget Overview* (2020), at pp. 53–54.

[11] City of Chicago, *2021 Budget Overview* (2020), at pp. 53–54.

increased demand of goods and services generated, across all industries, by an increase in demand in a particular industry. The model produces multipliers for each of 372 industries that are used in economic impact studies to estimate the total impact, in terms of total economic output and the number of jobs created, of a project in a particular product in a particular region.[12]

16.      The multipliers for a few industries are presented in Table 1. The first column, "Output Multiplier," represents the total economic impact of "new demand" of $1 in each of the listed industries; the second column, "Employment Multiplier," represents the number of jobs created by in response to $1 million in new demand in each of the listed industries.

17.      For example, if the City spent $1 million on public transit, that would translate into $1.75 million in total economic output in the Chicago area, and would create 25 new jobs. This means that the total social cost of spending $1 million on wasteful litigation of compensation claims in cases where wrongful conviction has already been established, rather than public transit, in the Chicago area is $1.75 million and 25 jobs.[13]  The total social cost then of the $27 million the City has spent litigating claims brought by victims of Burge and the Midnight Crew, could be as much as $47.25 million, and 683 jobs.[14]

---

[12] *See generally* Bess, Rebecca, and Zoë O. Ambargis. "Input-output models for impact analysis: Suggestions for practitioners using RIMS II multipliers." In *50th Southern Regional Science Association Conference*, pp. 23-27. Southern Regional Science Association Morgantown WV, 2011.

[13] One may object that spending on legal services also has a multiplier effect. This is true, however, only if the spending on legal services is new demand. If, however, litigating compensation claims for victims of wrongful imprisonment—in cases in which the wrongful imprisonment has already been established—is wasteful, as *amici* assert, and generates no social value, it is akin to paying workers to dig ditches and fill them back in. That is not true economic activity and is not new demand. Those workers are simply diverted from other productive endeavors which do generate social value. If, on the other hand, there is some social value to litigating compensation claims brought by the wrongfully convicted and imprisoned, then it is true that the total social cost depends on the difference between the multiplier effect for spending on legal services and the multiplier effect for the alternative, foregone investment. Even in this scenario, my overall conclusions still hold. The multiplier effects for all the alternatives listed in Table 1 are larger than the multiplier effect for legal services, so the total social cost is still more than the nominal amount spent.

[14] $27 million * 1.75 = $47.25 million.  $27 million * 25.31 = 683.

**Table 1**
## RIMS II Multipliers for Relevant Industries

Type 1 Multipliers at the Chicago MSA Level

| Industry | Output Multiplier | Employment Multiplier |
|---|---|---|
| Community food, housing, and other relief services | 1.68 | 14.29 |
| Individual and family services | 1.51 | 22.50 |
| Elementary and secondary schools | 1.23 | 19.73 |
| Home health care services | 1.36 | 19.98 |
| Transit and ground passenger transportation | 1.75 | 25.31 |

Notes: Employment multiplier is the number of incremental jobs (across all industries) from an additional $1 million of new demand in the industry shown.

Source: U.S. Bureau of Economic Analysis, Regional Input-Output Modeling System.

### C.      Distributional Effects

18.     The total social cost of the City's choice to litigate compensation claims brought by the wrongfully convicted is not shared equally among Chicago residents—there are stark "transfer" or distributional effects.  Money spent by the City on legal fees primarily goes to attorneys who earn more than the average taxpayer, and many of the foregone services provided by the City could have gone to local residents—for example, the homeless—who are far less fortunate than the average taxpayer.

19.     As two examples of the distributional effects of this misallocation of resources, I focus here on the examples of the City spending this money on either education or public transit, rather than legal services.  The average salary of a Chicago-area attorney is $159,000; by comparison, a Chicago-area bus driver earns an average salary of $52,610, and Chicago-area primary and secondary school teachers earn, on average, $69,560 and $82,610, respectively.[15]  Allocating these resources to legal services amounts to a transfer to relatively well-off attorneys, while the cost is disproportionately borne by the less fortunate.

Jarrod R. Welch

---

[15] Occupational Employment and Wage Statistics, U.S. Bureau of Labor Statistics, 2020.

# APPENDIX C—2011 Insurance Policy for the City of Chicago

# Exhibit B



**TORUS BERMUDA INTERMEDIARIES LIMITED as MGA for TORUS INSURANCE (UK) LIMITED**

AS Cooper Building
26 Reid Street, Hamilton HM 11
PO Box HM 1503, Hamilton HM FX
Bermuda
Tel: + (441) 295 6722
Fax: + (441) 295-1819
Email For Claims Matters Only:
claims@torusinsurance.com

POLICY NO.: MGA-UMB-2010-0003
RENEWAL

## SPECIAL EXCESS LIABILITY DECLARATIONS

**ITEM 1.**   **NAMED INSURED**   CITY OF CHICAGO, ILLINOIS
333 South State Street
Room 400
Chicago, Illinois 60604

**ITEM 2.**   **POLICY PERIOD** Inception Date: December 31, 2010 To: December 31, 2011
(12:01 A.M. prevailing time at the address stated in Item 1 above)

**ITEM 3.**   **LIMITS OF INSURANCE**

The Limits of Insurance, subject to all the terms and conditions of this Policy are:

Coverage A
A. Limits of Insurance

1. Aggregate Limits         Limits of Liability

    a. $5,000,000     **Products-Completed Operations Hazard** Aggregate

    b. $5,000,000     Errors and Omissions Liability Aggregate, other than **personal and advertising injury offense wrongful acts**

    c. $5,000,000     Employee Benefit Liability Aggregate

2. **Per Occurrence** or
   **Wrongful Act** or **Employee**
   **Benefit Wrongful Act Limit**

    $5,000,000     Any one occurrence or wrongful act or employee benefit wrongful act or series of continuous, repeated, or related occurrences or wrongful acts or employee benefit wrongful acts in excess of your retained limit.

 torus

**TORUS BERMUDA INTERMEDIARIES LIMITED as MGA for TORUS INSURANCE (UK) LIMITED**

AS Cooper Building
26 Reid Street, Hamilton HM 11
PO Box HM 1503, Hamilton HM FX
Bermuda
Tel: + (441) 295 6722
Fax: + (441) 295-1819
Email For Claims Matters Only:
claims@torusinsurance.com

POLICY NO.: MGA-UMB-2010-0003
RENEWAL

## SPECIAL EXCESS LIABILITY DECLARATIONS

B. **Retained Limit**

$15,000,000     Any one **occurrence** or **wrongful act** (other than **employment practice liability**) or **employee benefit wrongful act** or series of continuous, repeated, or related **occurrences** or **wrongful acts** or **employee benefit wrongful acts**.

$15,000,000     Any one **wrongful act** arising out the **employment practice liability**, or series of continuous, repeated, or related **occurrences** or **wrongful acts** arising out of **employment practice liability**

ITEM 4.     **ENDORSEMENTS APPLICABLE TO THIS POLICY ON THE ORIGINAL DATE OF ISSUE:**

|  | Title |
|---|---|
| 1. | Cyber Liability Exclusion |
| 2. | Fungus Exclusion Endorsement |
| 3. | Landfill Exclusion |
| 4. | Act of Terrorism Retained Limit Endorsement |
| 5. | Specified Entity Exclusion Endorsement |
| 6. | Designated Project Exclusion Endorsement |
| 7. | Violation of Communication Law Exclusion |
| 8. | Designated Personal Injury Offense Endorsement |
| 9. | Minimum Earned Premium Endorsement |
| 10. | Coverage B Layer Excess Follow Form Endorsement |
| 11. | Coverage B Schedule of Underlying Excess Policies |
| 12. | Amendatory Endorsement- Monell Liability |
| 13. | Knowledge of Occurrence |

ITEM 5.     PREMIUM USD 2,100,000

MINIUMUM EARNED PREMIUM 25%

Total Premium (Including Terrorism Risk Insurance Act Coverage Premium): $2,100,000
premium for Terrorism Risk Insurance Act Coverage: $21,000

Date of Issue: January 6, 2011
MGA-Umbrella MANU Declarations
Page 2 of 3



## SPECIAL EXCESS LIABILITY POLICY FOR
## CITY OF CHICAGO, ILLINOIS

### Table of Contents

| | | |
|---|---|---|
| **SECTION I. WHAT WE SHALL PAY ON YOUR BEHALF** | | 1 |
| A. | Insuring Agreements | 1 |
| B. | Defense and Defense Costs | 2 |
| **SECTION II. DEFINITIONS** | | 2 |
| **SECTION III. LIMITS OF INSURANCE** | | 11 |
| **SECTION IV. WHO IS AN INSURED** | | 12 |
| **SECTION V. EXCLUSIONS** | | 13 |
| **SECTION VI. GENERAL CONDITIONS** | | 19 |
| A. | Appeals | 19 |
| B. | Bankruptcy, Insolvency or Inability to Pay | 20 |
| C. | Cancellation | 20 |
| D. | Nonrenewal | 21 |
| E. | Conformance to Statute | 21 |
| F. | Duties in The Event of an Occurrence or Wrongful Act or Employee Benefit Wrongful Act or Claim or Suit | 22 |
| G. | First Named Insured | 23 |
| H. | Inspection | 23 |
| I. | Legal Actions Against Us | 24 |
| J. | Other Insurance | 24 |
| K. | Policy Changes | 24 |
| L. | Policy Period | 24 |



# SPECIAL EXCESS LIABILITY POLICY FOR

## CITY OF CHICAGO, ILLINOIS

| M. | Policy Territory | 24 |
| N. | Premium | 25 |
| O. | Separation Of Insureds | 25 |
| P. | Subrogation | 25 |
| Q. | Transfers of Your Rights and Duties | 25 |



**Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK) Limited**
AS Cooper Building
26 Reid Street, Hamilton HM 11
PO Box HM 1503, Hamilton HM FX
Bermuda
Tel: + (441) 295 6722
Fax: + (441) 295 1819
Email For Claims Matters Only:
claims@torusinsurance.com.

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties, and what is and is not covered.

Throughout this Policy the words **you and your** refer to the Named Insured(s) shown in the Declarations and any other person(s) or organization(s) qualifying as an **insured** under this Policy. The words **we, us,** and **our** refer to the Company providing this insurance.

Other words and phrases that appear in boldface have special meaning. Refer to SECTION II. DEFINITIONS, and SECTION IV. WHO IS AN INSURED.

In consideration of the payment of the premium and in reliance upon the statements in the Declarations, **we** agree to provide as follows:

## SECTION I. WHAT WE SHALL PAY ON YOUR BEHALF

### A. INSURING AGREEMENTS

#### 1. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

We shall pay **you**, or on **your** behalf, the **ultimate net loss**, in excess of the **retained limit**, that the **insured** becomes legally obligated to pay by reason of liability imposed by law or assumed under an **insured contract** because of **bodily injury** or **property damage** arising out of an **occurrence** during the Policy Period.

#### 2. ERRORS AND OMISSIONS LIABILITY

We shall pay **you**, or on **your** behalf, the **ultimate net loss**, in excess of the **retained limit**, that the **insured** becomes legally obligated to pay to compensate others for loss arising out of **your wrongful act** that takes place during the Policy Period and arises solely in performing or failing to perform duties of the **public entity**.

#### 3. EMPLOYEE BENEFIT LIABILITY

We shall pay **you**, or on **your** behalf, the **ultimate net loss**, in excess of the **retained limit**, that the **insured** becomes legally obligated to compensate others for loss arising out of **your employee benefit wrongful act** that takes place during the Policy Period, in the **administration** of **your employee benefit program.**



**B.    DEFENSE AND DEFENSE COSTS**

1.    The defense of any **claim** or **suit** to which this Policy applies is **your** obligation and that of **your** legal representative, the City of Chicago Corporation Counsel. **You** will pay all costs of **claim** or **suit** investigation, litigation, and legal expense which can be directly allocated to a specific **claim** or **suit.**

2.    **We** will not be obligated to assume charge of the investigation, settlement or defense of any **claim** made, **suit** brought or proceeding instituted against **you. We** will, however, have the right and shall be given the opportunity to participate in the defense and trial of any **claim, suit** or proceedings relative to any **occurrence, wrongful act** or **employee benefit wrongful act,** which in **our** opinion, may create liability for **us** under the terms and conditions of this Policy. If **we** exercise such right, **we** will do so at **our** own expense.

3.    In the event **you** receive a settlement demand on a **claim** or **suit** covered by this Policy which is in excess of **your retained limit** and to which **we** do not agree, then, upon **your** tender to **us** of an amount equal to **your retained limit, we** will then pay on **your** behalf all sums for which **you** may become legally liable including defense costs. **We** will not defend any **suit** or **claim** after **our** applicable Limit(s) of Insurance has been exhausted by payment of judgments or settlements.

If the final judgement or settlement is less than the amount tendered to **us,** the unapplied portion will be returned to **you** less **our** defense costs.

When the final judgement or settlement is less than the amount tendered to **us,** and the sum of the final judgement or settlement plus the defense costs exceeds **your retained limit,** than the defense costs in excess of **your retained limit** will be shared on an equal basis by **you** and **us.**

## SECTION II.   DEFINITIONS

A.    **Administration** means:

1.    Counseling **employees,** including their dependents and beneficiaries, with respect to the **employee benefit program;**

2.    Handling records in connection with the **employee benefit program;** and/or

3.    Effecting or terminating any **employee's** participation in a plan included in the **employee benefit program.**



B.   **Automobile** means a land motor vehicle, trailer or semi-trailer; or, such land motor vehicles used in a transit or public transportation system operating over non-fixed routes as provided in the exception provisions of Exclusion BB.

C.   **Bodily Injury** means bodily harm, sickness, disability or disease. **Bodily injury** shall also mean mental injury, mental anguish, humiliation, shock or death if resulting directly from **bodily injury,** sickness, disability or disease. **Bodily injury** shall include care and loss of services resulting at any time resulting from the **bodily injury** of any person or persons.

D.   **Claim(s)** means a demand for money.

E.   **Employee** includes a **leased worker** or a volunteer while acting within the scope of his/her duties as such.

F.   **Employee benefit program** includes any employee benefit plan involving, but not limited to, the following:

     Group life insurance, group accident or health insurance, profit sharing plans, pension plans and stock subscription plans provided that no one other than an **employee** may subscribe to such insurance or plans, unemployment insurance, social security benefits, workers' compensation and disability benefits.

G.   **Employee benefit wrongful act** means any actual or alleged negligent act, error, or omission in the **administration** of the **employee benefit program.**

H.   **Employment practice liability** shall mean any actual or alleged negligent error or omission resulting in loss to:

   1   A person arising out of any:

       a.   Refusal to employ that person;

       b.   Termination of that person's employment; or

       c.   Employment related practices, policies, acts or omission, including, but not limited to: coercion, demotion, evaluation, **retaliation,** reassignment, discipline, defamation, harassment, failure to promote, humiliation, discrimination; or acts or omissions as described in 1.c. herein directed at a **whistle-blower;** or

   2   The spouse, child, parent, brother or sister of that person as a consequence of loss to that person to whom any of the employment-related practices described in paragraphs. 1.a., 1.b., or l.c. above apply.

This coverage applies:



a. Whether **you** may be liable as an employer or in any other capacity; and

b. To any obligation to share damages with or repay someone else who must pay damages because of the injury.

I **First aid** means the immediate and emergency care given to an ill or injured person before regular medical aid can be obtained.

J **Hired automobile** means an **automobile** used under contract on **your** behalf or loaned to **you,** provided such **automobile** is not owned by **you** or registered in **your** name or in the name of any of **your employees** or servants.

K. **Insured contract** means:

1. A contract for a lease of premises including but not limited to premises rented or loaned to **you;**

2. A sidetrack agreement;

3. Any easement or license agreement;

4. An obligation, as required by ordinance;

5. An elevator maintenance agreement;

6. That part of any other contract or agreement pertaining to **your** business under which **you** assume the tort liability of another party to pay for **bodily injury** or for **property damage,** or for a **wrongful act** from a **personal injury offense** to a third person or organization. **Tort liability** means a liability that would be imposed by law in the absence of any contract or agreement; or

An **insured contract** does not include that part of any contract or agreement:

That indemnifies an architect, engineer, or surveyor, his agents or **employees,** for injury or damage arising out of:

a. Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs, or specifications; or

b. Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage.

L. **Joint powers authority(ies)** means two (2) or more public agencies joined together by a joint agreement in order to jointly exercise any power common to the contracting parties, including, but not limited to the power to create risk pooling and joint purchase of private insurance.



M.  **Land subsidence** means the movement of land or earth, including, but not limited to, sinking or settling of land, earth movement, earth expansion and/or contraction, landslide, slipping, falling away, caving in, eroding, earth sinking, and earth rising or shifting or tilting.

N.  **Leased worker** means a person leased to **you** by a labor leasing firm under an agreement between **you** and the labor leasing firm, to perform duties related to the conduct of **your** business.

O.  **Loading or unloading** means the handling of property:

　　1.  While it is in or on an aircraft; or

　　2.  While it is being moved from an aircraft to the place where it is finally delivered.

But **loading or unloading** does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft.

P.  **Municipality** means a legally incorporated or duly authorized association of inhabitants of a limited area limited to the following: city, town, county, village, township, borough, hamlet, burgh, or state.

Q.  **Nuclear facility** means:

　　1  Any **nuclear reactor;**

　　2  Any equipment or device or used for:

　　　　a.  Separating the isotopes of uranium or plutonium,

　　　　b.  Processing or utilizing **spent fuel,** or

　　　　c.  Handling, processing or packaging nuclear **waste;**

　　3  Any equipment or device used for the processing, fabricating, or alloying of **special nuclear material** if at any time the total amount of such material in **your** custody at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233, or any combination thereof, or more than 250 grams of uranium 235;

　　4  Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of nuclear **waste;** or

　　5  The site on which 1. and 2. above are located, all operations conducted on those sites, and all premises used for such operations.



R.   **Nuclear material** means **source material, special nuclear material** or **by-product material.**

S    **Nuclear reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

T.   **Occurrence** means an accident, including continuous, repeated, or related exposure to substantially the same general harmful conditions, which results in **bodily injury** or **property damage** neither expected or intended from **your** standpoint.

U.   **Owned automobile** means an **automobile** owned by **you** or under long term lease to **you.**

V.   **Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste material. **Waste** material includes materials which are intended to be or have been recycled, reconditioned or reclaimed.

     **Pollutants** shall not include potable water, water distributed to the consumer intended to be potable water, agricultural water, or water furnished to commercial users, or water used for fire suppression.

W.   **Products-completed operations hazard** means all **bodily injury** and **property damage** occurring away from premises **you** own or rent and arising out of **your product** or **your** work except:

     1.    Products that are still in **your** physical possession; or

     2.    Work that has not yet been completed or abandoned.

     **Your work** will be deemed completed at the earliest of the following times:

     1.    When all of the work called for in **your** contract has been completed;

     2.    When all of the work to be done at the site has been completed if **your** contract calls for work at more than one site; or

     3.    When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

     Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

     This hazard does not include **bodily injury** or **property damage** arising out of:



1. The transportation of property, unless the injury or damage arises out of a condition in or of a vehicle created by the **loading or unloading** of it; or

2. The existence of tools, uninstalled equipment or abandoned or unused materials.

X. **Property damage** means:

1. Physical injury to or destruction of tangible property, including all resulting loss of use of that property; or

2. Loss of use of tangible property that is not physically injured or destroyed.

Y. **Public entity** refers to that **municipality,** governmental body, department, or unit, which is a **Named Insured** in the Declarations.

Z **Retained limit** refers to the amount stated in the Declarations. This amount may consist of a self insured retention, **underlying insurance,** or a combination thereof. If there are policies of **underlying insurance** and they do not apply to the **occurrence, wrongful act,** and/or **employee benefit wrongful act, you** shall retain this amount as self-insurance as stated in the Declarations with respect to:

1. **Bodily injury** or **property damage** arising out of each such **occurrence** or series of continuous, repeated or related **occurrences;**

2. Each such **wrongful act** or series of continuous, repeated or related **wrongful acts;** or

3. Each such **employee benefit wrongful act** or series of continuous, repeated, or related **employee benefit wrongful acts.**

The **retained limit,** with respect to a self-insured retention, shall not include defense costs.

AA. **Retaliation** means a **wrongful act** of **yours** relating to or alleged to be in response to any of the following activities:

1. The disclosure or threat of disclosure by **your employee** to a superior or to any governmental agency of any act by **you** which is alleged to be a violation of any federal, state, local, or foreign law, common or statutory, or any rule or regulation promulgated thereunder;



    2.    The actual or attempted exercise by **your employee** of any right that such **employee** has under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to **employee** rights;

    3.    The filing of any **claim** or **suit** under the Federal False Claims Act of any other federal, state, local, or foreign **whistle-blower** law; or

    4.    Strikes of **your employee.**

BB.    **Source material, special nuclear material** and **by-product material** have the meaning given them in the Atomic Energy Act of 1954 or in any amendatory law thereof.

CC.    **Spent fuel** means any fuel element or fuel component, solid or liquid, which has been used in or exposed to radiation in a **nuclear reactor.**

DD.    **Suit** means a civil proceeding in which damages are alleged because of **bodily injury** or **property damage, wrongful act** or **employee benefit wrongful act** to which this insurance applies. **Suit** includes:

    i    An arbitration proceeding in which such damages are claimed and to which **you** must submit or do submit with **our** and **your** consent; or

    2    Any other alternative dispute resolution proceeding in which such damages are claimed and to which **you** submit with **our** and **your** consent.

EE.    **Ultimate net loss** means the sum actually paid or payable due to a **claim** or **suit** for which **you** are liable either by a settlement to which **you** and **we** agreed or a final judgment. Such sum will include proper adjustments for recoveries and salvage.

FF.    **Underlying insurance** refers to the policies listed in the Schedule of **Underlying Insurance** and includes:

    1.    Any renewal or replacement of such policies;

    2.    Any other insurance available to the **you; and**

    **3.**    Any other valid and collectible risk financing mechanism provided under a **joint powers authority.**

GG.    **Underlying insurer** means any insurer which provides a Policy listed in the Schedule of **Underlying Insurance** and includes any insurer which provides any renewal or replacement of such policies and any insurer which provides any other insurance available to **you.**



HH.  **Waste** means any **waste** material containing **by-product material** and arising out of the operation by any person or organization of any **nuclear facility** included within the definition of **nuclear facility.**

II   **Whistle-blower** means an **employee,** who discloses or threatens to disclose to a superior or any governmental agency, or who gives testimony relating to any action by **you,** which may be a violation of public Policy as reflected in legislation, administrative rules, regulations or decisions, judicial decisions, or professional codes of ethics.

JJ.  **Wrongful act** means:

Any actual or alleged error or misstatement, omission, negligent act, or breach of duty including misfeasance, malfeasance, and nonfeasance by **you,** including, but not limited to, those constituted by:

1.  Any violation of antitrust statutes;

2.  Any negligent ministerial act;

3.  Any faulty preparation or approval of maps, plans, reports, surveys, designs, bid documents, bid specifications, other specifications, or inaccuracies due to estimates of probable costs, but only if any of the afore listed services are provided by any **insured** for another **insured;**

4.  **Employment practice liability;** or

5.  Discrimination on any basis, including, but not limited to: race, creed, religion, ethnic background, national origin, age, handicap, sex or sexual orientation; but not intentionally committed by **you** or at **your** direction.

**Wrongful act** also means any **personal injury offense** or **advertising injury offense.**

**Advertising injury offense** means any act, error, or omission constituted by one or more of the following:

1.  Oral or written publication of material that slanders or libels a person or organization, or disparages a person or organization's goods, products, or services;

2.  Oral or written publication of material that violates a person's right of privacy;

3.  Misappropriation of advertising ideas or style of doing business; or

4.  Infringement of copyright, title or slogan.



**Personal injury offense** means any act, error, or omission constituted by one or more of the following:

1. False arrest, detention or imprisonment;

2. Malicious prosecution;

3. Oral or written publication of material that slanders or libels a person or organization, or disparages a person or organization's goods, products, or services;

4. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies by or on behalf of its owner, landlord or lessor;

5. Violation of an individual's right to privacy; or

6. Assault and battery.

KK. **Your Product** means:

1. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

    a. **You;**

    b. A person or organization whose business or assets **you** have acquired; and

2. Containers, other than vehicles, materials, parts or equipment furnished in connection with such goods or products;

**Your product** includes:

1. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your product;**

2. The providing of or failure to provide warnings or instructions;

3. Work or operations performed by **you** or on **your** behalf; and

4. Materials, parts or equipment furnished in connection with such work or operations.



torus

## SECTION III.    LIMITS OF INSURANCE

A.    The Limits of Insurance shown in the Declarations and the rules below state the most we will pay in excess of **your retained limit** regardless of the number of:

1.    **Insureds.** However, in the event that there are multiple **municipalities as Named Insureds, our** Limits of Insurance shall apply separately to each **municipality** insured under this Policy;

2.    **Claims** made or **suits** brought; or

3.    Persons or organizations making **claims** or bringing **suits.**

B.    The **retained limit** shown in the Declarations applies:

1.    Only to damages for **occurrences,** losses for **wrongful acts,** or losses for **employee benefit wrongful acts** covered under this Policy; and

2.    Separately to each **occurrence, wrongful act,** or **employee benefit wrongful act** or series of continuous, repeated, or related **occurrences, wrongful acts,** or **employee benefit wrongful acts;** and

3.    Separately to each **municipality** insured under this Policy in the event that there are multiple **municipalities as Named Insureds.**

C.    **Our** duty to pay any sums that **you** become legally obligated to pay arises only after there has been a complete expenditure of **your retained limit** by means of payments for judgments or settlements. **Your retained limit** shall not be exhausted by defense costs nor **your** office expenses, **employees'** salaries, or expenses of any claims servicing organization that **you** have engaged. **We** will then be liable only for that portion of damages in excess of **your retained limit** up to **our** Limits of Insurance.

D.    If the limits of insurance of the **underlying insurance** are less than **your retained limit, you** shall bear the risk of the difference. If such limits, however, are greater than **your retained limit,** this Policy is in excess of the greater limits.

E.    The Per **Occurrence** or **Wrongful Act** or **Employee Benefit Wrongful Act** Limit of Insurance is the most **we** will pay for the sum of all damages because of **bodily injury** or **property damage** arising out of a single **occurrence** or all **losses** arising out of a single **wrongful act** or all losses arising out of a single **employee benefit wrongful act.**



F.  **All occurrences** arising out of continuous, repeated, or related **occurrences shall be**
    treated as one **occurrence.** All **wrongful acts** or **employee benefit wrongful acts** arising
    out of continuous, repeated, or related **wrongful acts** or **employee benefit wrongful acts**
    shall be treated as one **wrongful act** or one **employee benefit wrongful act.** The Limits
    of Insurance in effect when the first **claim** or **suit** is made and reported to **us** shall apply.

G.  The Aggregate Limits are the most we will pay for the total of all damages:

    1.  Under the **products-completed operations hazard** arising out of all
        **occurrences;** or

    2.  For all losses arising out of all **wrongful acts;** or

    3.  For all losses arising out of all **employee benefit wrongful acts;**

    and subject to SECTION III. A. above, if there are multiple **municipalities** as **Named
    Insureds.**

H.  The Limits of Insurance apply separately to each consecutive annual period. The Policy
    Period begins with the effective date shown in the Declarations. If the Policy Period is
    extended after issuance for an additional period of less than twelve (12) months, the
    additional period will be deemed part of the last preceding period.

## SECTION IV.  WHO IS AN INSURED

**Insured** means each of the following:

A.  The **Named Insured** designated in the Declarations;

B.  Those individuals who were or now are elected or appointed officials of the **Named
    Insured,** including members of its governing body or any other agencies, districts,
    authorities, committees, trustees, boards, commissions, or similar entity of the **Named
    Insured,** while acting on behalf of the Named Insured;

C.  Any of **your employees,** servants, or volunteers while acting within the course and scope
    of their employment or duties as volunteers;

D.  Any and all legally authorized **joint power authority(ies)** representing any listed **Named
    Insured** under this Policy. The following are also **insureds** with respect to such **joint
    power authority(ies):**

    1.  The municipality agencies participating as member agencies in the **joint power
        authority(ies),** and any and all districts, authorities, committees, trustees, boards,
        commissions, or similar entity subject to the direction or control of such agencies
        or for which the board members act as governing body. The member agency
        includes all departments and constituent agencies of the member agency; and



  2  Any person(s) who are past or present elected or appointed officers, employees, or authorized volunteers of the member agencies, whether or not compensated while acting on behalf of the member agencies and within their scope of employment or volunteer capacities, including acting on boards at the direction of the agencies.

E  Any person:

  1.  Designated in paragraphs A. through D. with respect to any automobile not owned by you that is used in **your** operations as a **public entity;** and

  2.  Using any **owned automobile** or **hired automobile** or any person legally responsible for the use thereof, provided that the **automobile** is being used with **your** permission.

The coverage granted by this provision, however, does not apply to:

  1.  Any person operating an **automobile** while working in a business that sells, services, repairs, delivers, tests, parks, or stores **automobiles;** or

  2.  The owner or lessee of any **hired automobile,** other than the **insured** or any agent or **employee** of such owner or lessee.

## SECTION V.  EXCLUSIONS

**We** will not defend or pay under this Policy for **claims** or **suits** against **you:**

A.  Arising out of the ownership, maintenance, loading or unloading, use or operation of any aircraft, airfields, runways, hangars, buildings or other properties in connection with aviation activities.

B.  For which **you,** or any carrier as **your** insurer, may be held liable under any workers' or unemployment compensation law, disability benefits law or any similar law. However, this Policy will respond to tort liability arising from Employers Liability subject to all other terms and conditions.

  However, this Policy will respond to tort liability arising from Employers Liability subject to all other terms and conditions;

C.  Arising out of any **advertising injury offense** due to:

  1.  Breach of contract, other than misappropriation of advertising ideas under an implied contract;

  2.  The failure of goods, products or services to conform with advertised quality or performance;



3.  The wrong description of the price of goods, products, or services; or

4.  Operations by an **insured** whose primary business is advertising, broadcasting, publishing or telecasting.

D.  For **property damage:**

1.  To property owned by **you;** or

2.  To aircraft in **your** care, custody or control or as to which **you** are for any purpose exercising physical control.

E   Arising from liability **you** assume in a contract or agreement. This exclusion does not apply to liability for damages:

1.  Assumed in a contract or agreement that is an **insured contract** provided the **bodily injury** or **property damage** occurs subsequent to the execution of the contract or agreement; or

2.  That **you** would have in the absence of the contract or agreement;

F.  1.  For **bodily injury** or **property damage** due to an **occurrence** or loss due to a **wrongful act** which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants** at any time;

2.  For any loss, cost, or expense arising out of any:

a.  Request, demand or order that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants;** or

b.  **Claim** or **suit** by, or on behalf of, a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **pollutants.**

However, 2.b. shall not apply to such loss, cost, or expense arising from any spill, release, or other hazardous condition at or from the premises, equipment, or location(s) which **you** do not own, rent, control or occupy.

However, this exclusion shall not apply to the following:

i   Any liability arising out of police use of mace, oleoresin capsicum (o.c.), pepper gas or tear gas;



    ii.    Weed abatement or spraying; or

    iii.    Any liability arising out of the **products-completed operations hazard;** or

    iv.    Any liability arising from the collision, upset, or overturn of an **automobile** or equipment.

All **bodily injury** or **property damage** due to an **occurrence** or loss due to a **wrongful act** arising from i., ii., iii., or iv. above, arising out of the same, interrelated, associated, repeated or continual discharge, dispersal, release or escape of **pollutants** shall be deemed one **occurrence** or **wrongful act.** The commencement of such discharge, dispersal, release or escape of **pollutants** shall be recorded and reported to the Corporation Counsel or designated Department Head within a seven (7) day period.

It is further agreed that regardless of whether any **suit** or **claim** against **you** has been made, **you** shall give written notice to **us** or any of **our** authorized brokers within forty (40) calendar days of the Corporation Counsel's or designated Department Head's recorded entry of such discharge, dispersal, release or escape of **pollutants** which may result in liability for **bodily injury** or **property damage** due to an **occurrence** or loss due to a **wrongful act** *as* described in i., ii., iii, or iv. above;

G.    1    Arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers, or asbestos dust; or

    2.    For any of **your** obligations to indemnify any party because of damage arising out of **bodily injury** or **property damage** due to an **occurrence** or loss due to a **wrongful act** at any time as a result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers, or asbestos dust; or

    3.    For any of **your** obligations to defend any **claim** or **suit** against **you** seeking damages arising out of **bodily injury** or **property damage** due to an **occurrence** or loss due to a **wrongful act,** if such **claim** or **suit** results from or is contributed to any combination of the following: manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers, or asbestos dust.

We also shall not pay any cost related to the defense, investigation, and settlement of any such **claim** or **suit** as described in I., 2., or 3. above;



H.    For liability:

1    With respect to which you are an **insured** under a nuclear energy liability Policy by the Mutual Atomic Energy Liability Underwriters, the American Nuclear Insurers, or the Nuclear Insurance Association of Canada, or any successor organizations, or would be an **insured** under any such Policy but for its termination upon exhaustion of its limit of liability; or

2.    Arising out of the hazardous properties of **nuclear material** with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) **you** are, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization; **Or**

3    Arising out of the hazardous properties of **nuclear material,** if:

a.    The **nuclear material** is at any **nuclear facility** owned by, or operated by **you** or on **your** behalf or has been discharged or dispersed therefrom;

b.    The **nuclear material** is contained in **spent fuel** or **waste** at any time possessed, handled, used, processed, stored, transported or disposed of by **you** or on **your** behalf; or

c.    The damage or loss arises out of the furnishing by **you** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **nuclear facility, but** if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion c. applies only to damage or loss to such **nuclear facility** and any property located at the facility;

We also shall not pay any cost related to the defense, investigation, and settlement of any **claim** or **suit.**

I    Arising out of the failure or inability to supply or provide an adequate supply of electricity, fuel, or water arising out of the interruption of the electrical power, fuel, or water supply.

This exclusion does not apply to any **claims** or **suits** against the **insured** based on or attributable to the failure or inability to supply or to provide an adequate supply of water if such failure is caused by an **occurrence** and the capacity of the **insured's** installed production facilities and contractual supply arrangements is equal to or greater than one hundred percent (100%) of the water demand immediately preceeding such failure, on the **insured's** water system.



J.    Arising out of a **wrongful act** by **you** or on **your** behalf in the handling of **claims** or **suits** within **your retained limit** whenever **you** investigate, defend, or settle such **claims** or **suits** or elect a third party to investigate, defend or settle such **claims** or **suits;**

K.    Arising out of the effecting or failure to effect insurance contracts;

L.    Arising out of the Employee Retirement Income Security Act of 1974 or amendments thereto;

M.    Arising out of an alleged willful commission of a crime by **you** or other dishonest, fraudulent, or malicious act.

    This exclusion shall not apply to any vicarious liability that any **insured** has with regard to the managerial, advisory, supervisory, or controlling obligations over the actions of another **insured.**

N.    Arising out of **your wrongful act** for gain, profit, or advantage to which **you** are not legally entitled;

    This exclusion shall not apply to any vicarious liability that any **insured** has with regard to the managerial, advisory, supervisory, or controlling obligations over the actions of another **insured;**

O.    For **personal injury offense** or **advertising injury offense:**

    1.    Arising out of oral or written publication of material, if done by or at the direction of the **insured** with knowledge of its falsity; or

    2.    Arising out of oral or written publication of material whose first publication took place before the beginning of the Policy Period. All **personal injury offense** or **advertising injury offense** arising out of publication of the same or similar material subsequent to the beginning of the Policy Period is also excluded;

P.    Arising out of the purchase, sale, or offer of sale, or solicitation of any security, debt, bank deposit or financial interest or instrument;

Q.    Arising out of any representations made at any time in relation to the price or value of any security, debt, bank deposit, or financial interest or instrument, including, but not limited to, advice given to any person to participate in any plan included in the **employee benefit program;**

R.    Arising out of any depreciation or decline in price or value of any security, debt, bank deposit or financial interest or instrument;



S.   Arising out of an insufficiency of funds to meet any obligation under any **employee benefit program;**

T.   Arising out of act, error, or omission by the **insured** to effect and maintain insurance or bonding for plan property or assets of **employee benefit program;**

U.   Arising out of failure of performance or performance under any contract by an insurer of benefits subject to the **employee benefit program;**

V.   For any **property damage** arising out of **land subsidence** for any reason whatsoever;

W.   Arising out of direct condemnation of property or exercise of power of eminent domain by **you** or on **your** behalf, or inverse condemnation, or any taking of property by **you** which is compensable under the Fifth or Fourteenth Amendments to the United States Constitution, or any taking of property by **you** which is compensable under law of the State in which the **claim** or suit is made;

This exclusion shall not apply to physical injury or to destruction of tangible property, including all resulting loss of use of such property for which **you** may be legally responsible and for which recovery is sought for **claims** or **suits** for inverse condemnation, by whatever name called; provided, however, that in any case which a **claim** or **suit** for inverse condemnation, by whatever name called, is made against **you,** coverage shall only exist for physical injury to or destruction of tangible property, including all resulting loss of use of that property, and there shall be no coverage for reduced value of property (diminution of value), attorney fees, expert fees, severance damages, relocation costs or any other form of relief, however denominated;

X.   For **wrongful acts** arising out of refund of taxes, fees, or assessments;

Y.   Arising out of exposure to or transmission of any actual or suspected Human Immunodeficiency Virus (HIV), Acquired Immune Deficiency Syndrome (AIDS), or AIDS Related Complex (ARC);

Z.   For liability arising out of, or in connection with, the operation of any hospital, or health care facility, owned or operated by the **insured,** including, but not limited to:

     1.   The rendering or failure to render:

         a.   Medical, surgical, dental, x-ray or nursing service or treatment, or the furnishing of food or beverages in connection therewith;

         b.   Any service or treatment related to physical or mental health or of a professional nature;

         c.   Any cosmetic or tonsorial service or treatment; or



2    The furnishing of or dispensing of drugs or medical, dental or surgical supplies or appliances.

This exclusion shall not apply to any liability arising out of:

a    Occupational physical examinations, nursing services or nursing treatment at out-patient clinics, paramedics, ambulance operations, or emergency medical technicians;

**b.**    **Employment practice liability;** or

**c.**    **First aid** to any person;

AA.    For liability arising out of or in connection with any transit authority, transit system, or public transportation system owned, operated, or regulated by any **insured.** This exclusion shall not apply to transit or public transportation systems operating over non-fixed routes, including, but not limited to, Dial-a-Ride, senior citizen transportation, or handicapped persons transportation or to contingent liability coverage where such services are contracted;

BB.    For injunctions, equitable relief, or any other form of relief other than monetary damages;

CC.    For liability arising out of or in connection with the operation of any school, owned or operated by **you;** or

DD.    Any obligation of the **Insured** under any Uninsured Motorist or Underinsured Motorist law and to any sums **you** may be legally entitled to recover as damages from the owner or operator of an uninsured or underinsured **automobile** because of **bodily injury** and **property damage** sustained by any **insured,** caused by an **occurrence** and arising out of the ownership, maintenance, operation, use, loading or unloading of such **automobile.**

## VI.   GENERAL CONDITIONS

A.    **Appeals**

If **you** or **your underlying insurers** do not appeal a judgment in excess of **your retained limit, we** have the right to make such an appeal. If **we** elect to appeal, the cost incurred will be at **our** expense and not included within **our** Limits of Insurance. **Our** liability on such an award or judgment shall not exceed **our** Limits of Insurance as stated in the Declarations.



B. **Bankruptcy, Insolvency or Inability to Pay**

**Your** bankruptcy, insolvency or inability to pay, or the bankruptcy, insolvency or inability to pay of any of **your underlying insurers** will not relieve **us** from the payment of any **claim** or **suit** covered by this Policy.

But under no circumstances will such bankruptcy, insolvency, or inability to pay require **us** to drop down or in any way replace **your retained limit** or assume any obligation associated with **your retained limit.**

C. **Cancellation**

1. The **Named Insured** may cancel this Policy by mailing to the Insurer advance written notice of cancellation.

2. If this Policy has been in effect for sixty (60) days or less, the Insurer may cancel this Policy by mailing or delivering to the **Named Insured** written notice of cancellation at least:

   a. Ten (10) days before the effective date of cancellation if the Insurer cancels for nonpayment of premium; or

   b. Ninety (90) days before the effective date of cancellation if the Insurer cancels for any other reason.

3. If this Policy has been in effect for more than sixty (60) days the Insurer may cancel this Policy only for one or more of the following reasons:

   a. Nonpayment of premium;

   b. The Policy was obtained through a material misrepresentation;

   c. The **Named Insured** or Other Insured(s) have violated any of the terms and conditions of the Policy;

   d. The risk originally accepted has measurably increased;

   e. Certification to the Director of Insurance of the loss of reinsurance by the Insurer which provided coverage to the Insurer for all or a substantial part of the underlying risk insured; or

   f. A determination by the Director that the continuation of the Policy could place the Insurer in violation of the insurance laws of the State.

   If the Insurer cancels this Policy based on one or more of the above reasons except for nonpayment of premium, the Insurer will mail written notice to the **Named Insured** at least ninety (90) days before the effective date of cancellation. When



cancellation is for nonpayment of premium, the Insurer will mail notice at least ten (10) days before the effective date of cancellation.

4.    The Insurer will mail notice to the **Named Insured** and the agent or broker at the last addresses known to the Insurer.

5.    Notice of cancellation will state the effective date of cancellation and a specific explanation of the reason or reasons for cancellation. The Policy period will end on that date.

6.    If this Policy is cancelled, the Insurer will send the **Named Insured** any premium refund due. If the Insurer cancels, the refund will be pro rata. If the **Named Insured** cancels, the refund may be less than pro rata. The cancellation will be effective even if the Insurer has not made or offered a refund.

7.    Proof of mailing will be sufficient proof of notice.

D.    **Nonrenewal**

1.    If the Insurer decides not to renew this Policy, the Insurer will mail written notice stating the reason for nonrenewal to the **Named Insured's** last mailing address known to the Insurer at least ninety (90) days before the expiration date of the Policy. A copy of the notice will also be sent to:

a.    The broker, if known to the Insurer, or the agent of record; and

b.    The last known mortgagee or lienholder named in the Policy at the last mailing address known to the Insurer.

This paragraph does not apply if the Insurer has manifested a willingness to renew directly to the **Named Insured.**

E.    **Conformance to Statute**

To the extent a term of condition of this Policy conflicts with a statute of the state within which this Policy is issued, this Policy shall be amended to conform to the minimum requirements of the statute.



F. **Duties in The Event of an Occurrence or Wrongful Act or Employee Benefit Wrongful Act or Claim or Suit**

1) General Reporting Requirements

   a) **You** shall notify **us** in writing as soon as practicable of any **occurrence, wrongful act,** or **employee benefit wrongful act** of which **you** become aware which may result in a **claim** or **suit** under this Policy and which involve:

      i) A serious case where, in **your** judgment or the judgment of **your** defense counsel, the exposure may exceed 50% of the **retained limit;**

      ii) A demand or demands totaling 50% of the **retained limit** or more;

      iii) **Claims** or **suits** where, in **your** judgment or the judgment of **your** defense counsel, have potential liability in excess of 50% of **your retained limit** that **you** intend to take to trial.

   b) To the extent possible, notice should include:

      i) How, when, and where the **occurrence, wrongful act,** or **employment benefit wrongful act** took place;

      ii) Names and addresses of any injured persons and witnesses; and

      iii) The nature and or location of any injury or damage arising out of the **occurrence,** loss arising out of the **wrongful act** or **employee benefit wrongful act.**

   c) **You** and any other involved **insured** must:

      i) Cooperate with any **underlying insurers;**

      ii) Comply with the terms and conditions of any **underlying insurance;** and

      iii) Pursue all rights of contribution or indemnity against any person or organization who may be liable to **you** because of **bodily injury** or **property damage, personal injury offense, advertising injury offense, wrongful act** or **employee benefit wrongful act** under this Policy or any **underlying insurance.** This condition, however, shall not apply to the self insured retention of the **retained limit.**



    d    When we believe that a **claim** or **suit** may exceed the **retained limit, we** may join **you** and, if applicable, any **underlying insurer** in the investigation, settlement and defense of all **claims** and **suits** in connection with such **occurrence, wrongful act,** or **employee benefit wrongful act.** In such event, **we** and **you** will cooperate fully with each other.

    e.    Knowledge of any **occurrence** or **wrongful act, claim** or **suit** by an agent, servant or **employee** of the **Named Insured** shall not in itself constitute knowledge by the **Named Insured** unless notice of such injury, **claim** or **suit** shall have been received by the Corporation Counsel, City of Chicago.

2.    Such notice is to be sent with all pertinent facts as respect GENERAL CONDITIONS, paragraphs F.1.b. to:

Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK) Limited
PO Box HM 1503
Hamilton HM FX
Bermuda

## G.    First Named Insured

The **insured** first named in Item 1. in the Declarations is authorized to act on behalf of all **Named Insureds** and other **insureds** with respect to the giving and receiving of notice of cancellation and to receiving any return premium that may become payable under this Policy. The **insured** first named in Item 1. in the Declarations is responsible for the payment of all premiums, but the **Named Insureds** jointly and severally agree to make such premium payments in full if the **insured** first named in Item 1. fails to pay the amount due within thirty (30) days after **we** give a written demand for payment to the **insured** first named in Item 1.

## H.    Inspection

We have the right, but are not obligated, to inspect **your** premises and operations at any time. **Our** inspections are not safety inspections. They relate only to the insurability of **your** premises and operations and the premiums to be charged. We may give **you** reports on the conditions we find. We may also recommend changes. While they may help reduce **claims** or **suits**, we do not undertake to perform the duty of any person or organization to provide for the health or safety of **your** employees or the public. We do not warrant that **your** premises or operations are safe or healthful or that they comply with laws, regulations, codes, or standards.

We may review and **your** legal and claims files as respects **claims** or **suits** whose exposure may exceed 50% of **your** retained limit.



I.    **Legal Actions Against Us**

There will be no right of action against **us** under this insurance unless:

1.    **You** have complied with all the terms and conditions of this Policy; and

2.    The amount **you** owe has been determined with **our** consent or by actual trial and final judgment.

J.    **Other Insurance**

If other valid and collectible insurance, or group coverage under a **joint powers authority,** applies to a **claim** or **suit** that is also covered by this Policy, and subject to SECTION III. LIMITS OF INSURANCE of this Policy, this Policy will apply excess of the other insurance, whether this other insurance is primary, excess, contingent, or issued on any other basis. This provision, however, will not apply if the other insurance is specifically written to be excess of this Policy.

K.    **Policy Changes**

This Policy contains all the agreements between **you** and **us** concerning this insurance. The first **Named Insured** in the Declarations is authorized to make changes in this Policy with **our** consent. This Policy can only be changed by a written endorsement **we** issue and make a part of this Policy.

Notice to any broker or knowledge possessed by a broker or any other person will not effect a waiver or change in any part of this Policy.

L.    **Policy Period**

The Policy Period commences on the effective date shown in the Declarations. The period ends on the earlier of either the expiration date or the effective date of cancellation of this Policy. If **you** became an **insured** under this Policy after the effective date, the Policy Period begins on the date **you** became an **insured.**

M.    **Policy Territory**

This Policy applies to **occurrences, wrongful acts,** and **employee benefit wrongful acts** anywhere in the world with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America, and only if a **claim** is made and a **suit** is brought for such **occurrence, wrongful act,** and **employee benefit wrongful act** in the United States of America.

If coverage for a **claim** or **suit** under this Policy is in violation of any United States of America economic or trade sanctions, including but not limited to, sanctioning administered and enforced by the United States Treasury Department's Office of Foreign Assets Control ("OFAC"), then coverage for that **claim** or **suit** will be null and void.



N.    **Premium**

**You** shall be responsible for the payment of the Advanced Premium, as indicated in the Declarations, prior to the effective date of this Policy. The Advanced Premium is a deposit premium only, which shall be credited to the amount of the earned premium due at the end of the Policy Period.

O.    **Separation of Insureds**

Except with respect to the Limits of Insurance Section of this Policy and any rights or duties specifically assigned to the first **Named Insured** designated in the Declarations, this insurance applies:

1.    As if each **Named Insured** were the only **Named Insured**; and

2.    Separately to each **insured** against whom a **claim** is made or **suit** brought.

P.    **Subrogation**

If you have rights to recover all or part of any payment **we** have made under this Policy, those rights are transferred to **us. You** must do nothing after such payment to impair these rights and **you** must help **us** enforce them.

Any recoveries shall be applied proportionately to the amount of indemnity paid.

Expenses incurred in the exercise of rights of recovery shall be apportioned between the interests, including **yours,** in the ratio of their respective recoveries as finally settled.

Q.    **Transfers of Your Rights and Duties**

The interest of any **insured** is not assignable. **Your** rights and duties under this Policy may not be transferred without **our** written consent.

If **you** are declared legally bankrupt, **your** rights and duties will be transferred to **your** legal representative but only while acting within the scope of his duties as **your** legal representative.

_____

Authorized Representative

25 of 25



**TORUS BERMUDA INTERMEDIARIES LIMITED as MGA for TORUS INSURANCE (UK) LIMITED**

AS Cooper Building
26 Reid Street, Hamilton HM 11
PO Box HM 1503, Hamilton HM FX
Bermuda
Tel: + (441) 295 6722
Fax: + (441) 295-1819
Email For Claims Matters Only:
claims@torusinsurance.com

POLICY NO.: MGA-UMB-2010-0003
RENEWAL

## SPECIAL EXCESS LIABILITY DECLARATIONS

**ITEM 6.** **RETAINED LIMIT CLAIMS SERVICING ORGANIZATION:**                  Self Administered

**Producer:**      RK Harrison Insurance Brokers Limited
**(Name and**     One Whittington Avenue
**Address)**       London EC3V 1LE

Authorized Representative



Endorsement No:                1
This endorsement, effective:   December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No:     MGA-UMB-2010-0003
Issued to:                     City of Chicago, Illinois
By:                            Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

## CYBER LIABILITY EXCLUSION

In consideration of the premium charged, it is agreed that this Policy shall not apply to any **Bodily Injury** arising out of or in connection with the negligent transfer, storage or use of any data or information conducted through, within or by the internet or any other public information exchange form.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

Date of Issue: January 6, 2011
5046MGA-UMB-Cyber Liability Exclusion

 torus

Endorsement No: 2
This endorsement, effective: December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No: MGA-UMB-2010-0003
Issued to: City of Chicago, Illinois
By: Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

## FUNGUS EXCLUSION

In consideration of the premium charged, it is agreed that this Policy does not apply to **Bodily Injury, Property Damage**, or any other loss, cost or expense, including, but not limited to losses, costs or expenses related to, arising from or associated with clean-up, remediation, containment, removal or abatement, caused directly or indirectly, in whole or in part, by:

    a. Any "Fungus(i)", "Mold(s)", mildew or yeast; or

    b. Any "Spore(s)" or toxins created or produced by or emanating from such "Fungus(i)", "Mold(s)", mildew or yeast; or

    c. Any substance, vapor, gas, or other emission or inorganic body or substance produced by or arising out of any "Fungus(i)", "Mold(s)", mildew or yeast; or

    d. Any material, product, building component, building or structure, or any concentration of moisture, water or other liquid within such material, product, building component, building or structure, that contains, harbors, nurtures or acts as a medium for any "Fungus(i)", "Mold(s)", mildew, yeast, or "Spore(s)" or toxins emanating therefrom,

Regardless of any other cause, event, material, product and / or building component that contributed concurrently or in any sequence to that **Bodily Injury, Property Damage**, loss, costs or expense.

For the purposes of this exclusion, the following definitions apply:

    (i) "Fungus(i)" includes, but is not limited to, any of the plants or organisms belonging to the major group Fungi, lacking chlorophyll, and including "Mold(s)", rusts, mildews, smuts, and mushrooms.

    (ii) "Mold(s)" includes, but is not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and "Fungus(i)" that produce Mold(s).



Endorsement No:                    2
This endorsement, effective:       December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No:         MGA-UMB-2010-0003
Issued to:                         City of Chicago, Illinois
By:                                Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

## FUNGUS EXCLUSION

(iii)   "Spore(s)" means any dormant or reproductive body produced by or arising or emanating out of any "Fungus(i)", "Mold(s)", mildew, plants, organisms, or microorganisms.

All other terms and conditions of this Policy remain unchanged.

_Authorized Representative_

Date of Issue: January 6, 2011
5009MGA-UMB-Fungus Exclusion
Page 2 of 2



Endorsement No:                  3
This endorsement, effective:      December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No:       MGA-UMB-2010-0003
Issued to:                        City of Chicago, Illinois
By:                               Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

## LANDFILL EXCLUSION

In consideration of the premium charged, it is agreed that this Policy does not apply to any liability arising out of or in connection with any landfill, dumps, location or site used to deposit, store or transfer waste.

For purposes of this Endorsement, "Waste" shall mean all waste and includes, without limitation, materials to be discarded, stored pending final disposal, recycled, reconditioned or reclaimed.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative



Endorsement No:                4
This endorsement, effective:   December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No:     MGA-UMB-2010-0003
Issued to:                     City of Chicago, Illinois
By:                            Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

## ACT OF TERRORISM – INSURED'S RETAINED LIMIT ENDORSEMENT

This Policy is amended as follows:

**A.  ITEM 3B. OF THE DECLARATIONS, LIMITS OF INSURANCE,** is amended to include the following additional **Insured's Retained Limit:**

>  Coverage A **Act of Terrorism-Insured's Retained Limit:$15,000,000. SIR**

>  Coverage B **Act of Terrorism-Insured's Retained Limit:$55,000,000. SIR**
>  As per Endorsement No. 10.

**SECTION III. LIMITS OF INSURANCE, paragraph D.** is amended to include the following:

>  Solely as respect to any **Act of Terrorism-Insured's Retained Limit,** we will be liable only for that portion of damages in excess of the **Insured's Retained Limit** which is as follows:

>  The amount stated in the Declarations as the **Act of Terrorism- Insured's Retained Limit** as a result of any one **occurrence,** or series of continuous, repeated, or related **occurrences.**

>  All **claims** and **suits** seeking damages for any liability arising out of an **Act of Terrorism** are subject to this **Act of Terrorism — Insured's Retained Limit.** Defense Expenses shall not erode this **Act of Terrorism — Insured's Retained Limit.**

>  The **Act of Terrorism — Insured's Retained Limit** applies whether or not there are any applicable underlying policies listed in the Schedule of Underlying Insurance or applicable limits of any other underlying insurance providing coverage to any **insured.** If there is applicable underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to any **insured,** amounts received through such underlying insurance may be applied to reduce or exhaust the **Each Occurrence Act of Terrorism-Insured's Retained Limit.** However, in no event will amounts received through such underlying insurance for the payment of defense expenses reduce the **Each Occurrence Act of Terrorism-Insured's Retained Limit.**

Date of Issue: January 6, 2011
MANUMGA-UMB-Act of Terrorism – Insured's Retained Limit Endorsement
Page 1 of 4



Endorsement No:                    4
This endorsement, effective:       December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No:         MGA-UMB-2010-0003
Issued to:                         City of Chicago, Illinois
By:                                Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

## ACT OF TERRORISM – INSURED'S RETAINED LIMIT ENDORSEMENT

B. For the purpose of this endorsement, **SECTION II. DEFINITIONS** is amended to include the following additional definitions:

1. **Defense Expenses** means any payment allocated to a specific loss, **claim** or **suit** for its investigation, settlement or defense, including but not limited to:

   a) Attorney's fees and all other investigation, loss adjustment and litigation expenses;

   b) Premiums on bonds to release attachments;

   c) Premiums on appeal bonds required by law to appeal any **claim** or **suit**;

   d) Costs taxed against the insured in any **claim** or **suit**;

   e) Pre-judgment interest awarded against any **insured**;

   f) Interest that accrues after entry of judgment.

2. **Act of Terrorism** is defined as either:

   a) A certified **act of terrorism** defined by Section 102. Definitions., of the Terrorism Risk Insurance Act of 2002 and any revisions or amendments.

   b) The following Section 102 definition of **act of terrorism** from the Terrorism Risk Insurance Act of 2002 applies:

   (1) **Act of Terrorism:**
       (A) Certification. — The term **act of terrorism** means any act that is certified by the Secretary of the Treasury of the United States, in concurrence with the Secretary of State, and the Attorney General of the United States:
       (i) To be an act of terrorism;
       (ii) To be a violent act or an act that is dangerous to:

Date of Issue: January 6, 2011
MANUMGA-UMB-Act of Terrorism – Insured's Retained Limit Endorsement
Page 2 of 4



Endorsement No:                4
This endorsement, effective:   December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No:     MGA-UMB-2010-0003
Issued to:                     City of Chicago, Illinois
By:                            Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

# ACT OF TERRORISM – INSURED'S RETAINED LIMIT ENDORSEMENT

(I) Human life;
(II) Property; or
(III) Infrastructure;

(iii) To have resulted in damage within the United States, or outside of the United States in the case of:

(I) An air carrier or vessel described in paragraph (5)(B); [for the convenience of this endorsement, paragraph (5)(B) reads: occurs to an air carrier (as defined in Section 40102 of title 49, United States Code) to a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs, or at the premises of any United States mission];

(II) the premises of a United States mission; and

(iv) To have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

(B) Limitation: No act shall be certified by the Secretary as an **act of terrorism** if:

(i) The act is committed as part of the course of a war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or
(i) Property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000.

(C) Determinations Final: Any certification of, or determination not to certify, an act as an **act of terrorism** under this paragraph shall be final, and shall not be subject to judicial review.

(D) Nondelegation: The Secretary may not delegate or designate to any other officer, employee, or person, any determination under this paragraph of whether, during the effective period of the Program, an act of terrorism has occurred; or

c. The use or threatened use of force or violence against person or property, or commission



Endorsement No:                4
This endorsement, effective:   December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No:     MGA-UMB-2010-0003
Issued to:                     City of Chicago, Illinois
By:                            Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

## ACT OF TERRORISM – INSURED'S RETAINED LIMIT ENDORSEMENT

of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm a government, the civilian population or any segment thereof, or to disrupt any segment of the economy.

d. **Terrorism** will also include any act which is verified or recognized by the United States Government as an **act of terrorism.**

C. Solely as respect to any liability arising out of any **Act of Terrorism, SECTION B. DEFENSE AND DEFENSE EXPENSES** paragraphs 1. and 2. and 3. are deleted in their entirety, and paragraph 3. is replaced by the following:

**We** will not be obligated to assume charge of the investigation, settlement or defense of any **claim** made, **suit** brought or proceeding instituted against any **insured. We** will however, have the right and shall be given the opportunity to participate in the defense and trial of any **claims, suits** or proceedings relative to any **occurrence** which, in **our** opinion, may create liability on **our** part under the terms of this Policy. If we exercise such right, **we** will do so at **our** own expense.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

Date of Issue: January 6, 2011
MANUMGA-UMB-Act of Terrorism – Insured's Retained Limit Endorsement
Page 4 of 4



Endorsement No:                 5
This endorsement, effective:    December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No:      MGA-UMB-2010-0003
Issued to:                      City of Chicago, Illinois
By:                             Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

## SPECIFIED ENTITY EXCLUSION

This policy is amended as follows:

**SPECIFIED ENTITY EXCLUSION:**

In consideration of the premium charged, it is agreed that this Policy shall not apply to any liability arising from and/or out of operations, of the entities named below; those individuals who were or now are elected or appointed officials of the entities named below, including members of its governing body or any other agencies, districts, authorities, committees, trustees, boards, commissions, or similar entity(ies) of the **Named Insured,** while acting on behalf of the entities named below; any of **your employees,** servants, or volunteers while acting within the course and scope of their employment or duties as volunteers for the entities named below:

1. Chicago Park District
2. Chicago Public Schools
3. Chicago Transit Authority
4. City Colleges of Chicago
5. MPEA (Navy Pier and McCormick Place)
6. Chicago Housing Authority
7. Public Building Commission
8. Chicago Department of Aviation (O'Hare International, Midway Airport, Chicago / Gary Airport, and Meigs Field)

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

Date of Issue: January 6, 2011
MANUMGA-UMB-Specified Entity Exclusion



Endorsement No:                 6
This endorsement, effective:    December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No:      MGA-UMB-2010-0003
Issued to:                      City of Chicago, Illinois
By:                             Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

# DESIGNATED PROJECT EXCLUSION

This policy is amended as follows:

**DESIGNATED PROJECT(S) EXCLUSION**

In consideration of the premium charged, it is agreed that this Policy shall not apply to any liability as respect to premises owned, maintained or used by any **insured** and operations necessary or incidental to such project(s) performed by or on behalf of any **insured**, or goods or products manufactured at or distributed from such project(s), as scheduled below:

### SCHEDULE OF DESIGNATED PROJECT(S)

Project:        O'Hare Modernization Program

All other terms and conditions of this Policy remain unchanged.

_Authorized Representative_

Date of Issue: January 6, 2011
MANUMGA-UMB-Designated Project Exclusion



Endorsement No:                7
This endorsement, effective:   December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No:     MGA-UMB-2010-0003
Issued to:                     City of Chicago, Illinois
By:                            Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

# VIOLATION OF COMMUNICATION OR INFORMATION LAW
# EXCLUSION ENDORSEMENT

This Policy is amended to include the following exclusion:

**Violation of Communication or Information Law**

This insurance does not apply to any liability arising out of any act that violates any statute, ordinance or regulation of any federal, state or local government, including any amendment of or addition to such laws, which prohibits or limits the sending, transmitting or communicating of material or information.

It is understood that to the extent any coverage may otherwise be available under this policy or any of its endorsements, the provisions of this exclusion will supersede.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

Date of Issue: January 6, 2011
5004MGA-UMB- Violation of Communication or Information Law Exclusion



| | |
|---|---|
| Endorsement No: | 8 |
| This endorsement, effective: | December 31, 2010 |
| (at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations) | |
| Forms a part of Policy No: | MGA-UMB-2010-0003 |
| Issued to: | City of Chicago, Illinois |
| By: | Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited |

# DESIGNATED PERSONAL INJURY OFFENSES ENDORSEMENT

This Policy is amended as follows:

Solely with respect to any **claims** or **suits** arising out of the **personal injury offenses** of false arrest, detention and imprisonment, and malicious prosecution as well as assault and battery committed by the **insured** concurrent with and related to such offenses, **SECTION I. WHAT WE SHALL PAY ON YOUR BEHALF, A. INSURING AGREEMENT,** Paragraph 2. ERRORS AND OMISSIONS LIABILITY is deleted in its entirety and replaced by the following:

2.     ERRORS AND OMISSIONS LIABILITY

We shall pay **you**, or on **your** behalf, the **ultimate net loss** in excess of the **retained limit**, that the **insured** becomes legally obligated to pay to compensate others for loss arising out of false arrest, detention or imprisonment, and malicious prosecution as well as assault and battery committed by the insured concurrent with and related to such offenses which arise solely from **your** performance of or failure to perform duties as a public entity, if:

a.     (1)     The criminal or civil charges that form the basis for the false arrest, detention or imprisonment, malicious prosecution or concurrent and related assault and battery **claim** or **suit** are dismissed during the Policy Period; or

      (2)     The conviction of the claimant based on the false arrest, detention or imprisonment, malicious prosecution or concurrent and related assault and battery is voided during the Policy Period; or

      (3)     In the event no criminal or civil charges are filed, the claimant arrested, detained or imprisoned is released from custody during the Policy Period;

      and



Endorsement No:                8
This endorsement, effective:   December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No:     MGA-UMB-2010-0003
Issued to:                     City of Chicago, Illinois
By:                            Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

# DESIGNATED PERSONAL INJURY OFFENSES ENDORSEMENT

   b.  Prior to the inception date of this Policy, no agent, servant, or **employee** of the Corporate Counsel, City of Chicago was aware of a suit filed.

This endorsement applies to all **claims** or **suits** arising solely out of the designated **personal injury offenses**, regardless of the legal theory or cause of action alleged, including, but not limited to common law torts, violations of statutes, and violations of civil or constitutional rights. It is understood that this Policy provides no coverage for any **claims** or **suits** arising out of the **personal injury offenses** of false arrest, detention and imprisonment, malicious prosecution or concurrent and related assault and battery other than as provided by this endorsement.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

Date of Issue: January 6, 2011
MANUMGA-UMB-Designated Personal Injury Offenses
Page 2 of 2



Endorsement No:               9
This endorsement, effective:   December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No:     MGA-UMB-2010-0003
Issued to:                     City of Chicago, Illinois
By:                            Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

## MINIMUM EARNED PREMIUM ENDORSEMENT

In consideration of the premium charged, it is agreed that:

> If this Policy shall be cancelled by the first **Named Insured**, **we** shall return ninety
> percent (90%) of the unearned portion of the annual premium calculated on a pro-rata
> basis (the returned amount of the premium shall be the "short rate return premium", the
> retained amount shall be the "short rate earned premium"). If however, a Minimum
> Earned Premium is set forth in item 5 of the Declarations which exceeds the short rate
> earned premium, then **we** will retain the Minimum Earned Premium and return the
> difference between the Minimum Earned Premium and the annual premium.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

Date of Issue: January 6, 2011
5047MGA-UMB-COND-Minimum Earned Premium



**torus**

Endorsement No:                    10
This endorsement, effective:        December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No:          MGA-UMB-2010-0003
Issued to:                          City of Chicago, Illinois
By:                                 Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

## COVERAGE B LAYER EXCESS FOLLOW FORM ENDORSEMENT

In consideration of the premium charged, this Policy shall also provide an additional, excess follow form layer of insurance coverage to the Special Excess Liability Policy for the City of Chicago, referred to as Coverage B, as follows:

1. Item 3 of the Declarations, referencing the Limits of Insurance and Retained Limit, is amended for Coverage B to provide for a Limit of Liability of $15,000,000, and a Retained Limit of $55,000,000 (which shall recognize erosion of aggregates in underlying Insurance if applicable).

Coverage B

    A.  Limits of Insurance

        1.  Aggregate Limits        Limits of Liability

            a.  $15,000,000        Annual Aggregate where applicable

        2.  **Per Occurrence** or
            **Wrongful Act** or **Employee**
            **Benefit Wrongful Act Limit**

            $15,000,000        Any one occurrence or **wrongful act** or **employee benefit wrongful act** or series of continuous, repeated, or related occurrences or **wrongful acts** or **employee benefit wrongful acts** in excess of **your retained limit.**

Date of Issue: January 6, 2011
MANUMGA-UMB- Coverage B Layer Excess Follow Form Endorsement
Page 1 of 2



Endorsement No:      10
This endorsement, effective:   December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item I(b) of the Declarations)
Forms a part of Policy No:    MGA-UMB-2010-0003
Issued to:            City of Chicago, Illinois
By:               Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

## COVERAGE B LAYER EXCESS FOLLOW FORM ENDORSEMENT

2.   The following provisions are added to Section I. A., Insuring Agreements of the Policy, but solely for the purposes of Coverage B:

C. Coverage B

     1.     We will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages.

The amount we will pay for damages is limited as described in Section III. Limits of Insurance, subject to the Schedule of Underlying as set forth in Endorsement number 11.

     2.     Coverage B Layer shall follow the terms, definitions, conditions and exclusions of Special Excess Liability Policy for the City of Chicago, subject to the Limits of Insurance and Retained Limit applicable to Coverage B Layer and the Schedule of Underlying Insurance attached to this endorsement. In no event shall Coverage B Layer provide broader coverage than that provided by Coverage A Layer.

     3.     If we are prevented by law or statute from paying damages covered by this policy on behalf of the **Insured**, then we will indemnify the **Insured** for those sums in excess of the **Retained Limit**.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

Date of Issue: January 6, 2011
MANUMGA-UMB- Coverage B Layer Excess Follow Form Endorsement
Page 2 of 2



**torus**

Endorsement No:                    11
This endorsement, effective:      December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1 (b) of the Declarations)
Forms a part of Policy No:        MGA-UMB-2010-0003
Issued to:                        City of Chicago, Illinois
by:                               Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

---

## COVERAGE B SCHEDULE OF UNDERLYING EXCESS POLICY(IES)

The Schedule of Underlying for Coverage B is as follows:

Limits of Liability

| | | |
|---|---|---|
| 1. Coverage: Multilayer Liability-Occurrence<br>Insurer: Torus Bermuda Intermediaries Limited<br>as MGA | USD 5,000,000 | Products Completed Operations Hazard Aggregate |
| Policy No. MGA-UMB-2010-0003<br>Policy Period: December 31, 2010- 2011 | USD 5,000,000 | Errors and Omissions Liability Aggregate other than personal and advertising injury offense wrongful acts |
| | USD 5,000,000<br>USD 5,000,000 | Employee Benefits Liability Aggregate Any one occurrence or wrongful act or employee benefit wrongful act or series of continuous, repeated, or related occurrences or wrongful acts or employee benefit wrongful acts in excess of your retained limit |
| | | Excess of USD 15,000,000 Retained Limit |
| 2. Coverage: Excess Liability<br>Insurer: AXIS Surplus Insurance Co.<br>Policy No. EAU745237/01/2010<br>Policy Period: December 31, 2010-2011 | USD 10,000,000<br>USD 25,000,000<br>USD 10,000,000 | Per Occurrence,<br>General Aggregate<br>All Other Aggregates, where applicable (excess of Item 1, above) |
| 3. Coverage: Excess Liability<br>Insurer: Everest National Insurance Co.<br>Renewal of:71P 6000005-101<br>Policy Period: December 31, 2010-2011 | USD 10,000,000<br>USD 10,000,000 | Per Occurrence<br>Annual Aggregate where applicable (excess of Item 2 above) |
| 4. Coverage: Excess Liability<br>Insurer: Westchester Surplus Lines Ins. Co.<br>Policy No. G22011133 006<br>Policy Period: December 31, 2010-2011 | USD 15,000,000<br>USD 15,000,000 | Per Occurrence<br>Annual Aggregate where applicable (excess of Item 3 above) |

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

Date of Issue: January 6, 2011
5001MGA-UMB-LTS-Coverage B Schedule of Underlying Excess Policy(ies)



Endorsement No:                12
This endorsement, effective:   December 31, 2010
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in Item 1(b) of the Declarations)
Forms a part of Policy No:     MGA-UMB-2010-0003
Issued to:                     City of Chicago, Illinois
By:                            Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

## AMENDATORY ENDORSEMENT

It is hereby agreed that Section V. Exclusion M. is amended as follows:

M. Arising out of an alleged willful commission of a crime by **you** or other dishonest, fraudulent, or malicious act.

This exclusion shall not apply to any vicarious liability or monell liability that any **insured** has with regard to the managerial, advisory, supervisory, or controlling obligations over the actions of another **insured.**

All other terms and conditions of this Policy remain unchanged.

_Authorized Representative_

Date of Issue: January 6, 2011
5049MGA-UMB-OMN- Amendatory Endorsement



Endorsement No:                13
This endorsement, effective:   December 31, 2010
(At 12:01 A.M., standard time, the address of the Named Insured as shown in Item 1 of the Declarations)
Forms a part of Policy No:     MGA- UMB-2010-0003
Issued to:                     City of Chicago, Illinois
By:                            Torus Bermuda Intermediaries Limited as MGA for Torus Insurance (UK)Limited

# KNOWLEDGE OF OCCURRENCE

It is agreed that this Policy is amended as follows:

Notwithstanding any provision(s) in this Policy to the contrary, and solely as respects any loss reporting requirements under this Policy, it is understood that knowledge of **Occurrence** by the agent, servant or employee of the **Insured** or any other person shall not in itself constitute knowledge by the **Insured,** unless the Department of Law, Corporation Counsel received notice from said agent, servant, employee or any other person.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

Date of Issue: January 6, 2011
MANU-MGA-UMB-Knowledge of Occurrence