**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES GIBSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19 C 4152 |
| v. | ) | |
| | ) | Hon. Jeffrey I. Cummings |
| CITY OF CHICAGO, a municipal | ) | |
| Corporation et al., | ) | Magistrate M. David Weisman |
| | ) | |
| Defendants. | ) | |

<u>**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**</u>

Plaintiff submits the following Statement of Additional Material Facts (SOF) relative to

Plaintiff's Response to the Defendants' Motions for Summary Judgment pursuant to L.R.

56.1(b)(3).[1]

1.      The Individual Defendant Officer's Statement of Material Facts ("DOSOF")
concedes material facts are disputed, and specifically uses the term "disputed" five times. *See* Doc.
489 at ¶¶ 42, 44, 50, 54, 75.[2]

**A.   <u>The Defendants' First Investigation Into Mr. Gibson</u>**

2.      On December 27, 1989, Chicago police officers arrested James Gibson ("Gibson")
without probable cause and brought him to Area 3 for questioning in the homicides of Lloyd
Benjamin and Hunter Wash. *Doc 486-1 at Exhibit 1,* Gibson Deposition, pp. 327-328, 360-362;
DOSOF ¶¶ 22, 24.

3.      While at Area 3, and at various times from December 27, 1989 to December 30,
1989, Gibson was handcuffed and smacked, kicked, punched, burned, threatened, called racial slurs,
and deprived of food, water, sleep and the use of a bathroom by one or more members of the Chicago

---

[1] All paragraphs submitted in this Statement of Additional Material Facts apply with equal and full
force to both summary judgment motions filed by the Defendant Officers and the Defendant City.
This approach is consistent with the City's Statement of Undisputed Material Facts incorporated
nearly every single fact paragraph from the Individual Officer's motion for summary judgment.
(Doc. 482 at p. 2, ¶ 3).
[2] When used herein, "DOSOF" refers to the purported "Material Facts" from Doc. 489, the
"Defendant Officers' Corrected Statement of Material Facts" filed on October 3, 2024 as well as
the Plaintiff's Response to each purported "Material Fact" titled "Plaintiff's Response to the
Defendant Officers' Corrected Statement of Material Facts" filed simultaneously with these
additional material facts.

Police Department. DOSOF ¶ 23, 26-28; *Pltf Exhibit 1, People v. Gibson*, 2018 IL App (1st) 162177 ("Gibson I") and *Pltf Exhibit 2, People v. Gibson*, 2019 IL App (1st) 182040-U ("Gibson II"); *Pltf Exhibit 3,* April 26, 2016 Hearing Transcript, pp. 36-89, 95-103, 117-136; *Pltf Exhibit 4,* May 25, 2016 Hearing Transcript, pp. 31-173; *Pltf Exhibit 5,* May 3, 2016 TIRC Interview Transcript, pp. 18-50, 55-76; *Doc 486-1 at Exhibit 1,* pp. 367-493, 539-540, 552-564, 608-624; *Pltf Exhibit 6,* January 2, 1990 Photographs of Gibson Injuries; *Pltf Exhibit 7,* January 2, 1990 Judge Bastone Order to Photograph Gibson; *Pltf Exhibit 8,* January 2, 1990 Martorana Reply to Investigation Requests; *Pltf Exhibit 9,* May 23, 2012 TIRC Claim Form; *Pltf Exhibit 10,* Gibson Depo. Ex. 28; *Pltf Exhibit 11,* Gibson Depo. Ex. 19; *Pltf Exhibit 12,* Ortiz Depo. Ex. 1 at HM 005852-54, HM 005893.

4.     Gibson alleges that during his interrogations at Area 3 "the officers said i will beat the shit out of you smart ass nigger," while his co-defendant, Keith, testified that the officers slapped him and said "nigger, you're lying." *Pltf Exhibit 10,* p. 3; *Doc 486-3 at Exhibit 29, 2/14/1991 Suppression Hearing Transcript, p. 103; *Pltf Exhibit 1,* ¶ 41.

5.     As a result of the abuse, Gibson had to urinate on the floor of the interrogation room, lost consciousness at least once, and ultimately made an inculpatory statement on December 30, 1989 about the Benjamin and Wash murders. Gibson's statement was documented in a police report dated January 3, 1990 and was later testified to at Mr. Gibson's trial by one of the Defendants. DOSOF ¶ 28, 32, 43-47, 128, 143; *Doc 486-1 at Exhibit 2,* Gibson Trial Transcript, pp. 003850:22 - 003852:17; *Pltf Exhibit 12,* Ortiz Depo. Ex. 1, pp. HM 005879-84; *Doc 486-1 at Exhibit 1,* pp. 366:11-21, 369-373; *Doc 486-1 at Exhibit 10,* January 14, 1990 Supplementary Report, p. 2; *Pltf Exhibit 3,* pp. 39-40.

6.     Gibson testified that police fed him an untrue story of the murders on December 30, 1989 to tell detectives Moser and Caesar, and later the state's attorney, which he did. Nonetheless, Gibson was released and taken home that same night. DOSOF ¶¶ 40-45, 48; *Doc 486-1 at Exhibit 1,* pp. 490-492; *Pltf Exhibit 3,* pp. 81-89; *Pltf Exhibit 5,* p. 34-35.

**7.**     Gibson testified that Defendant Anthony Maslanka physically abused him. *Pltf Exhibit 3,* pp. 36-50, 55-63, 66-70, 79-89; *Pltf Exhibit 4,* pp. 31-173; *Pltf Exhibit 5,* pp. 18-22; 24-31, 34-35, 41-42; *Doc 486-1 at Exhibit 1,* pp. 367-382, 412-464, 471-472, 518-519; *Pltf Exhibit 9*; *Doc 486-6 at Exhibit 61,* July 6, 2011 Petition for Executive Clemency.

8.     Gibson testified that Defendant Paladino physically abused him. *Pltf Exhibit 3,* pp. 36-50, 55-63, 66-70, 79-89; *Pltf Exhibit 4,* pp. 31-173; *Pltf Exhibit 5,* pp. 18-22; 24-31, 34-35, 41-42; *Doc 486-1 at Exhibit 1,* pp. 367-382, 412-464, 471-472; 518-519; *Pltf Exhibit 9,*; *Doc 486-6 at Exhibit 61*.

9.     Gibson testified that Defendant O'Mara physically abused him. DOSOF ¶ 26; *Pltf Exhibit 3,* pp. 34-66, 81-89; *Pltf Exhibit 4,* pp. 31-173; *Pltf Exhibit 5,* pp. 18-50; *Doc 486-1 at Exhibit 1,* pp. 367-457, 490-492, 518-519; *Pltf Exhibit 9*.

10.     Gibson testified that Defendant Collins physically abused him. DOSOF ¶ 26; *Pltf Exhibit 3,* pp. 34-70, 81-89; *Pltf Exhibit 4,* pp. 31-173; *Pltf Exhibit 5,* pp. 18-50; *Doc 486-1 at Exhibit 1,* pp. 367-457, 490-492, 518-519; *Pltf Exhibit 9*.

11. Gibson testified that Defendant Breska physically abused him. *Pltf Exhibit 3*, pp. 63-70, 73-80, 81-89; *Pltf Exhibit 4*, pp. 31-173; *Pltf Exhibit 5*, pp. 20-50; *Doc 486-1 at Exhibit 1*, pp. 405-492, 518-519; *Pltf Exhibit 9*.

12. Gibson testified that Defendant Rusnak physically abused him. *Pltf Exhibit 3,* pp. 63-70, 73-80, 81-89; *Pltf Exhibit 4,* pp. 31-173; *Pltf Exhibit 5,* pp. 20-50; *Doc 486-1 at Exhibit 1,* pp. 405-492, 518-519; *Pltf Exhibit 9*.

13. Gibson testified that Defendant McCann physically abused him. *Pltf Exhibit 3,* pp. 36-50, 63-70, 81-89; *Pltf Exhibit 4,* pp. 31-173; *Pltf Exhibit 5,* pp. 18-50; *Doc 486-1 at Exhibit 1,* pp. 367-519; *Pltf Exhibit 9*.

**14.** Gibson testified that before he made inculpatory statements on December 30, 1989, Defendant Byrne pulled out his gun in a small interview room, played with it, and asked Gibson questions about it. Gibson testified that other detectives were in the room when this happened, including Maslanka, Paladino, Caesar, and McCann. *Pltf Exhibit 3,* p. 66; *Pltf Exhibit 5,* pp. 23; *Doc 486-1 at Exhibit 1,* pp. 518-519; *Pltf Exhibit 12* at HM 005894.

15. When asked in 2016 how Gibson felt after Sgt. Byrne pulled his gun out, Mr. Gibson testified that when it happened: "I didn't have no feeling. I had lost all sense of direction of feeling at that time. I was just – I was hurting and I didn't have no feeling." *Pltf Exhibit 3,* p. 66 (Also in Responsive Facts, ¶¶ 61).

**16.** Gibson testified that Defendants Byrne, Moser, and Ceasar knew Gibson was being physically abused by the other Defendants and did nothing to stop it. *Pltf Exhibit 3,* pp. 36-50, 63-70, 89-90; *Pltf Exhibit 4,* pp. 31-173; *Pltf Exhibit 5,* pp. 18-50; *Doc 486-1 at Exhibit 1,* pp. 490-500, 509-519; *Pltf Exhibit 9*.

17. Gibson testified that several officers were present for his abuse throughout the three-day period from December 27 to December 30, 1989 but that he could not identify those officers because he "had came in contact with so many detectives, I start getting the detectives confused because they would come in as partners and then they would switch up and they would com in with three, four of them. At first, I though they were all the same. But I had into to contact by now with sixteen different detectives so I start getting confused." DOSOF ¶ 27; *Pltf Exhibit 3,* p. 64; *Pltf Exhibit 5,* p. 26.

18. Gibson testified that the officers who beat him were in plain clothes and unmarked cars from December 27 to December 30, 1989 and that the officers did not identify themselves during the beatings. *Pltf Exhibit 4,* pp. 31-39; *Pltf Exhibit 3,* pp. 64; *Pltf Exhibit 5,* pp. 26; *Doc 486-1 at Exhibit 1,* pp. 327, 361-362, 475, 501; *Doc 486-2 at Exhibit 13,*; *Doc 486-3 at Exhibit 22,* 6/13/2022 Maslanka Deposition, at pp. 27, 82, 96, 99-100.

19. The third floor of Area 3, where Gibson alleges he was abused, was where the Individual Defendants worked at the time of Mr. Gibson's arrest and was "an open-floor galleria. The detectives on that floor shared whatever desk was available." *Doc 486-3 at Exhibit 22,* pp. 35, 97; *Doc 486-3 at Exhibit 21,* 6/20/2022 Byrne Deposition, p. 18; *Pltf Exhibit 13*, June 16, 2022 Paladino Deposition, pp. 49-50.

3

20.     Defendant Maslanka testified that he spoke with Defendants Paladino, Rusnak, Breska, and Collins during the investigation into the Benjamin and Wash murders, that General Progress Reports are left for and passed on to the next group of detectives to follow up on, and that he probably spoke to Moser about the investigation because Moser was part of the investigation and was Maslanka and Paladino's "partner." DOSOF ¶¶ 43, 48, 77-78, 85, 87, *Doc 486-3 at Exhibit 22*, pp. 27, 82, 90, 96, 99-100; *Pltf Exhibit 13*, pp. 56-59; 62-64; I, *Pltf Exhibit 12 at* HM 005879-84; HM005911; *Doc 486-2 at Exhibit 13,* 12/29/1989 Supplementary Report.

21.     Defendant Moser alleges he asked Gibson to repeat the statement that Gibson allegedly gave other officers about the murders on December 30, 1989. Maslanka also testified that he asked Gibson to relate what he told Rusnak and Breska. Maslanka then testified that "it's just odd that we asked him to relate what he told the other detectives." DOSOF ¶¶ 43-45; *Doc 486-1 at Exhibit 1,* pp. 492: 4-15; *Doc 486-3 at Exhibit 22,* p. 145; *Pltf Exhibit 14*, 1/2/1990 Supplementary Report (Byrne Depo. Ex. 2).

22.     On the same day Gibson was released from Area 3, on December 30, 1989 with no charges, Gibson told the Office of Professional Standards that he was beaten by members of the Chicago Police Department. DOSOF ¶ 114; *Doc 486-1 at Exhibit 1,* pp. 554-558, 560:14-561:3; *Pltf Exhibit 12*, at HM 005849-52.

**B.   The Second "Investigation" Into Mr. Gibson**

23.     Chicago Police Officer Richard Chenow, an expert with the CPD crime lab determined the caliber of the bullets recovered from Benjamin and Wash was .32 caliber on December 27, 1989. *Doc 486-1 at Exhibit 2*, Trial Transcript 90CR3212, pp. 003859:22 – 003865:9.

24.     There were no written statements of any witness implicating Gibson in the Benjamin or Wash murders at the time Gibson was arrested on December 31, 1989 around 7:00pm. DOSOF ¶¶ 92, 97, 105, 109.

25.     Defendants Byrne, O'Mara, Collins, Moser, McCann, and Ceasar arrested Mr. Gibson on December 31, 1989. *Pltf Exhibit 14*.

26.     The Arrest Report for James Gibson states that Gibson was arrested because he was "named by the co-defendant and an independent eye witness," but that eyewitness is not specifically identified. Exhibit 37; *Pltf Exhibit 15*, 12/31/1989 Gibson Arrest Report *(*Byrne Depo. Ex. 1).

27.     Defendant Moser testified under oath at Gibson's motion to suppress hearing that Keith's statement inculpating Gibson in the double homicide was the basis for probable cause to arrest Mr. Gibson on December 31, 1989. *Doc 486-3 at Exhibit 29*, pp. 49-50.

**28.**     Eric Johnson aka Keith Smith, aka KD alleges the statement he provided to police on December 31, 1989 was false and a result of Defendants Paladino, Maslanka, Breska, Rusnak and McCann beating, slapping, punching, choking, and kicking him, calling him racial slurs, threatening him, and telling him that he was lying. Keith alleges Defendant Caesar witnessed at least some of this abuse. *Doc 482-50, Exhibit 48*, 5/6/2022 Keith Smith Deposition, pp. 36-37, 74-123, 140; *Doc 486-3 at Exhibit 29*, pp. 101-136.

4

**29.** Keith Smith testified that he did not read or review his statement prior to signing it and that officers told him he could go home if he signed it. *Doc 482-50, Exhibit 48*, pp. 36-37, 74-123, 140; *Doc 486-3 at Exhibit 29*, pp. 111-127. Detective Moser testified at the suppression hearing in front of Judge Neville that Keith's statement incriminated Mr. Gibson. *Doc 486-3 at Exhibit 29*, pp. 14-26.

30. Fernando Webb spoke with Janice Johnson before she met with police on December 31, 1989, to ask Webb what he told police. Janice Johnson spoke to Webb again before trial, and testified that Webb admitted that he lied to police. DOSOF ¶ 110; *Doc 486-1 at Exhibit 2*, pp. 003803-003805, 003777-003778.

**31.** In 2016, Carla Smith testified in the presence of Mr. O'Rourke, a prosecutor for the State. Mr. O'Rourke asked questions of Carla on cross examination. Carla testified that on December 31, 1989 police told her they would let her brother, Keith, go home if she made a statement implicating her brother and Gibson. Carla also testified police told her they would write out the statement they wanted her to give for her to sign, but it was not what she had said. *Doc 486-2 at Exhibit 19*, 3/8/2016 Hearing Transcript, pp. 000573-580, 000582-584.

32. Carla Smith testified that Gibson and Keith Smith were not in her house but that police officers wrote down that they were downstairs in the basement. Carla testified she signed the statement, that the handwriting was not hers, and that the statement she signed was not true. *Doc 486-2 at Exhibit 19*, pp. 000581-584.

**33.** Keith testified in 2021 that both Janice and Carla, his sisters, admitted their statements were false and fabricated by police. Doc 482-50, Exhibit 48, pp. 151-153.

34. Carla testified in 2021 that she now does not remember testifying in 2016, that she did not remember going to the police station after her brother was arrested for murder, and that she does not remember anything the police said to her or that she even signed a statement. *Doc 486-4 at Exhibit 34*, 6/29/2021 Carla Smith Deposition, pp. 12-14, 16-17.

35. Carla also testified in 2021 that the statement she allegedly gave police was not her handwriting, that she did not write it, that she did not remember telling police what was on the statement, and that she did not remember Gibson being in the basement of her home or talking about robbing the victim. *Doc 486-4 at Exhibit 34*, pp. 22, 25-28.

36. Keith was released from prison the same day he signed his plea agreement in 2012, which Keith has since testified contained a "bunch of bull crap." *Doc 482-50, Exhibit 48*, pp. 194-202; DOSOF ¶ 157; *Doc 486-6 at Exhibit 53*, 1/27/2012 Plea Agreement 90CR3212-02; *Doc 486-6 at Exhibit 54*, 1/27/2012 Hearing Transcript 90CR3212-02.

## C. Gibson's Documentation of His Injuries and Allegations of Abuse

37. On January 2, 1990, Gibson made his first appearance in front of a judge on the Wash and Benjamin homicide charges. There, Gibson informed Judge Bastone and Gibson's public defender that he was beaten by members of the Area 3 Chicago Police Department. DOSOF ¶ 117; *Doc 486-1 at Exhibit 1*, pp. 619-624; *Pltf Exhibit 3*, pp. 117-123.

38.     Judge Bastone ordered photographs be taken of James Gibson's injuries, which were documented by an investigator. Mr. Gibson's physical injuries were also visible on his face as his face was puffy, but clothes covered injuries on his body. *Doc 486-1 at Exhibit 1,* p. 497; *Pltf Exhibit 6; Pltf Exhibit 7; Pltf Exhibit 8.*

39.     Four color Polaroid photos were taken of Gibson's chest and ribcage, bearing handwritten notations that say, "Right Chest Swollen" and "Left Chest Swollen," and the date, January 2, 1990, but one photograph, purportedly of Mr. Gibson's "buttox" has never been discovered. The three photographs described herein are shown below. *Pltf Exhibit 6; Pltf Exhibit 8.*







40.     After taking photographs of Gibson, the investigator wrote a reply to the Investigation Request, stating that he took photographs of Gibson, stating they were "all of swollen areas." *Pltf Exhibit 8*.

41.     Judge Bastone further ordered that James Gibson be sent to Cermak Hospital to be examined and treated for his injuries**.** *Pltf Exhibit 3*, pp. 117-123; DOSOF ¶¶ 118-119.

**42.**     On January 3, 1990, Gibson was treated at Cermak Hospital where he complained of depression and pain in the left side of his chest from being "hit by police." During Gibson's later psychiatric evaluation, bruises were observed on his left ribs and noted on his patient admission history. DOSOF ¶¶ 118-119; *Doc 486-5 at Exhibit 42*, Cermak Health Services records, pp. HM 005921-5922

43.     Gibson testified that he and his attorneys attempted to obtain the photographs taken on January 2, 1990 documenting his allegations of abuse as well as his medical records from Cermak Hospital, but that neither were provided to Gibson until 2016. *Pltf Exhibit 4*, pp. 134-144, 152-169.

44.     Gibson testified that his attorneys would not bring his claim of police torture before a judge without corroborating evidence. *Pltf Exhibit 4*, pp. 101-121.

**45.**     According to OPS records, Gibson told OPS Investigator Jose Ortiz on March 13, 1990 that "Detectives Collins and O'Mara between 27-30 December 1989 detained him in Area 3, Violent Crimes without charging him for an excessive length of time…On the 29th of December, while still being detained in Area 3 – VC without being legally charged, both Detectives Collins and O'Mara punched him in the ribs and neck area approximately 30-40 times, kicked him in the groin area twice, and slapped him about 7 times, and further threatened to beat the shit out of him…"JSOUMF ¶ 70; *Pltf Exhibit 16*, 3/13/1990 OPS Telephone Interview of James Gibson, at OSP 004956. Gibson also told OPS that he sought treatment for his injuries at Cermak Medical Center after he was admitted at Cook County Jail and signed a medical release form for OPS to obtain those records. *Id.*

**46.**     The Illinois Appellate Court, in 2019, vacated Gibson's conviction and finding that "Burge's subordinates beat [Gibson] during his interrogation" and "defendant [Mr. Gibson] is entitled to a new trial, at which his incriminating statement to the Area 3 detectives, the product of police torture, may not be introduced as substantive evidence of his guilt," and that the statement "proved to be the decisive evidence against him, the lynchpin of his conviction." *Pltf Exhibit 1 and Pltf Exhibit 2.* In 2020, the Circuit Court of Cook County granted Mr. Gibson a Certificate of Innocence. *Pltf Exhibit 17*, 2/11/2020 Order granting Gibson Certificate of Innocence.

## D.  **Gibson's Criminal Proceedings**

47.     Gibson and his co-defendant, Keith, were both tried for the murder charges in front of Judge Neville, who handled all pre-trial matters for both defendants. At the sentencing hearing, the State argued that "this Court is familiar with the facts from both the bench trial as well as the trial of Mr. Johnson in this case." *See generally Doc 486-3 at Exhibit 29*; *see generally Doc 486-1 at Exhibit 2*; *Pltf Exhibit 18*, 5/28/1992 Sentencing Hearing Transcript, p. E-16.

48. In his amended motion to suppress, filed on October 22, 1990, Gibson sought the suppression of all witness statements "and confessions" including the "oral statement admitted in evidence against him." During the suppression hearing, Gibson's counsel stated that there appears to be statements made by Mr. Gibson, which Gibson wanted suppressed. *Pltf Exhibit 19*, Gibson pro se Motion to Suppress; *Doc 486-3 at Exhibit 29*, pp. 64-65. The prosecutor for the State denied that Gibson made any statements to the police after his arrest on December 31, 1989 or that there were any statements by Mr. Gibson that "came out of" his interviews prior to his arrest. Gibson's motion to suppress was denied. *Doc 486-3 at Exhibit 29*, pp. 64-65.

49. At trial, during Defendant Moser's testimony, the State specifically argued that Mr. Gibson's statement was admissible because it was "a declaration against interests" and could be "characterized as against his penal interests." *Doc 486-1 at Exhibit 2*, pp. 6-13. Afterward, the Court stated on the record that "Mr. Gibson puts himself in this statement at the scene of the incident and also indicates that he knew the incident was going to take place for some time before. I suppose based on that scenario the State can argue inferentially that he was doing something there to assist, and I think that's sufficient to allow them to put it in." *Doc 486-1 at Exhibit 2*, pp. 11-12. Moser also testified that he interviewed Webb, Janice, and Carla at Area 3. *Id.* at 175.

50. After a bench trial, Judge Neville found Gibson guilty on all counts and made findings of fact, including the following:

> I have a question of what to do with the statement of Mr. Gibson. I think at this point it is clear that there is an admission, and I believe that this becomes more than just an admission to being in the location based on a couple of other things that I think that corroborates.

> There is no doubt at this point that Mr. Gibson said he was there when this incident happens, and there is no doubt that Mr. Gibson says he sees a gun. He just has the gun in the hands of two other people.

> …

> Basically, Mr. Gibson puts himself there and says other people did it. He does not explain why, if he knew about this being planned for some months before and, in fact, he knew that the robbery was going to take place, why is he there to begin with. Apparently, the officers didn't ask, and Mr. Gibson didn't decide to indicate that.

> I find it pretty remarkable that it would be happenstance that he would show up at the garage two months or ---Let's not even say two months – whatever time after he knew that a robbery was going to take place, he would be there right at the exact time that this happened.

> …

> I have thought long and hard after I heard the evidence yesterday about what the State has. I think that the statement from Mr. Gibson is of extreme importance in my finding as it corroborates the testimony of both the sisters and Fernando Webb and more than just some slight details.

I find that Carla and Janie Webb are credible witnesses regarding their testimony that Mr. Gibson was in their house and had made those statements. I find that Fernando Webb is credible to the extent that he puts Mr. Gibson, and corroborates Mr. Gibson's own statement at the garage with the gun at the time.

I think that the testimony and that evidence coupled with Mr. Gibson's knowledge of the robbery and being at the location in his own words are sufficient to prove Mr. Gibson guilty of this crime for both murders beyond a reasonable doubt, and I find him guilty."

*Doc 486-1 at Exhibit 2*, pp. 45-47.

51.     On July 6, 2011, in his Petition for Executive Clemency, Gibson made the allegation that Detectives Maslanka and Paladino, specifically, committed acts of physical abuse against him. Gibson also claimed in his Petition for Executive Clemency that:

Paladino and Maslanka invited a few other detectives into the room, bringing an iron with them. One of the detectives asked James about his alias, 'Peter Gunn.' He said he had heard of a tattoo on James's arm with that name, and asked to see it. They then forced off James's shirt and pressed the searing iron against the tattoo. James struggled with the detectives, crying out in pain: but James was overmatched. To this day James still bears a scar from the burn."

*Doc 486-6 at Exhibit 61*, pp. 13-14; *Pltf Exhibit 4, p.* R 714; *Doc 486-1 at Exhibit 1,* Gibson Deposition, pp. 577, 650, 654.

**52.**     On May 23, 2012, James Gibson filed a claim with the Illinois Torture Inquiry and Relief Commission alleging that his statement was the product of physical abuse by Area 3 detectives, specifically "John Paladino, Anthony Maslanka, McCann, and several others." City of Chicago's Answer, Dkt 117, ¶ 83 (admitting that "plaintiff filed a claim with TIRC 'alleging that his statement was the product of physical abuse by Area 3 detectives.'"); *Pltf Exhibit 9*; *Pltf Exhibit 4,* p. R 714.

**53.**     On July 22, 2015, the TIRC issued a case disposition in which it concluded that by a preponderance of evidence there was sufficient credible evidence of torture to merit judicial review. City of Chicago's Answer, Dkt 117, ¶ 84 (admitting that "TIRC issued a Case Disposition dated July 22, 2015 pertaining to plaintiff's claim, in which TIRC concluded there was sufficient credible evidence of torture to merit judicial review.").

**E.  Defendants' Code of Silence**

54.     No Chicago Police Department officer, detective, supervisor, or commander reported Mr. Gibson's abuse and all Individual Defendants have denied any abuse occurred or that they participated in it. See Defendant Breska's Answer, Dkt. 118; Defendant Caesar's Answer, Dkt. 119; Defendant Leja's Answer, Dkt. 120; Defendant Moser's Answer, Dkt. 121; Defendant Rusnak's Answer, Dkt. 122; Defendant Estate of Phillip Collins's Answer, Dkt. 133; Defendant Estate of John McCann's Answer, Dkt. 134; and Defendant Estate of John O'Mara's Answer, Dkt. 135 at ¶ 3-4, 30-38, 41, 97-110.

55.     Defendants jointly authored police reports about the investigation and witness statements. But, when asked to identify who "the reporting" referred to for each action undertaken in the police reports relating to Gibson's case, Defendant Maslanka testified that the same phrase "the reporting" officer referred to different individuals throughout the report, and that "The only way [someone else] could know is when you put it to me and I can give you that answer." *Doc 486-3 at Exhibit 22*, pp. 58-88. Additionally, the report detailing how Keith changed his story to police numerous times, but consistently incriminated Gibson, does not contain the times any of those statements were made. *Id.* at pp. 90-92.

56.     John Byrne invoked his Fifth Amendment right against self-incrimination 237 times in response to questioning by Gibson's counsel in this action, despite denying any misconduct when responding to Gibson's OPS complaint against him in 1990. When he did respond to questions about Gibson's case, John Byrne stated more than once that he has no "independent recollection of this case or any aspect of it." *Doc 486-3* at *Exhibit 21* at pp. 16:1-24, 41-42; *Pltf Exhibit 20*, 8/1/2023 Jeffrey J. Noble Deposition, pp. 64-65; *Doc 486-2 at Exhibit 20*, 4/16/1990 Byrne Memo to Burge.

57.     Defendants Byrne, Maslanka, and Paladino invoked their Fifth Amendment right to avoid self- incrimination in this action when asked whether they were aware of allegations that detectives in Area 2 and 3 had tortured suspects and coerced confessions and when asked about any allegations of abuse made by individuals who were not Gibson. *Doc 486-3 at Exhibit 22*, pp. 27, 41-43 (training) 82, 96, 99-100, 112-127 (allegations), 132-141; *Pltf Exhibit 13*, pp. 18-47, 56-59; 62-73; *Doc 486-3 at Exhibit 21*, pp. 26-28, 32-38, 44-46, 48-74, 78-79, 82-95 (policy and practice).

58.     Defendant Maslanka invoked his Fifth Amendment right to avoid self-incrimination when asked by Plaintiff's counsel in this action about his alleged torture, abuse, and coercion of Terry Harris, Alfonzo Pinex, Donald Terrance, Tony Anderson, Demond Weston, Cortez Brown, Marcus Wiggins, Jesse Clemon, Lamari Clemon, Demoni Clemon, Clinton Welton, Diyez Owen, Travis Richardson, and Tremaine Green. *Doc 486-3 at Exhibit 22*, pp. 112-127, 132-141.

**59.**     Defendant Byrne invoked his Fifth Amendment right to avoid self-incrimination when asked by Plaintiff's counsel in this action about his alleged torture, abuse, and coercion of Andrew Wilson, Lee Holmes, Stanley Wrice, Rodney Benson, Alonzo Smith, David Bates, Greg Banks, Darrell Cannon, Reginald Mahaffey, Jerry Mahaffey, Jese Winston, Michael Tillman, Phillip Adkins, Aaron Patterson, Thomas Craft, Lavert Jones, Stanley Howard, Donald Torrence, Madison Hobley, Grayland Johnson, Ronald Kitchen, and Marcus Wiggins. *Doc 486-3 at Exhibit 21*, pp. 33-35, 45-46, 48-51, 53-71, 73-74, 78-79, 81-82, 86-92.

**60.**     Defendant Paladino invoked his Fifth Amendment right to avoid self-incrimination when asked by Plaintiff's counsel in this action about his alleged torture, abuse, and coercion of Stanley Howard, Marron Diggins, Shadid Muman, Andrew Maxwell, Jerry Thompson, Madison Hobley, Donald Torrence, Cortez Brown, Tony Anderson, Clinton Welton, Damoni Clemon, Diyez Owens, Iamari Clemon, Jesse Clemon, Marcus Wiggins, Michael Peterson, Sandy Curtis, Travis Richardson, Jerry Gillespie, Michael Saunders, and Gregory Logan, *Pltf Exhibit 13*, pp. 24-48.

**61.**     Defendants Maslanka, Paladino, and Byrne invoked their Fifth Amendment right to avoid self-incrimination when asked by Plaintiff's counsel in this action about the training, if any,

they received before and after becoming a Chicago police officer. *Doc 486-3 at Exhibit 22*, pp. 38-45; *Doc 486-3 at Exhibit 21*, pp. 30-31; *Pltf Exhibit 13*, pp. 13-15

62.     Defendants Byrne, Paladino, and Maslanka invoked their Fifth Amendment right to avoid self- incrimination in this action when asked questions about Jon Burge. *Doc 486-3 at Exhibit 21*, pp. 15-42-43, 58-59; *Pltf Exhibit 13*, pp. 16-17, 20-21, 52, 56, 58-59; *Doc 486-3 at Exhibit 22*, pp. 18-21 (supervisors), 23-25 (job burge/chain of command), 112-127, 132-141 (allegations).

63.     During post-conviction and TIRC proceedings, several Defendant Officers subpoenaed either invoked their Fifth Amendment right to remain silent so as not to incriminate themselves or denied the allegations of abuse by Gibson. *Doc 482-54 Exhibit 52*, 3/17/2023 Anthony Finnell Expert Report, p. 39; *Doc 486-2 at Exhibit 19*, pp. 95, 99-101, 107-110; *Doc 486-3 at Exhibit 25*, 6/15/2016 Hearing Transcript 90CR3212, pp. 109, 111; *Pltf Exhibit 21*, 7/12/2016 Hearing Transcript 90CR3212, pp. 91-92, 94, 97.

64.     The Defendants that did not invoke their Fifth Amendment right to avoid self-incrimination, and those that did but answered questions about this case, generally testified that they did not have an independent recollection of the case or that they did not recall the facts relating to Gibson's abuse. *Doc 482-26 Exhibit 25*, Jeffrey Noble Expert Report, pp. 64-65. The City's expert, Jeffrey Noble, testified that claiming not to recall something that one actually recalls is a form of lying that is sometimes engaged in by police officers. *Doc 482-26 Exhibit 25*, pp. 65-66.

65.     Defendant Moser testified that he first heard allegations of torture that were made about Jon Burge and the officer he commanded "sometime just after he came to Area 3," which were about a "midnight crew." *Doc 486-2 at Exhibit 14*, 6/17/2022 William Moser Deposition, pp. 40-41.

66.     Defendants McCann, Collins, O'Mara, and Burge are deceased and did not testify in this action. Plaintiff's Amended Complaint, Dkt. 111, Defendant Estate of Phillip Collins's Answer, Dkt. 133; Defendant Estate of John McCann's Answer, Dkt. 134; and Defendant Estate of John O'Mara's Answer, Dkt. 135; Defendant Estate of Jon Burge's Answer, Dkt 136.

67.     No Individual Defendant had a complaint register sustained against them prior to December 27, 1989. No Individual Defendant who was accused of physical abuse or excessive force was disciplined by the Chicago Police Department prior to December 27, 1989. *Doc 486-3 at Exhibit 21*, pp. 83-84, *Pltf Exhibit 20*, pp. 102-103; *Doc 482-23 Exhibit 22*, 1/26/2023 Naomi Avendano 30(b)(6) Deposition, p. 93; *Doc 486-2 at Exhibit 19*, p. 100.

## F.  Other Instances of Abuse

68.     The City knew of more than one allegation of torture or abuse by Area 2 or Area 3 detectives and supervisors, including Defendants Burge, Byrne, Paladino, and Maslanka, before December 1989. *Pltf Exhibit 22, Avendano Depo. Ex. 6; Pltf Exhibit 23, Avendano Depo. Ex. 10; Pltf Exhibit 24, Avendano Depo. Ex. 11; Pltf Exhibit 25, Avendano Depo. Ex. 12; Pltf Exhibit 26, Avendano Depo. Ex. 13; Pltf Exhibit 27, Avendano Depo. Ex. 25; Doc 482-23 Exhibit 22*, pp. 162–164; *Doc 482-27 Exhibit 26*, 2006 Report of Special State's Attorney Edward J. Egan, p. 290.

69.     Keith Smith, a Black male, alleged that in December 1989 some of the Individual Defendants physically abused Keith into making a false statement implicating Gibson. Keith

alleges he told detectives and prosecutors of this abuse the same day it occurred, on December 31, 1989. DOSOF ¶ 95, 154, *Doc 486-3 at Exhibit 29*, pp. 101-138; *Doc 486-5 at Exhibit 47*, 7/27/1990 Affidavit of Eric K. Johnson; *Doc 482-50, Exhibit 48*, pp. 36-37, 74-123, 140.

70.     Despite alleging that he was abused further after making those abuse allegations, Keith testified during a pre-trial motion to suppress hearing that his statement was a product of police torture and coercion. The statement was not suppressed and Keith was later convicted of murder. DOSOF ¶ 95, 154; *Doc 486-3 at Exhibit 29*, p. 101-138; *Doc 482-50, Exhibit 48*, pp. 36-37, 74-123, 140.

71.     Keith received $100,000 in compensation pursuant to the City of Chicago's 2015 reparations ordinance, which was passed in 2015 to officially recognize that Burge and officers under his command had tortured African-American suspects. *Pltf Exhibit 28,* Avendano Depo. Ex. 24; *Doc 482-23 Exhibit 22*, p. 95; *Pltf Exhibit 29*, 5/6/2015 City Council Substitute Resolution 2015-256.

72.     To receive reparation funds under City Council Substitute Resolution 2015-256, the applicant must "make a credible claim of abuse under Jon Burge of under his command." *Doc 482-23 Exhibit 22*, pp. 97-98.

73.     Stanley Howard, a Black male, alleged that a plastic cover was placed over his head and that he was struck in the face and kicked by Area 2 detectives, including John Byrne, in November 1984 until he confessed to murder. *Doc 482-23 Exhibit 22*, pp. 136-137; *Doc 482-27 Exhibit 26,* p. 217-220. Howard was treated at Cermak Hospital where he was found to have bruises on his shoulder and chest and a cut on his knee, among other injuries. *Doc 482-23 Exhibit 22*, p. 137; *Doc 482-27 Exhibit 26*, p. 220.

74.     On November 4, 1984, Howard filed a complaint with OPS, which was ultimately closed as "not sustained," in June 1987, three years later. CSOF ¶ 47; *Pltf Exhibit 30*, Stanley Howard Complaint Register #173407, pp. 89-92. The investigation into Howard's allegations were held in abeyance until after his criminal trial. CSOF ¶ 47; *Doc 482-23 Exhibit 22,* p. 141. OPS waited until at least three years after Howard first made allegations to conduct any witness interviews or review medical documentation of Howard's alleged injuries. CSOF ¶ 47.

75.     Howard filed a civil suit again alleging police abuse, which was forwarded to OPS. *Pltf Exhibit 30*, p.7. Although OPS interviewed one of the accused detectives in 1990 (three years after the allegations were made), two of the three detectives accused of abuse by Howard were not interviewed at all because, by 1987, one was on disability and the other had since resigned from the police department. *Pltf Exhibit 30*, pp. 4, 68-71.

76.     In 2003, Howard was pardoned by the Governor. *Doc 482-23 Exhibit 22,* p. 145-146; *Doc 482-27 Exhibit 26*, p. 219. Afterward, Stanley Howard settled with the City for $1,800,000 to dismiss his civil rights action against the City and its officers, including Jon Burge, John Paladino, and John Byrne. *Pltf Exhibit 31*, Avendano 30b6 Depo Exhibit 22.

77.     Ronald Kitchen, a Black male, alleged that he was physically abused in August 1988 while at Area 3 by officers who struck him about the body with sticks and kicked him in his groin. CSOF ¶ 48; *Pltf Exhibit 32*, Avendano 30b6 Depo Exhibit 19. After receiving a complaint

from the Cook County Jail, in September of 1988, a CR was opened, but was later closed with a recommendation of not sustained, "due to the lack of cooperation on the part of the victims" because according to the investigator "there is no way positively identify any accused officer." CSOF ¶ 48; *Pltf Exhibit 32*, Avendano 30b6 Depo Exhibit 19, p. 2.

78.     OPS wrote a letter to the complaint alleging Kitchen was abused, asserting that it "conducted and completed a thorough investigation into all the allegations of misconduct by a member(s) of the Chicago Police Department. After evaluating all of the available evidence, we have concluded that there is not sufficient evidence to either prove or disprove the allegations…" *Pltf Exhibit 32*, Avendano 30b6 Depo Exhibit 19, p.3. OPS documented medical support for his Kitchen's claim. *Pltf Exhibit 55,* Ronald Kitchen CR 163391.

79.     In July 2009, the charges against Kitchen were dismissed. *Doc 482-23 Exhibit 22*, pp. 153-154. Afterward, Ronald Kitchen settled with the City for $6,150,000 to dismiss his civil rights action against the City and its officers, including John Byrne, and Jon Burge. *Pltf Exhibit 33*, Avendano 30b6 Depo Exhibit 21.

80.     Madison Hobley, a Black male, alleges that police beat, kicked, punched, verbally abused, threatened, and smothered him over the head with a plastic bag while being interrogated by Area 2 homicide detectives on January 6, 1987 until he confessed to murder. *Doc 482-23 Exhibit 22, pp.* 156-157; *Doc 482-27 Exhibit 26*, pp. 183-189.  Hobley was treated at Cermak Hospital on January 7, 1989, and his intake records reflected Hobley suffered physical abuse. *Pltf Exhibit 34*, Madison Hobley Complaint Register #154779; *Doc 482-27 Exhibit 26*, p. 191.

81.     Hobley moved to suppress his confession, which was denied. *Doc 482-27 Exhibit 26*, pp. 188-189. A complaint was initiated with OPS on February 14, 1987 and a CR was opened, but the ASA prosecuting Hobley's criminal case requested that OPS refrain from interviewing the officers involved in Hobley's abuse complaint "until the pre-trial motions in the criminal case have been resolved." *Pltf Exhibit 34*, p. 50.

82.     The officers accused of abuse by Hobley were not even interviewed until the fall of 1990, three years after the alleged abuse. *Pltf Exhibit 34*, pp. 61-84. The CR was ultimately closed as not sustained in December 1990. *Pltf Exhibit 34*, p. 170; *Doc 482-27 Exhibit 26*, p. 190. Hobley was pardoned by the Governor on January 9, 2003. *Doc 482-23 Exhibit 22,* p. 158; *Doc 482-27 Exhibit 26*, p. 183. Afterward, Hobley settled with the City for $7,500,000 to dismiss his civil rights action against the City and its officers, including Jon Burge, and John Paladino. *Pltf Exhibit 35*, Avendano 30b6 Depo Exhibit 23.

83.     Andrew Wilson alleged that police, including Jon Burge, punched, kicked, smothered him with a plastic bag, electrocuted him, and pressed him against a hot radiator until he falsely confessed to murder in 1982. *Doc 482-54 Exhibit 52*, p. 23; *Pltf Exhibit 36*, Avendano 30b6 Depo Exhibit 3. Wilson's injuries while in police custody were documented in a February 17, 1982 letter from the medical director of the Cook County Jail to the Superintendent of Police, Richard Breczek, wherein "a thorough investigation of this alleged brutality" was requested. CSOF ¶ 35-36; *Pltf Exhibit 37*, Avendano 30b6 Depo Exhibit 16; *Doc 482-23 Exhibit 22, p.* 42.

84.     Breczek sent the letter to OPS and a CR was opened, but the investigation was held in abeyance until after Wilson's criminal case, and was closed three years later, in 1985 as

not sustained, allegedly because Wilson's attorneys declined to allow Wilson to be interviewed after his conviction. CSOF ¶ 36.Breczek forwarded the letter relaying Wilson's abuse to Richard Daley, the State's Attorney, stating: "I have publicly stated that we will scrupulously investigate every allegation of police misconduct brought to our attention. However, in pursuing this posture I also do not want to jeopardize the prosecution's case in any way. I will forbear from taking any steps other than the one previously mentioned [i.e. opening a CR with OPS] in connection with these allegations until I hear from you or one of your assistants.*" Pltf Exhibit 38*, Avendano 30b6 Depo Exhibit 17; *Doc 482-23 Exhibit 22*, pp. 46-47. Richard Daley, who later became the mayor of Chicago in 1989, never responded to this letter. *Doc 482-23 Exhibit 22*, pp. 47, 58-59.

85. The Illinois Supreme Court, in *People v. Wilson,* 116 Ill.2d 29, No. 58276 (IL, April 2, 1987), reversed Wilson's conviction because, according to the City, "the state failed to show by clear and convincing evidence that the injuries sustained by Mr. Wilson were not inflicted as a means of coercing his confession." *Pltf Exhibit 36; Doc 482-23 Exhibit 22,* pp. 48-49. The City was aware of this decision before Gibson's interrogation. *Pltf Exhibit 39*, Avendano 30b6 Depo Exhibit 4; *Doc 482-23 Exhibit 22,* p. 49-50.

86. On December 18, 2020, Wilson was granted a certificate of innocence. *Doc 482-54 Exhibit 52*, p. 28. Afterward, Wilson filed a civil rights suit against the City, wherein a jury found that "in 1982 the City of Chicago had a de facto policy, practice, or custom whereby Chicago police officers were allowed to physically abuse persons suspected or injuring or killing another Chicago police officer." *Pltf Exhibit 22*; *Doc 482-23 Exhibit 22,* p. 60-61.

87. The City was on notice of this finding in Wilson's civil suit before Gibson's arrest. *Doc 482-23 Exhibit 22,* pp. 61-62. Although the officers and the City were not ultimately held liable, the jury did find that Wilson's constitutional rights were violated. *Pltf Exhibit 22*. Wilson's CR was later reopened in 1991, which eventually led to the termination of Burge and the suspension of officers under his command. CSOF ¶ 2.

88. Avendano testified that "If there is a pending criminal case, there are times when the state's attorney will request that the CR investigation be put in abeyance until after the criminal proceedings are included [sic]" and "They won't be closed. They will then be reopened at the appropriate time." *Doc 482-23 Exhibit 22,* pp. 67-68. Avendano then testified that "in jurisprudence a criminal trial, with all that it entails including loss of freedom, takes precedence over a disciplinary proceeding when that disciplinary proceeding can continue after the trial without impunity or without damaging anyone's right in the criminal trial….I would imagine that it was more to his advantage to have a criminal court decide a motion to suppress rather than a disciplinary proceeding against officers." *Doc 482-23 Exhibit 22,* pp. 142-143.

89. In 2010, Burge was convicted on charges of perjury and obstruction of justice for falsely denying that he and detectives under his command had engaged in torture and abuse and denying that he was aware of this torture and physical abuse of suspects. *Pltf Exhibit 29; U.S. v. Burge*, 08 CR 846, Dkt. 1 (N.D. Ill 2008); *Doc 482-54 Exhibit 52*, p. 29; *Pltf Exhibit 29*; *Pltf Exhibit 40*, 1/21/2011 Burge Sentencing Transcript. James Gibson was convicted on October 8, 1991, the City was aware of the "charges" to suspend Jon Burge then, but it was not made public until October 11, 1991. *Pltf Exhibit 20*, pp. 161:1-162:10; *Doc 482-23 Exhibit 22,* p. 127:2-9.

90.     In sentencing Burge for perjury, U.S. District Judge Lefkow stated, in part, as follows:

> You denied any knowledge of torture of the plaintiff or of any other torture or abuse having occurred under your direction or command. You denied it in answers to the interrogatories, and you maintained that denial under oath in this courtroom where you testified in your own defense. Unfortunately for you the jury did not believe you, and I must agree that I did not either. ...

> Now when I hear your attorney implying that if someone did the crime, no harm, no foul, they deserved it, I am frankly shocked. Even if counsel only means to say that none of these people can be believed because they are criminals, the mountain of evidence to the contrary completely belies that position. ...

> When a confession is coerced, the truth of the confession is called into question. When this becomes widespread, as one can infer from the accounts that have been presented here in this court, the administration of justice is undermined irreparably. ...

> Let me turn from the seriousness of the offense to the issue of deterrence. As you know I am no stranger to violent crime. I am deeply indebted to the valiant police officers who, like you did on so many occasions, dedicated themselves to apprehending the persons responsible. I fully trusted, and I was not disappointed, that the Chicago Police Department and other law enforcement agencies would apprehend the perpetrator of the crime that affected me. Respect is hardly a sufficient word for how I feel about the talent and dedication of the people who helped me and my family in a time of crisis.

> Yet too many times I have seen officers sit in the witness box . . . and give implausible testi[mony] to defend themselves or a fellow officer against accusations of wrongdoing. ... Perhaps the praise, publicity, and commendations you received for solving these awful crimes was seductive and may have led you down this path. On your behalf how I wish that there not been such a dismal failure of leadership in the department that it came to this.

*Pltf Exhibit 40,* pp. 3-4, 6, 7-8, 10;

## G.  The 1989 City Council Hearings:

**91.**     On August 17, 1989, September 14, 1989, and November 30, 1989, members of the public raised claims of torture of individuals in police custody by Jon Burge at meetings of the Chicago Police Board, sought investigation into those allegations, and requested Burge's suspension pending the results of that investigation.. The Superintendent of the Police Department was present at the meetings. CSOF ¶ 34; *Doc 482-23 Exhibit 22,* p. 110, 121-122, 124; *Doc 482-24 Exhibit 23*, Avendano 30(b)(6) Depo Exhibit 9; *Doc 482-54 Exhibit 52*, p. 24; *Pltf Exhibit 41*, 8/17/1989 Chicago Police Board Minutes; Pltf Exhibit 42, 9/14/1989 Chicago Police Board Minutes; *Pltf Exhibit 43*, 11/30/1989 Chicago Police Board Minutes.

**92.**     The City Council passed a resolution on September 13, 1989 seeking "an investigation of alleged police brutality in the City of Chicago" and requiring the Police

Superintendent to produce all records involving police brutality over the last six months. *Doc 482-54 Exhibit 52*, p. 23; *Doc 482-24 Exhibit 23*.

93.     When asked to suspend Burge for his misconduct, the police superintendent refused, stating: "Commander Burge is working as far as I know and he'll be working, Mr. Powers. I have no reason to suspend Commander Burge. You want him suspended. I have no reason to suspend him at this time." *Pltf Exhibit 23*; *Doc 482-23 Exhibit 22*, pp. 124-125.

94.     The Chief Administrator of OPS, David Fogel and the police superintendent, LeRoy Martin, admitted in 1989 that a code of silence existed in the Chicago Police Department. *Pltf Exhibit 44*, 10/11/1989 Transcript of City Council Public Hearing, pp. 285, 368-369.

95.     Avendano testified that the only outcome of the 1989 City Council hearings was that OPS and the police superintendent "were charged with going back to review information and files to answer the questions that were being presented to this committee." *Doc 482-23 Exhibit 22,* pp. 112-113. There were no resolutions passed or new policies enacted; the Council did nothing else to address the alleged police brutality before Mr. Gibson's arrest and abuse. *Doc 482-23 Exhibit 22,* p. 113.

96.     Avendano testified that before the 1989 City Council hearings, officers including Burge had been sued for torture and abuse in Andrew Wilson's civil suit and the City was "on notice that their actions could be scrutinized." *Doc 482-23 Exhibit 22,* p. 129.

## H.  The City's Own Findings and Admissions Confirming a Pattern and Practice of Abuse

97.     The Illinois Torture Inquiry and Relief Commission (TIRC) was created by the Illinois General Assembly in 2009. Illinois State Representative Art Turner stated during a debate that ("the rationale for this commission is to look into the police allegations or the torture allegations that have been leveled against Chicago police officers under the supervision of Commander Jon Burge." Pltf Exhibit 45, 5/29/2008 House of Representatives Transcription Debate at Gibson 010992.

98.     An April 2016 report of the Police Accountability Task Force entitled Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities they Serve stated, "From 1972 to 1991, CPD detective and commander Jon Burge and others he supervised tortured and abused at least 100 African-Americans on the South and West sides in attempts to coerce confessions." *Pltf Exhibit 46*, 4/13/2016 Police Accountability Task Force Report at Gibson 010215; *Pltf Exhibit 29,* City Council Substitute Resolution 2015-256, Establishment of reparations fund for victims of torture by Police Commander Jon Burge, May 6, 2015, Gibson 010046-010049 ("More than 100 African-Americans who were detained by the Chicago Police Department between 1972 and 1991 have accused Burge or police officers working under his command of engaging in acts of torture and physical abuse.").

99.     Burge was the lieutenant in charge of Area 2 Violent Crimes from 11/12/81 to 8/10/86 and the commander of Area 3 from 1/27/88 to 11/13/91. In a career spanning more than twenty years, Jon Burge rose to the rank of Commander in the Chicago Police Department before he was suspended on 11/12/91 after charges were filed in the police board seeking his separation and he was fired in 1993 for the abuse he carried out. *Pltf Exhibit 29.*

100.    According to the April 2016 Report of the Police Accountability Task Force, "Burge's methods included administering electric shocks to victims' genitals, suffocating them with typewriter covers, threatening them with loaded guns, and burning them on radiators." Other allegations included punching, kicking, and hitting suspects, including with objects like telephone books. *Pltf Exhibit 46* at Gibson 010215.

101.    According to the April 2016 Report of the Police Accountability Task Force, "For years, Burge and the City denied allegations of torture, reinforcing community beliefs in a police 'code of silence.'" *Pltf Exhibit 46* at Gibson 010215.

102.    Complaints of torture and abuse carried out by Burge and his subordinates have been the subject of multiple investigative reports, including by an investigator of the Office of Professional standards, the division within the Chicago Police Department then responsible for investigating excessive force , and a special states attorney. On or about September 28, 1990, OPS investigator Michael Goldston provided a report regarding the conduct of Jon Burge and officers under his command at Area 2 to the Chief Administrator of OPS, the so-called Goldston Report. City of Chicago's Answer, Dkt. 117 at ¶ 99; *Doc 482-27 Exhibit 26*. The City only commissioned the Goldston Report after the Chicago Reader published House of Screams in January 1990. *Pltf Exhibit 20*, p. 153:10-22.

103.    On or about October 26, 1990, OPS investigator Francine Sanders submitted a report regarding the conduct of Jon Burge and officers under his command, the so-called Sanders Report, regarding Andrew Wilson's claim that he was abused "while in the custody of Area 2 personnel" as a suspect in the killing of Officers Fahey and O'Brien on February 9, 1982. City of Chicago's Answer, Dkt 117 at ¶ 99; *Doc 482-30 Exhibit 29*, 11/2/1990 Goldston Sanders Report.

104.    The Sanders report recommended a "sustained" finding for multiple violations of policy against Burge and Detectives Jon Yucaitis and Patrick O'Hara, including that Burge "repeatedly administered electrical stimulation to Mr. Wilson's body in order to create pain and that he held Mr. Wilson, while handcuffed, against a hot radiator causing burns to Mr. Wilson's face, chest and thigh." In addition, the Sanders Report stated that it found that Burge "engaged Andrew Wilson in several unjustified physical altercations during which Mr. Wilson was handcuffed and incapable of providing any resistance," and "[f]ailed to provide prompt medical attention to Andrew Wilson, a prisoner in his custody who was suffering from multiple injuries," *Doc 482-30 Exhibit 29*, p. 64. The Sanders Report also stated that Detectives Jon Yucaitis and Patrick O'Hara were involved or had knowledge of these acts against Mr. Wilson. *Doc 482-30 Exhibit 29*, p. 63-66.

105.    One of the aims of the Goldston report was to "determine if there was systematic abuse at Area 2 during that period, and if so, to determine culpability, if any, of Area 2 Command Personnel." *Doc 482-30 Exhibit 29* at 000001; City of Chicago's Answer, Dkt 117 at ¶ 101.

106.    The Goldston Report identified allegations of misconduct at Areas 1 and 2 and concluded that: "In the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic. The time span involved covers more than ten years. The abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture. The evidence presented by some individuals convinced juries and appellate courts that personnel assigned to Area 2 engaged in methodical

abuse." The Goldston Report identified at least 50 potential victims of Burge and officers under his Command at Area 2, including allegations of "shockings," "baggings," and "beatings." *Doc 482-30 Exhibit 29* at 000006 and 000008-000025 (Appendix B, D & F); City of Chicago's Answer, Dkt 117 at ¶ 101.

107.    The Goldston Report also concluded that the alleged victims of misconduct from May 1973 through October 1985 resulted in the following number of CR investigations:  beatings (27 instances), electric shock (9 instances), a plastic bag or typewriter cover being put over the victim's head (13 instances), use of a firearm to threaten or strike the victim (11 instances), hangings (2), and more than one type of abuse was alleged in some instances. *Doc 482-30 Exhibit 29* at 000024-000025; *Doc 482-54 Exhibit 52*, p. 31.

108.    The Goldston Report stated that "In the process of analyzing the data produced during this endeavor, credibility of the individuals and sources was paramount. The credibility of some individuals was suspect as a result of their relationships to other individuals (gang affiliation, shared criminal history, familial, et. cetera). There were also a number of individuals who were contacted by the People's Law Office. The manner in which the PLO broached the subject of abuse in these cases is questionable. There were examples of their representatives initiating the contact by relating the nature of their business, which would include information that some other individual alleged physical abuse at the hands of Commander BURGE for example. The next question asked would be, "Were you ever physically abused by Jon BURGE?" BURGE had some contact with practically each person with whom the PLO spoke and each had, at the least, been suspected of committing a serious offense. Taking these facts into consideration, any response by these individuals had to be taken with the proverbial grain of salt. Others were quite credible as a result of how they related what allegedly happened to them and being supported by corroborating evidence such as medical records. In fact, some individuals were so credible that civil suits filed by them resulted in settlements. In one case, a conviction was reversed based on information given in a motion to suppress which had originally been denied." *Doc 482-30 Exhibit 29* at 000005.

109.    The Goldston Report concluded, "The number of incidents in which an Area 2 command member is identified as an accused can lead to only one conclusion. Particular command members were aware of the systematic abuse and perpetuated it either by actively participating in same or failing to take any action to bring it to an end. This conclusion is also supported by the number of incidents in which the Area 2 offices are named as the location of the abuse." *Doc 482-30 Exhibit 29* at 000006.

110.    Among other things, the Goldston Report sources included complaint register files, police reports, court transcripts, and other Chicago Police Department documents dated prior to 1986, and only evaluated alleged victims through October 1986. The Report specifically identified Defendants Burge, Byrne, and Maslanka as those accused of misconduct. City of Chicago's Answer, Dkt 117 at ¶ 101; *Doc 482-30 Exhibit 29* at 000007-000025.

111.    The Goldston Report found that only 26 CR's were initiated for the 50 individuals who alleged abuse at Area 2 before Mr. Gibson's arrest, none of which were sustained. *Doc 482-30 Exhibit 29* at 000024-000025; *Pltf Exhibit 20*, p. 77.

112.     In 1991, after receipt of the Goldston Report, Superintendent Leroy Martin forwarded it to the Police Foundation for review and analysis. The Police Foundation authored certain correspondence and memoranda regarding the Goldson Report and supplied those to the police department. Among other things, the Police Foundation stated, "The methodology in the Goldston Report fails to support the conclusions it draws about its major assertions." *Pltf Exhibit 47*, 11/22/1991 Police Foundation Letter to Leroy Martin; *Doc 482-35 Exhibit 34*, 2/26/1992 Police Foundation Analysis at CITY-JG-006174; *Doc 482-36 Exhibit 35*, 7/30/1992 Police Foundation Analysis at CITY-JG-006177-006187.

113.     July 2006, the Special State's Attorney released a report under the auspices of Special State's Attorney Edward J. Egan and Chief Deputy Special State's Attorney Robert D. Boyle regarding the conduct of Jon Burge and officers under his command (the "Egan Report"). The Egan Report stated that "The petition asked that a Special State's Attorney be appointed to investigate allegations of torture . . . and other offenses by police officers under the command of Jon Burge at Area 2 and Area 3 Headquarters in the city of Chicago during the period from 1973 to the present." City of Chicago's Answer, Dkt 117 at ¶ 99, 100; Doc 482-27 Exhibit 26, p. 3.

114.     The Egan Report further stated "When we accepted this Court's request to serve as Special Prosecutors, we examined the pleadings filed in connection with the Petition for Appointment of a Special State's Attorney and particularly the Order of Appointment. The petition asked that a Special State's Attorney be appointed 'to investigate allegations of torture, perjury, obstruction of justice, conspiracy to obstruct justice, and other offenses by police officers under the command of Jon Burge at Area 2 and Area 3 Headquarters in the city of Chicago during the period from 1973 to the present.'" City of Chicago's Answer, Dkt 117 at ¶ 99, 100; Doc 482-27 Exhibit 26, p. 3.

115.     The State's Attorney "subpoenaed 40 police officers most of whom are retired. All but 11 refused to be interviewed by us; 4 of them testified over their objections after grants of immunity." Specifically, at least thirty different Area 2 and Area 3 supervisors and detectives, while under oath in front of the grand jury (and while represented by counsel paid for by the City) invoked the Fifth Amendment in response to all questions concerning the arrest, interrogation, alleged torture and abuse of suspects, the coercion and fabrication of evidence, and the pattern and practice by the City of police torture, fabrication of evidence, and the code of silence. The Officers that invoked the Fifth Amendment during this investigation included Jon Burge, John Byrne, John Paladino, and Anthony Maslanka. *Doc 482-27 Exhibit 26,* p. 11.

116.     The authors of the Egan Report interviewed hundreds of witnesses and submitted 148 complaints to an investigation, including the complaints of 64 people who had alleged acts of brutality at the hands of Jon Burge and those under his command. *Doc 482-27 Exhibit 26,* pp. 8-9.

117.     The Egan Report concluded: "After our investigation, that has taken almost four years, we judge that there are cases which we believe would justify our seeking indictments for mistreatment of prisoners by Chicago police officers. These cases are based on the complaints of Andrew Wilson, Alfonzo Pinex and Phillip Adkins. It is our judgment that the evidence in those cases would be sufficient to establish guilt beyond a reasonable doubt. The police officer involved in the Wilson case is Jon Burge. In the Pinex case the officers are Anthony Maslanka and Michael McDermott. In the Adkins case the officers are James Lotito and Ronald Boffo. There are many

other cases which lead us to believe or suspect that the claimants were abused, but proof beyond a reasonable doubt is absent.". *Doc 482-27 Exhibit 26,* p. 16.

118. Egan Report further concluded: "There are many other cases which lead us to believe or suspect that the claimants were abused, but proof beyond a reasonable doubt is absent. While not all the officers named by all the claimants were guilty of prisoner abuse, it is our judgment that the commander of the Violent Crimes section of Detective Areas 2 and 3, Jon Burge, was guilty of such abuse. It necessarily follows that a number of those serving under his command recognized that, if their commander could abuse persons with impunity, so could they." *Doc 482-27 Exhibit 26,* p. 16.

119. The Egan Report further concluded:

> We have made the judgment that the admissible evidence would justify our asking a grand jury to indict in three cases: they are the cases of Andrew Wilson, Phillip Adkins, and Alfonso Pinex. There are many other cases that raised the belief that the claimant was telling the truth, e.g. Michael Johnson, Melvin Jones and Shadeed Mumin, but their testimony would not be sufficient to establish proof beyond a reasonable doubt. And there are some cases we have concluded that the claimant was not telling the truth, e.g. Leroy Orange and Leonard Kidd.

> In our judgment the evidence would support an indictment and conviction of Jon Burge in the case of Andrew Wilson. We believe that he also mistreated Michael Johnson and Melvin Jones. He was the commander of the unit. Common sense compels the conclusion that those who worked for him would not be concerned about their own mistreatment of prisoners, if their commander mistreated them. We have said in another part of this report that if some action had been taken against Jon Burge at the time of the Andrew Wilson case, or even shortly after, our appointment would not have been necessary."

*Doc 482-27 Exhibit 26,* pp. 12-13; *Pltf Exhibit 48*, 1/31/2005 OSSA Memo regarding Michael Johnson, pp. 4, 9; *Pltf Exhibit 49*, 8/18/2003 Memo from Gordon Nash to Egan and Boyle, p. 1.

120. After analyzing the complaints of abuse known to the City between 1971 and 1991, Plaintiff's expert, Anthony Finell, determined there were at least 120 men that alleged they were tortured at Areas 2 and 3, at least 29 of whom have now been exonerated. *Doc 482-54 Exhibit 52,* p. 21. Of these individuals, several were paid reparations from the City on the basis that each presented a credible claim of torture or abuse by Jon Burge or an officer under his command during this timeframe, including Gibson's co-defendant, Keith. *Doc 482-54 Exhibit 52,* p. 21.

121. Anthony Finnell concluded that: "The widespread involvement of Chicago Police officers in the torture and coercion of African American criminal suspects to obtain confessions, as was the acknowledged practice over a period of time in Area 2 and 3, could not have existed without the knowledge and, at least, the tacit consent of other police officers and supervisors who may not have been directly involved in the misconduct." *Doc 482-54 Exhibit 52,* p. 39.

122. Anthony Finell further concluded "By December 1989, there was a systemic failure to properly supervise, discipline, train, and control detectives and supervisors at Area 2

and 3, and a systemic code of silence within the City of Chicago and its police department, particularly with regard to the beating and torturing of African American men at Area 2 and later Area 3 under Burge's command." *Doc 482-54 Exhibit 52*, p. 39.

123.    In 2015, the Chicago City Council recognized that "words alone cannot adequately convey the deep regret and remorse that we and our fellow citizens feel for any and all harm that was inflicted by Burge and the officers under his command." *Pltf Exhibit 29*. The Council further stated that "'wrongs [] were committed and injustices [] were perpetrated'" by Burge and his officers, and explained that recognizing that those "wrongs [] were committed" would "enable us, as a City, to take the steps necessary to ensure that similar acts never again occur in Chicago.'" *Pltf Exhibit 29*.

124.    In 2015, a City Council Resolution stated, "For only words can end the silence about wrongs that were committed and injustices that were perpetrated, and enable us, as a City, to take the steps necessary to ensure that similar acts never again occur in Chicago." *Pltf Exhibit 29*..

125.    A press release from the Mayor's office dated July 21, 2006 entitled Statement of Mayor Richard M. Daley, Special Prosecutors Report stated in part, as follows:

> This week, the court released a lengthy special prosecutors report on the practice of abuse and torture of suspects in the 1970s and 1980s at the Calumet police district.

> The city strongly supported the release of this report because the public deserves to know the full story about this shameful episode in our history.

> They also need to know that the city has, in the two decades since, put in place a series of safeguards aimed at preventing such abuses.

> First, let me say, we ask a lot of our police. They put their lives on the line to protect our communities. They see tragedy and loss every day, and are forced to confront the people responsible and bring them to justice. It's a tough, dangerous and often heartbreaking job.

> But even as they work in a violent world, these men and women have a responsibility to operate within the law they have taken an oath to uphold. It's this simple: You cannot enforce the law by breaking the law.

> No matter how awful the crime, no suspect should be subject to the kinds of abuses detailed in this report. And no suspect should ever be coerced into confessing to crimes he did not commit.

> It fundamentally undermines our system of justice, and destroys public confidence. It should never happen.

*       *       *

Finally, I want to comment on one aspect of the report that has received a great deal of attention and that is the letter then police superintendent sent to my office about one case when I was state's attorney twenty-four years ago.

I believe the letter, which suggested but did not charge abuse in the case of a man accused of killing a police officer, was referred to the appropriate professionals within the State's Attorney's Office.

Only years later did the pattern of misconduct on the part of Burge and his unit become known.

*Pltf Exhibit 50*, 7/21/2006 Press Release re Statement of Mayor Daley.

126.    A release dated April 14, 2015, from Mayor Rahm Emanuel's press office stated in part:

Mayor Rahm Emanuel, Alderman Howard Brookins (21st), Chairman of the City Council Black Caucus, Alderman Joe Moore (49th), Alderman Joe Moreno (1st), and representatives of a number of victims of disgraced former police commander Jon Burge today announced a sweeping reparations package for the individuals Burge abused and tortured prior to being fired from the police department in 1993. The package, which will be introduced to the City Council on Wednesday, is the culmination of months of work and meetings with stakeholders and representatives of Burge victims, including Chicago Torture Justice Memorials and Amnesty International, USA.

Jon Burge's actions are a disgrace - to Chicago, to the hard-working men and women of the police department, and most importantly to those he was sworn to protect," said Mayor Emanuel. "Today, we stand together as a city to try and right those wrongs, and to bring this dark chapter of Chicago's history to a close."

* * *

The package includes three overarching components, including a public recognition of the torture committed by Jon Burge, financial reparations for his victims, and a collection of services to help bring closure for the individuals impacted by his actions, as well as their families.

As a reminder of the injustices that occurred, and to ensure that they are not repeated, the City will acknowledge and educate the public about this dark chapter in Chicago's history. This will include a formal City Council apology, the creation of a permanent memorial recognizing the victims of torture, and curricula about the Burge case and its legacy in eighth and tenth grade CPS history classes.

The City will also provide services to support Burge victims and their families. City College tuition and job training will be provided for free to Burge victims, their immediate family members and their grandchildren. The City will fund psychological, family, substance abuse, and other counseling services to Burge victims and their immediate family members. The City will work with sister agencies to create new opportunities for Burge victims in reentry or transitional job programs. The City will

also prioritize Burge victims and their families for re-entry support and social services, senior care services, health services and small business assistance.

Additionally, a $5.5 million fund will be created to provide financial reparations to individuals with a credible claim of Burge-related torture.

*Pltf Exhibit 51*, 4/14/2015 Mayor Emmanuel Press Release.

127.    In an article published in 2018 after Burge's death, Lori Lightfoot during her candidacy was quoted as stating that "With the passing of Jon Burge, we must reflect on the dark legacy that he embodied." She was also quoted as stating, "So many lives shattered, and a horrible stain on the legitimacy of policing that resonates today." *Pltf Exhibit 52*, 9/19/2018 AP News Article re Burge.

128.    In another article published in 2020, Mayor Lightfoot was quoted as stating that "Jon Burge caused immeasurable harm to so many people." The 2016 Report of the Police Accountability Task Force, which was chaired by Lightfoot and appointed by Mayor Emanuel, stated,

From 1972 to 1991, CPD detective and commander Jon Burge and others he supervised tortured and abused at least 100 African-Americans on the South and West sides in attempts to coerce confessions. Burge's methods included administering electric shocks to victims' genitals, suffocating them with typewriter covers, threatening them with loaded guns and burning them on radiators. For years, Burge and the City denied allegations of torture, reinforcing community beliefs in a police "code of silence." Burge was eventually suspended in 1991, and the Chicago Police Board fired him in 1993. After Burge's firing, the FOP attempted (unsuccessfully) to enter a float in the South Side Irish Parade honoring him.

*Pltf Exhibit 56*, 7/3/2020 Planet Money Article; *see also Pltf Exhibit 46*, pp. 22, 34.

**129.**    Many other City, County, and State officials have recognized the Burge torture practice, including current and former Aldermen Thomas Allen, Ed Smith, Isaac Carothers, and David Orr; former Cook County Clerk, Alderman and current U.S. Representative Danny Davis; former State Rep. Jim Sacia; and State Sen. Kwame Raoul. *Pltf Exhibit 57*, 7/24/2007 Transcript of City Council Hearing on Allegations of Police Torture**,** Chicago City Council, Committee on Police and Fire, Police Torture Hearing (July 24, 2007) at pp. 33, 34, 36 (Gibson 010428 - Gibson 010429, Gibson 010431) (Statement of Alderman Thomas Allen); pp. 46-47 (Gibson 010440-010441) (Statement of Alderman Ed Smith) ("[T]hese atrocities that were committed would not have been committed had someone condoned it or either acquiesced when it was going on because apparently no one said anything and it just kept happening and because of that, a lot of people endured some abuse . . . Now, it is incumbent upon the City, it is incumbent upon us, everyone who has a concern about this to do something about it."); p. 34 and 35 (Gibson Production 010429-010430) (Statement of Isaac Carothers) (stating that "I think there's no doubt that everybody in this chamber, I believe everybody in this building, I believe in this city believes that certainly Burge committed these atrocities. I think we all know that . . . [E]veryone believes and knows what Burge did."); at p. 49 (Gibson Production 010443) (Statement of Alderman Joe Moore) (criticizing state and federal prosecutors for failing to "bring a measure of justice in this case, to hold the people

who committed these heinous crimes, who abused their authority to some measure of justice."); at p. 61 (Gibson Production 010455) (Statement of Congressman and former Alderman Danny Davis) ("After expenditures of more than $10 million of public funds to defend Burge and others involved in these illegal, immoral, repugnant activities, it is time for the City to move expeditiously to a fair and just settlement of these cases. Further expenditures defending police torture is in my judgment inconsistent with the law and harmful to the public interests."); *Pltf Exhibit 45*, p. 226 (Statement of Illinois State Representative Jim Sacia) (Commission tasked with "investigating the most despicable man that ever carried a badge"); *Pltf Exhibit 58*, 3/25/2009 Statement of Illinois State Senator Kwame Raoul (96th General Assembly, Regular Session Senate Transcript, March 25, 2009), at p. 27 ("[T]his is about people who were tortured in police departments utilizing methods such as electrodes to testicles, suffocating with . . . typewriter covers. . . . We've heard about the Attorney General's Office and the Cook County State's Attorney's Office playing hot potato with this matter. You know, we're trying to create a vehicle where there would be a commission who would confront this issue once and for all. . . . [C]losure will not be achieved until each and every victim of Commander Burge and – and the police officers under his command, each and every one of their cases are heard.").

130.    Former Aldermen Helen Shiller and David Orr, members of the City Council in 1989 when Gibson was arrested, signed affidavits specifically admitting that they were aware of the allegations of police misconduct, police brutality and torture by Jon Burge and his subordinates prior to Mr. Gibson's abuse. *Doc 482-44 Exhibit 43*, 9/20/2022 Helen Shiller Affidavit; *Doc 482-60 Exhibit 58*, 9/15/2022 David Orr Affidavit.

131.    Former Cook County Clerk David Orr stated at a City Council committee hearing on July 24, 2007 in part as follows:

> I am submitting testimony because I like the rest of you have watched this scandal fester for more than 25 years and obviously it is way past time to correct these injustices.
>
> In the 1980s when I was in the City Council sitting where you did, I signed a resolution demanding action on the Area 2 torture scandal. The evidence of prosecution was indisputably strong then as the Egan/Boyle report concedes. Despite the long delays, the evidence remains strong now.
>
> Area 2 conducted a program of torture involving beatings, mock executions, electric-shock, suffocation and racist psychological abuse to obtain confessions.
>
> By the way, an Alderman asked whether all the victims were black, and the answer is yes, they were.

*Pltf Exhibit 57,* pp. 54-58.

132.    On September 8, 2022 Judge Ellis was asked to resolve a dispute between the parties relating to Plaintiff's Notice of Deposition to the City of Chicago's designated 30(b)(6) representative. The City argued that the 27 separate cases of allegations of physical abuse over a couple decade period of time was too broad for discovery purposes, arguing: "I don't even know

if it's possible for a single witness to get up to speed on every one of those cases and talk about those cases…which encompasses a 50-year timeframe from 1973 to the present with respect to the city's alleged knowledge." Exhibit 21, 10:9-19. The Court held that, in relation to the 30(b)(6) witness, "the relevant time period is when Mr. Gibson was there and what was happening at that point in time and whether there was a pattern or practice at that point in time and whether the city was aware of it. So I'll limit the time period for this to 1989 and going back five years." Ex. 21: 14:20-15:3. After Judge Ellis's ruling, Mr. Gibson sought to depose the City's 30(b)(6) witness on an individual case of misconduct outside this five-year timeframe, which the Court readily permitted. Ex. 21 at 17:5-19.

133.     The City received at least eleven allegations of misconduct relating to electrical shocking or burning by police in just a 15-16 month time period in 1985. The Police Board and City Council held hearings on the issue, but the police superintendent did not issue or propose any rules, regulations, general orders, or special orders prohibiting the use by detectives of electrical devices to inflict pain on suspects. The City explained that general orders prohibiting officers from using unconstitutional force were already in place as of 1973. *Doc 482-23 Exhibit 22*, pp. 75-77. Defendant John Byrne was one of the officers accused of this electrical shocking abuse. *Pltf Exhibit 53*, Avendano 30b6 Depo Exhibit 2; *Doc 482-23 Exhibit 22*, p. 75.

134.     In 1987, prior to Mr. Gibson's arrest, David Fogel, the Chief Administrator of OPS did not mince words, stating "[a] good number of our investigators continue to be irremediably incompetent." *Doc 482-21 Exhibit 20*, 10/19/1987 David Fogel Memo re OPS, p. 2. The memorandum concludes that "OPS gives the appearance of moving forward on all complaints. The opposite occurs. The appearance of doing a thorough investigation with full due process (and endless unnecessary reviews) for all, actually operates to immunize police from internal discipline increases their overtime, leads to an enormous 'paper storm' and has institutionalized lying.…I have come to the conclusion that OPS gives the appearance of formal justice, but actually helps to institutionalize subterfuge and injustice." CSOF ¶¶ 27-29; *Doc 482-54 Exhibit 52*, p. 23; *Doc 482-21 Exhibit 20*, p. 2-5.

135.     The City's 30(b)(6) representative, Naomi Avendano, admitted that the City was aware of repeated complaints of torture, abuse, and coercion by Area 2 and 3 detectives and supervisors before Gibson's abuse and trial. *Pltf Exhibit 22; Pltf Exhibit 23; Pltf Exhibit 24; Pltf Exhibit 25; Pltf Exhibit 26; Pltf Exhibit 27; Doc 482-23 Exhibit 22*, pp. 62-63, 162–164. The City, through Special Corporation Counsel to the Superintendent of Police, stated in a public filing in 1992 that "The testimony regarding similar acts sets forth detailed accounts of tortuous treatment which are almost identical to the torture suffered by Andrew Wilson. The testimony reveals an astounding pattern or plan on the part of respondents to torture certain suspects, often with substantial criminal records, into confessing to crimes or to condone such activity. The similar acts testimony would clearly be admissible in a federal or state court, and it should be admissible in this proceeding." Pltf Exhibit 54, 1/22/1992 Reidy Opposition Memorandum in Police Board Action, p. 1.

136.     The City's expert, Jeffrey Noble, has been hired by the City of Chicago over 25 times and has "never" found a *Monell* pattern and practice of abuse by Chicago police officers.

Noble acknowledged during his deposition that the City failed to produce the Goldston Report prior to Gibson and Keith's trials. *Pltf Exhibit 20*, pp. 82-85.

137.    The City's expert, Jeffrey Noble, testified "if you are present when your supervisor is engaging in misconduct, you may believe that that particular supervisor may turn a blind eye to that type of conduct." *Pltf Exhibit 20*, p. 43-44.

**138.**    The police superintendent in 1989 was charged with the daily oversight of the police department, was the natural person to whom the Office of Professional standards of the CPD would address any memorandums or proposals to revamp OPS, and promulgates general orders, which are the "main orders that govern the job of a police officer and their conduct" and special orders that police are bound by. *Doc 482-23 Exhibit 22*, p. 23, 30-31, 91-92.

**139.**    Avendano testified that the superintendent in 1989, Leroy Martin, was also the commander of Area 2 before becoming superintendent, the location where Burge tortured suspects throughout the 1980s. *Doc 482-23 Exhibit 22*, pp. 117. As commander, Martin received charging sheets of all citizen complaints made against officers under his command, including Burge, Byrne, Paladino, Maslanka, and others. *Doc 482-23 Exhibit 22*, pp. 118. Once he became superintendent, Martin then moved Burge from Area 2 to Area 3. *Doc 482-23 Exhibit 22*, pp. 120. Further, the police superintendent had the power and ability to open CR's into police misconduct. *Pltf Exhibit 38*; *Doc 482-23 Exhibit 22*, p. 46-47.

140.    In 1989, the General Order in place at the City of Chicago Police Department, General Order 82-14, specifically stated that the "member assigned to investigate a complaint against a Department member will…complete the investigation as soon as possible, but no later than ten days after the date the complaint was received or on the date of any authorized extension," and "ensure that his commanding officer is informed of continuing developments in the investigation." Additionally, it is only "if the complaint is sustained" that the investigator must "request a copy of the accused member's 'Summary of Previous Disciplinary Actions' from the Internal Affairs Division, [and] a copy of the accused member's 'Record of Previous Complimentary History' from the Personnel Division." *Doc 482-7 Exhibit 6,* General Order 82-14 at JG-000554-556.

/s/ *Andrew M. Stroth*
Andrew M. Stroth
Action Injury Law Group, LLC
1 South Dearborn, Suite 1400
Chicago, Illinois 60603 (844) 878-4529
astroth@actioninjurylawgroup.com

Alexander T. Brown
William G. Beck
Michael J. Abrams
Jackson R. Hobbs

Lathrop GPM LLP
2345 Grand Blvd., Suite 2200
Kansas City, MO, 64108
(816) 292-2000
alexander.brown@lathropgpm.com
william.beck@lathropgpm.com
michael.abrams@lathropgpm.com
jackson.hobbs@lathropgpm.com

Chaka M. Patterson
Alston & Bird LLP
560 Mission Street, Suite 2100
San Francisco, CA 94105
Ph.: (415) 246-1025
Fax: (415) 243-1001
chaka.patterson@alston.com

Anne J. Martin
Alston & Bird LLP
950 F Street NW
Washington, D.C. 2004
(202) 239-3300
anne.martin@alston.com

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2024, I filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notification of this filing

to all attorneys of record.

/s/*Andrew M. Stroth*
Andrew M. Stroth
*Counsel for Plaintiff*